Exhibit B



**TRANSPERFECT**

City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**Arbitral Award by China International Economic and Trade Arbitration Commission**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese (Simplified) into English (US).



_____
Shayna Himelfarb

Sworn to before me this
October 1, 2021

_____
Signature, Notary Public

_____
Stamp, Notary Public

# Arbitral Award



**CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION**

# China International Economic and Trade Arbitration Commission Arbitral Award

First Complainant: Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership)

Address: Room 1215-1, Tower 3, 1366 Hongfeng Road, Huzhou City, Zhejiang Province

Second Complainant: Huzhou Huihengying Equity Investment Partnership (Limited Partnership)

Address: Room 1215-15, Tower 3, 1366 Hongfeng Road, Huzhou City, Zhejiang Province

Third Complainant: Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership)

Address: Room 1215-16, Tower 3, 1366 Hongfeng Road, Huzhou City, Zhejiang Province

Counsel for the Complainants: Zheng Wei, Fang Mei, Li Zheng, Qu Chenxi, Zhu Huayi and Sun Qimin, Anli Partners


First Respondent: Shenzhen SMI Shengdian Cultural and Media Group Co., Ltd.

Address: Floors 18-20, Cultural Industry Headquarters Tower, Futian Sports Park, 3030 Fuqiang Road, Futian District, Shenzhen City, Guangdong Province

Second Respondent: Qin Hui (ID number: ███████████████)

Address: 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing

Third Respondent: SMI International Cinemas Limited

Address: SMI International Tower, 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing

Fourth Respondent: Run Yun Chengdu Culture Communication Co., Ltd.

Address: 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing

Counsel for the Respondents: Liu Fang and Qiu Xinwei, Broad & Bright

Beijing

April 22, 2021

# Arbitral Award

[2021] Zhong Guo Mao Zhong Jing Cai Zi No. 0742

China International Economic and Trade Arbitration Commission (hereinafter referred to as "Arbitration Commission") has accepted the current arbitration case pursuant to the arbitration clauses of the *Capital Increase Agreements for Run Yun Chengdu Culture Communication Co., Ltd.* ([2017] Zi Zi No. 06-1, [2017] Zi Zi No. 06-2 and [2017] Zi Zi No. 06-3) signed on March 15, 2017 by and between the Complainants Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership), Huzhou Huihengying Equity Investment Partnership (Limited Partnership) and Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership) (hereinafter respectively referred to as "First Complainant", "Second Complainant" and "Third Complainant" and collectively as "Complainants") and the First Respondent Shenzhen SMI Shengdian Cultural and Media Group Co., Ltd. (hereinafter referred to as "First Respondent"), the Third Respondent SMI International Cinemas Limited (hereinafter referred to as "Third Respondent") and the Fourth Respondent Run Yun Chengdu Culture Communication Co., Ltd. (hereinafter referred to as "Fourth Respondent") and of the *Supplemental Agreement to the Capital Increase Agreement for Run Yun Chengdu Culture Communication Co., Ltd.* signed on the same date as mentioned above by and between the Complainants and the First Respondent and the Second Respondent Qin Hui (hereinafter referred to as "Second Respondent" individually, and together with the First Respondent, the Third Respondent and the Fourth Respondent as "Respondents" collectively), as well as to the written application for arbitration submitted by the Complainants to the Arbitration Commission on March 30, 2020. This arbitration case is referred to as "S20200960".

The arbitration proceeding of this case shall follow the *Arbitration Rules of China International Economic and Trade Arbitration Commission* that were promulgated as of January 1, 2015 (hereinafter referred to as "*Arbitration Rules*").

The Arbitration Court of the Arbitration Commission (hereinafter referred to as "Arbitration Court") served the Notice of Arbitration, the *Arbitration Rules* and the *List of Arbitrators* through express delivery on both the Complainants and the Respondents on May 26, 2020. In the meantime, the Arbitration Court served on the Respondents the application for arbitration and relevant evidentiary materials submitted by the Complainants.

The abovementioned documents delivered to the First Respondent have been properly served, but those delivered to the Second, Third and Fourth Respondents have been returned by postal services. Therefore, the Arbitration Court notified the Complainants in writing respectively on June 9 and 15, 2020 of the return of the mails addressed to the Second, Third and Fourth Respondents and requested the Complainants to reasonably inquire about the valid correspondence addresses of the concerned Respondents according to Article 8 of the *Arbitration Rules*.

Subsequently, the Arbitration Court received the Complainants' Letters of Confirmation dated June 12, 2020 and June 16, 2020 respectively. The letters confirmed that the address for service of the Second Respondent was "Peng Yun, ███████ 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing" or "Qin Hui, █████████████████████████████████ ███████████", and that the address for service of the Fourth Respondent was "Peng Yun, ████████ No. 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing" and the address of the Third Respondent was "SMI International Tower, 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing".

Accordingly, the Arbitration Court re-mailed the *Notice of Arbitration*, among other documents, through express delivery to the addresses above-confirmed of the Second, Third and Fourth Respondents. The documents served on the Second Respondent to "████████████████████████████████ ███████" were returned again, but a third attempt of service to "No. 9 Xiangjun North Alley, Hujialou Street, Chaoyang District, Beijing" turned out successful. Moreover, those addressed to the Third and Fourth Respondents have all been properly served.

The Arbitration Court sent mails on July 21, 2020 to all parties to confirm their addresses for service and advised them to raise opinions or objections they have with respect to the arbitration proceedings already conducted (including the service of documents) within stipulated time frames. None of the parties raised any opinion or objection within the stipulated time frames, though.

As the Respondents were comprised of several parties and they failed to reach consensus on the selection of arbitrators by themselves jointly or through joint entrustment to the Director of the Arbitration Commission, the Director of the Arbitration Commission then designated Mr. Tao Xiuming and Mr. Li Yong arbitrators and at the same time designated Mr. Sun Xiaomin chief arbitrator for this case according to provisions of the *Arbitration Rules*. The three arbitrators, after signing a *Letter of*

*Statement* on accepting such designation, set up an Arbitration Panel on August 24, 2020 to hear this case jointly. With approval of the Arbitration Court, the Arbitration Panel decided to commence the hearing of this case in Beijing on September 28, 2020.

The Arbitration Court mailed the Notice of Arbitration Panel Formation as well as the *Letters of Statement* signed by the arbitrators and the Notice of Court Session through express delivery to all parties on August 24, 2020. The Arbitration Panel sent on the same date a Notice of Procedures through the Arbitration Court to all parties, requesting the Respondents to submit written pleadings together with evidentiary materials and counterclaims (if any) prior to September 14, 2020.

As Mr. Tao Xiuming resigned from the office of arbitrator for this case, the Arbitration Court served a Notice of Court Session Postponement to all parties on September 25, 2020.

Director of the Arbitration Commission later designated Ms. Liu Lanfang to replace Mr. Tao Xiuming in a bid to proceed with this case according to *Arbitration Rules*. With approval of the Arbitration Court, the new Arbitration Panel decided to commence case hearing on November 12, 2020. The Arbitration Court then served a Notice of Arbitrator Replacement and a Notice of Court Session on all parties on October 20, 2020.

The Arbitration Court received "An Application for Re-mailing Arbitration Documents and Re-arranging Dates of Court Session" from the First and Second Respondents on November 11, 2020. To facilitate the Respondents to participate in the proceedings of this case, the Arbitration Court re-mailed the Notice of Arbitration as well as attachments thereto, the Notice of Arbitration Panel Formation as well as attachments thereto, the Notice of Court Session, the Notice of Procedures, the Notice of Court Session Postponement, etc. to the Respondents on November 11, 2020. However, the re-mailing did not represent a process of re-service on the Respondents. The Arbitration Panel determined to postpone the commencement of case hearing to December 22, 2020 on the same date as mentioned above. Accordingly, the Arbitration Court served a Notice of Court Session Postponement on all parties on November 11, 2020.

The Respondents submitted an application to the Arbitration Court for designating arbitrators and obtaining a normal duration of pleading on November 27, 2020. In response, the Complainants made a reply on December 7, 2020. The Arbitration Court, too, made a reply on December 11, 2020, deciding to not consent to the Respondents' application. So the arbitration proceedings continued for this case.

The Arbitration Panel held the court session as scheduled to hear this case in Beijing on December 22, 2020. Both the Complainants and the Respondents participated in the hearing through their counsel. The Respondents submitted such documents as the Respondents' Disagreement on Arbitration Procedures, the Pleadings, the Evidence List and attachments thereto. The Complainants presented their arbitration claims as well as the facts and reasons on which their claims were based and the Respondents made their defense in the hearing process. The parties made explanations on their evidence, produced the originals of their evidence and answered questions raised by the Arbitration Panel in the discovery process.

Afterwards, on January 4, 2021 the Arbitration Court received from the Complainants the Letter of Confirmation on Arbitration Claims, the Evidence List and Explanations, the Supplemental Evidence List and Explanations and attachments thereto, and the Audit Report on the Proforma Financial Statements of Run Yun Chengdu Culture Communication Co., Ltd. (photocopy), and it forwarded the foregoing to the Respondents together with a Notice of Fee Payment, advising the Respondents to raise opinions or objections during prescribed time frames. The Complainants subsequently paid the arbitration fees in arrears within stipulated time frames.

The Arbitration Court received the Complainants' Reply Opinion on January 25, 2021 and the Respondents' Supplemental Pleadings and Explanations, Supplemental Pleadings (II), Respondents' Supplemental Evidence List and attachments thereto on January 26, 2021. The Arbitration Court had the foregoing submissions exchanged between the two parties and requested them to raise opinions in writing within stipulated time frames.

The Arbitration Court received the 'Evidence Examination Opinion, Supplemental Reply Opinion and attachments thereto from the Complainants on February 3, 2021 and the Respondents' (Pleaders') Supplemental Pleading Opinion from the Respondents on February 10, 2021.

The Arbitration Court received the Explanations on Correcting Clerical Errors in Arbitration Claims-related Documents from the Complainants on March 18, 2021 and forwarded the same to the Respondents, requesting the latter to raise written opinions within stipulated time frames. The Respondents did not raise any opinion or objection during the stipulated time frames, though.

To meet the need of arbitration procedures, President of the Arbitration Court, upon the application of the Arbitration Panel, agreed and decided to postpone the deadline for

entering the determination on this case to April 24, 2021.

In the process of arbitration, all documents and written notices pertaining to this case have been effectively served by the Arbitration Court on all the parties according to provisions of Article 8 of the *Arbitration Rules*.

This case has been closed after hearing. Through collegiate discussion, the Arbitration Panel has entered this determination based on the existing written submissions made by the two parties and the facts found out in court hearing.

The details of this case, the opinions of the Arbitration Panel and the results of adjudication are stated as follows:

## I. Case Particulars

(I). The Complainants' Arbitration Claims and Key Facts/Bases

Run Yun Chengdu Culture Communication Co., Ltd. (hereinafter referred to as "Subject Company" or "Fourth Respondent") previously had 10 million yuan in registered capital and dealt mainly in movie projection and cinema operation. Its original shareholders Shenzhen SMI Shengdian Cultural and Media Group Co., Ltd. (hereinafter referred to as "First Respondent" or "SMI Shengdian") and SMI International Cinemas Limited (hereinafter referred to as "Third Respondent" or "SMI International") respectively held 51% and 49% of the Subject Company's equity. The Second Respondent Qin Hui (hereinafter referred to as "Second Respondent" or "Qin Hui"; unless otherwise stated, the four Respondents will be collectively referred to as "Respondents" hereinafter) was the actual controller of the Subject Company. SMI Holdings Group Limited (hereinafter referred to as "SMI Holdings"), non-party to this case, planned to spin off its cinema assets and have these cinema assets and business carried by the Fourth Respondent, thereby listing the Fourth Respondent on the main stock market in China through the backdoor of Success Electronics, a company listed on the A-share market. For this purpose, the First Complainant, the Second Complainant and the Third Complainant respectively signed the *Capital Increase Agreements for Run Yun Chengdu Culture Communication Co., Ltd.* ([2017] Zi Zi No. 06-1, [2017] Zi Zi No. 06-2, and [2017] Zi Zi No. 06-3) (unless otherwise stated, the three agreements are collectively referred to as "the *Capital Increase Agreement*" hereinafter) with the First Respondent, the Third Respondent and the Subject Company on March 15, 2017. The Complainants and the First and Second Respondents signed the *Supplemental Agreement to the Capital Increase Agreement for Run Yun Chengdu Culture Communication Co.,*

*Ltd.* (hereinafter referred to as "*Supplemental Agreement*") on the same date as mentioned above. The foregoing agreements constituted the entire transaction involved in this case. They were connected with and inseparable from one another. Their clauses are stated as follows:

Article 2.1 of the *Capital Increase Agreement* stipulated that "based on the company's operating conditions, profitability and development prospects, among other factors, and through amicable consultation between investors on one side and SMI Shengdian and SMI International on the other, the company is valued at 13.5 billion yuan (note of the Arbitration Panel: all amounts in this case are denominated in Renminbi) prior to the current capital increase. Given such valuation, each investor shall contribute 500 million yuan to subscribe the increased capital, with the rest of the contribution included into the company's capital reserve".

Definition in Attachment 1: shareholding ratio of an investor = amount of the investor's contribution/ (pre-investment valuation + total amount of the current round of capital increase) × 100%

Article 5.1 thereof stipulated that "all parties agree to cooperate with and cause the company to finish doing the following things within 60 business days after the investors have paid their contributions into the capital verification account according to provisions of Article 4.3 hereof: (c) to complete the equity change registration relating to the capital increase at the local administration for industry and commerce in the place of the company's registration".

Article 6.2 stipulated that "all parties agree to spare no efforts, actions and measures to cooperate with the company in follow-up activities to ensure that the company gets listed on the stock market in a manner complying with laws and regulations. For the purpose of getting listed, the equity interest changes in the company after this agreement is inked, such as equity transfer and capital increase, shall be subject to the provisions of relevant transaction agreements signed by and between the company and its shareholders".

Article 7.1 stipulated that "the Subject Company, SMI Shengdian and SMI International represent and warrant to investors that: ……(c) the company, SMI Shengdian and SMI International, in signing and performing this agreement, do not and will not……(iv) go against any court judgment or arbitral award given to them or any decisions or provisions of government or competent administrative agencies; (e) the company's equity is free of all pledges or other encumbrances…(h) SMI Shengdian and

SMI International ensure a stable control over the company before it is listed on the stock market".

Article 11.2 stipulated that "should a defaulting party fails to remediate its default during the period of remedy provided in Article 11.1 hereof, the non-defaulting party shall have the right to claim compensation from the defaulting party for the loss it sustains as a result of the default in addition to the rights provided in Paragraph (c), Article 12.1 hereof and under relevant Chinese laws. The defaulting party shall compensate the non-defaulting party for the direct and indirect harm it does to the latter for reason of its default".

Article 3 of the *Supplemental Agreement* stipulated that "original shareholders undertake that the Subject Company will have 787.88 million yuan in audited net profit in 2017; and that the net profit growth rate of the subject company will be no less than 15% for every subsequent year after 2017 preceding its successful listing on the stock market".

Article 4.1 thereof stipulated that "under the following circumstances, whether due to subjective or objective causes, the investors shall have the right to demand that original shareholders acquire the equity held by the investors in the Subject Company at the price agreed upon in Article 4.2 hereof: 4.1.1 Any time after the day a 24-month period following the date of capital increase elapses; 4.1.2 The Subject Company fails to meet the promised performance target agreed upon in Article 3 hereof; ……4.1.4 The Subject Company still fails to get listed on the stock market 60 months after the last date of capital increase; or 4.1.5 Original shareholders violate their commitments in Article 10.2 hereof".

Article 4.2 stipulated that "acquisition price = increased capital × (1 + 15% × number of the days of investment/360) － financial consulting fees and stock (equity) returns already obtained by an investor".

Article 4.3 stipulated that "original shareholders shall complete performing the acquisition obligation within 90 days of the receipt from the investors of a written notice of equity acquisition".

Article 4.4 stipulated that "should original shareholders fail to perform the equity acquisition obligation according to Articles 4.2 and 4.3 hereof, the investors shall have the right to demand that original shareholders transfer 5% of their equity in the Subject Company to the investors as damages to the latter in consideration of 1 yuan only. Such damages shall not affect the continued performance of the acquisition obligation. Original

shareholders shall assist the investors in handling the equity (transfer) registration procedures with respect to the equity transfer aforesaid as of the date of the investor's service of the notice of transfer and make available all written documents necessary for the equity transfer registration and submit a written application to relevant authority for such registration within 10 business days of the receipt of such notice".

Article 11.2 stipulated that "should original shareholders delay the payment of any amount in violation of the provisions hereof, they shall pay 5‰ of the amount in arrears as damages to the investors for every day so delayed in addition to the liabilities agreed upon in other clauses hereof. Such damages shall be paid to the investors together with the payment in arrears".

Article 11.4 stipulated that "the payment of damages shall not adversely affect the non-defaulting party's rights to demand that the defaulting party indemnify the former against its loss, continue to perform the agreement or to cancel the agreement".

Pursuant to the abovementioned agreements, the three Complainants respectively paid 50 million yuan in security deposit to the Subject Company on March 22, 2017. The Subject Company returned the deposit money to the First, Second and Third Complainants on May 8, June 27 and June 30, 2017, actually occupying the money for 48 days, 98 days and 101 days, respectively.

The First, Second and Third Complainants paid 500 million yuan in increased capital to the Subject Company on May 8, June 26 and June 28, 2017 respectively, a total of 1.5 billion yuan.

However, the Respondents failed to perform its contractual obligations as agreed and therefore shall be responsible for its default in that:

1. The Subject Company did not meet its performance target and actually could no longer attain the goal of getting listed on the stock market. Therefore, the First and Second Respondents shall jointly undertake the obligation to acquire the equity of the Complainant's in the Subject Company and pay the prices for the equity acquisition.

Firstly, as the Subject Company failed to deliver on its commitment to the target net profit, the First and Second Respondents shall jointly undertake the equity acquisition obligation and pay the equity acquisition prices.

Article 3 of the *Supplemental Agreement* stipulated that the First and Second Respondents undertake that the audited net profit for 2017 will stand at 787.88 million yuan.

According to the *Audit Report on the Proforma Financial Statements of Run Yun Chengdu Culture Communication Co., Ltd.* (Zhong Xi Shen Zi [2018] No. 1751, hereinafter referred to as "*Audit Report*") issued on July 12, 2018 by accounting firm Zhongxi CPAS, however, the audited net profit of the Subject Company was 312,829,162.33 yuan only for the year of 2017.

As stipulated in Article 4.1.2 of the *Supplemental Agreement*, the First and Second Respondents shall bear the obligation to acquire the Complainants' equity in the Subject Company since the Subject Company failed to meet the foregoing performance target.

Secondly, as the Subject Company was faced with substantial obstacles to listing, it was definitive that it could not get listed as agreed upon. Therefore, the First and Second Respondent shall jointly undertake the equity acquisition obligation and pay the equity acquisition prices to the Complainants accordingly.

The Subject Company's stock had previously been sequestrated several times by judicial authorities. Specifically, the 51% equity held by the First Respondent in the Fourth Respondent had been subject to five rounds of sequestration measures, while the 49% equity held by the Third Respondent in the Fourth Respondent to three rounds of sequestration measures.

As the actual controller of the Subject Company, the Second Respondent had been denied access to the securities market for a period of five years according to the *Decision of China Securities Regulatory Commission on Market Access Denial* ([2018] No. 14) issued by China Securities Regulatory Commission (hereinafter referred to as CSRC) on August 30, 2018.

The Subject Company had been listed as a defaulter without credit by several courts.

The foregoing facts had constituted substantive obstacles to the Subject Company's listing on the stock market by way of initial public offering (IPO). Pursuant to provisions of Articles 12, 13 and 16 of the *Initial Public Offering and Listing Management Measures* of the CSRC', both SMI International and SMI Shengdian were under the control of Qin Hui, the actual controller of the Subject Company, and their equity in the Subject Company had both been sequestrated by judicial authorities. This constituted a violation of the requirement that "the stock held in the issuer by a shareholder dominated by an actual controller shall be free of major title disputes" and might lead to a change in the actual controller in the end. Moreover, the fact that Qin Hui, as an actual controller, was denied market access would also constitute a material obstacle to the Subject Company's

IPO and listing. That's to say, the Subject Company could no longer get listed through IPO.

At the same time, the foregoing facts also constituted material obstacles to the Subject Company's listing by way of major assets restructuring (backdoor listing). The' *Major Assets Restructuring Management Measures for Listed Companies* of the CSRC provides in Article 11 that "should a company to be listed on the stock market undergoes major assets restructuring, it shall make sufficient explanations for the transaction's compliance with the following requirements and disclose the same to the public: … (2) [the transaction] will not result in a would-be listed company's failure to comply with the listing conditions". Therefore, the criteria for listing through assets restructuring is actually equated to those for listing through IPO.

In addition, the *'Listed Company Acquisition Management Measures* of the CSRC provides in Article 5 that "acquirers shall include investors and other persons who take the same actions as them". Article 6 thereof provides that "an acquirer shall not acquire a listed company under the following circumstances: (1) where the acquirer is burdened with a considerably large amount of debt which is and remains unpaid when due; (2) where the acquirer was involved or suspected of being involved in major illegal activities during the past three years; (3) where the acquirer engaged in severe dishonest behaviors on the securities market during the past three years; (4) where the acquirer, as a natural person, is involved in the circumstances stipulated in Article 146 of the *Company Law*; (5) other circumstances stipulated in laws or administrative regulations or identified by the CSRC." Therefore, the Second Respondent, as the actual controller of the Fourth Respondent, may constitute the acquirer stipulated in the *Listed Company Acquisition Management Measures*, in that its administrative punishment by the CSRC belonged to "severe dishonest behaviors on the securities market". Moreover, the Fourth Respondent may be deemed to be "burdened with a considerably large amount of debt which is and remains unpaid when due" and to have "severe dishonest behaviors on the securities market", for it had seen its assets sequestrated several times and been listed as a defaulter without credit.

To sum up, the Fourth Respondent could no longer get listed by way of major assets restructuring (backdoor listing).

As the Subject Company could not get listed, this has already triggered the conditions for the First and Second Respondents to acquire the stock of the Complainants. In accordance with Article 4.1.4 of the *Supplemental Agreement*, the Subject Company

shall get listed before the date, i.e. June 27, 2022, on which a period of 60 months expires since the last date of capital increase, i.e. June 28, 2017. But it could not attain that goal in fact. So the First and Second Respondents shall perform the acquisition obligation accordingly.

Thirdly, the Complainants' claims of the equity acquisition prices are based on the following standards:

The First, Second and Third Complainants paid 500 million yuan in increased capital to the Subject Company on May 8, June 26 and June 28, 2017 respectively, a total of 1.5 billion yuan. As of March 12, 2020, investment days are 1016 days, 967 days, 965 days, respectively. At the same time, they have received 10 million yuan in financial consulting fees respectively.

Article 4.2 of the *Supplemental Agreement* stipulated that "acquisition price = increased capital × (1 + 15% × number of the days of investment/360) － financial consulting fees and stock (equity) returns already obtained by an investor".

According to the agreed calculation method, as of March 12, 2020, the First and Second Respondents shall jointly and severally pay 701,666,666.67 yuan, 691,458,333.33 yuan, and 691,041,666.67 yuan respectively to the First Complainant, the Second Complainant, and the Third Complainant in equity acquisition prices, a total of 2,084,166,666.67 yuan.

2. The First and Second Respondents shall transfer 5% equity in the Subject Company to the Complainants because they have delayed performing their acquisition obligation.

The Complainants mailed a *Notice on the Performance of Equity Acquisition Obligation* to the First and Second Respondents respectively on September 19, 2018, demanding that the latter two parties perform their obligations within 90 days upon receipt of the notice. The First Respondent refused to accept the notice; the Second Respondent did accept the notice on September 20, 2018, but has failed to perform the obligation so far. The Complainants re-mailed the *Notice on the Performance of Equity Acquisition Obligation* to the First Respondent on September 26, 2018, demanding that it perform their obligations within 90 days upon receipt of the notice. The First Respondent finally accepted the notice on September 29, 2018, but has failed to perform the obligation to date.

As the First and Second Respondents have delayed performing their acquisition

obligations, the Complainants therefore have the right to demand that the First and Second Respondents transfer 5% equity they are holding in the Fourth Respondent to the Complainants in consideration of 1 yuan according to Article 4.4 of the *Supplemental Agreement*.

The Complainants mailed a *Notice on the Performance of Compensation Obligation* to the First and Second Respondents respectively on December 20, 2019, demanding that the latter two parties transfer their equity according to the said agreement. Both the First and Second Respondents have accepted the *Notice on the Performance of Compensation Obligation* on December 23, 2019. Moreover, the First Complainant has paid the equity transfer price worth 1 yuan to the First Respondent on December 26, 2019.

Therefore, the First and Second Respondents shall transfer 5% of the equity it is holding in the Fourth Respondent to the Complainants according to stipulations under Article 4.4 of the *Supplemental Agreement*.

3. The First and Second Respondents shall pay damages to the Complainants for their failure to pay the equity acquisition prices in a timely manner.

Pursuant to Article 4.3 of the *Supplemental Agreement*, the First and Second Respondents shall complete the equity acquisition within 90 days of the receipt from the Complainants of the written notice of acquisition. The 90-day performance period expired on December 29, 2018 after the First Respondent received the Complainants' *Notice on the Performance of Equity Acquisition Obligation* on September 29, 2018'. Therefore, the First and Second Respondents should have begun to pay damages for their delay in paying the equity acquisition prices since December 30, 2018.

Pursuant to Article 11.2 of the *Supplemental Agreement*, the First and Second Respondents shall jointly and severally pay damages to the Complainants on a daily basis at a rate of 5‰ of the payment delayed. Specifically, such damages shall be calculated on a daily basis at 5‰ of the daily amount of the equity acquisition prices delayed for the period from December 30, 2018 to the actual date of payment, worth 4.2 billion yuan or so in total.

Considering that the amount was quite large, the Complainants agreed to appropriately adjust the figure according to Article 112 of the *Contract Law of the Peoples Republic of China* effective when the concerned contracts in this case were signed (hereinafter referred to as "*Contract Law*"). When the *Capital Increase Agreement* and the *Supplemental Agreement* were signed, both the Complainants and the

Respondents agreed that the Subject Company before investment was worth 13.5 billion yuan and the Complainants would obtain 5% of the Subject Company's equity once the Respondents defaulted. The amount of 675 million yuan was actually the potential loss the Respondents anticipated or should have anticipated for its default behaviors when concluding the contracts. Therefore, the Complainants proposed to reduce the damages for delayed equity acquisition prices to 675 million yuan, which should be evenly distributed among the Complainants.

4. The First and Second Respondents shall pay the Complainants returns on the security deposit the latter placed as well as damages for delayed payment of such returns.

Firstly, the First and Second Respondents shall pay the Complainants returns on the deposit.

The *Supplemental Agreement* stipulated in Article 5.1.3 that the First and Second Respondents shall pay the Complainants returns on the security deposit placed under the *Capital Increase Agreement* at an annual interest rate of 15%. It further stipulated in Article 5.2.1 that the First and Second Respondents shall settle and actually pay the returns on the security deposit on the date of the payment of the deposit money to the capital verification account for the period from the date on which the investors paid the deposit into a designated account to the date on which the deposit was transferred to the capital verification account.

The three Complainants respectively paid 50 million yuan in security deposit to the Subject Company on March 22, 2017. The Subject Company returned the deposit money to the First, Second and Third Complainants on May 8, June 27 and June 30, 2017, actually occupying the money for 48 days, 98 days and 101 days, respectively. Pursuant to the abovementioned agreements, the First and Second Respondents shall pay the three Complainants 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan respectively, a total of 5,145,833.33 yuan, in returns on the security deposit at a simple annual interest rate of 15% on the date of returning the deposit to the investors.

Secondly, the First and Second Respondents shall pay damages to the Complainants for delayed payment of returns on the security deposit.

Pursuant to stipulations in Article 11.2 of the *Supplemental Agreement*, the First and Second Respondents shall jointly compensate the Complainants for the loss of interest accrued by the returns on security deposit during the period of delay. As the deposit money had been returned, the returns on such money was a fixed amount worth 5.15

million yuan or so and the standard used to calculate the damages for such returns, i.e. 5‰ of the returns on a daily basis (equivalent to 180% on a yearly basis), under Article 11.2 of the *Supplemental Agreement*, was too high, the Complainants therefore agreed to lower the rate used to calculate the amount of damages for the returns on security deposit to 24% on a yearly basis.

5. On the liabilities for contractual breach and compensatory obligations of the Third and Fourth Respondents

The Fourth Respondent was involved in several instances of assets sequestration resulting from litigation and listed as a defaulter without credit; the First and Third Respondents pledged their equity in the Subject Company during the term of the agreement concerned, burdened their equity with encumbrances and had their such equity sequestrated by courts, which also constituted encumbrances. So the First, Third and Fourth Respondents had all violated the stipulations of Article 7.1 (c) and (e) of the *Capital Increase Agreement*.

The abovementioned behaviors of the First, Third and Fourth Respondents directly resulted in the Subject Company's inability to get listed by way of IPO or backdoor listing. Furthermore, they had violated the stipulations of Article 6.2 of the *Capital Increase Agreement*.

The Complainants sent a notice to the Third and Fourth Respondents through SF Express delivery service on November 30, 2018, demanding that the latter two immediately take remedy measures for the investors' loss by paying cash in an amount equal to the equity acquisition prices. As agreed upon in Article 18.2 of the *Capital Increase Agreement*, if such notice was served via a widely recognized express delivery service, it would be deemed to have been duly served on the third business day immediately subsequent to the date of the notice being delivered to the express delivery service. However, the Third and Fourth Respondents did not perform their remediation obligations, either, after the notice was served on them.

The Complainants again sent a *Notice on the Performance of Remediation Obligation* to the Third and Fourth Respondents respectively by EMS on March 3, 2020, but the latter two still failed to perform their remediation obligations.

Therefore, the First, Third and Fourth Respondents shall undertake the compensation obligations under Article 11.2 of the *Supplemental Agreement*. Because the First Respondent shall additionally perform the equity acquisition obligation and the

compensation obligation for default pursuant to the *Supplemental Agreement*, its obligations were wider in scope than those under Article 11.2 of the *Capital Increase Agreement*. For this reason, the Complainants identified the subject of the compensation obligations under Article 11.2 of the *Capital Increase Agreement* as the Third and Fourth Respondents and limited the scope of compensation to the equity acquisition prices and the damages for delayed payment of the equity acquisition prices.

6. The Respondents shall bear all the expenses incurred by the Complainants for reason of this case as well as the arbitration fees in their entirety.

The Complainants lodged a total of seven arbitration claims as follows:

1. To enter into the determination that the First and Second Respondents jointly and severally pay the First, Second and Third Complainants equity acquisition prices (the subject of acquisition was the 3.12% equity held by the three Complainants in the Fourth Respondent; the equity acquisition prices were to be calculated according to the method stipulated in Article 4.2 of the *Supplemental Agreement* for the period up to the date on which the Respondents have jointly paid the acquisition prices, with the financial consulting fees deducted. Up to March 12, 2020, the equity acquisition prices to be paid by the First and Second Respondents shall be 701,666,666.67 yuan, 691,458,333.33 yuan, and 691,041,666.67 yuan respectively to the First Complainant, the Second Complainant, and the Third Complainant in equity acquisition prices, a total of 2,084,166,666.67 yuan);

2. To enter into the determination that the First and Second Respondents immediately transfer to the First, Second and Third Complainants their 5% equity in the Fourth Respondent, which will be evenly distributed among the three Complainants;

3. To enter into the determination that the First and Second Respondents jointly and severally pay each of the First, Second and Third Complainants 225 million yuan in damages for delayed payment of the equity acquisition prices, a total of 675 million yuan;

4. To enter into the determination that the First and Second Respondents jointly and severally pay each of the First, Second and Third Complainants returns on the security deposit placed by them (given the 500 million yuan-worth security deposit placed by each of the three Complainants, the returns on such deposit to be paid by the Respondents would be 1,000,000 yuan, 2,104,166.67 yuan, and 2,041,666.67 yuan for the period from March 22 to May 8, 2017, June 27, 2017, and June 30, 2017 respectively, totaling 5,145,833.33 yuan, calculated at the annual return rate of 15%), as well as damages for delayed payment of the returns on the security deposit (for the First Complainant, the

damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 1,000,000 yuan, at an annual rate of 24% for the period from May 9, 2017 to the date of such returns being paid up in their entirety and would add up to 692,666.67 yuan should they be calculated up to March 12, 2020. For the Second Complainant, the damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 2,041,666.67 yuan, for the period from June 28, 2017 to the date of such returns being paid up in their entirety and would add up to 1,346,138.89 yuan should they be calculated up to March 12, 2020. For the Third Complainant, the damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 2,104,166.67 yuan, for the period from July 1, 2017 to the date of such returns being paid up in their entirety and would add up to 3,421,944.45 yuan should they be calculated up to March 12, 2020)

5. To enter into the determination that the Third and Fourth Respondents bear joint and several compensation liabilities for the first and third arbitration claims.

6. To enter into the determination that the Respondents jointly and severally indemnify the Complainants against the expenses incurred by the latter in conducting the arbitration proceeding, including 500,000 yuan in legal cost (166,666 yuan to be paid to the First Complainant, 166,667 yuan to the Second Complainant and 166,667 yuan to the Third Complainant), 5,000 yuan in property preservation cost (to be paid to the First Complainant in its entirety), and 420,000 yuan in property preservation guarantee cost (140,000 yuan to be paid to the First, Second and Third Complainants respectively).

7. To enter into the determination that the Respondents bear all the arbitration fees for this case.

(II). Pleadings of the Respondents

1. The contested agreements shall be examined amid all transactions between the Respondents and the enterprises of Zhongzhi Group. Zhongzhi enterprises committed fraud in the disguise of investment through such chain actions as "planned listing through restructuring - capital increase - trust - repurchase". In severe violation of the principles of fairness, honesty and credibility, the agreements should be revoked.

The three Complainants were all enterprises or private equity funds actually controlled by Xie Zhikun and Zhongzhi Group. They "undertook to unconditionally support and cooperate with the Fourth Respondent in getting listed on the stock" when investing in the latter in March 2017. The Complainants later had Success Electronics, a

corporation listed on the A-share market, acquire 100% of the equity in the Fourth Respondent by way of stock issuance and cash payment. The *Semi-annual Report 2020* of Success Electronics revealed, however, that the company's controlling shareholder was actually Zhongzhi Rongyun (Beijing) Business Management Co., Ltd., which was actually controlled by Xie Zhikun. Therefore, Success Electronics was a listed company under de facto control of Xie Zhikun and Zhongzhi Group.

Zhongzhi Group gradually transferred and even stripped the Respondents of their assets under the disguise of such deals as "planned listing through restructuring - capital increase - trust - repurchase", and in turn demanded that the Respondents re-purchase its equities and pay large amounts of damages when they fail to do so, which severely violated the principles of fairness, honesty and credibility for trading.

Success Electronics issued a *Notice on the Resumption of Trading and Continuation of Major Assets Restructuring* on January 11, 2018 without prior consent and confirmation of the Respondents, declaring that it would acquire the 100% equity of the Fourth Respondent at a total price of 20 billion yuan in Renminbi, with the counterparties being SMI Shengdian, SMI International and the three Complainants, among other parties. The notice pointed out that the Fourth Respondent's shareholders were under the control (through a VIE structure) of a wholly-owned subsidiary of SMI Shengdian and SMI Holdings Group Limited, a company listed on the Hong Kong stock market. In the absence of a clear deal structure, Success Electronics' willful declaration behavior dealt an extremely bad effects on the Hong Kong-listed company SMI Holdings Group Limited. As a matter of fact, Success Electronics had only around 470 million yuan in net assets, therefore not capable to acquire the Fourth Respondent which is worth 20 billion yuan. What's worse, it defined Qin Hui as the actual controller of the post-deal listed company without permission. When it was unable to proceed with the "greedy" plan, Success Electronics summarily declared termination of the restructuring and listing plan on April 17 resorting to the excuse that Qin Hui, as the actual controller of the listed company Ningbo Sunlight Electrical Appliance Co., Ltd. (securities code: 002473), was served a *Letter of Prior Advice on Administrative Punishment* on April 14, 2018. The entire plot inflicted extremely adverse market impact and reputational loss to the Respondents.

The *Audit Report* provided by the Complainants was not complete. The Report showed that the Fourth Respondent accrued 267 million yuan in asset impairment loss in 2017 and such loss was exactly the primary cause of the Fourth Respondent's dramatic profit reduction in 2017.

As the controller of the three Complainants, Zhongtai Specialty Financing Holdings ("") signed an *Equity Trust Agreement* with the Respondents in August 2018, irrevocably entrusting the equity (84.37% in total) held by SMI Shengdian and SMI International in the Fourth Respondent to Zhongtai to excise (for a period of three years, which may be extended to four years). Therefore, the enterprises of Zhongzhi Group have actually been managing the entire cinema assets of the Fourth Respondent upon trusteeship since September 2018.

Zhongtai signed a *Seals, Certificates and Licenses Handover List* with Gaosheng Wealth on January 9, 2019. Since then, Zhongtai has entrusted the official seals and business licenses of cinemas owned by the Fourth Respondent to the care of Gaosheng Wealth in their entirety. During the trust by Zhongtai, however, the ownership of several cinemas of the Fourth Respondents had already been transferred to Beijing Jiushan Culture Co., Ltd., Shenzhen Jiefuruisi Investment Management Co., Ltd. and Run Yun Chengdu Cinema Management Co., Ltd., all of which were members of Zhongzhi Group.

2. Even though the *Capital Increase Agreement* and the *Supplemental Agreement* are not to be revoked (the Respondents do not recognize this), Qin Hui was in fact not "original shareholder" referred to in the *Supplemental Agreement* and therefore should not be held responsible for joint responsibilities together with "original shareholder" SMI Shengdian.

The definition of "original shareholders" in the *Supplemental Agreement* did not include Qin Hui. Firstly, Qin was not a shareholder of the Fourth Respondent in terms of the real equity structure of the latter. Secondly, the *Supplemental Agreement* had expressly defined the signatories on the first page of the body text, including such texts as "original shareholder: Party B: Shenzhen SMI Shendian Cultural and Media Group Co., Ltd.", "actual controller: Party C: Qin Hui". Thirdly, the *Supplemental Agreement* clearly stated in Article 1.1 "Definition" that "the original shareholder refers to SMI Shengdian" and only "for the convenience of reference, SMI Shengdian and Mr. Qin Hui are collectively referred to as original shareholders". Fourthly, several clauses of the *Supplemental Agreement* clearly implied that "original shareholder" and "actual controller" were two different subjects.

3. Even though the *Capital Increase Agreement* and the *Supplemental Agreement* are not to be revoked (the Respondents do not recognize this), the Complainants' investment in the Fourth Respondent had actually constituted a debt in the disguise of equity. Therefore, the 1.5 billion yuan in payment to the Fourth Respondent by the

Complainants should be recognized as borrowings, not to be repaid by shareholders or actual controller of the Fourth Respondent.

Pursuant to the *Notice on Issuing Filing Management Norms for the Privately Offered Asset Management Plans of Securities and Futures Operators (No. 4)* issued by the Asset Management Association of China, "a debt in the disguise of equity" refers to a form of investment whose returns are not pegged to the operational performance of the invested enterprises and distributed based on the investment returns or loss of the invested enterprises and which instead undertakes to secure the principal and returns of the investment, pay a fixed amount of returns to the investors on a regular basis as agreed, and have the invested enterprises repurchase the equity owned by the investors or repay the principal and interest of the investment upon the satisfaction of certain conditions. Repurchase, third party acquisition, valuation adjustment mechanism and regular dividend distribution are its typical forms.

The *Supplemental Agreement* stipulated regular payment of fixed amounts of returns and repurchase arrangements in Article 5 and Article 4.1. According to such arrangements, the deal between the Complainants and the Fourth Respondent was equity investment in name, but a borrowing with an annual interest rate of 15% indeed. Therefore, the money should be repaid by the Fourth Respondent to the Complainants as a borrowing.

4. Even if the *Capital Increase Agreement* and the *Supplemental Agreement* are valid (the Respondents do not recognize this), the *Equity Trust Agreement* signed in 2018 had actually made material modification to these agreements so that the equity acquisition prices and the returns on the security deposit should be paid after the delegated party Zhongtai (a member of Zhongzhi Group) completes the equity transfer regarding the Fourth Respondent.

Although the *Supplemental Agreement* stipulated in Article 4.3 the time of payment for the equity acquisition prices, the *Equity Trust Agreement* stipulated in Article 1.1.7 that Zhongtai should distribute the post-disposal equity of the Fourth Respondent in the order and according to the method as follows: (a) to top up the principal of and returns on Zhongtai's investment according to the *Supplemental Agreement* signed by and between Zhongtai, the Fourth Respondent's controlling shareholder (i.e. SMI Shengdian) and Zhongtai's investors (i.e. the Complainants) on March 15, 2017; (b) to repay the debt and interest payable to Zhongtai by SMI Shengdian, SMI International and their affiliated parties (including the Fourth Respondent). According to the *Equity Trust Agreement*, therefore, the principal of and returns on the investment as well as the debt of the

Respondents to Zhongtai under the *Supplemental Agreement* should be paid or repaid with the proceeds after SMI Shengdian's and SMI International's equity in the Fourth Respondent is sold at reasonable valuations.

As the *Equity Trust Agreement* was concluded later than the *Supplemental Agreement*, it should be construed as an agreement between the Respondents and Zhongtai, controller of the Complainants, to modify what they had previously agreed upon after reaching a consensus with regard to a particular matter. Accordingly, the equity acquisition prices and the returns on security deposit should reasonably be paid after the equity in the Fourth Respondent was sold out.

5. Even if the *Capital Increase Agreement* and the *Supplemental Agreement* are valid and the Respondents therefore have to pay damages to the Complainants accordingly (the Respondents do not recognize this), the method used to calculate the damages is highly unreasonable.

(1) The Complainants addressed the *Notice on the Performance of Equity Acquisition Obligation*, the *Notice on the Performance of Remediation Obligation* and the *Notice on the Performance of Compensation Obligation* to wrong places and therefore failed to serve the notices effectively. This resulted in the Respondent's so-called "default behavior".

According to documents provided by the Complainants, the Complainants had already served the *Notice on the Performance of Equity Acquisition Obligation*, among other documents, to relevant Respondents. However, the express waybill provided by the Complainants did not have the recipient's signature. The screenshot of the online inquiry did evidence that the documents had been received upon signature, but there was no indication of who had signed the mails. Therefore, such screenshot cannot be used as evidence of the Respondents having received the notices. In fact, Qin Hui has long been living abroad with his family. After September 2018 or so, in particular, he has been living in Europe and the US. Clearly knowing that Qin was not in China, the Complainants intentionally mailed him the so-called "repurchase notice". Qin was not possible to have received the notices at all, in fact.

In addition, Qin Hui's address contained in the *Supplemental Agreement*, namely, ███████████████████████████████████████████, was hand-written by some anonymous person, not printed, and therefore could not be proven to have existed when the agreement was signed by the parties. Furthermore, the address could not be proven to be a correspondence address clearly acknowledged by Qin Hui

himself. As a matter of fact, the address had long been not the actual residence of Qin. Therefore, mailing to that address did not constitute an effective service.

(2) The interest rate applied to the damages (if any) to be paid by the Respondents should not exceed a level (16.2%) four times the one-year LPR in effect when the Complainants instituted the arbitration proceeding.

Pursuant to Articles, 26, 30 and 32 of the *Provisions on Several Issues concerning the Laws Applicable to the Trial of Private Lending Cases* issued by the Supreme People's Court in August 2020, the interest rate should be determined at a level four times the LPR in effect when the Complainants instituted the arbitration proceeding, namely, March 20, 2020. As the one-year LPR released on March 20, 2020 by the National Interbank Funding Center with authorization of the People's Bank of China stood at 4.05%, the annual interest rate for such damages should therefore not exceed 16.2%.

6. Even if the *Capital Increase Agreement* and the *Supplemental Agreement* are effective and the Respondents therefore have to pay some damages to the Complainants (the Respondents do not recognize this), the Respondents have become insolvent because of the failure to perform fiduciary duties on the part of members of Zhongzhi Group. Moreover, the damages, if any, to be paid by the Respondents as an obligation should be deducted from the damages payable by Zhongzhi Group to the Fourth Respondent for such failure. Meanwhile, the Respondent should have the right to seek the rest of the damages from the Complainants.

(1) Zhongtai did not perform the duty of care and diligence in performing its fiduciary duty and resulted in significant loss to the Respondents. Due to its ill management, the Respondents became insolvent.

(2) The Respondents' repayment obligations, if any, should be deducted from the damages payable to the Respondents from Zhongtai. Meanwhile, the Respondents should have the right to seek the rest of the damages.

According to relevant provisions of the *Equity Trust Agreement,* Zhongtai should fully perform the delegated work and should not pose adverse effect on the day-to-day operation of the Fourth Respondent; and that, should it materially failed to perform any obligations under the abovementioned agreement, the Respondents should have the right to demand damages from Zhongtai. In fact, all the Complainants were all under the control of Zhongtai, and Zhongtai caused extremely great harm to the Respondents during the period it was entrusted to operate the Fourth Respondent. Therefore, pursuant to

Articles 99 and 406 of the *Contract Law*, the Respondents held that, even if the Respondents has any obligation to pay any amount to the Complainants, the amount can be offset against the loss Zhongtai inflicted on the Respondents, considering the essence of the deal and the need to save cost for the arbitration panel and the parties, and based on the principle of fairness, honesty and credibility.

7. Even if the *Capital Increase Agreement* and the *Supplemental Agreement* are effective and the Respondents therefore have to pay some damages to the Complainants (the Respondents do not recognize this), SMI International and the Fourth Respondent did have any behavior violating the *Capital Increase Agreement* and the *Supplemental Agreement* and therefore do not have to bear any liabilities for breaching those agreements.

Firstly, the Complainants asserted that SMI International and the Fourth Respondent violated Article 6.2 of the *Capital Increase Agreement* that "all parties agree to spare no efforts, actions and measures to cooperate with the company in follow-up activities to ensure that the company gets listed on the stock market in a manner complying with laws and regulations." In fact, the stipulation did not require all parties to ensure that the Fourth Respondent gets listed; it only required them to cooperate in getting the Fourth Respondent listed in an earnest manner. The Complainant's finding that the Respondent was in default because the Fourth Respondent failed to get listed is an unreasonable and too rigorous interpretation of the obligation to "spare no efforts…to cooperate" and therefore severely distorts the true intention of the *Capital Increase Agreement*.

Secondly, with regard to the Complainants' claim that SMI International and the Fourth Respondent violated Article 7.1 (c) and (e) of the *Capital Increase Agreement*, the Respondents are of the opinion that Article 7.1 involved only representations and warranties made by the Fourth Respondent, SMI Shengdian and SMI International and that it did not stipulate that such representations and warranties would continue to be effective after the capital increase. In equity investment agreements, "representations" refer to facts or states that took place in the past and exist at present and are factual descriptions for the target enterprise when an investment agreement is signed; "warranties", in particular, refer to guarantees made with respect to facts or acts that occurred in the past or at present and do not cover any time after a deal is closed.

Thirdly, neither SMI International nor the Fourth Respondent was a signatory to the *Supplemental Agreement*. It follows that there is no legal basis for the Complainants to require them to take responsibilities under the *Supplemental Agreement*.

8. The Complainants should bear the arbitration fees and all the expenses they incur in this case on their own, and furthermore, bear the entire expenses incurred by the Respondents for the conduct of arbitration in this case.

(III). Opinions of the Complainants' Counsel

1. There was no defect in the service of process for this case.

The *Capital Increase Agreement* between the Complainants and the Respondents stipulated the correspondence addresses of the Fourth Respondent, SMI Shengdian and SMI International in Article 18.3; the *Supplemental Agreement* stipulated the correspondence address of Qin Hui in Article 12.2. The Complainants have provided the correspondence addresses of the foregoing Respondents when filing this arbitration case.

When part of the documents were returned, the Complainants made reasonable inquiry through public channels and further provided the Arbitration Panel with other correspondence addresses of SMI International, of the Fourth Respondent (that of its contact person Peng Yun) and of Qin Hui respectively.

Pursuant to the notice (2020) Zhong Guo Mao Zhong Jing Zi No. 068137 issued by the Arbitration Panel on July 21, 2020, the Arbitration Panel again served arbitration notices, among other documents, to the foregoing addresses and all express delivery records showed that they had been properly delivered. Subsequently, the Arbitration Panel further mailed the Notice of Arbitration Panel Formation, the Notice of Court Session and the Notice of Arbitrator Replacement to the abovementioned addresses in follow-up proceedings. All express delivery records showed that they had been properly delivered.

Therefore, the Arbitration Panel has sent arbitration documents to the Respondents' correspondence addresses through express delivery, complying with the requirements for the service of process under Paragraph 3, Article 8 of the *Arbitration Rules*. The arbitration documents for this case, among others, have been served on all Respondents by July 21, 2020 at the latest. The Arbitration Commission also confirmed this in the notice (2020) Zhong Guo Mao Zhong Jing Zi No. 104700 that "the Arbitration Court of this Commission has served all documents and materials of this case on the Complainants and the Respondents according to provisions of Article 8 of the *Arbitration Rules*".

2. This case deals with the capital increase dispute between the Complainants and the Respondents. Therefore, the Respondents should pay the equity acquisition prices and assume corresponding liability for contractual breach according to provisions of the

*Capital Increase Agreement* and the *Supplemental Agreement*.

(1) This case deals with the capital increase dispute between the Complainants and the Respondents.

The Complainants instituted the current arbitration pursuant to Article 14 of the three *Capital Increase Agreements* signed by and between the Complainants and SMI Shengdian, SMI International and the Fourth Respondent, as well as Article 14 of the *Supplemental Agreement* signed by and between the Complainants and SMI Shengdian and Qin Hui. Therefore, this case handles only the capital increase dispute between the Complainants and the Respondents and is based only on the *Capital Increase Agreement* and the *Supplemental Agreement*. Other deals under other agreements are not in the purview of the current arbitration.

(2) The conditions for equity repurchase agreed upon in the *Supplemental Agreement* had been satisfied, so the Respondents should undertake the equity repurchase obligation and other liabilities as agreed.

Firstly, the conditions for equity repurchase agreed upon in the *Supplemental Agreement* had been met. According to Article 3 of the *Supplemental Agreement*, Qin Hui and SMI Shengdian undertook that the Subject Company's net profit stood at 787.88 million yuan for the year of 2017. But the *Audit Report* indicated that the Subject Company's audited net profit for that year was only 312,829,162.33 yuan.

In addition, the 51% equity held by SMI Shengdian in the Subject Company had been imposed five rounds of sequestration measures by judicial authorities, while the 49% equity held by SMI International in the Subject Company three rounds of sequestration measures. Qin Hui was also given a securities market access ban for a period of five years. And the Subject Company was listed as a defaulter without credit several times.

Given the fact that the conditions for equity repurchase have been satisfied, the Complainants have mailed the *Notice on the Performance of Equity Acquisition Obligation* and the *Notice on the Performance of Remediation Obligation* to the Respondents according to the correspondence addresses and agreed methods of service stipulated in contracts.

Secondly, none of the Respondents' defenses are established. With regard to the Respondent's claim that the *Audit Report* was not true, the Complainants held that the report had been issued by a professional accounting firm with the qualifications for auditors and that whether it was issued by an audit firm often used by the Fourth

Respondent did not affect its validity. Moreover, the Fourth Respondent had affixed its official seal to the *Audit Report*, indicating that it recognized the data therein.

With regard to the Respondent's claim that the Complainants were at fault in making the conditions for equity repurchase satisfied, the Complainants believed that, in the first place, the conditions for equity repurchase were triggered by behaviors of the Respondents themselves. Specifically, the Subject Company failed to achieve the performance target for 2017 due to its poor management and operation; SMI Shengdian and SMI International had their equities frozen because they failed to perform their obligations under the court ruling (2018) Qian 2325 Zhi Bao No. 31; Qin Hui was imposed market access denial measures because Ningbo Sunlight Electrical Appliance Co., Ltd. falsified its revenues and profits in violation of the *Securities Law*; and the Subject Company was listed as a defaulter without credit because it failed to perform its obligations under the court judgment (2018) Liao 0204 Zhi No. 1590. All these facts were neither a result of the Complainants' acts nor under the Complainants' control.

In the second place, the triggering of the conditions for equity repurchase took place before the conclusion of the *Trust Plan* and the *Equity Trust Agreement* and before the transfer of the cinema assets. The *Audit Report* was based on the financial data of the Subject Company prior to December 31, 2017. The freezing of SMI Shengdian's and SMI International's equities, the imposition of market access denial on Qin Hui and the Subject Company's listing as a defaulter without credit all happened in August 2018, before the Respondents entered into other deals with other parties. Therefore, the satisfaction of the conditions for equity repurchase was by no means related to the Complainants.

(3) The deal involved in this case did not constitute "a debt in the disguise of equity" and the amount of damages due to the Complainants did not need to be reduced.

Firstly, all the four agreements signed by and between the Complainants and the Respondents emphasized the purpose of getting the Subject Company listed on the stock market. Meanwhile, the *Supplemental Agreement* identified that the Complainants, as shareholders, should have the right to information, the right to dividend and the right to management of the Subject Company, among other rights. The stipulation of the agreement that the Subject Company's original shareholders should give the Complainants compensation in the form of profit and repurchase the equity held by the Complainants when conditions were ripe was merely a VAM clause that ensures the Complainants realize their investment interest. This is very common in commercial financing and investment practices, particularly in private equity investment practices.

On the other hand, neither the *Capital Increase Agreement* nor the *Supplemental Agreement* had any manifestation of the will to borrow money from the Respondents; neither of them restricted the Complainants from transferring its equity; nor did they provide for any credit enhancement measures in a circumstance where the amount of capital increase added up to 1.5 billion yuan. None of them were consistent with the commercial practices for borrowings.

Secondly, the Complainants registered with the administration of industry and commerce the equity changes and appointed directors on the board of directors of the Subject Company as agreed, having actually participated in the Subject Company's operations. Moreover, they exercised the right to information of the Subject Company by obtaining such financial data as the *Audit Report*. As the Complainants have actively performed their rights as shareholders of the Subject Company, the deal manifested the characteristics of an equity trading.

(4) The Complainants have sufficient grounds to demand that the Subject Company and SMI International assume joint and several compensation liabilities.

The Complainants demand that the Subject Company and SMI International assume joint and several compensatory liabilities pursuant to Articles 6.2, 7.1, 11.1 and 11.2 of the *Supplemental Agreement*. They have sufficient factual and legal bases to do so.

Firstly, both the Subject Company and SMI International breached provisions of Articles 6.2 and 7.1 of the *Supplemental Agreement*. According to stipulations of Article 6.1, the Subject Company and SMI International shall take active measures to achieve the goal of listing the Subject Company on the stock market in the end and may not commit negative acts preventing the Subject Company from getting listed. However, the Subject Company's listing as a defaulter without credit and SMI International's assets being frozen have become material obstacles for the Subject Company to get listed. Moreover, as stipulated in Article 7.1 (h), SMI Shengdian and SMI International shall ensure that the Subject Company remains stable in terms of its control before it gets listed. To the contrary, the fact that SMI International had its assets frozen would lead to disputes in the Subject Company's control.

Secondly, on condition that the Subject Company and SMI International violated their obligations agreed upon in the *Capital Increase Agreement*, they should make compensation to the injured party for any losses, direct or indirect, in connection with their defaults according to Articles 11.1 and 11.2 thereof. That's to say, they should pay various amounts payable but unpaid by Qin Hui and SMI Shengdian. On this basis, the

Complainants have limited their compensation to the equity acquisition prices and the damages for delayed payment of such prices according to the principle of fairness. The Subject Company and SMI International should undertake the foregoing compensation liabilities.

3. The deals between the Respondents and other parties are not governed by the Arbitration Commission and do not affect the substantive hearing of this case, either.

As stated above, this case is based only on the *Capital Increase Agreement* and the *Supplemental Agreement*. Other deals between the Respondents and Zhongtai or Gaosheng Wealth are not related to the performance of the *Capital Increase Agreement* and the *Supplemental Agreement* and therefore do not fall into the scope of arbitration agreed upon in the agreements as bases for this case.

In addition, the Arbitration Commission has no jurisdiction over other deals of the Respondents and such deals do not affect the substantive hearing of the capital increase deals involved in this case.

Firstly, the Arbitration Commission has no jurisdiction over the disputes between the Respondents and Zhongtai or Gaosheng Wealth. The Respondents failed to provide any evidence to prove that it had signed any arbitration agreement based on which it could refer any dispute with Zhongtai or Gaosheng Wealth to the Arbitration Commission. To the contrary, the *Equity Trust Agreement*, which did not take effect for it was not duly sealed, provided that the method to resolve any dispute is to file lawsuits in the court.

Secondly, other deals between the Respondents and Zhongtai or Gaosheng Wealth do not affect the substantive hearing of this case. From the perspective of the subject of deals, the Respondents cannot hold the Complainants responsible for other deal contracts. In fact, the Complainants, Zhongtai, Gaosheng Wealth and Success Electronics are all independent business entities as duly incorporated legal persons or non-legal person organizations. The holding of equity by one of them in another does not affect independent expression of intention and legal effect, which, therefore, cannot be used as the basis for one of them to assume liabilities of another. The Complainants were not subjects of the *Trust Plan* and the *Trust Agreement*, which were unilaterally sealed by the Respondents. Moreover, the Complainants did not sign and seal the *Seals, Certificates and Licenses Handover List*; nor did it ever actually control the official seals of the Respondents. The Subject Company's cinema assets have never been transferred to the Complainants, either. The said agreements are not binding on the Complainants in any way, whether they are valid or not. From the perspective of the content of deals, the

Respondents' other deals and the deal involved in this case are independent from and therefore do not affect one another. Furthermore, the other deals between the Respondents and Zhongtai or Gaosheng Wealth were free of any unfair, fraudulent or coercive circumstances. As a matter of fact, the Respondents deliberately concealed part of facts and imposed a farfetched relationship between the consultations it made with Zhongtai concerning credit enhancement for loans and the capital increase deal it entered into with the Complainants, with a view to evading its equity repurchase obligation under this case. Therefore, the Respondents' claim on wholeness of the deals is not established.

4. As the *Audit Report* gave a true and fair view of the Subject Company and the securities market access ban on Qin Hui remains unrevoked, the conditions for equity repurchase agreed upon in the *Supplemental Agreement* have been satisfied.

(1) The *Audit Report* gave a true and fair view of the Subject Company and the Respondents failed to deliver on its commitment in terms of performance.

The Respondents failed to present any evidence to raise objections against the data and audit methods used in the *Audit Report*. Their emphasis on the repayment of debts to ABS, the accrual of asset impairment loss, the background and purpose of the acquisition of cinema assets, etc. are not related to the accuracy and effectiveness of the data in the *Audit Report* and therefore do not affect the result of audit. Moreover, the Subject Company had always been owned by SMI Shengdian and SMI International and actually controlled by Qin Hui during the period covered by the *Audit Report*.

(2) The securities market access ban imposed on Qin Hui remains unrevoked now. Given this and other default behaviors of the Respondents, the Subject Company is unlikely to get listed as agreed upon.

The CSRC has retained the securities market access ban on Qin Hui to date. Qin lodged an administrative lawsuit against the ban. But the No. 1 Intermediate People's Court of Beijing rejected his claim in its *Administrative Judgment* (2019) Jing 01 Xing Chu No. 671, finding that the 5-year ban imposed by the CSRC on accessing the securities market by Qin "was based on clear facts, sufficient evidence, proper in severity and valid in terms of procedures". Therefore, Qin is not able to conduct securities market activities before 2023. With Qin's actual controller status remaining unchanged, the Subject Company will not be able to get listed within the agreed time frame. Therefore, the conditions for equity repurchase stipulated in the *Supplemental Agreement* have been satisfied.

Even if the fact that Qin Hui is denied access to the securities market is disregarded, as the Subject Company has been listed as a defaulter without credit and SMI Shengdian and SMI International have their equities in the Subject Company frozen several times, it is definite that the Subject Company is unlikely to get listed within the stipulated time frame.

5. The Complainants and the Respondents did not modify the *Supplemental Agreement* through the *Equity Trust Agreement*, and the latter is unrelated to this case. The Complainants did not entrust the equity of the Subject Company to the custody of other parties.

6. The liquidation process of SMI Holdings is unrelated to this case, so this case does not have to be suspended.

The *Bankruptcy Law of the People's Republic of China* provides in Article 20 that "civil lawsuits or arbitrations that have been commenced but not yet closed shall be suspended after the People's Court accepts an application for bankruptcy; the lawsuits or arbitration may continue after administrators take over the assets of debtors".

All the four Respondents are not bankrupt debtors and SMI Holdings has selected a liquidator, so this case does not have to be suspended. The subject matter of this case is the equity held by the Complainants in the Subject Company; it is unrelated to the rights enjoyed by SMI Holdings in relation to the Subject Company through its agreements with SMI Shengdian and SMI International. Therefore, the result of this case will not affect SMI Holdings according to the principle of independent personality for legal persons and the principle of contract relativity.

(IV). Supplemental Opinions of the Respondents' Counsel

1. The *Equity Trust Agreement* has materially changed the rights and obligations under the *Supplemental Agreement* signed in March 2017.

The following evidence has all proven the fact of equity trust between the Respondents and Zhongtai: the WeChat records of Hu Yidong, former principal of SMI Group, and of Ren Xiaonan, counsel for Zhongzhi Group, dated July 25, 2018 and notarized by Beijing Chang'an Notary Public Office and the *Trust Plan and Notes*; the *Seals, Certificates and Licenses Handovver List* evidencing Zhongtai's handover of the official seals, certificates and business licenses of the Subject Company and its affiliated cinemas to Gaosheng Wealth, another member of Zhongzhi Group, on January 9, 2019; the *Equity Trust Agreement* signed by and between the Respondents and the

Complainants' actual controller Zhongtai in August 2018; the *Application for the Use of Seals for 123 Cinemas to Authorize China Film Stellar Theater Chain to Collect Ticket Revenues Generated on Taopiaopiao's Ticketing Platform (Run Yun Chengdu)*; as well as the records on the OA system of the approval of fund uses on the part of employees of Zhongzhi Group.

Pursuant to the *Equity Trust Agreement*, the principal of and returns on the Complainants' investment in the Subject Company and the debts and interests payable by the Respondents to Zhongtai under the *Supplemental Agreement* should be paid or repaid with the proceeds from the sale of the equities held by SMI Shengdian and SMI International in the Subject Company at reasonable valuations.

2. SMI International and the Subject Company are not signatories to the *Supplemental Agreement*. Knowing the existence of a VIE arrangement, the Complainants still attempted to change its equity investment in the Subject Company into "a debt in the disguise of equity" through the *Supplemental Agreement*. In fact, the *Supplemental Agreement* not only has no binding force on the Respondents, but also severely harms the rights and interests of SMI Holdings, a company listed in Hong Kong (0198.HK). Therefore, the agreement should be declared null and void.

3. The *Audit Report* submitted by the Complainants should not be used as evidence that proves the Subject Company's failure to meet performance target in 2017. To the contrary, the various data in the report evidence the dramatic growth of the Subject Company's assets and business size in the year of 2017. In fact, the data in the report and their disposal were results of consultations and confirmations among various parties for the purpose of getting the Subject Company listed.

According to the *Audit Report*, the Subject Company's operating revenues increased by 106 million yuan, accounts receivable increased by 360 million yuan or so, advances by 70 million yuan or so, other current assets by 266 million yuan, and total assets by 2.28 billion yuan or so, in 2017 over 2016. Meanwhile, the other accounts payable decreased by 230 million yuan or so and the taxes payable increased by 73.16 million yuan or so in 2017 over 2016. Moreover, the Subject Company paid around 263 million yuan in other operating activities-related cash, repaid around 334 billion yuan to ABS and so on, and accrued 267 million yuan (as opposed to 610,000 yuan in 2016) in asset impairment loss, in 2017.

4. With regard to the punishment given by the CSRC for the 20 million yuan-worth false profit posted by the listed company Sunlight Electrical Appliances, Mr. Qin Hui is

totally opposed to it and has first filed an administrative review and then an administrative lawsuit against the CSRC. However, the CSRC referred the case to the Public Security Bureau of Ningbo City. After investigation, Ningbo Public Security Bureau issued a *Decision to Terminate Investigation*, finding that "Qin Hui was not the actual controller of Ningbo Sunlight Electrical Appliances Co., Ltd. and was not informed of the false profit".

Regarding whether the punishment imposed on Mr. Qin Hui will adversely affect the Subject Company's listing effort, the Respondents maintained that there are various plans for an enterprise to get listed on the stock market through restructuring, [so the punishment will not necessarily affect the Subject Company's listing]. What's more, when the listing effort failed, an equity trust arrangement was made for the Subject Company and modified previous arrangements of various parties for the listing plan. Therefore, there is no reason at all for the Complainants to file the current arbitration case and make various unreasonable demands more than two years later according to previous agreements after various subsequent arrangements were made.

(V). Supplemental Opinions of the Third and Fourth Respondents' Counsel

1. Under a VIE control arrangement, the 51% equity held by the Third and Fourth Respondents in the Subject Company is actually owned by the Hong Kong-listed SMI Holdings in its entirety. The Fourth Respondent is also a wholly-owned subsidiary of SMI Holdings, which controls the Fourth Respondent indirectly. SMI Holdings is right now in the process of liquidation upon bankruptcy. To prevent the assets of SMI Holdings from being disposed erroneously, the Third and Fourth Respondents hereby request the Arbitration Commission to suspend the current arbitration proceeding.

2. The Third and Fourth Respondents are not signatories to the *Supplemental Agreement*. Knowing the existence of a VIE arrangement, the Complainants still attempted to change its equity investment in the Subject Company into "a debt in the disguise of equity" through the *Supplemental Agreement*. In fact, the *Supplemental Agreement* not only has no binding force on the Third and Fourth Respondents, but also severely harms the rights and interests of SMI Holdings, a company listed in Hong Kong. Therefore, the agreement should be declared null and void.

## II. Opinions of the Arbitration Panel

It is worth noting that the parties to this case and their counsel have submitted to the Arbitration Panel quite many materials and opinions as to the facts and legal issues

surrounding this case. These materials and opinions have all been kept in the dossiers of this case in the form of evidence, records, evidence examination opinions, counsel's opinions or explanations. The Arbitration Panel has perused and considered them all. Should any of them be not quoted or referred to in the Case Particulars or indeed be quoted or referred to in the Case Particulars but not adopted in the opinions of the Arbitration Panel, it does not mean that they are in any way neglected or acquiesced in by the Arbitration Panel.

According to the entire materials submitted by the parities and the facts ascertained in the court hearing and based on the agreements in the contracts and legal provisions concerned, the Arbitration Panel has entered into the following opinions:

(I). On the Laws Applicable to This Case

The three *Capital Increase Agreements* involved in this case all stipulated in Article 14.1 that "the effectiveness, interpretation and execution hereof, as well as the resolution of disputes arising from this agreement, shall be governed by the laws of China". The *Supplemental Agreement* involved in this case also stipulated in Article 14.1 that "the conclusion, effectiveness, performance, interpretation, modification, dispute resolution and termination with respect to this agreement shall all be governed by the laws, administrative regulations and bylaws of China currently in effect". According to these, Article 3 of the *Law of the Application of Law for Foreign-related Civil Relations of the People's Republic of China* and Paragraph 2, Article 49 of the *Arbitration Rules*, the Arbitration Panel holds that the dispute under this case shall be governed by the law of the People's Republic of China.

(II). Effectiveness of the Contracts Involved in This Case

It is the opinion of the Arbitration Panel that the *Capital Increase Agreement* and the *Supplemental Agreement* involved in this case are both true expression of intention of the parties, do not contravene mandatory provisions of China's laws and administrative regulation, and have been established and put into effect according to law, so they can serve as the bases for the Arbitration Panel to identify the rights and obligations of the parties on both sides.

The Arbitration Panel has noted the Respondents' claims that the Complainants have changed their equity investment in the Subject Company into "a debt in the disguise of equity" through the *Supplemental Agreement* and therefore the agreement should be declared null and void.

The Arbitration Panel has also noted the Complainants' claims that the deal in this case does not constitute "a debt in the disguise of equity"; the purpose of the contract in this case is to get the Subject Company listed on the stock market; and the *Supplemental Agreement* stipulates various shareholders' rights of the Complainants in the Subject Company and the Complainants will become the Subject Company's shareholders and exercise the rights of shareholders by performing the agreement. The agreement's provisions on original shareholders repurchasing the Complainants' equity and compensating for the Complainants' profit are simply "VAM" clauses used by the Complainants to ensure realization of the returns on their investment and are manifestations of the flexibility and the freedom of contract in equity investment.

Through investigation, the Arbitration Panel finds that the *Supplemental Agreement* stipulates in Article 2.3 that "original shareholders shall successfully get the Subject Company listed on the A-share market in China, whether directly or indirectly".

In Article 6 "governance of the Subject Company", the *Supplemental Agreement* stipulates that the Complainants shall have the right to appoint one director on the Subject Company's board of directors.

In Article 7 "investors' right to information", it is stipulated that, as shareholders, the Complainants enjoy the right to information of and supervision over the Subject Company's operation and management, the right to obtain information and data on the Subject Company's finance, management, operation, marketing and other aspects, the right to make recommendations to the Subject Company's management and the right to hear reports of the Subject Company's management on relevant matters.

It is also ascertained that the Complainants have completed the procedures to register themselves as shareholders of the Subject Company with the administration of industry and commerce and become shareholders of the latter on August 18, 2017.

Based on the foregoing facts, the Arbitration Panel holds that the *Supplemental Agreement* does not contain any stipulations concerning borrowings or changing the equity investment into a debt in the disguise of equity. Instead, the agreement provides for the rights of the Complainants as shareholders of the Subject Company. According to such provisions, the Complainants completed the registration of equity changes with the administration of industry and commerce in the process of performing the agreement and exercised their shareholders' rights. The Arbitration Panel must point out that the *Supplemental Agreement's* stipulation on the Subject Company's original shareholders repurchasing the Complainants' equity and making compensation to the latter for profit

is a VAM clause widely adopted in the private equity investment practices as an equity valuation method. According to this method, when making equity investment, relevant parties can in advance make compensation arrangements for the part of the equity valuation that is higher than the equity's actual value. That's to say, they can determine the equity investment prices according to a target company's anticipated performance; when the target company fails to attain the performance, the investors have the right to demand that the invested party acquire their equity in the target company and/or pay compensation for performance deficit. As such VAM clauses represent adjustment to equity prices and do not contravene the mandatory provisions of China's laws and administrative regulations, they are not invalid clauses. Therefore, the Arbitration Panel holds that the Respondents' claim that the *Supplemental Agreement* has changed the Complainants' equity investment in the Subject Company into "a debt in the disguise of equity" and therefore is invalid lacks the support of necessary contracts, facts and legal bases. It follows that the Arbitration Panel does not support such claim.

(III). Basic Facts Found by the Arbitration Panel

The Complainants signed a *Capital Increase Agreement* with the First, Third and Fourth Respondents respectively as investors on March 15, 2017. The three agreements were coded as (2017) Zi Zi No. 06-1, (2017) Zi Zi No. 06-2 and (2017) Zi Zi No. 06-3 respectively, with roughly the same content.

Article 2.1 thereof stipulated that "based on the company's operating conditions, profitability and development prospects, among other factors, and through amicable consultation between investors on one side and SMI Shengdian and SMI International on the other, the company is valued at 13.5 billion yuan (note of the Arbitration Panel: all amounts in this case are denominated in Renminbi) prior to the current capital increase. Given such valuation, each investor shall contribute 500 million yuan to subscribe the increased capital, with the rest of the contribution included into the company's capital reserve".

Article 2.2 stipulated that "the proportion of equity held by the investors post the capital increase shall be calculated as a share of the newly increased capital in the total registered capital of the company (including the registered capital subscribed by other investors in the current round of capital increase)".

Article 4.1 stipulated that "the investors shall pay an amount of security deposit equal to 10% of their capital contributions into the company's designated account within five business days of the signing hereof".

Article 5.1 stipulated that "all parties agree to cooperate with and cause the company to finish doing the following things within 60 business days after the investors have paid their contributions into the capital verification account according to provisions of Article 4.3 hereof:…… (c) to complete the equity change registration procedures relating to the capital increase at the local administration for industry and commerce in the place of the company's registration".

Article 6.1 stipulated that "for the purpose of listing, the investors undertake to unconditionally consent, support and assist in the company's acquisition (the acquired parties are affiliated parties of original shareholders and/or independent third parties), restructuring and integration of affiliated cinema assets".

Article 6.2 stipulated that "all parties agree to spare no efforts, actions and measures to cooperate with the company in follow-up activities to ensure that the company gets listed on the stock market in a manner complying with laws and regulations. For the purpose of getting listed, the equity interest changes in the company after this agreement is inked, such as equity transfer and capital increase, shall be subject to the provisions of relevant transaction agreements signed by and between the company and its shareholders".

Article 7.1 stipulated that "the Subject Company, SMI Shengdian and SMI International represent and warrant to investors that: … (e) the company's registered capital be paid according to the laws of China, free of misappropriation and false contribution; apart from what is disclosed, the company's equity is free of all pledges or other encumbrances and of nominal share holding or other similar arrangements… (h) SMI Shengdian and SMI International ensure a stable control over the company before it is listed on the stock market".

Article 11.2 stipulated that "should a defaulting party fails to remediate its default during the period of remedy provided in Article 11.1 hereof, the non-defaulting party shall have the right to claim compensation from the defaulting party for the loss it sustains as a result of the default in addition to the rights provided in Paragraph (c), Article 12.1 hereof and under relevant Chinese laws. The defaulting party shall compensate the non-defaulting party for the direct and indirect harm it does to the latter for reason of its default".

Attachment 1 to the *Capital Increase Agreement* stipulated that shareholding ratio of an investor = amount of the investor's contribution/ (pre-investment valuation + total amount of the current round of capital increase) × 100%.

The Complainants signed a *Supplemental Agreement* with the First and Second Respondents on the same date as the *Capital Increase Agreement* was signed. The *Supplemental Agreement* stipulated that, by the signing date hereof, the Subject Company had two registered shareholders, with SMI Shengdian holding 51% and SMI International holding 49% of its equity; Qin Hui was the actual controller of the Subject Company in that he held 100% of the equity in SMI Shengdian and 65.5% of the equity in the Hong Kong-listed company SMI Holdings, which indirectly held 100% of the equity in SMI International; the Complainants signed a *Capital Increase Agreement* on March 15, 2017, providing that the Complainants would contribute 1.5 billion yuan in increased capital to the Subject Company at the pre-investment valuation of 13.5 billion yuan in Renminbi and hold 9.37% of the equity in the Subject Company after the capital increase.

Article 1.1 in Article 1 Definition of the *Supplemental Agreement* stipulated that "original shareholder means SMI Shengdian. For the convenience of reference, SMI Shengdian and Mr. Qin Hui are collectively referred to as original shareholders hereinafter." "Subject equity means the entire equity held by Party A (investors) in the Subject Company by performing the *Capital Increase Agreement*, namely, 9.37% equity in the Subject Company". "Successful listing means that the Subject Company gets listed on the A-share market directly through IPO or indirectly through restructuring. That is to say, the Subject Company is to become a listed company or a subsidiary of a listed company that is publicly traded on Shanghai Stock Exchange or Shenzhen Stock Exchange." "Net Profit means the profit net of extraordinary items audited according to the accounting practices of China".

Article 2.1 stipulated that "original shareholders shall include more cinema assets (not limited to those under common control) into the Subject Company by all means, including without limitation equity acquisition. Therefore, original shareholders shall restructure and integrate all cinema assets under their control into the Subject Company within a period of 12 months after the last capital increase date (included)".

Article 2.3 stipulated that "original shareholders shall successfully get the Subject Company listed on the A-share market in China, whether directly or indirectly".

Article 3 stipulated that "original shareholders undertake that the audited net profit of the Subject Company stand at 787.88 million yuan in 2017 and grow at a rate of no less than 15% on a yearly basis during the period from 2017 to successful listing of the Subject Company".

Article 4.1 stipulated that "under the following circumstances, whether they are a

result of subjective or objective causes, the investors shall have the right to demand that original shareholders acquire the equity held by the investors in the Subject Company at the price agreed upon in Article 4.2 hereof:

4.1.1 Any time after the day a 24-month period following the date of capital increase elapses;

4.1.2 The Subject Company fails to meet the promised performance target agreed upon in Article 3 hereof;

4.1.3 Original shareholders fail to complete the following work within a period of 18 months after the last capital increase date (included): a) to cancel the control agreements concerning Article 2.2 hereof and perform all legal procedures, including without limitation causing SMI Holdings' board of directors and shareholders' general meeting to adopt resolutions on canceling the said control agreement; b) to cause SMI Holdings' shareholders general meeting to adopt resolutions on A-share listing the Subject Company through major assets restructuring or IPO;

4.1.4 The Subject Company still fails to get listed on the stock market 60 months after the last date of capital increase.

4.1.5 Original shareholders violate their commitments in Article 10.2 hereof".

Article 4.2 stipulated that "acquisition price = increased capital $\times$ (1 + 15% $\times$ number of the days of investment/360) $-$ financial consulting fees and stock (equity) returns already obtained by an investor,

where: n = actual number of days of investment (where the increased capital is paid by installments, the days of investment shall be calculated separately, including all days in the period from the date on which the capital is actually paid into the capital verification account to the date on which original shareholders pay the investors the equity acquisition prices); financial consulting fees as defined in Article 5.2.1; stock (equity) returns as defined in Article 9".

Article 4.3 stipulated that "original shareholders shall complete performing the acquisition obligation within 90 days of the receipt from the investors of a written notice of equity acquisition".

Article 4.4 stipulated that "should original shareholders fail to perform the equity acquisition obligation according to Articles 4.2 and 4.3 hereof, the investors shall have the right to demand that original shareholders transfer 5% of their equity in the Subject

Company to the investors as damages to the latter in consideration of 1 yuan only. Such damages shall not affect the continued performance of the acquisition obligation. … Original shareholders shall assist the investors in handling the equity (transfer) registration procedures with respect to the equity transfer aforesaid as of the date of the investor's service of the notice of transfer and make available all written documents necessary for the equity transfer registration and submit a written application to relevant authority for such registration within 10 business days of the receipt of such notice."

Article 5.1 stipulated that "original shareholders undertake that the investors' returns be no lower than the simple annual interest rate of 15% before listing, and the investors' total returns on their investment for a period of five years (included) after the capital increase date be no lower than 100% of their increased capital (including those calculated at the simple annual interest rate of 15% before listing) after listing".

Article 5.2.1 stipulated that "all parties agree that, before the Subject Company's successful listing, the investment returns referred to in Article 5.1 hereof shall find expression in the financial expenses to be paid by Party C (i.e. the Second Respondent) or a third party designated by Party C to the investors. That's to say, Party C or the third party designated by it shall on a yearly basis pay the investors financial consulting fees worth 10% of the total amount of their capital contribution from the date of capital increase, with 2% paid on the date of capital increase, 10% paid on the corresponding date of each subsequent year and 8% on the corresponding date of the last year. In the case of an incomplete year, the actual number of days shall be used to reckon such fees. Moreover, original shareholders shall settle and actually pay the returns on the security deposit on the date of the payment of the deposit money to the capital verification account for the period from the date on which the investors paid the deposit into a designated account to the date on which the deposit was transferred to the capital verification account".

Article 8 stipulated that "the Subject Company shall be audited simultaneously with SMI Holdings and issue the investors an audit report with the company itself as the subject of the report for the year of 2016 after SMI Holdings releases its audit report. The audit matters of the Subject Company referred to in this agreement shall be audited by a qualified accounting firm recognized by the investors according to the accounting practices of the People's Republic of China".

Article 10.2 stipulated that "original shareholders undertake that, before the Subject Company succeeds in getting listed, they will not transfer their equities to external parties;

nor will they do so indirectly by transferring their equities in the Subject Company. That's to say, Mr. Qin Hui's actual controller status in relation to the Subject Company shall remain unchanged before the Subject Company gets listed. Nevertheless, original shareholders may engage in internal equity restructuring on condition that the actual controller status does not undergo any change".

Article 11.2 stipulated that "should original shareholders delay the payment of any amount in violation of the provisions hereof, they shall pay 5‰ of the amount in arrears as damages to the investors for every day so delayed in addition to the liabilities agreed upon in other clauses hereof. Such damages shall be paid to the investors together with the payment in arrears"

Article 11.4 stipulated that "the payment of damages shall not adversely affect the non-defaulting party's rights to demand that the defaulting party indemnify the former against its loss, continue to perform the agreement or to cancel the agreement".

The First, Second and Third Complainants respectively paid 50 million yuan in security deposit to the Fourth Respondent on March 22, 2017. The Fourth Respondent returned the deposit money to the First, Second and Third Complainants on May 8, June 27 and June 30, 2017, actually occupying the money for 48 days, 98 days and 101 days, respectively.

The First Respondent paid 3 million yuan in financial consulting fees to the Complainants on March 28, 2017 and the Fourth Respondent paid 27 million yuan in the same fees on July 4, 2017.

The First, Second and Third Complainants paid 500 million yuan in increased capital to the Fourth Respondent on May 8, June 26 and June 28, 2017 respectively, a total of 1.5 billion yuan.

The Complainants completed the registration of their capital contribution to the Fourth Respondent with the administration of industry and commerce on August 18, 2017, thus holding 9.37% of the Subject Company's equity.

Zhongxi CPAS, an accounting firm, issued an *Audit Report on the Proforma Financial Statements of Run Yun Chengdu Culture Communication Co., Ltd.* (Zhong Xi Shen Zi [2018] No. 1751) on July 12, 2018, concluding that the net profit of the Fourth Respondent shown in its consolidated proforma profit statement was 312,829,162.33 yuan only for the year of 2017.

The Complainants served a *Notice on the Performance of Equity Acquisition*

*Obligation* on the First and Second Respondents respectively on September 19, 2018, claiming that the Subject Company's audit report 2017 indicated that its net profit that year was 312,829,162.33 yuan only, falling short of the promised performance target agreed upon in Article 3 of the *Supplemental Agreement*, and therefore, the First and Second Respondents shall acquire the Complainants' equity in the Subject Company according to Article 4 of the *Supplemental Agreement*. The Complainants demanded that the First and Second Respondents pay the Complainants equity acquisition prices and complete the acquisition obligation within 90 days of the service of the notice aforesaid.

The Complainants served a *Notice on the Performance of Remediation Obligation* on the Third and Fourth Respondents on November 30, 2018 and March 3, 2020, respectively. In the notice, the Complainants claimed that the Fourth Respondent's audited net profit for the year of 2017 stood at 312,829,162.33 yuan only, thus having triggered the equity acquisition obligation under the *Supplemental Agreement*; the fact that actual controller Qin Hui was punished by the CSRC substantially affected the Subject Company's listing; and after the Subject Company failed to get listed through the backdoor Success Electronics, the Respondents did not send any notice to or make any arrangements for the Complainants. A public information inquiry conducted recently indicated that the Subject Company's equity had been sequestrated by judicial authorities or pledged and the company itself had been listed as a defaulter without credit. The foregoing facts violated stipulations in the *Capital Increase Agreement* and the *Supplemental Agreement*, causing huge loss to the Complainants. Therefore, the Complainants asked the Third and Fourth Respondents to take remediation measures forthwith by paying the Complainants an amount of cash equal to the equity acquisition prices.

The Complainants then served a *Notice on the Performance of Compensation Obligation* on the First and Second Respondents respectively on December 20, 2019, claiming that the latter parties had constituted a default by failing to perform their equity acquisition obligations and therefore shall transfer 5% of the equity they held in the Subject Company to the Complainants as damages for their default. Now that the Complainants have paid the one yuan in equity transfer prices to the First Respondent, according to Article 4.4(1) of the *Supplemental Agreement*, the First Respondent shall make available all written documents necessary for the equity transfer registration and submit a written application to relevant authority for such registration within 10 business days of the receipt of this notice, assisting the Complainants in completing the registration

with the administry of industry and commerce with respect to the 5% equity transferred as compensation.

The Complainants did pay one yuan in equity transfer prices to the Respondents on December 26, 2019.

However, the Respondents have not yet paid the equity acquisition prices to date; nor have they handled the equity change registration procedures with respect to the 5% equity in the Subject Company.

(V). On the Scope of Hearing for the Arbitration Panel

The Respondents asserted that the dispute in this case shall be examined amid all transactions between the Respondents and the enterprises as members of Zhongzhi Group. Zhongzhi enterprises committed fraud in the disguise of investment and stripped the Respondents of its entire assets in severe violation of the principles of fairness, honesty and credibility. Even if the Respondents have to pay some amounts to the Complainants pursuant to the *Capital Increase Agreement* and the *Supplemental Agreement*, the equity acquisition prices and the returns on security deposit should be paid after the trustee Zhongtai completes the equity transfer relating to the Fourth Respondent, because the *Equity Trust Agreement* inked in 2018 has made substantive modifications to the contracts in this case. According to stipulations of the *Equity Trust Agreement*, therefore, the Complainants' arbitration claims should not be supported.

The Complainants claimed that this case covers the capital increase dispute under the *Capital Increase Agreement* and the *Supplemental Agreement* only. The deals between the Respondents and non-party Zhongtai, Gaosheng Wealth and Success Electronics are mutually independent and do not affect the liabilities of the Respondents under the *Capital Increase Agreement* and the *Supplemental Agreement* for they are all independent commercial subjects. Moreover, the Complainants are not parties to the *Equity Trust Agreement*. Therefore, the agreement is unrelated to this case and not to be heard by the Arbitration Panel for this case.

The Arbitration Panel finds through investigation that the Complainants filed this case pursuant to the arbitration clauses of the *Capital Increase Agreement* between the Complainants and the Respondents and of the *Supplemental Agreement* signed by and between the Complainants and the First and Second Respondents. The matters to be arbitrated are "any disputes or claims for compensation arising from or in connection with this agreement or defaults, termination or invalidity of contracts" under Article 14 of the

*Capital Increase Agreement*, and "disputes that arise in the process of performing this agreement by all parties" under Article 14 of the *Supplemental Agreement.*

The Arbitration Panel notes that the Respondents have submitted an *Equity Trust Agreement* signed by and between the four Respondents and Zhongtai, among other parties, in August 2018. Regarding this trust agreement, the Complainants proposed in their evidence examination opinions that the agreement's trueness and legitimacy should be denied for the Respondents failed to produce the original agreement. The Arbitration Panel also notes that the Complainants were not signatories to the trust agreement, that Zhongtai, as a party to that agreement, did not sign the agreement, either, and that Article 9.2 of the agreement explicitly stipulated that it shall take effect as of the date on which it is duly signed by individuals in the case of an natural person party or by authorized counsel in the case of a legal person party and also affixed with official seals by the same persons. Furthermore, the agreement stipulated in Article 8.2 that disputes under the agreement shall be resolved through lawsuits filed with the people's court of law in Chaoyang District, Beijing.

Given the foregoing facts, the Arbitration Panel holds that the scope of arbitration for this case should be limited to the disputes arising from or in connection with the *Capital Increase Agreement* and the *Supplemental Agreement* between the Complainants and the Respondents according to provisions of their arbitration clauses and that the dispute between the Respondents and those that are non-party to this case should not fall within the purview of the Arbitration Panel organized for this case in that the Complainants and the non-party Zhongtai, Gaosheng Wealth and Success Electronics are all mutually independent commercial subjects and that the latter three are not signatories to the contracts involved in this case. Moreover, the *Equity Trust Agreement*, irrespective of whether it is true and effective, stipulated that disputes under the agreement shall be resolved through lawsuits filed with the people's court of law. In addition, there is no evidence that the parties to this case and other parties agree to incorporate the disputes under the *Equity Trust Agreement* into the scope of arbitration for this case. Therefore, the Arbitration Panel holds that the disputes under the *Equity Trust Agreement* do not fall into the scope of arbitration for this case.

To sum up, the Respondents' claim mentioned above is not supported by the Arbitration Panel.

(VI). On Whether Qin Hui Is an Original Shareholder Defined in the *Supplemental Agreement.*

The Respondents claim that "original shareholders" under the *Supplemental Agreement* do not include Qin Hui because Qin was the actual controller and not an original shareholder of the Subject Company and that the *Supplemental Agreement* explicitly defined the identities of the signatories. Article 1.1 of the agreement defined that "original shareholders refer to SMI Shengdian" and only "for the convenience of reference, SMI Shengdian and Mr. Qin Hui are collectively referred to as original shareholders". Furthermore, several clauses of the agreement have drawn a clear line between "original shareholder" and "actual controller" as two different subjects. It follows that Qin Hui should not be held to undertake the obligations of original shareholders under the *Supplemental Agreement* together with original shareholder SMI Shengdian.

The Arbitration Panel finds through investigation that the *Supplemental Agreement*'s signatories included the Complainants as investors, SMI Shengdian as the original shareholder and Qin Hui as the actual controller of the Subject Company.

The *Supplemental Agreement*'s whereas clauses stipulated that, by the signing date of the agreement, the Subject Company had two registered shareholders, including SMI Shengdian (51%) and SMI International (49%), and that Qin Hui was the actual controller of the Subject Company in that he held 100% of the equity in SMI Shengdian and 65.5% of the equity in the Hong Kong-listed company SMI Holdings, which indirectly held 100% of the equity in SMI International. All parties therefore agreed that, after the Subject Company completed the cinema assets restructuring under Article 2.1 hereof, original shareholders would cause all shareholders of the Subject Company to agree to get the company listed on the stock market indirectly by the preferred means of major asset restructuring (which might constitute listing via restructuring) by injecting the entire assets of the Subject Company into a company listed on the A-share market.

Article 1 Definition of the *Supplemental Agreement* stipulated that "original shareholder means SMI Shengdian. For the convenience of reference, SMI Shengdian and Mr. Qin Hui are collectively referred to as original shareholders hereinafter."

Article 4.1.3 stipulated that if "original shareholders fail to complete the following work within a period of 18 months after the last capital increase date (included): a) to cancel the control agreements concerning Article 2.2 hereof and perform all legal procedures, including without limitation causing SMI Holdings' board of directors and shareholders' general meeting to adopt resolutions on canceling the said control agreement; b) to cause SMI Holdings' shareholders general meeting to adopt resolutions

on A-share listing of the Subject Company through major assets restructuring or IPO".

Article 10.2 stipulated that "original shareholders undertake that, before the Subject Company succeeds in getting listed, they will not transfer their equities to external parties; nor will they do so indirectly by transferring their equities in the Subject Company. That's to say, Mr. Qin Hui's actual controller status in relation to the Subject Company shall remain unchanged before the Subject Company gets listed. Nevertheless, original shareholders may engage in internal equity restructuring on condition that the actual controller status does not undergo any change".

Given the foregoing stipulations, the Arbitration Panel holds that from the perspective of the *Supplemental Agreement*'s structure, the prelude and whereas clauses emphatically stated the identities of various parties, while the definition clauses defined key words of the contractual clauses, in a bid to avoid ambiguities in interpreting and executing the agreement. Based on such arrangement, the identities of all parties have been made clear in the prelude and whereas clauses. However, as Qin Hui was the actual controller of SMI Shengdian and therefore crucial to the performance of the agreement, the agreement referred to original shareholders collectively as SMI Shengdian and Qin Hui for the convenience of reference and in order to avoid doubt. Therefore, original shareholders in the *Supplemental Agreement* did not merely refer to registered shareholders of the Subject Company on the date of signing of the agreement, but also included actual controller Qin Hui. On the other hand, the purpose of the *Supplemental Agreement* was to make further arrangements to get the Subject Company listed, including steps to be taken for the Subject Company to be restructured for listing purpose, the safeguards for the investment returns of the Complainants before and after the Subject Company's listing, the liabilities of Qin Hui and SMI Shengdian for the Subject Company's listing, the VAM clauses, etc. Undoubtedly, several obligations to be undertaken by original shareholders in the *Supplemental Agreement* had to be performed by Qin Hui and SMI Shengdian together; some obligations could even be performed by Qin only, such as those stipulated in Article 4.1.3 and Article 10.2 mentioned above. Therefore, if the original shareholders referred to in the *Supplemental Agreement* did not include Qin Hui, some obligations to be undertaken by the original shareholders would end up void. Based on all parties' agreements on the obligations to be undertaken by original shareholders, therefore, the original shareholders shall include Qin Hui.

The Arbitration Panel holds that Qin Hui belongs to the original shareholders defined in the *Supplemental Agreement* and therefore shall undertake the liabilities and

obligations of the original shareholders thereunder.

(VII). On Whether the Conditions for Equity Repurchase Have Been Satisfied.

The Complainants assert that the Subject Company failed to deliver on its commitment on target net profit. According to the *Audit Report* issued by Zhongxi CPAS, an accounting firm, the Subject Company's audited net profit was 312,829,162.33 yuan only for the year of 2017, falling far short of the target agreed upon in Article 3 of the *Supplemental Agreement*. Moreover, the Subject Company's equity has been sequestrated by judicial authorities several times and the company itself has been listed as a defaulter without credit. Worse, the Second Respondent, as the actual controller of the Subject Company, has been denied access to the securities market. The Subject Company therefore can no longer get listed as agreed upon, so the conditions for equity repurchase have been satisfied.

However, the Respondents claim that the equity repurchase conditions have not yet been met. The *Audit Report* cannot be used as evidence that the Subject Company did not meet its performance target in 2017, according to the Respondents. Moreover, for the purpose of getting listed, the Subject Company repaid its debts to ABS in advance and acquired large amounts of cinema assets that year, dealing a great impact on otherwise stable operations. With respect to the punishment imposed by the CSRC on Qin Hui, an administrative lawsuit has thus far been filed. The punishment will not constitute an obstacle to the listing of the Subject Company on the stock market.

The Arbitration Panel finds through investigation that the *Supplemental Agreement* stipulated in Article 3 that "original shareholders undertake that the Subject Company will have 787.88 million yuan in audited net profit in 2017 and a net profit growth rate of no less than 15% for every subsequent year preceding its successful listing on the stock market"

Article 4.1 of the *Supplemental Agreement* stipulated that "under the following circumstances, whether they are a result of subjective or objective causes, the investors shall have the right to demand that original shareholders acquire the equity held by the investors in the Subject Company at the price agreed upon in Article 4.2 hereof:

4.1.1 Any time after the day a 24-month period following the date of capital increase elapses;

4.1.2 The Subject Company fails to meet the promised performance target agreed upon in Article 3 hereof;

4.1.3 Original shareholders fail to complete the following work within a period of 18 months after the last capital increase date (included): a) to cancel the control agreements concerning Article 2.2 hereof and perform all legal procedures, including without limitation causing SMI Holdings' board of directors and shareholders' general meeting to adopt resolutions on canceling the said control agreement; b) to cause SMI Holdings' shareholders general meeting to adopt resolutions on A-share listing of the Subject Company through major assets restructuring or IPO;

4.1.4 The Subject Company still fails to get listed on the stock market 60 months after the last date of capital increase;

4.1.5 Original shareholders violate their commitments in Article 10.2 hereof".

Article 8 stipulated that "the audit matters of the Subject Company referred to in this agreement shall be audited by a qualified accounting firm recognized by the investors according to the accounting practices of the People's Republic of China".

The Arbitration Panel also finds a note in the *Audit Report on the Proforma Financial Statements of Run Yun Chengdu Culture Communication Co., Ltd.* (Zhong Xi Shen Zi [2018] No. 1751) issued by Zhongxi CPAS that "we have conducted the audit work according to provisions of audit practices applicable to the registered public accountants of China". The report came up with the conclusion that the audited net profit of the Subject Company was 312,829,162.33 yuan only for the year of 2017.

Furthermore, the CSRC issued a *Decision of China Securities Regulatory Commission on Market Access Denial (Hu Yidong, Qin Hui and Kang Lu)* on August 30, 2018, imposing a 5-year securities market access ban on the Second Respondent Qin Hui, the actual controller of the Subject Company.

The Complainants served a *Notice on the Performance of Equity Acquisition Obligation* to the First and Second Respondents respectively on September 19, 2018, demanding that the latter two parties pay the equity acquisition prices and perform their equity acquisition obligations within 90 days of the receipt of such notice.

The Subject Company was listed as a default without credit on August 15, 2018, November 6, 2018 and March 12, 2020 respectively for failing to perform its obligations under the administrative rulings (2018) Liao 0204 Zhi No. 1590, (2018) Yue 1973 Zhi No. 9269 and (2020) Jing 0105 Zhi Hui No. 592.

The '*Initial Public Offering and Listing Management Measures* of the CSRC provides in Article 12 that "the issuer shall not have undergone major changes in terms

of its main business, directors and senior officers; nor shall it have undergone changes in actual controller, in the last three years".

Article 13 thereof provide that "the issuer shall have clear equity titles and the equity held by controlling shareholders or other shareholders dominated by controlling shareholder or actual controller in the issuer shall be free of major title disputes".

Article 16 thereof provides that "the issuer's directors, supervisors and senior officers shall comply with the job qualifications stipulated by laws, administrative regulations and bylaws and be free of the following circumstances: (1) where they are still subject to the securities market access ban imposed by the CSRC".

The '*Major Assets Restructuring Management Measures for Listed Companies* of the CSRC provides in Article 11 that "should a company to be listed on the stock market undergoes major assets restructuring, it shall make sufficient explanations for the transaction's compliance with the following requirements and disclose the same to the public: … (2) [the transaction] will not result in a would-be listed company's failure to comply with the listing conditions".

The '*Listed Company Acquisition Management Measures* of the CSRC provides in Article 6 that "no person is permitted to take advantage of the acquisition of a listed company to impair the legal rights and interests of the acquired company as well as of its shareholders. An acquirer shall not acquire a listed company under the following circumstances:

(1) where the acquirer is burdened with a considerably large amount of debt which is and remains unpaid when due;

(2) where the acquirer was involved or suspected of being involved in major illegal activities during the past three years;

(3) where the acquirer engaged in severe dishonest behaviors on the securities market during the past three years;

(4) where the acquirer, as a natural person, is involved in the circumstances stipulated in Article 146 of the *Company Law*;

(5) where the acquirer is otherwise prohibited from acquiring a listed company pursuant to the provisions of laws or regulations or the determinations of China Securities Regulatory Commission."

Based on the abovementioned, the Arbitration Panel holds that, firstly, the Subject

Company's failure to attain the profit target stipulated in Article 3 of the *Supplemental Agreement* has already triggered the conditions for equity repurchase according to provisions of Article 4.1 of the *Supplemental Agreement*.

The Arbitration Panel notes that the Respondents claims that the *Audit Report* provided by the Complainants cannot be used as evidence for the Subject Company's failure to attain performance target on the ground that the Subject Company repaid its debt to ABS in advance and acquired large amounts of cinema assets in 2017, thus dealing a severe impact on the otherwise stable operations of the Subject Company. With regard to this claim, the Arbitration Panel is of the opinion that the *Audit Report* complied with the conditions stipulated in Article 8 of the *Supplemental Agreement*, including that the audit matters shall be recognized by the investors, that the audit firm shall have relevant qualifications and that the audit firm shall conduct audit according to the accounting practices of the People's Republic of China. Moreover, the Subject Company has affixed its official seal to the *Proforma Consolidated Profit Statement* attached to the *Audit Report*, indicating that it has recognized the financial data contained in the report. Furthermore, the advanced repayment of debts and the acquisition of cinemas in 2017 were both normal operating activities of the Subject Company. As an operator, the Respondents should above all be fully responsible for the operating results of the Subject Company. Therefore, the Respondents' claim mentioned above lacks the support of necessary contractual and factual bases and is therefore not admitted by the Arbitration Panel.

Secondly, should the Subject Company fail to get listed on the date on which a period of 60 months expires after the last capital increase date, the equity repurchase conditions will still be triggered according to provisions of Article 4.1.4 of the *Supplemental Agreement*. The Arbitration Panel finds that the last capital increase date was June 28, 2017, so the date on which the 60-month period expires will be June 27, 2022. As the Subject Company has been seized by several judicial authorities, listed as a defaulter without credit and its actual controller Qin Hui been imposed a 5-year market access ban by the securities regulator, the Subject Company has lost the opportunities to get listed at the time agreed upon in Article 4.1.4 of the *Supplemental Agreement* according to Articles 12, 13 and 16 of the *Initial Public Offering and Listing Management Measures*, Article 11 of the *Major Assets Restructuring Management Measures for Listed Companies* and Article 6 of the *Listed Company Acquisition Management Measures*. In this way, the equity repurchase conditions will still be triggered.

The Arbitration Panel notes that the Respondents maintain that Qin Hui has lodged an administrative lawsuit against the punishment imposed by the CSRC on him. The Arbitration Panel finds that the Respondents have failed to produce evidence to prove that the securities market access ban has been rescinded. To the contrary, the Complainants have provided an *Administrative Judgment* (2019) Jing 01 Xing Chu No. 671 issued by the No. 1 Intermediate People's Court of Beijing. The judgment ruled that the 5-year ban imposed by the CSRC on accessing the securities market by Qin "was based on clear facts, sufficient evidence, proper in severity and valid in terms of procedures". Therefore, the Respondents' claim is not admitted by the Arbitration Panel.

The Arbitration Panel also notes that the First and Second Respondents refuse to acknowledge their receipt of the *Notice on the Performance of Equity Acquisition Obligation*. An investigation finds that the Complainants have respectively served the notice on the First and Second Respondents on September 19, 2018. To prove this, the Complainants have presented original mail vouchers, which contain the signature of the recipients. The Respondents do not recognize the trueness of the evidence, but they have failed again to provide sufficient evidence to discredit the evidence. According to the principle of high probability, therefore, the Respondents' claim is not admitted by the Arbitration Panel.

(VIII). Arbitration Claims of the Complainants

The Complainants have lodged seven arbitration claims. The Arbitration Panel will analyze and adjudicate these claims one by one as follows:

1. On the Complainants' first arbitration claim, that is, to enter into the determination that the First and Second Respondents jointly and severally pay the First, Second and Third Complainants equity acquisition prices respectively (the subject of acquisition was the 3.12% equity held by the three Complainants in the Fourth Respondent; the equity acquisition prices were to be calculated according to the method stipulated in Article 4.2 of the *Supplemental Agreement* for the period up to the date on which the Respondents have jointly and severally paid the acquisition prices, with the financial consulting fees deducted. Up to March 12, 2020, the equity acquisition prices to be paid by the First and Second Respondents shall be 701,666,666.67 yuan, 691,458,333.33 yuan, and 691,041,666.67 yuan respectively to the First Complainant, the Second Complainant, and the Third Complainant in equity acquisition prices, a total of 2,084,166,666.67 yuan).

The Arbitration Panel finds that the *Supplemental Agreement* stipulated in Article 4.2 that "acquisition price = increased capital × (1 + 15% × number of the days of

investment/360) — financial consulting fees and stock (equity) return already obtained by an investor,

where: n = actual number of days of investment (where the increased capital is paid by installments, the days of investment shall be calculated separately, including all days in the period from the date on which the capital is actually paid into the capital verification account to the date on which original shareholders pay the investors the equity acquisition prices); financial consulting fees as defined in Article 5.2.1; stock (equity) returns as defined in Article 9".

Article 4.3 stipulated that "original shareholders shall complete performing the acquisition obligation within 90 days of the receipt from the investors of a written notice of equity acquisition".

The Arbitration Panel also finds that the First, Second and Third Complainants have paid 500 million yuan in increased capital to the Subject Company on May 8, June 26 and June 28, 2017 respectively, a total of 1.5 billion yuan.

The First Respondent has paid 3 million yuan in financial consulting fees to the Complainants on March 28, 2017, and the Fourth Respondent has paid 27 million yuan in the same fees on July 4, 2017, to the Complainants, adding up the financial consulting fees to 30 million yuan.

The Arbitration Panel holds that, as the conditions for equity repurchase have been satisfied, the First and Second Respondents shall perform their equity acquisition obligations by acquiring the 3.12% equity held by the Complainants in the Fourth Respondent according to stipulations of the contract concerned and paying the equity acquisition prices according to Article 4.2 of the *Supplemental Agreement* and that the 15% fixed income shall be calculated to the date on which the Respondents jointly pay up the equity acquisition prices, with the paid financial consulting fees deducted. Given the fact that the First, Second and Third Complainants have respectively paid 500 million yuan in increased capital to the Fourth Respondent on May 8, June 26 and June 28, 2017, a total of 1.5 billion yuan, the First and Second Respondents shall pay the equity acquisition prices to the First, Second and Third Complainants respectively during the period from May 8, June 26 or June 28, 2017 to the date on which the Respondents actually pay up such prices. As the three Complainants confirm that they have respectively received 10 million yuan in financial consulting fees from the First Respondent, a total of 30 million yuan, the 30 million yuan amount shall therefore be

deducted from the equity acquisition prices payable to the Complainants.

To sum up, this first arbitration claim of the Complainants is supported by the Arbitration Panel.

2. On the second arbitration claim of the Complainants, that is, to enter into the determination that the First and Second Respondents immediately transfer to the First, Second and Third Complainants their 5% equity in the Fourth Respondent, which shall be evenly distributed among the three Complainants.

The Complainants claim that according to the Article 44 of the *Supplemental Agreement* they have the right to demand that the First and Second Respondents transfer immediately their 5% equity in the Fourth Respondent to the Complainants in consideration of one yuan only. Therefore, the Complainants served a *Notice on the Performance of Equity Acquisition Obligation* to the First and Second Respondents on September 19 and September 26, 2018 respectively, demanding that the latter two perform their acquisition obligations within 90 days of the receipt of the notice. Moreover, the Complainants did pay the one yuan in equity transfer prices to the Respondents on December 26, 2019. But the First and Second Respondents did not perform their contractual obligations accordingly.

The Arbitration Panel finds through investigation that Article 4.4 of the *Supplemental Agreement* stipulated that "should original shareholders fail to perform the equity acquisition obligation according to Articles 4.2 and 4.3 hereof, the investors shall have the right to demand that original shareholders transfer 5% of their equity in the Subject Company to the investors as damages to the latter in consideration of 1 yuan only. Such damages shall not affect the continued performance of the acquisition obligation. Original shareholders shall assist the investors in handling the equity (transfer) registration procedures with respect to the equity transfer aforesaid as of the date of the investor's service of the notice of transfer and make available all written documents necessary for the equity transfer registration and submit a written application to relevant authority for such registration within 10 business days of the receipt of such notice."

It also finds that the Complainants served a *Notice on the Performance of Equity Acquisition Obligation* to the First and Second Respondents on September 19 and September 26, 2018 respectively, demanding that the latter two perform their equity acquisition obligations and pay the equity acquisition prices within 90 days of the receipt of the notice.

It further finds that the Complainants have paid one yuan in equity transfer prices to the Respondents on December 26, 2019, but the First and Second Respondents did not handle the equity change registration procedures with respect to their 5% equity in Subject Company accordingly.

Given the foregoing facts, the Arbitration Panel holds that the First and Second Respondents have constituted a default in that they have failed to perform their equity acquisition obligation within 90 days of the receipt of the *Notice on the Performance of Equity Acquisition Obligation* served by the Complainants according to contractual agreements. They should have transferred their 5% equity in the Fourth Respondent to the Complainants in consideration of one yuan according to contractual provisions. Nevertheless, the First Complainant has paid the one yuan equity transfer price to the First Respondent on December 26, 2019. Therefore, the First and Second Respondents shall transfer 5% of the equity in the Fourth Respondent to the Complainants. This second arbitration claim of the Complainants is therefore supported by the Arbitration Panel.

3. On the third arbitration claim of the Complainants, that is, to enter into the determination that the First and Second Respondents jointly and severally pay each of the First, Second and Third Complainants 225 million yuan in damages for delayed payment of the equity acquisition prices, a total of 675 million yuan.

The Complainants assert that according to the *Supplemental Agreement*, the First and Second Respondents should complete the equity acquisition within 90 days of the receipt from the Complainants of a written notice of such acquisition and otherwise should pay the Complainants damages at a rate of 5‰ of the delayed payment on a daily basis. The First Complainant has served a *Notice on the Performance of Equity Acquisition Obligation* on the Respondents on September 29, 2018, so the First and Second Respondents have begun to delay paying the damages since December 30, 2018 and the amount of damages so delayed has added up to approximately 4.2 billion yuan. Considering the large amount, the Complainants agree to make a proper adjustment to the amount according to Article 113 of the *Contract Law*. As the Complainants shall obtain 5% of the equity in the Fourth Respondent and this part of equity is worth 675 million yuan based on the 13.5 billion yuan pre-investment valuation of the Fourth Respondent agreed upon by the parties in the *Capital Increase Agreement* and the *Supplemental Agreement*, the Complainants therefore claim that the damages for the delayed equity acquisition prices be reduced to 675 million yuan, which shall be evenly distributed among the Complainants.

The Complainants claim that the amount of damages is too high and that the interest rate should not exceed the level four times the LPR for one-year loans at the time of the institution of the arbitration, i.e. 16.2%.

The Arbitration Panel finds through investigation that Article 4.3 of the *Supplemental Agreement* stipulated that "original shareholders shall complete performing the acquisition obligation within 90 days of the receipt from the investors of a written notice of equity acquisition".

Article 11.2 further stipulated that "should original shareholders delay the payment of any amount in violation of the provisions hereof, they shall pay 5‰ of the amount in arrears as damages to the investors for every day so delayed in addition to the liabilities agreed upon in other clauses hereof. Such damages shall be paid to the investors together with the payment in arrears".

The Arbitration Panel also finds that the Complainants mailed a *Notice on the Performance of Equity Acquisition Obligation* to the First and Second Respondents respectively on September 19, 2018, demanding that the latter two parties pay the equity acquisition prices within 90 days of the receipt of such notice. The Second Respondent received the notice on September 20, 2018, and the First Respondent received the notice on September 29, 2018.

It further finds that the *Capital Increase Agreement* stipulated in Article 2.1 that "based on the company's operating conditions, profitability and development prospects, among other factors, and through amicable consultation between investors on one side and SMI Shengdian and SMI International on the other, the company is valued at 13.5 billion yuan (note of the Arbitration Panel: all amounts in this case are denominated in Renminbi) prior to the current capital increase. Given such valuation, each investor shall contribute 500 million yuan to subscribe the increased capital, with the rest of the contribution included into the company's capital reserve".

Based on these, the Arbitration Panel holds in the first place that the First and Second Respondents shall pay damages to the Complainants for delayed payment of the equity acquisition prices according to contractual stipulations.

However, the Arbitration Panel notes that the Respondents believe that the amount of damages is too high and therefore should be calculated at a rate four times (16.2%) the LPR for one-year loans in effect at the time of the filing of this case according to the *Provisions on Several Issues concerning the Laws Applicable to the Trial of Private*

*Lending Cases* issued by the Supreme People's Court. The Arbitration Panel holds that what the Complainants claim in this case are damages for delayed payment, rather than interest for private lending, so the application of the Supreme People's Court provisions on private lending is clearly inappropriate, therefore, not supported by the Arbitration Panel.

Meanwhile, the Arbitration Panel also notes that the Complainants also think that the amount of damages is too high according to original contractual provisions and therefore propose to use the value of the 5% equity it claims in the second arbitration claim, i.e. 675 million yuan, as the amount of the damages claimed hereunder. Regarding this, the Arbitration Panel holds that this method of calculation for damages is lacking in contractual bases and fails to make explanations for the reasonableness of the 675 million yuan proposal. Therefore, the 675 million yuan claim for damages made by the Complainants is not supported by the Arbitration Panel.

Based on the merits of this case and considering the fact that the Arbitration Panel has already made some compensation to the Complainants for the harm done to them by the Respondents in its adjudication for the first and second arbitration claims, the Arbitration Panel therefore exercises discretion to rule that the First and Second Respondents shall jointly and severally pay the First, Second and Third Complainants 150 million yuan in damages for delayed payment of the equity acquisition prices respectively, a total of 450 million yuan, according to Articles 5 and 114 of the *Contract Law*.

4. On the fourth arbitration claim of the Complainants, that is, to enter into the determination that the First and Second Respondents jointly and severally pay each of the First, Second and Third Complainants returns on the security deposit placed by them (given the 500 million yuan-worth security deposit placed by each of the three Complainants, the returns on such deposit to be paid by the Respondents would be 1,000,000 yuan to the First Complainant for the period from March 22 to May 8, 2017, 2,041,666.67 yuan to the Second Complainant for the period from March 22 to June 27, 2017, and 2,104,166.67 yuan to the Third Complainant for the period from March 22 to June 30, 2017 respectively, totaling 5,145,833.33 yuan, calculated at the annual return rate of 15%), as well as damages for delayed payment of the returns on the security deposit (for the First Complainant, the damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 1,000,000 yuan, at an annual rate of 24% for the period from May 9, 2017 to the date of such returns

being paid up in their entirety and would add up to 692,666.67 yuan should they be calculated up to March 12, 2020. For the Second Complainant, the damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 2,041,666.67 yuan, for the period from June 28, 2017 to the date of such returns being paid up in their entirety and would add up to 1,346,138.89 yuan should they be calculated up to March 12, 2020. For the Third Complainant, the damages for delayed payment of the returns on security deposit shall be calculated based on the amount of such returns, i.e. 2,104,166.67 yuan, for the period from July 1, 2017 to the date of such returns being paid up in their entirety and would add up to 3,421,944.45 yuan should they be calculated up to March 12, 2020).

The Complainants claim that the First and Second Respondents shall pay returns on their security deposit at the annual interest rate of 15% according to Article 5.1.3 of the *Supplemental Agreement*. The Fourth Respondent actually occupied the security deposit money of the First, Second and Third Complainants for 48 days, 98 days and 101 days respectively and accordingly should pay them 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan in returns on the security deposit at a simple annual interest rate of 15% on the date of returning the deposit to the investors. Since the First and Second Complainants did not pay such returns when repaying the security deposit, they should therefore pay damages at a rate of 5‰ or a converted annual rate of 180% according to Article 11.2 of the *Supplemental Agreement*. Because this rate is too high, the Complainants agree to lower it to the annual rate of 24%.

The Respondents also claim that the damages claimed by the Complainants are too high and should be reduced.

The Arbitration Panel finds that the *Supplemental Agreement* stipulated in Article 5.1.3 that "original shareholders shall pay investors returns on the security deposit placed under the *Capital Increase Agreement* at a simple annual rate of 15%".

Article 11.2 of the *Supplemental Agreement* stipulated further that "should original shareholder delay the payment of any amount in violation of the provisions hereof, they shall pay 5‰ of the amount in arrears as damages to the investors for every day so delayed in addition to the liabilities agreed upon in other clauses hereof. Such damages shall be paid to the investors together with the payment in arrears".

In addition, the Arbitration Panel finds that the three Complainants respectively paid 50 million yuan in security deposit to the Fourth Respondent on March 22, 2017. The Fourth Respondent returned the deposit money to the First, Second and Third

Complainants on May 5, June 27 and June 30, 2017, actually occupying the money for 48 days, 98 days and 101 days, respectively.

It also finds that the Fourth Respondent returned only the principal of the security deposit to the Complainants, without paying returns on such money.

Based on the abovementioned, the Arbitration Panel holds that the Fourth Respondent actually occupied the security deposit money of the First, Second and Third Complainants for 48 days, 98 days and 101 days respectively and accordingly should pay them 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan in returns on the security deposit at a simple annual interest rate of 15% on the date of returning the deposit to the investors. Since the First and Second Respondents did not pay such returns to the Complainants when the Subject Company repaid the security deposit, they have constituted a default. According to Article 11.2 of the *Supplemental Agreement*, therefore, the First and Second Respondents shall make compensation to the First, Second and Third Complainants for their loss of interest accrued during the period in which the returns on security deposit is delayed. The Arbitration Panel notes the Respondents' proposition that the amount of damages for such default agreed upon in Article 11.2 of the *Supplemental Agreement* is too high. It also notes that the Complainants believe the amount of damages for the security deposit is too high and therefore has proposed to lower it to the annual rate of 24%.

The Arbitration Panel holds that damages are mainly for compensation purposes according to legal provisions of the People's Republic of China and that the rate of 24% applied to calculate such damages is clearly too high given that the annual rate of returns on the security deposit paid by the First and Second Respondents to the Complainants is already as high as 15% and the Complainants have failed to provide evidence to prove their actual loss under this arbitration claims. Therefore, the Arbitration Panel rules at its own discretion that the First and Second Respondents shall pay damages to the Complainants for delayed payment of the returns on security deposit at the annual rate of 9% according to Articles 5 and 114 of the *Contract Law*.

To sum up, the Arbitration Panel determines that the First and Second Respondents shall jointly and severally pay 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan in returns on the security deposit respectively to the First, Second and Third Complainants, a total of 5,145,833.33 yuan, and for delayed payment of such returns, additionally pay the First Complainant damages calculated at an annual rate of 9% of the base amount of 1,000,000 yuan for the period from May 9, 2017 to the date of such returns being paid up

in their entirety, the Second Complainant damages calculated at an annual rate of 9% of the base amount of 2,041,666.67 yuan for the period from June 28, 2017 to the date of such returns being paid up in their entirety, and the Third Complainant damages calculated at an annual rate of 9% of the base amount of 2,104,166.67 yuan for the period from July 1, 2017 to the date of such returns being paid up in their entirety..

5. On the fifth arbitration claim of the Complainants, that is, to enter into the determination that the Third and Fourth Respondents bear joint and several compensation liabilities for the first and third arbitration claims.

The Complainants claim that the Respondents should make every effort to get the Fourth Respondent listed on the stock market and therefore ensure that the Fourth Respondent's equity is free of pledges or other encumbrances according to Articles 6.2, 7.1, 11.1 and 12.1 of the *Supplemental Agreement*. However, due to the default of the Fourth Respondent, it could no longer get listed through IPO or backdoor listing and therefore caused severe loss to the Complainants. The *Capital Increase Agreement* and the *Supplemental Agreement* were connected with and inseparable from each other and constituted the deal in this case together. Therefore, the Third and Fourth Respondent should assume joint and several liabilities with respect to the first and third arbitration claims mentioned above.

The Arbitration Panel finds through investigation that the Complainants, the First Respondent, the Third Respondent and the Fourth Respondent were collectively referred to as "parties", while each or any of them was separately referred to as a "party", according to the prelude to the *Supplemental Agreement*.

Article 6.2 of the *Supplemental Agreement* stipulated that "all parties agree to spare no efforts, actions and measures to cooperate with the company in follow-up activities to ensure that the company gets listed on the stock market in a manner complying with laws and regulations."

Article 7.1 further stipulated that "the Subject Company, SMI Shengdian and SMI International represent and warrant to investors that: ……(c) the company, SMI Shengdian and SMI International, in signing and performing this agreement, do not and will not……(iv) go against any court judgment or arbitral award given to them or any decisions or provisions of government or competent administrative agencies; (e) the company's equity is free of all pledges or other encumbrances……(h) SMI Shengdian and SMI International ensure a stable control over the company before it is listed on the stock market."

Article 11.1 of the *Capital Increase Agreement* stipulated that "unless otherwise agreed upon in this agreement, should a party (defined as "the defaulting party" for the purpose of this clause) fail to perform any of its obligations under this agreement or in any other way violate this agreement, the other party (defined as "the non-defaulting party" for the purpose of this clause) may serve a written notice on the defaulting party to state the nature and scope of such default and demand that the defaulting party make remediation within the time frame reasonably determined in the notice".

Article 11.2 further stipulated that "should a defaulting party fail to remediate its default during the period of remedy provided in Article 11.1 hereof, the non-defaulting party shall have the right to claim compensation from the defaulting party for the loss it sustains as a result of the default in addition to the rights provided in Paragraph (c), Article 12.1 hereof and under relevant Chinese laws. The defaulting party shall compensate the non-defaulting party for the direct and indirect harm it does to the latter for reason of its default."

Article 18.2 stipulated on notification and service of notices that "…should any notice be served via a widely recognized express delivery service, it would be deemed to have been duly served on the third business day immediately subsequent to the date of the notice being delivered to the express delivery service"

The Arbitration Panel further finds that the Complainants served a *Notice on the Performance of Remediation Obligation* on the Third and Fourth Respondents through SF Express and EMS on November 30, 2018 and March 3, 2020, respectively, requiring the latter two to pay cash in an amount equal to the equity acquisition prices.

Neither the Third Respondent nor the Fourth Respondent performed their payment obligations according to the notice mentioned above.

Based on the abovementioned, the Arbitration Panel holds that the *Capital Increase Agreement* aimed to get the Fourth Respondent listed on the stock market while the *Supplemental Agreement* was an actual arrangement for the Fourth Respondent to get so listed. Pursuant to the *Capital Increase Agreement*, the First, Second, Third and Fourth Respondents shall jointly undertake the responsibility to guarantee the performance of the agreement as a single party. Since the Respondents caused the purpose of the agreement to not materialize due to their default, they shall compensate the Complainants for the losses suffered by the latter according to Article 11.2 of the *Capital Increase Agreement*, be it direct or indirect. For this reason, the Complainants have demanded that the First and Second Respondents perform their equity repurchase obligations and pay

damages for delayed payment of such acquisition prices. As the Arbitration Panel has ruled in favor of the Complainants with regard to their first and third arbitration claims, it determines again that the Third and Fourth Respondents shall undertake joint and several compensatory liabilities for the failure of the First Respondent' and the Second Respondent' to perform their obligations under the first and third determinations.

The Arbitration Panel points out that given the Complainants' dual identity as the Subject Company's shareholders and creditors, the Fourth Respondent shall comply with both the principle of maintaining adequate capital and the principle of protecting the creditors' legitimate rights and interests in performing its obligation under this arbitration claim.

The Arbitration Panel heeds that the Third and Fourth Respondents do not acknowledge their receipt of the *Notice on the Performance of Remediation Obligation*. An investigation finds that the Complainants have respectively served the notice on the First and Second Respondents on November 11, 2018 and March 3, 2020. To prove this, the Complainants have presented original mail vouchers. The Respondents do not recognize the trueness of the evidence, but they have failed again to provide sufficient evidence to discredit the evidence. According to the principle of high probability, therefore, the Respondents' claim is not admitted by the Arbitration Panel.

6. On the sixth arbitration claim of the Complainants, that is, to enter into the determination that the Respondents jointly and severally indemnify the Complainants against the expenses incurred by the latter in conducting the arbitration proceeding, including 500,000 yuan in legal cost (166,666 yuan to be paid to the First Complainant, 166,667 yuan to the Second Complainant and 166,667 yuan to the Third Complainant), 5,000 yuan in property preservation cost (to be paid to the First Complainant in its entirety), and 420,000 yuan in property preservation guarantee cost (140,000 yuan to be paid to the First, Second and Third Complainants respectively).

The Arbitration Panel holds that the abovementioned expenses incurred by the Complainants are reasonable cost generated in the process of handling this case and that the Complainants have submitted evidence to support the foregoing expenses. Therefore, according to the particulars of this case and the provisions of Paragraph 2, Article 52 of the *Arbitration Rules*, the Arbitration Panel determines that the Respondents as a whole shall compensate the Complainants for the expenses incurred in dealing with this case, including 166,666 yuan in legal cost to the First Complainant, 166,667 yuan in legal cost to the Second Complainant, 166,667 yuan in legal cost to the Third Complainant, 5,000

yuan in property preservation cost to the First Complainant, 140,000 yuan in property preservation guarantee cost to the First Complainant, 140,000 yuan in property preservation guarantee cost to the Second Complainant and 140,000 yuan in property preservation guarantee cost to the Third Complainant.

7. On the seventh arbitration claim of the Complainants, that is, to enter into the determination that the Respondents bear all the arbitration fees for this case.

The Arbitration Panel holds that this case is caused by the Respondents' default. In view of the Arbitration Panel's support to the Complainants' arbitration claims and pursuant to the provisions of Paragraph 1, Article 52 of the *Arbitration Rules*, therefore, the Arbitration Panel determines that the arbitration fees for this case shall be 15% borne by the Complainants and 85% borne by the Respondents.

### III. Determination

According to the foregoing facts and reasons, the Arbitration Panel determines as follows:

1. The First and Second Respondents shall jointly and severally pay equity acquisition prices to the First, Second and Third Complainants to acquire the 3.12% equity held by each of the three Complainants in the Fourth Respondent. Specifically, they shall pay the following amount of equity acquisition prices to the First Complainant: 500 million yuan in Renminbi $\times (1 + 15\% \times n/360) - 10$ million yuan, n = the number of days from May 8, 2017 to the date of the prices actually paid up;

They shall pay the following amount of equity acquisition prices to the Second Complainant: 500 million yuan in Renminbi $\times (1 + 15\% \times n/360) - 10$ million yuan, n = the number of days from June 26, 2017 to the date of the prices actually paid up; and

They shall pay the following amount of equity acquisition prices to the Third Complainant: 500 million yuan in Renminbi $\times (1 + 15\% \times n/360) - 10$ million yuan, n = the number of days from June 28, 2017 to the date of the prices actually paid up.

2. The First and Second Respondents shall transfer to the First, Second and Third Complainants 5% of the equity in the Fourth Respondent, which shall be evenly distributed among the First, Second and Third Complainants.

3. The First and Second Respondents shall joinly and severally pay 150 million yuan in damages to the First Complainant, 150 million yuan in damages to the Second Complainant and 150 million yuan in damages to the First Complainant respectively for

delayed payment of the equity acquisition prices.

4. The First and Second Respondents shall jointly and severally pay 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan in returns on the security deposit respectively to the First, Second and Third Complainants, and for delayed payment of such returns, additionally pay the First Complainant damages calculated at an annual rate of 9% of the base amount of 1,000,000 yuan for the period from May 9, 2017 to the date of such returns being paid up in their entirety, the Second Complainant damages calculated at an annual rate of 9% of the base amount of 2,041,666.67 yuan for the period from June 28, 2017 to the date of such returns being paid up in their entirety, and the Third Complainant damages calculated at an annual rate of 9% of the base amount of 2,104,166.67 yuan for the period from July 1, 2017 to the date of such returns being paid up in their entirety.

5. The Third and Fourth Respondents shall undertake joint and several compensatory liabilities for the failure of the First Respondent' and the Second Respondent' to perform their obligations under the first and third determinations.

6. The Respondents shall jointly and severally compensate the Complainants for the expenses incurred in dealing with this case, including 166,666 yuan in legal cost to the First Complainant, 166,667 yuan in legal cost to the Second Complainant, 166,667 yuan in legal cost to the Third Complainant, 5,000 yuan in property preservation cost to the First Complainant, 140,000 yuan in property preservation guarantee cost to the First Complainant, 140,000 yuan in property preservation guarantee cost to the Second Complainant and 140,000 yuan in property preservation guarantee cost to the Third Complainant.

7. Of the arbitration fee worth RMB 14,481,468 yuan for this case, 15% or 2,172,220.20 yuan shall be borne by the Complainants, while 85% or 12,309,247.80 yuan shall be borne by the Respondents. As the arbitration fee has been paid in its entirety by the Complainants to the Arbitration Commission, the Respondents shall therefore paid 12,309,247.80 yuan in arbitration fee to the Complainants to compensate for the arbitration fee advanced by the latter.

The foregoing amounts shall be paid by the Respondents to the Complainants within 30 days of the issuance of these determinations.

These arbitral determinations shall be final and take effect as of the date of their issuance.

(This page does not have main body. )

Chief arbitrator:

Arbitrator:

Arbitrator:

April 22, 2021

Beijing

China International Economic and Trade Arbitration Commission (seal)

1100000135001



**CHINA INTERNATIONAL ECONOMIC AND TRADE ARBITRATION COMMISSION**