# Exhibit J



City of New York, State of New York, County of New York

I, Shayna Himelfarb, hereby certify that the document "**Supplemental Agreement**" is, to the best of my knowledge and belief, a true and accurate translation from Chinese (Simplified) into English (US).

_____
Shayna Himelfarb

Sworn to before me this
October 1, 2021

_____
Signature, Notary Public



_____
Stamp, Notary Public

**LANGUAGE AND TECHNOLOGY SOLUTIONS FOR GLOBAL BUSINESS**

1250 BROADWAY, 32ND FLOOR, NEW YORK, NY 10001  |  T 212.689.5555  |  F 212.689.1059  |  WWW.TRANSPERFECT.COM

OFFICES IN 90 CITIES WORLDWIDE

Contract No.: [　　　　　　　　]

# Supplemental Agreement
# To
# Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd.

**Among**

**Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership)**

**Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership)**

**Huzhou Huihengying Equity Investment Partnership (Limited Partnership)**

**and**

**Shenzhen SMI Shengdian Culture Media Group Co., Ltd.**

**Qin Hui**

**signed on**

[hw:] **March** [hw:] 15, **2017**

**Beijing, China**

[seal:] Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership) 330502005596 3

[seal:] Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership) 330502005504

[seal:] Huzhou Huihengying Equity Investment Partnership (Limited Partnership) 330502005503

[seal:] [illegible]

## Supplemental Agreement to the Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd.

This Agreement is signed by the following parties in Beijing, China on [hw:] March [hw:] 15, 2017:

**Investor: Party A: Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership)**

    Authorized representative: Yu Lili

    Main business premises: 1215-1, Building 3, No.1366 Hongfeng Road, Huzhou City

    Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership)

    Authorized representative: Chen Gang

    Main business premises: 1214-16, Building 3, No.1366 Hongfeng Road, Huzhou City

    Huzhou Huihengying Equity Investment Partnership (Limited Partnership)

    Authorized representative: Chen Gang

    Main business premises: 1214-15, Building 3, No.1366 Hongfeng Road, Huzhou City

**Original shareholder: Party B: Shenzhen SMI Shengdian Culture Media Group Co., Ltd. ("SMI Shengdian")**

    Legal representative: Wang Hongbin

    Domicile: 18F, 19F and 20F of Futian Sports Park Cultural Industry Headquarters Building[ ], No.3030 Qianglu Road, Futian District, Shenzhen.

    Unified social credit code: 914403007451916737

**Actual controller: Party C: Qin Hui**

    ID number: [hw:] ▇▇▇▇▇▇▇▇▇▇

    Address: [hw:] ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

**Whereas:**

1. Target company: Chengdu Runyun Culture Communication Co., Ltd. is a limited liability company established and legally existing in accordance with the laws of the People's Republic of China, registered in Wuhou District, Chengdu City, People's Republic of China, with a registered capital of RMB 10 million. Currently, it is the main operating entity of SMI Cinemas, and its main business is film screening and cinema operation.
2. As of the signing date of this Agreement, the Target Company has 2 registered shareholders, of which Shenzhen SMI Shengdian Culture Media Group Co., Ltd. holds 51% and SMI International Cinema Co., Ltd. holds 49% of its equity, respectively.
3. As of the signing date of this Agreement, Mr. Qin Hui is the actual controller of the Target Company. Mr. Qin Hui holds 100% equity of SMI Shengdian; 65.5% equity of SMI Holdings (0198. HK), a listed company on the Main Board of Hong Kong, which indirectly holds 100% equity of SMI International.
   SMI Holdings controls the revenue corresponding to the 51% equity of the Target Company enjoyed by SMI Shengdian through the agreements signed between and by Beijing SMI Hui Catering Management Co., Ltd. (a subsidiary of SMI Holdings) and other related parties. SMI Holdings currently enjoys 100% of the Target Company's revenue.
4. On [[hw:]Mach [hw:]15], 2017, Party A signed the Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd. ("Capital Increase Agreement") [hw:](2017) Zi Zi No.06], agreeing that Party A will make a capital increase by RMB 1.5 billion at the pre-money valuation of the Target Company of RMB 13.5 billion, and will hold [[hw:]9.37%] of the equity of the Target Company after the capital increase.
5. The parties unanimously agree that after the Target Company completes the reorganization of cinema assets under Article 2.1 of this Agreement, the original shareholders' meeting will urge all shareholders of the Target Company to agree to give priority to injecting all assets of the Target Company into an A-share listed company by means of major asset reorganization (which may constitute reorganization and listing) to realize indirect listing. The specific selection of the A-share listed company (hereinafter referred to as the "listed company") and the aforesaid major asset restructuring plan will be adopted by the shareholders' meeting of the Target Company at that time.
   Major asset restructuring of the Target Company does not affect the Target Company's application for initial public offering to China's securities regulatory authorities at an appropriate time, that is, the Target Company will apply for IPO.

In accordance with the relevant laws and regulations of the People's Republic of China, the above-mentioned parties have reached a consensus through friendly negotiation, and hereby enter into the following terms of this Agreement for mutual compliance by all parties.

## Article 1 Definition

1.1 Unless otherwise indicated in the context of this Agreement, the following words have the following meanings.

| | |
|---|---|
| The parties or the parties to the Agreement. | Referring to the investors, original shareholders and actual controller |
| Target Company or Company. | Referring to Chengdu Runyun Culture Communication Co., Ltd. |
| Investors | Referring to Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership), Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership) and Huzhou Huihengying Equity Investment Partnership (Limited Partnership). Unless otherwise stated in this Agreement or according to the context, it may refer to the aforesaid subject in whole or in part. |
| Original shareholder | Referring to SMI Shengdian. In the following expressions of this Agreement, for convenience of expression, it all refers to the collective name of SMI Shengdian and Mr. Qin Hui. |
| This Agreement | Referring to the Supplemental Agreement to the Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd. and the supplemental agreement documents (if any) jointly signed by the parties on matters agreed in the Supplemental Agreement to the Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd. |
| Capital Increase Agreement | Referring to the Capital Increase Agreement [hw:] (2017) Zi Zi No.06] signed on [hw:] March][hw:] 15, 2017. |
| Capital increase contribution | Referring to the capital increase actually paid by Party A to the account of the Target Company under the Capital Increase Agreement. The amount of increased capital contribution shall be subject to the actual arrival in the account of the Target Company. If the increased capital contribution arrives in batches, the amount of increased capital contribution refers to the actual amount of each batch, respectively. |
| SMI International | Referring to SMI International Cinemas Limited. |
| SMI Shengdian | Referring to Shenzhen SMI Shengdian Culture Media Group Co., Ltd. |
| SMI Holding | Referring to SMI Holding Group Co., Ltd., a company listed on the Hong Kong Stock Exchange, with the stock code of 00198.HK. |
| Target equity | Referring to the total equity of the Target Company obtained by Party A from the performance of the capital increase agreement, which is the [hw:] 9.37]% equity of the Target Company. |
| Capital increase day | Referring to the date when Party A's capital increase contribution under the Capital Increase Agreement actually arrives at the capital verification account of the Target Company; if the capital increase contribution arrives in batches, for each amount, it refers to the date when the capital increase contribution of each batch actually arrives at the Target Company's account. As far as the deposit paid by the investor is concerned, the date when the deposit enters the capital verification account is the capital increase date. |
| China | Referring to the People's Republic of China, excluding Hong Kong Special Administrative Region, Macao Special Administrative Region and Taiwan Province Region for the purpose of this Agreement. |
| Government agency | Referring to (1) Chinese people's governments, people's congresses, people's courts (including special courts) and people's procuratorates (including special procuratorates) at all levels; (2) Chinese arbitration institutions and their branches;(3) any government-authorized agency, institution or social organization that exercises administrative, legislative, judicial, management, supervision, expropriation and taxation powers under the leadership of or in the name of the above-mentioned institutions. |
| Yuan | Referring to the legal currency-yuan of the People's Republic of China |
| Hong Kong Stock Exchange | Referring to Hong Kong Stock Exchange Limited. |
| Securities Regulatory Commission | It refers to China Securities Regulatory Commission. |

| Listed company | Referring to the A-share (i.e., publicly listed on Shanghai Stock Exchange or Shenzhen Stock Exchange) listed company into which the Target Company injects all its assets by means of major asset reorganization (which may constitute reorganization and listing), which shall be specifically approved by the shareholders' meeting of the Target Company. |
|---|---|
| Successful listing | In this Agreement, it means that the Target Company realizes A-share listing through direct (IPO) or indirect (restructuring and listing), that is, it becomes a listed company or a subsidiary of a listed company publicly traded on Shanghai Stock Exchange or Shenzhen Stock Exchange. The specific time of successful listing refers to the time when the investors have acquired A shares. |
| Share | Referring to the shares issued by the listed company under the successful listing of the Target Company. |
| Locking period | Referring to the period when the investor cannot transfer the underlying shares in accordance with laws, regulations and relevant provisions of the Exchange, or because of the commitment made by the investor to promote the successful listing of the Target Company. |
| Actual investment days | Referring to the days from the capital increase date (inclusive) to the date (exclusive) when this part of the principal is recovered by the investor through share repurchase or reduction by the original shareholders or by compensation from the original shareholders |
| Net profit | Referring to the net profit audited according to Chinese accounting standards after deducting non-recurring gains and losses. |

1.2  The clause headings of this Agreement are for convenience only and do not affect the understanding of the clauses of this Agreement.

## Article 2  Main Reorganization Procedure of the Target Company

2.1  Reorganization of cinema assets

The original shareholders shall put more cinema assets (not limited to those under the same control) into the Target Company by means including but not limited to the acquisition of equity. The original shareholders shall integrate and reorganize all cinema assets under their control into the Target Company before the corresponding date of 12 months from the last capital increase date (inclusive).

2.2  Lifting the control of the agreement and agreeing to split for listing

The original shareholders shall urge the shareholders' meeting of SMI Holdings to lift the agreement control over the Target Company and agree to the application of SMI Holdings for splitting and listing on the A-shares exchange in China according to the relevant regulations of the Hong Kong Stock Exchange.

2.3  Successful listing of the Target Company on an A-share exchange by the original shareholder by direct or indirect means

**Article 3  Performance Commitment**

3.1  The original shareholders promise that the audited net profit of the Target Company in 2017 was 787.88 million yuan; during the period from after 2017 to successful listing, the annual audited net profit growth rate of the Target Company will not be less than 15%.

**Article 4  Equity Purchase Arrangement**

4.1  Under any of the following circumstances, regardless of subjective or objective reasons, the investor has the right to request the original shareholders to purchase the equity of the Target Company held by the investor at the price agreed in Article 4.2 of this Agreement:

   4.1.1   Any time after the corresponding date of 24 months from the date of capital increase;

   4.1.2   The Target Company fails to meet the performance commitment targets agreed in Article 3 of this Agreement;

   4.1.3   The original shareholders fail to complete the following matters before the corresponding date of 18 months from the last capital increase date (inclusive):

   a) Dissolve the control agreement related to Article 2.2 of this Agreement and complete all legal procedures, including but not limited to urging the board of directors and shareholders' meeting of SMI Holdings to adopt relevant resolutions on dissolution of the control agreement;

   b) Urge SMI Controlling Shareholders' Meeting to adopt the relevant resolutions on the Target Company's listing on A-shares market through major asset restructuring or separate IPO;

   4.1.4   As of the corresponding date of 60 months from the last capital increase date, the Target Company has not yet completed the successful listing.

   4.1.5   The original shareholders violate the commitments in Article 10.2 of this Agreement.

4.2 Purchase price = capital increase amount x (1+15% x N/360) - the financial consultant fees and share (or equity) income that the investor has obtained.

N= actual investment days (if the capital increase contribution is entered by stages, the investment days shall be calculated separately, from the date when the funds are actually paid to the capital verification account to the date when the original shareholders actually pay the purchase price to the investors);

See Article 5.2.1 for details of financial consultant fees;

See Article 9 for details of share (or equity) income.

4.3 The original shareholder shall complete the equity purchase obligation within 90 days after receiving the written notice from the investor requesting them to purchase the equity. Unless otherwise agreed by the investor and the original shareholders.

4.4 Where the original shareholders fail to fulfill the equity purchase obligation as agreed in Articles 4.2 and 4.3 of this Agreement, the investor has the right to request the original shareholders to transfer 5% of the equity of the Target Company to the investor at 1 yuan consideration as compensation for breach of contract. Compensation for breach of contract does not affect the continued performance of the purchase obligation.

Where the investor demands compensation from the original shareholders, it shall send a written notice to the original shareholders, which shall be sent by express mail and e-mail. If it is sent by express mail, the original shareholders' receipt (including receipt by others on their behalf) shall be deemed as delivery; if the mail is sent by mail, it shall be deemed as being delivered within 1 working day after the mail is successfully sent.

The original shareholders shall assist the investor in handling the formalities of change registration (equity transfer) of equity compensation mentioned in this article from the date of delivery of the notice. The original shareholders shall prepare all the written documents required for change registration within 10 working days and submit a written change application to the relevant department.

**Article 5  Guarantee of Investors' Income**

5.1 The original shareholders promise that the investor's income before listing shall not be less than 15% of the annual simple interest rate. After listing, within 5 years (including 5 years) from the date of capital increase, the total investment income of the investor shall not be less than 100% of the capital increase (including the income of 15% of the annual simple interest rate before listing). If the investment period exceeds 5 years, the original shareholder shall pay the investor the investment income of 15% of the annual interest rate, and the investor may choose to require the original shareholder to purchase the equity in accordance with Article 4 of this Agreement.

The investor agrees that after listing, if the total investment income of the investor exceeds 100% within 5 years (including 5 years) from the date of capital increase, the

investor shall return the income part beyond 100% to the original shareholders, but the total amount of the returned income shall be limited to the income obtained by the investor before listing (referring to the actually obtained part of the income of 15% of the annual simple interest rate as mentioned in Article 5.1).

The income from the deposit paid by the original shareholders to the investor under the Capital Increase Agreement shall be calculated at the annual interest rate of 15%.

5.2   Acquisition method:
  5.2.1   Before the successful listing of the Target Company.

The parties agree that before the successful listing of the Target Company, the investment income mentioned in Article 5.1 of this Agreement is reflected by the way that Party C or its designated third party pays the financial advisory fee to the investor, that is, Party C or its designated third party pays the financial advisory fee equivalent to 10% of the total capital increase to the investor every year from the capital increase date. A 2% shall be paid on the date of capital increase, 10% shall be paid on the corresponding day every year from the date of capital increase, and 8% shall be paid on the corresponding date in the last year. If it is less than one year, it shall be settled according to the actual existence days.

The original shareholders shall settle and pay the security deposit income to the investor on the day when the deposit is paid to the capital verification account, and the income shall be calculated from the day when the investor pays the deposit to the designated account to the day when the deposit is transferred to the capital verification account.

  5.2.2   After the successful listing of the Target Company

  (1) Within 6 months after successful listing, the original shareholders and the investor shall settle the outstanding 5% income per year in the 15% annual single interest income to the investor before listing according to the actual number of days, which shall be paid in cash within 6 months after successful listing.

  (2) During the restricted sale period of the shares held by the investor, the original shareholders will not pay the investor's income except the income agreed in 5.2.2(1).

  (3) After the end of the restricted share sale period of the investor, the investor has the right to complete the reduction within 12 months. When the investor makes share reduction, the standard of total guaranteed income is: 1) When the total number of investment years are less than or equal to 5 years, the total rate of return shall not be less than 100% (including the guaranteed income of 15% of the single interest income every year before listing); 2) for the part exceeding 5 years, the payment shall be made according to the guaranteed income of 15%

of the annual single interest rate and the actual number of days.

After the date of capital increase, if the Target Company distributes dividends to shareholders during the investor's share-holding period, the financial advisory fee paid by Party C or its designated third party to the investor in the current year shall offset this part of dividends, and the portion that the dividend cannot offset shall be offset by the outstanding 5% annual income in the annual 15% single interest income per year before listing, which shall be paid in cash within six months after the successful listing of the Target Company.

**Article 6    Corporate Governance of the Target Company**

6.1    Director nomination

The board of directors of the Target Company is composed of [  ] directors. After the date of capital increase, the investor has the right to nominate a director to the Target Company, and the original shareholders shall ensure that the shareholders' meeting of the Target Company will vote to approve the election of the director nominated by the investor.

**Article 7    Investor's Right to Know**

7.1    The investor enjoys the right to know and supervise the operation and management of the Target Company as a shareholder, and has the right to obtain information and data on the financial, management, operation, market or other aspects of the Target Company. The investor has the right to put forward suggestions to the management of the Target Company and listen to reports from the management on relevant matters.

7.2    The Target Company shall provide the investor with the following data and information on time:

   7.2.1    Provide monthly consolidated management account within 30 days from the last day of each calendar quarter, including income statement, balance sheet and cash flow statement;

   7.2.2    Provide the company's annual consolidated management account 45 days after the end of each calendar year;

   7.2.3    Provide the company's annual consolidated audit account 120 days after the end of each calendar year;

   7.2.4    Provide the company's annual business plan, annual budget and forecast financial statements at least 30 days before the end of each calendar/financial year;

   7.2.5    Within 30 days after the investor receives the management account, provide an opportunity for the investor to discuss and review the management account with the company;

    7.2.6    Provide other statistical data and other financial and transaction information in the format required by the investor, so that the investor can be properly informed of the company information so as to protect its own interests.

    7.2.7    Within 30 days from the last day of each calendar quarter, provide the information table of major events of subsidiaries, including but not limited to the closure, sale and acquisition of subsidiaries.

**Article 8    Audit of the Target Company**

8.1    The Target Company shall conduct the audit simultaneously with SMI Holdings, and after SMI Holdings releases the audit report, it shall release the 2016 audit report with the Target Company as the main body to the investor;

8.2    The audit items of the Target Company mentioned in this Agreement shall be audited by an accounting firm with relevant qualifications recognized by the investor in accordance with the accounting standards of the People's Republic of China.

**Article 9    Distribution of Rights and Interests**

9.1    All the gains from the shares of the listed company acquired by the investor during the period of holding the shares acquired by this transaction, including but not limited to placing of shares and cash dividends, shall be owned by the investor.

9.2    All income generated by the equity of the Target Company during the period when the investor holds the equity of the Target Company shall be owned by the investor.

**Article 10    Representations, Warranties and Commitments**

10.1  The parties hereto respectively and not jointly represent, warrant and promise as follows:

    10.1.1  We are enterprises formally established and effectively existing in accordance with Chinese laws; or citizens of the People's Republic of China that do not have dual nationality.

    10.1.2  We have the entire and full rights and authority to sign and perform this Agreement, and have the capacity to sign this Agreement according to Chinese laws.

    10.1.3  We guarantees that all documents provided by us for signing this Agreement are true, valid and complete.

    10.1.4  The signing or performance hereof does not violate any major contract or agreement to which we are a party or which binds us or our related assets.

10.1.5   The representatives who signed this Agreement have been fully authorized to sign this Agreement according to the valid power of attorney or valid certificate of legal representatives.

10.1.6   We have fully, thoroughly and timely disclosed all the information and materials related to this transaction that need to be understood and mastered by all parties, and there is no major omission, misleading or fiction.

10.1.7   The statements, warranties and promises made by us in this Agreement are true, correct and complete on the signing date of this Agreement, and are still true, correct and complete when and after this Agreement comes into effect.

10.1.8   We guarantee to fully and properly perform all contents of this Agreement.

10.2   The original shareholders promise not to transfer their equity to the outside world or transfer their equity indirectly through the transfer of shareholders' equity of the Target Company before the successful listing of the Target Company, that is, Mr. Qin Hui's actual control position of the Target Company shall not be changed, but the internal equity restructuring of the enterprise can be carried out without changing the control position of the actual controller.

10.3   The investor promises that the investor shall ensure that the investor does not have any substantial adverse impact on the listing mentioned in Article 2.3 of this Agreement. If the investor has a substantial adverse impact on the listing due to the problem of the investing subject, the investor agrees to eliminate the adverse impact. This clause is independent, and the investor's failure to meet the commitment will not affect the rights and obligations of both parties as agreed in other clauses of this Agreement.

10.4   The parties confirm and agree that if the provisions in Article 4 "Equity Purchase Arrangement" hereunder are inconsistent with the provisions of laws, regulations and other normative documents related to the standardized operation of listed companies or the regulatory policies and requirements of CSRC, they shall be automatically terminated from the date when the listed company or the Target Company first submits the application document to the CSRC for successful listing or the first disclosure date (whichever is earlier). In the event that the listing is ultimately unsuccessful, such terms shall be automatically reinstated and, upon reinstatement, the part not performed during the termination period shall be supplemented.

**Article 11   Liability for Breach of Contract**

11.1   The original shareholders agree that the investor may require one of the original shareholders to fulfill all obligations or the original shareholders to fulfill their obligations in proportion to their shares, and the investor has full autonomy in deciding which shareholders is required to fulfill all the obligations or the shareholders are required to fulfill their respective obligations in proportions to their

shares.

11.2  If the original shareholders delay payment in violation of this Agreement, in addition to assuming responsibilities in accordance with other provisions of this Agreement, they shall pay [5%.] of the delayed amount per delay day to the investor as default fine, which shall be paid to the investor together with the delayed payment.

11.3  Where either party's representation/ guarantee hereunder is untrue, inaccurate or misleading, it shall be liable for breach of contract to the observant party. In addition to paying liquidated damages as agreed in this Agreement, the defaulting party shall also compensate the aggrieved party for all losses thus caused, and shall bear the expenses paid by the aggrieved party for claiming rights (including but not limited to litigation and arbitration fees, attorney fees, transportation and travel expenses, etc.).

11.4  Payment of liquidated damages shall not affect the right of the observant party to require the defaulting party to compensate for the losses and continue to perform the agreement, or the right to terminate the agreement.

11.5  Failure or delay in exercising a right stipulated in this Agreement or laws does not constitute a waiver of such right or other rights. Exercising the right stipulated in this Agreement or laws separately or in part does not prevent the party from further exercising that right or other rights.

**Article 12   Notification and Service**

12. 1 The parties to the agreement agree that any notice related to this Agreement shall be valid only if it is delivered in writing. Written forms include but are not limited to: Fax, express delivery, mail and e-mail. The above notices shall be deemed to have been delivered at the following time: When sent by fax, on the date when the fax is successfully sent and received by the recipient; when sent by express or by special person, on the day when the recipient receives the notice; when sent by registered mail, 7 working days after sending; when sent by e-mail, after the e-mail is successfully sent.

12.2  The notices shall be deemed as effectively served if they are delivered to the following places or sent to the following fax numbers or e-mail addresses:

**Investor:**
Party A: Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership)
       Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership)
       Huzhou Huihengying Equity Investment Partnership (Limited Partnership)

To: Yu Ting

Address: 8F, Block A, Borui Building, No. A26, North East Third Ring Road, Chaoyang District, Beijing

Telephone: +86 10 65048212

Fax: +86 10 65048100

E-mail:


**Original shareholder:**

Party B :. Shenzhen SMI Shengdian Culture Media Group Co., Ltd.

Address: 18F, 19F and 20F of Futian Sports Park Cultural Industry Headquarters Building, No.3030 Qianglu Road, Futian District, Shenzhen

To: Tang Yueyun

Zip code:

Fax: 0755-8295 5188

E-mail:


**Actual controller:**

Party D: Qin Hui

Address: [hw:] 1█████████████████████

To:

Zip code:

Fax:

E-mail:

**Article 13   Force Majeure**

13.1 Where either party to this Agreement suffers from a force majeure event (force majeure events refer to any events beyond the reasonable control of the affected party, which are unforeseeable or unavoidable and insurmountable even if foreseeable and occur after the signing date of this Agreement, and make it objectively impossible or impractical for that party to perform all or part of this Agreement. If such events including but not limited to floods, fires, droughts, typhoons, earthquakes, and other natural disasters, traffic accidents, strikes, disturbances, riots and wars (whether declared or not)) make any of the parties unable to perform all or part of their obligations hereunder, the performance of such obligations shall be suspended during the period when the performance is hindered by force majeure events.

13.2 In case of a force majeure event, the parties shall immediately decide how to implement this Agreement through amicable negotiation. After the event of force majeure or its influence is terminated or eliminated, the parties shall immediately resume performance of their respective obligations hereunder.

**Article 14   Applicable Law and Dispute Resolution**

14.1 The conclusion, entry into force, performance, interpretation, modification, dispute resolution and termination of this Agreement shall be governed by the current Chinese laws, administrative regulations and rules.

14.2 Any dispute arising from the performance hereof between the parties hereto shall be settled through negotiation. If negotiation fails, the parties agree to submit the dispute to China International Economic and Trade Arbitration Commission in Beijing, and the arbitration shall be conducted in accordance with its arbitration rules in effect at the time of submission of the dispute, unless otherwise stipulated in the effective award. The actual expenses paid by the parties for dispute resolution (including but not limited to arbitration fees and reasonable attorney fees) shall be borne by the losing party.

14.3 During the arbitration period, the clauses herein that are not involved in the dispute shall continue to be performed, and no party shall refuse to perform any of its obligations hereunder on the grounds of resolving disputes.

**Article 15   Tax and Fee Arrangement**

15.1 Each party shall bear its own expenses arising from the performance hereof, including but not limited to taxes, accounting fees, attorney fees, industrial and commercial change registration fees, etc.

**Article 16   Dissolution of Agreement**

16.1 This Agreement can be dissolved by reaching a consensus through negotiation among the parties;

16.2 If this Agreement is dissolved, the terms of liability for breach of contract in this Agreement shall remain valid for the breach of contract that occurred before dissolution. That is, if the other party suffers losses due to the breach of contract by one party before the termination of this Agreement, the party suffering the losses still has the right to claim compensation according to the liability for breach of contract clause of this Agreement. If this Agreement is dissolved, the provisions on the applicable laws and dispute resolution in this Agreement shall remain valid.

**Article 17   Confidentiality**

17.1 The parties hereto promise to keep the contents of this Agreement confidential at all times. Unless agreed by other parties, it is not allowed to disclose any data or information related to the cooperation hereunder to any party outside this Agreement. However, the foregoing restrictions shall not apply to the parties hereto making necessary disclosures to their directors, advisors and consultants bound by confidentiality agreements, government agencies with jurisdiction, regulatory authorities or stock exchanges, or making necessary announcements according to applicable laws, regulations and rules.

**Article 18   Others**

18.1 This Supplemental Agreement is inseparable from the Capital Increase Agreement, and both of them go into effect at the same time.

18.2 Where the documents signed by the parties before signing this Agreement (including "Letter of Intent for Investment" and "Capital Increase Agreement") or the explanations and commitments issued by one or more parties are inconsistent with this Agreement, this Agreement shall prevail.

18.3 This Agreement shall come into force from the date when the parties sign it (with the legal person affixing its official seal hereon, the legal representative signing or sealing hereon, and the natural person signing hereon).

18.4 This Agreement is made in ten copies, with each party holding two copies, and all copies have the same legal effect.

(There is no text below.)

There is no text on this page, which is the signature page of the Supplemental Agreement to the Capital Increase Agreement Concerning Chengdu Runyun Culture Communication Co., Ltd. [hw:] (2017) Zi Zi No.06 ]:

Party A: Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership) (seal)

    Entrusted representative (signature) [seal:] Huzhou Chuangtai Rongyuan Investment Management Partnership (Limited Partnership).
3305020055963
[stamp:] Yu Lili
Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership) (seal)
Entrusted representative (signature) [seal:] Huzhou Huirongsheng Equity Investment Partnership (Limited Partnership)
3305020055704
[stamp:] Chen Gangyin
Huzhou Huihengying Equity Investment Partnership (Limited Partnership) (seal)
Entrusted representative (signature) [seal:] Huzhou Huihengying Equity Investment Partnership (Limited Partnership)
3305020055703
[stamp:] Chen Gangyin
Party B:  Shenzhen SMI Shengdian Culture Media Group Co., Ltd. (seal)
Legal representative (signature)
[seal:] Shenzhen SMI Shengdian Culture Media Group Co., Ltd.
[stamp:] Wang Hongbin
Party C:  Qin Hui (signature)
[signature]