UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HUZHOU CHUANGTAI RONGYUAN INVESTMENT
MANAGEMENT PARTNERSHIP; HUZHOU
HUIHENGYING EQUITY INVESTMENT
PARTNERSHIP; and HUZHOU HUIRONGSHENG
EQUITY INVESTMENT PARTNERSHIP,

                              Petitioners,

                    -v.-

HUI QIN,

                              Respondent.

21 Civ. 9221 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Three Chinese companies, Huzhou Chuangtai Rongyuan Investment
Management Partnership ("Chuangtai Rongyuan"), Huzhou Huihengying
Equity Investment Partnership ("Huihengying"), and Huzhou Huirongsheng
Equity Investment Partnership ("Huirongsheng") (together, "Petitioners"),
invested Renminbi ("RMB") 1.5 billion in Chengdu Run Yun Culture
Communication Co., Ltd. ("Chengdu Run Yun") in anticipation of the
company's public offering on China's premiere stock market. Several years
later, Petitioners instigated an arbitration proceeding against Chengdu Run
Yun and several of its affiliates in Beijing, accusing them of breaching their
obligations under the relevant investment agreements. The arbitration panel
ultimately issued an award in Petitioners' favor. Victorious in China,
Petitioners now ask this Court to confirm the award against Respondent Hui
Qin in New York. For the following reasons, the Court grants Petitioners'
motion for summary judgment and confirms the arbitral award.

## BACKGROUND[1]

### A.   Factual Background

### 1.   The Contractual Relationship

The dispute at issue is between the original shareholders of Chengdu Run Yun and later investors in the company.  Chengdu Run Yun is a Chinese limited liability company that owns and operates movie theaters.  (Pet. 56.1 ¶ 6; CIETAC Award 5).  In 2017, it had just two registered shareholders: Shenzhen SMI Shengdian Cultural and Media Group Co., Ltd. ("SMI Shengdian"), which held 51% of Chengdu Run Yun's equity, and SMI International Cinemas Limited ("SMI International"), which held the remaining 49%.  (Resp. 56.1 ¶¶ 4-6).  Hui Qin, for his part, was the full owner of SMI

---

[1]    The facts set forth in this Opinion are drawn from the parties' submissions in connection with Petitioners' petition to confirm a foreign arbitral award (Dkt. #1), and their motion for summary judgment (Dkt. #15).  The Court draws primarily from Petitioners' Local Civil Rule 56.1 Statement of Material Undisputed Facts (Dkt. #17 ("Pet. 56.1")) and Respondent's Local Civil Rule 56.1 Counter Statement of Material Undisputed Facts (Dkt. #32 ("Resp. 56.1")).  Citations to a party's Rule 56.1 Statement incorporate by reference the documents cited therein.  In addition, "[e]ach numbered paragraph in the statement of material facts ... will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  Local Civil Rule 56.1(c).

The Court sources additional facts from the declarations submitted by the parties and the exhibits attached thereto, including the English translation of the arbitral award that Petitioners seek to confirm (the "CIETAC Award" (Dkt. #7-2)); the English translation of the Capital Investment Agreement with Chuangtai Rongyuan (the "Chuangtai Rongyuan Agreement" (Dkt. #7-4)); the English translation of the Capital Investment Agreement with Huirongsheng (the "Huirongsheng Agreement" (Dkt. #7-6)); the English translation of the Capital Investment Agreement with Huihengying (the "Huihengying Agreement" (Dkt. #7-8)); and the English translation of the Supplement to the Capital Increase Agreements (the "Supplemental Agreement" (Dkt. #7-10)).  Other facts sourced from the declarations and their accompanying exhibits are cited using the convention "[Name] Decl., Ex. [ ]."

For ease of reference, the Court refers to Petitioners' brief in support of their motion for summary judgment as "Pet. Br." (Dkt. #16), to the brief submitted by Respondent Qin in opposition as "Resp. Br." (Dkt. #28), and to Petitioners' reply as "Pet. Reply" (Dkt. #35).

Shengdian and a majority shareholder of SMI Holdings, which indirectly held 100% of SMI International's equity.  (Pet. 56.1 ¶ 7).

In anticipation of being listed on China's main stock market, Chengdu Run Yun entered a series of investment agreements with Petitioners, each of which was a limited partnership registered in China.  (Qin Decl. (Dkt. #33) ¶¶ 6-8; Pet. 56.1 ¶¶ 1-3).  To that end, on March 15, 2017, each Petitioner signed a Capital Increase Agreement with Chengdu Run Yun, SMI Shengdian, and SMI International.  (Resp. 56.1 ¶ 8; *see also* Chuangtai Rongyuan Agreement; Huirongsheng Agreement; Huihengying Agreement).[2]  Through those agreements, each Petitioner promised to invest RMB 500,000,000 in Chengdu Run Yun in exchange for proportional equity in the company.  (Resp. 56.1 ¶ 10; *see also, e.g.*, Chuangtai Rongyuan Agreement art. 2).

Also on March 15, 2017, each Petitioner entered into a Supplemental Agreement with Qin and SMI Shengdian.  (Pet. 56.1 ¶ 9; *see also* Supplemental Agreement).  As relevant here, the Supplemental Agreement details circumstances under which the "original shareholders" of Chengdu Run Yun were required to buy back Petitioners' equity in the company.  (Supplemental Agreement art. 4).  For instance, Petitioners could require a stock buyback if Chengdu Run Yun failed to meet certain performance targets or was not successfully listed on the stock market within an agreed-upon timeframe.  (*Id.* arts. 4.1.2, 4.1.4).

---

[2]     The Court refers to these agreements collectively as the "Capital Increase Agreements."

The Capital Increase Agreements and the Supplemental Agreement each contain arbitration clauses.  Article 14.3 of each Capital Increase Agreement provides:

> If the parties fail to reach a solution through amicable negotiation within [60] days from the date of dispute, the dispute shall be submitted to China International Economic and Trade Arbitration Commission (Beijing) for arbitration in accordance with the arbitration rules in effect at the time of applying for arbitration.

(Chuangtai Rongyuan Agreement art. 14.3; Huirongsheng Agreement art. 14.3; Huihengying Agreement art. 14.3).  Similarly, Article 14.2 of the Supplemental Agreement stipulates that:

> Any dispute arising from the performance hereof between the parties hereto shall be settled through negotiation.  If negotiation fails, the parties agree to submit the dispute to China International Economic and Trade Arbitration Commission in Beijing, and the arbitration shall be conducted in accordance with its arbitration rules in effect at the time of submission of the dispute, unless otherwise stipulated in the effective award.  The actual expenses paid by the parties for dispute resolution (including but not limited to arbitration fees and reasonable attorney fees) shall be borne by the losing party.

(Supplemental Agreement art. 14.2).

By June 2017, each Petitioner had invested RMB 500,000,000 in Chengdu Run Yun as promised, for a collective investment of RMB 1,500,000,000.  (CIETAC Award 8).

## 2. Arbitration Before the CIETAC

Approximately three years later, on March 30, 2020, Petitioners commenced an arbitration against SMI Shengdian, SMI International, Chengdu

4

Run Yun, and Qin (together, the "Arbitral Respondents") before the China International Economic and Trade Arbitration Commission ("CIETAC"). (Pet. 56.1 ¶ 14). Petitioners alleged that the Arbitral Respondents breached their obligations under both the Capital Increase Agreements and the Supplemental Agreement. (CIETAC Award 5-16).

CIETAC attempted to serve the arbitration materials on Qin three times. It first mailed notice of the arbitration to Qin on May 26, 2020. (CIETAC Award 1-2).[3] That mailing was returned as undeliverable. (*Id.* at 2). Petitioners then informed CIETAC of Qin's address at 9 Xiangjun North Alley, Hujialou Street, Chaoyang District in Beijing (the "North Alley Address"). (*Id.*). The North Alley Address was specifically attributed to Qin in the Supplemental Agreement. (*See* Qin Decl. ¶ 27). In or about June or July 2020, CIETAC twice attempted to serve Qin at the North Alley Address. (CIETAC Award 2). CIETAC determined that the second attempt to serve Qin at the North Alley Address was successful. (*Id.*; *see also id.* at 5 (finding that "all documents and written notices pertaining to this case have been effectively served by the Arbitration Court on all parties according to provisions of Article 8 of the Arbitration Rules")). What is more, according to the CIETAC Award, no party challenged the propriety of service when given an opportunity to do so in July 2020. (*Id.* at 2).

---

[3]    It is not clear from the record where CIETAC sent this initial mailing.

On August 24, 2020, CIETAC appointed a panel of three arbitrators to adjudicate the dispute.  (Pet. 56.1 ¶¶ 18-19).  The panel was originally comprised of Xiuming Tao, Yong Li, and Xiaomin Sun.  (*Id.* at ¶ 18).  Tao resigned from the panel on September 25, 2020, and CIETAC designed Lanfang Liu as his replacement.  (*Id.* at ¶ 20).

On November 11, 2020, Qin and SMI Shengdian requested that CIETAC re-send them the arbitration documents.  (CIETAC Award 3).  In response, CIETAC mailed Qin and SMI Shengdian additional copies of the Notice of Arbitration, Notice of Arbitration Panel Formation, Notice of Procedures, and related documents.  (*Id.* at 3).  CIETAC considered these mailings a courtesy and not renewed service.  (*Id.*).  CIETAC also adjourned the hearing set for November 12, 2020, to December 22, 2020.  (*Id.*).

The CIETAC panel held a multi-hour hearing in Beijing on December 22, 2020.  (Resp. 56.1 ¶ 21).  All parties, including Qin, were represented by counsel and were afforded an opportunity to submit written evidence and explanations of their positions.  (*Id.* at ¶¶ 23-25).  At the hearing, Petitioners and the Arbitral Respondents presented their claims orally and the panel questioned them about their positions.  (CIETAC Award 4).  Through his attorney, Qin argued to the panel, *inter alia*, that (i) Petitioners were engaged in a fraudulent scheme to strip Chengdu Run Yun of its assets and force Qin to buy back useless Chengdu Run Yun stock (*id.* at 16-18); (ii) Qin was not an original shareholder of Chengdu Run Yun and consequently was not bound by the Supplemental Agreement's stock buyback provision (*id.* at 18); and (iii) Qin

was not properly served with notice of the arbitration (*id.* at 20-21).  In February 2021, the parties submitted additional evidence and explanations of their positions to the panel.  (*Id.* at 4).

The CIETAC panel issued its written decision on April 22, 2021.  (Pet. 56.1 ¶¶ 30, 41; *see also* CIETAC Award).  The panel concluded that the Capital Increase Agreements and the Supplemental Agreement were valid under Chinese law and were binding on the parties to the arbitration.  (*Id.* at ¶ 35).  It also determined that Qin was an "original shareholder" of Chengdu Run Yun and thus subject to the Supplemental Agreement's buyback provision. (CIETAC Award 42-45).

The arbitrators then examined each of Petitioners' seven claims and explained their reasoning and decision on each.  (CIETAC Award 49-60). Ultimately, the panel found that the Arbitral Respondents had failed to perform their contractual obligations and awarded damages to Petitioners.  (Pet. 56.1 ¶ 37).  Specifically, it found in Petitioners' favor fully on claims 1, 2, 5, and 6, and partially on claims 3, 4, and 7.  (*Id.*).  It ordered the Arbitral Respondents to pay Petitioners within thirty days.  (*Id.* at ¶ 38).[4]

---

[4] Specifically, the CIETAC panel found the Arbitral Respondents liable for the following damages:

> [i] [SMI Shengdian and Qin Hui] shall jointly and severally pay equity acquisition prices to the [Petitioners] to acquire the 3.12% equity held by each of the three [Petitioners] in [Chengdu Run Yun]. Specifically, they shall pay the following amount of equity acquisition prices to [each Petitioner]: 500 million yuan in Renminbi × $(1 + 15\% \times n/360) - 10$ million yuan, n = the number of days from May 8, 2017 to the date of the prices actually paid up; …

To the Court's knowledge, the Arbitral Respondents have not paid any of the damages owed to Petitioners under the CIETAC Award to date.  (*See* Resp. 56.1 ¶ 42).

---

[ii] [SMI Shengdian and Qin Hui] shall transfer to [Petitioners] 5% of the equity in [Chengdu Run Yun], which shall be evenly distributed among the [Petitioners].

[iii] [SMI Shengdian and Qin Hui] shall jointly and severally pay 150 million yuan in damages to [each Petitioner] respectively for delayed payment of the equity acquisition prices.

[iv] [SMI Shengdian and Qin Hui] shall jointly and severally pay 1,000,000 yuan, 2,041,666.67 yuan and 2,104,166.67 yuan in returns on the security deposit respectively to the [Petitioners], and for delayed payment of such returns, additionally pay [Chuangtai Rongyuan] damages calculated at an annual rate of 9% of the base amount of 1,000,000 yuan for the period from May 9, 2017 to the date of such returns being paid up in their entirety, [Huihengying] damages calculated at an annual rate of 9% of the base amount of 2,041,666.67 yuan for the period from June 28, 2017 to the date of such returns being paid up in their entirety, and [Huirongsheng] damages calculated at an annual rate of 9% of the base amount of 2,104,166.67 yuan for the period from July 1, 2017 to the date of such returns being paid up in their entirety.

[v] [SMI International and Chengdu Run Yun] shall undertake joint and several compensatory liabilities for the failure of [SMI Shengdian and Qin Hui] to perform their obligations under the first and third determinations.

[vii] The Respondents shall jointly and severally compensate the [Petitioners] for the expenses incurred in dealing with this case, including 166,666 yuan in legal cost to [Chuangtai Rongyuan], 166,667 yuan in legal cost to [Huihengying], 166,667 yuan in legal cost to [Huirongsheng], 5,000 yuan in property preservation cost to [Chuangtai Rongyuan], 140,000 yuan in property preservation guarantee cost to [Chuangtai Rongyuan], 140,000 yuan in property preservation guarantee cost to [Huihengying] and 140,000 yuan in property preservation guarantee cost to [Huirongsheng].

[viii] Of the arbitration fee worth RMB 14,481,468 yuan for this case, 15% or 2,172,220.20 yuan shall be borne by the [Petitioners], while 85% or 12,309,247.80 yuan shall be borne by the Respondents. As the arbitration fee has been paid in its entirety by the [Petitioners] to the Arbitration Commission, the Respondents shall therefore paid [sic] 12,309,247.80 yuan in arbitration fee to the [Petitioners] to compensate for the arbitration fee advanced by the latter.

(Pet. 56.1 ¶ 37).

**B.      Procedural Background**

On November 8, 2021, Petitioners commenced this action to confirm the CIETAC Award by filing a Petition to Confirm and Enforce Arbitration (Dkt. #1); a memorandum of law in support of that Petition (Dkt. #6); and a supportive declaration (Dkt. #7).  The Court ordered Petitioners to move instead for confirmation of the arbitral award in the form of a motion for summary judgment.  (Dkt. #11).  They did so on December 8, 2021 (Dkt. #15), and Qin filed his opposition to the motion on April 5, 2022 (Dkt. #27).  Petitioners then filed their reply on April 19, 2022.  (Dkt. #35).  Qui subsequently filed a motion for leave to file a sur-reply (Dkt. #39), which motion the Court denied (Dkt. #41).  Accordingly, Petitioners' motion is now fully briefed and ripe for resolution.

## DISCUSSION

**A.      Applicable Law**

The Federal Arbitration Act establishes federal jurisdiction over arbitral awards governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention").  9 U.S.C. §§ 201-208.  An arbitration is subject to the New York Convention if it arises out of a commercial relationship that involves at least one foreign citizen or is otherwise reasonably related to a foreign state.  *Id.* § 202.  A corporation is a foreign citizen if it is incorporated or has its principal place of business outside of the United States.  *See id.*  Because Chuangtai Rongyuan, Huihengying, and Huirongsheng are all incorporated in China (Pet. 56.1 ¶¶ 1-3), the New York

Convention governs their petition.  *See Scandinavian Reins. Co. Ltd.* v. *Saint Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 71 (2d Cir. 2012) (applying the New York Convention to dispute involving a foreign corporation); *Yusuf Ahmed Alghanim & Sons, W.L.L.* v. *Toys "R" Us, Inc.,* 126 F.3d 15, 19 (2d Cir. 1997) (same).

For the Court to disregard a foreign arbitral award, the party opposing enforcement must prove that at least one of the seven defenses listed in the New York Convention applies.  *Europcar Italia, S.p.A.* v. *Maiellano Tours, Inc.*, 156 F.3d 310, 313 (2d Cir. 1998); *see also* 9 U.S.C. § 207 ("The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention.").  Specifically, a court may only refuse to enforce an arbitral award if:

> [i] The parties to the agreement ... were ... under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it ...; or
>
> [ii] The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or
>
> [iii] The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration ...; or
>
> [iv] The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties ...; or
>
> [v] The award has not yet become binding on the parties, or has been set aside or suspended by a competent

> authority of the country in which, or under the law of
> which, the award was made … [or;]
>
> [vi] The subject matter of the difference is not capable of
> settlement by arbitration under the law of that country;
> or
>
> [vii] The recognition or enforcement of the award would
> be contrary to the public policy of that country.

New York Convention art. V(1)-(2), June 10, 1958, 21 U.S.T. 2517, 330
U.N.T.S. 38.

The party opposing enforcement of an arbitral award carries a heavy
burden of proof. *Telenor Mobile Commc'ns AS* v. *Storm LLC*, 584 F.3d 396, 405
(2d Cir. 2009). Because of the "strong public policy in favor of international
arbitration," *Encyclopaedia Universalis S.A.* v. *Encyclopaedia Britannica, Inc.*,
403 F.3d 85, 90 (2d Cir. 2005), courts afford foreign arbitral decisions "great
deference," *Duferco Int'l Steel Trading* v. *T. Klaveness Shipping A/S,* 333 F.3d
383, 388 (2d Cir. 2003). Accordingly, the confirmation of an arbitration award
is generally "a summary proceeding that merely makes what is already a final
arbitration award a judgment of the court." *Florasynth, Inc.* v. *Pickholz,* 750
F.2d 171, 176 (2d Cir. 1984).

Petitions to confirm a foreign arbitral award are treated as motions for
summary judgment. *D.H. Blair & Co., Inc.* v. *Gottdiener,* 462 F.3d 95, 109 (2d
Cir. 2006). Summary judgment is warranted when "the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely disputed "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

While the moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact," *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Brown* v. *Henderson*, 257 F.3d 246, 252 (2d Cir. 2001). Rather, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Parks Real Estate Purchasing Grp.* v. *St. Paul Fire & Marine Ins. Co.*, 472 F.3d 33, 41 (2d Cir. 2006) (quoting Fed. R. Civ. P. 56(e)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc.* v. *CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir.

---

[5]     The 2010 Amendments to the Federal Rules of Civil Procedure revised the summary judgment standard from a genuine "issue" of material fact to a genuine "dispute" of material fact. *See* Fed. R. Civ. P. 56, advisory comm. notes (2010 Amendments) (noting that the amendment to "[s]ubdivision (a) … chang[es] only one word — genuine 'issue' becomes genuine 'dispute.' 'Dispute' better reflects the focus of a summary-judgment determination."). This Court uses the post-amendment standard, but continues to be guided by pre-amendment Supreme Court and Second Circuit precedent that refer to "genuine issues of material fact."

2003).  In considering "what may reasonably be inferred" from evidence in the
record, however, the court should not accord the non-moving party the benefit
of "unreasonable inferences, or inferences at war with undisputed facts."
*County of Suffolk* v. *Long Island Lighting Co.*, 907 F.2d 1295, 1318 (2d Cir.
1990)).  Moreover, "[t]hough [the Court] must accept as true the allegations of
the party defending against the summary judgment motion, ... conclusory
statements, conjecture, or speculation by the party resisting the motion will not
defeat summary judgment."  *Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir.
1996) (internal citation omitted) (citing *Matsushita*, 475 U.S. at 587).

## B.     Analysis

Arbitral awards are not self-enforcing; they are "given force and effect by
being converted to judicial orders by courts."  *D.H. Blair & Co., Inc.*, 462 F.3d at
104.  Qin offers four reasons why this Court should not give the CIETAC Award
legal effect in the United States under the New York Convention: (i) the
Supplemental Agreement is not valid; (ii) Qin was not given proper notice of the
arbitration and was otherwise unable to present his case; (iii) the arbitration
was not conducted in accordance with the terms of the Supplemental
Agreement, and (iv) enforcing the award would contravene U.S. public policy.
(Resp. Br. 13).  As discussed in the remainder of this section, none of these
reasons is availing.

### 1.     The Supplemental Agreement Was Valid

Qin first opposes the confirmation of the award under Article V(1)(a) of
the New York Convention, which permits courts to refuse to enforce an arbitral

award if the underlying arbitration agreement "is not valid under the law to which the parties have subjected it." New York Convention art. V(1)(a). Specifically, Qin asserts that the Supplemental Agreement is invalid under Chinese law because (i) it was not signed by all parties to the Capital Increase Agreements[6] and (ii) it imposes obligations on him that he cannot perform. (Resp. Br. 14-16).

Qin's failure to identify any Chinese authority to support these theories is fatal to his Article V(1)(a) defense. "To invoke [Article V(1)(a)], the party opposing enforcement must furnish the court with … proof that the parties' agreement did not constitute a valid arbitration agreement under [governing] law." *Henry* v. *Murphy,* No. M-82 (JFK), 2002 WL 24307, at *3 (S.D.N.Y. Jan. 8, 2002). Courts thus routinely reject Article V(1)(a) defenses where the respondent does not provide any source of governing law to consider in making their rulings. *See, e.g.*, *id.* (denying Article V(1)(a) defense because respondent provided "no support" for his assertion of invalidity); *Arbitration Between Overseas Cosmos, Inc. & NR Vessel Corp.*, No. 97 Civ. 5898 (DC), 1997 WL 757041, at *3 (S.D.N.Y. Dec. 8, 1996) ("Respondent has utterly failed … to cite any persuasive authority to support its position that the underlying agreement between the parties is unenforceable under English law."); *Skandia Am. Reins. Corp.* v. *Seguros Law Republica*, No. 96 Civ. 2289 (SS), 1996 WL 622559, at *6

---

[6]     The Capital Increase Agreements were signed by SMI Shengdian, SMI International, Chengdu Run Yun, and Petitioners. (Resp. 56.1 ¶ 8). The Supplemental Agreement was signed by SMI Shengdian, Qin, and Petitioners. (*Id.* at ¶ 9). Qin argues that the absence of the signatures of Chengdu Run Yun and SMI International on the Supplemental Agreement invalidates the supplement. (Resp. Br. 14-15).

(S.D.N.Y. Sept. 20, 1996) (denying Article V(1)(a) defense because respondent "proffered absolutely no proof" of contract invalidity). The Capital Increase Agreements and the Supplemental Agreement clearly provide that Chinese law governs disputes between Chengdu Run Yun, its owners, and its investors. (*See, e.g.*, Huirongsheng Agreement art. 14.1 ("The validity, interpretation and implementation of this Agreement and the settlement of disputes arising from this Agreement shall be governed by Chinese laws."); Supplemental Agreement art. 14.1 ("The conclusion, entry into force, performance, interpretation, modification, dispute resolution and termination of this Agreement shall be governed by the current Chinese laws, administrative regulations and rules.")). Qin does not offer a single source —Chinese or otherwise — to prove that the Supplemental Agreement is invalid due to either lack of signatures or impossibility, and this Court's research discloses none. In the absence of this authority, Qin's Article V(1)(a) defenses fail.

Qin's theory fails for a second reason. Qin maintains that the Supplemental Agreement cannot validly be enforced against him because he is not an original shareholder of Chengdu Run Yun. (Resp. Br. 15-16). To review, the Supplemental Agreement's buyback provision requires Chengdu Run Yun's "original shareholders" to repurchase Petitioners' stock if certain triggering events occur. (Supplemental Agreement art. 4). Qin reasons that he is not an original shareholder because he never directly owned equity in Chengdu Run Yun, and instead merely controlled the companies that held Chengdu Run Yun's stock. (Resp. Br. 14-16). However framed, Qin's

argument is not one about contract validity, but rather is an attempt to relitigate the substance of the arbitral panel's findings.

The merits of the underlying arbitration are beyond the scope of this Court's review, as the Second Circuit has made clear:

> A reviewing court may not vacate an award "merely because it is convinced that the arbitration panel made the wrong call on the law. On the contrary, the award should be enforced, despite a court's disagreement with it on the merits, if there is a barely colorable justification for the outcome reached."

*Matthew* v. *Papua New Guinea*, 398 F. App'x 646, 648 (2d Cir. 2010) (summary order) (quoting *Stolt-Nielsen S.A.* v. *AnimalFeeds Int'l Corp.*, 548 F.3d 85, 92 (2d Cir. 2008)). It does not matter whether this Court agrees with the arbitrators' interpretation of the Supplemental Agreement; so long as the panel considered the issue and reached a plausible conclusion, its determination controls. *See HDI Glob. SE* v. *Phillips 66 Co.*, No. 20 Civ. 631 (RMB) (GWG), 2020 WL 2415588, at *3 (S.D.N.Y. May 12, 2020) ("Whether the Panel's interpretation of the Contract or [Respondent's] interpretation of it is correct is immaterial — Courts do not have the power to review the merits of arbitrators' contract interpretations." (internal quotation marks and citations omitted)).

The CIETAC panel more than satisfied this minimal requirement. To interpret the phrase "original shareholders" in the Supplemental Agreement, the panel looked to the text of the provision, the relationship of the provision to the contract as a whole, and the parties' intent in contracting. (CIETAC Award 42-45). In light of these considerations, it concluded that "original shareholders" did "not merely refer to registered shareholders of [Chengdu Run

16

Yun] on the date of signing the agreement, but also include[s] actual controller
Qin Hui," due to his majority stake in both of Chengdu Run Yun's
shareholders.  (*Id.* at 44).  Although perhaps not the only way to interpret the
phrase, the arbitrators' conclusion is certainly supportable.  *See Stati* v.
*Republic of Kazakhstan*, 302 F. Supp. 3d 187, 204 (D.D.C. 2018) (rejecting
respondent's argument that award should not be enforced because petitioner
was not an "investor" under investment agreement at issue because there was
"no reason to second-guess the tribunal's conclusion" under the court's
"extremely limited" review).  Qin thus has not met his burden under Article
V(1)(a).

### 2.     Qin Was Able to Present His Case

Qin next invokes Article V(1)(b) of the New York Convention, which
provides a defense to enforcement where "[t]he party against whom the award
is invoked was not given proper notice of the appointment of the arbitrator or of
the arbitration proceedings or was otherwise unable to present his case."  New
York Convention art. V(1)(b).  Article V(1)(b) "essentially sanctions the
application of the forum state's standards of due process."  *Iran Aircraft Indus.*
v. *Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992) (quoting *Parsons & Whittemore*
*Overseas Co., Inc.* v. *Societe Generale De L'Industrie du Papier (RAKTA)*, 508
F.2d 969, 975 (2d Cir. 1974)).  In the United States, the "[t]he fundamental
requirement of due process is the opportunity to be heard 'at a meaningful time
and in a meaningful manner.'"  *Id.* at 146 (quoting *Mathews* v. *Eldridge*, 424
U.S. 319, 333 (1976)).  Key to this requirement is "notice reasonably

17

calculated, under all the circumstances, to apprise [him] of the pendency of the action and afford [him] an opportunity to present [his] objections." *Mullane* v. *Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

The procedures CIETAC used to serve Qin were not "fundamentally unfair" such that they violated due process.  *See Abu Dhabi Inv. Auth.* v. *Citigroup, Inc.*, No. 12 Civ. 283 (GBD), 2013 WL 789642, at *7 (S.D.N.Y. Mar. 4, 2013) (citing *Tempo Shain Corp.* v. *Bertek, Inc.*, 120 F.3d 16, 20 (2d Cir. 1997)).  To review, CIETAC's first two attempts to serve Qin by mail were unsuccessful.  (CIETAC Award 1-2).  The third time CIETAC attempted to serve Qin, it mailed notice to the North Alley Address, which is the address attributed to Qin on the Supplemental Agreement.  (*Id.* at 2).  CIETAC also verified that the documents were duly served on Qin on that attempt.  (*Id.*).

Mailing notice to Qin at this address was not unreasonable under the circumstances.  Although notice is a fact-specific inquiry, mailing notice to a party's known address is widely accepted as constitutionally sufficient.  *Weigner* v. *City of New York,* 852 F.2d 646, 650 (2d Cir. 1988) ("[T]he Supreme Court has consistently held that mailed notice satisfies the requirements of due process.").  At least one other Court in this Circuit has found that mailing arbitration documents to an address listed in the underlying agreement is sufficient notice under the New York Convention.  *See Tianjin Port Free Trade Zone Int'l Trade Serv. Co., Ltd.* v. *Tiancheng Chempharm, Inc.*, No. 17 Civ. 4130 (JS) (AYS), 2018 WL 2436990, at *4 (E.D.N.Y. May 30, 2018).  And the fact that Qin contacted CIETAC to request additional copies of the arbitration

18

documents (CIETAC Award 3), suggests that he was aware of the proceeding. *See CBF Industria de Gusa S/A* v. *Amci Holdings, Inc.*, 316 F. Supp. 3d 635, 653 (S.D.N.Y. 2018) (considering an arbitral respondent's request for additional time to answer an initial pleading "evidence that [the respondent] was provided proper notice of the Arbitration").

To the extent that Qin challenges CIETAC's conclusion that the third attempt at service complied with the arbitration rules (*see* Resp. Br. 20-21), the Court defers to the panel's conclusion that "all documents and written notices pertaining to this case have been effectively served by the Arbitration Court on all the parties according to provisions of Article 8 of the Arbitration Rules" (CIETAC Award 5).  After all, it is for "arbitrators, not courts, to decide disputes about the meaning and application of particular procedural preconditions for the use of arbitration …. includ[ing] the satisfaction of prerequisites such as … notice."  *BG Grp., PLC* v. *Republic of Argentina*, 572 U.S. 25, 34-35 (2014) (internal quotation omitted).  Qin has not met his heavy burden of proving improper notice.

Qin also has not shown *that* he was "otherwise unable to present his case" to the arbitration panel.  See New York Convention art. V(1)(b).  Qin repeatedly asserts that the panel "[did] not even entertain[]" his counsel's arguments about alleged fraud by Petitioners.  (Resp. Br. 27-28; Resp. 56.1 ¶¶ 23, 25-27, 31, 40).  But he fails to back this assertion up with the "specific facts" required to survive summary judgment.  *Anderson*, 477 U.S. at 248.  The CIETAC Award explicitly acknowledges that Qin's counsel made this fraud

argument to the panel.  (CIETAC Award 16-18).  The panel found the argument

beyond the scope of the contract interpretation issues the parties agreed to

submit to arbitration.  (*Id.* at 41-42).  "That Respondent still does not agree

with the Arbitral [panel]'s decision does not mean he was deprived [of] a fair

opportunity to present his case."  *BSH Hausgeräte GMBH* v. *Kamhi*, 291 F.

Supp. 3d 437, 442 (S.D.N.Y. 2018).

Qin also briefly notes that he was not permitted to present witness

testimony to the panel.  (Resp. 56.1 ¶ 23).  This procedural right is not always

required by due process: "[I]nability to produce one's witnesses before an

arbitral tribunal is a risk inherent in an agreement to submit to arbitration.  By

agreeing to submit disputes to arbitration, a party relinquishes his courtroom

rights — including that to subpoena witnesses — in favor of arbitration 'with

all of its well known advantages and drawbacks.'"  *Parsons*, 508 F.2d at 975

(quoting *Wash.-Balt. Newspaper Guild* v. *Wash. Post Co.*, 442 F.2d 1234, 1238

(D.C. Cir. 1971)); *see also Nat'l Football League Mgmt. Council* v. *Nat'l Football

League Players Ass'n*, 820 F.3d 527, 545 (2d Cir. 2016) ("It is well settled that

procedural questions that arise during arbitration, such as which witnesses to

hear and which evidence to receive or exclude, are left to the sound discretion

of the arbitrator and should not be second-guessed by the courts.").

In sum, Qin has not shown that the arbitral process lacked fundamental

fairness. He was afforded reasonable notice and ample opportunities to present

his evidence and arguments.  Qin's invocation of Article V(1)(b) therefore fails.

### 3.      Qin's Challenges to the Arbitral Procedure Fail

Qin also opposes the confirmation of the CIETAC Award under Article V(1)(d) of the Convention, which provides that a court may refuse to recognize an arbitration award where "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties[.]" New York Convention art. V(1)(d); *see also Encyclopaedia Universalis*, 403 F.3d at 91 (noting that, while enforcement of arbitral awards under Article V(1)(d) might "exalt[ ] form over substance ... the fact [remains] that the parties explicitly settled on a form and the New York Convention requires that their commitment be respected").

In this regard, Qin maintains that he was denied his contractual right to appoint an arbitrator to the panel.  The Capital Increase Agreements specify that the arbitration panel "shall be composed of three arbitrators, one arbitrator ... appointed by either of the parties to the arbitration, and the chief arbitrator ... appointed by [CIETAC]."  (Chuangtai Rongyuan Agreement art. 14.4; Huirongsheng Agreement art. 14.4; Huihengying Agreement art. 14.4). They also provide that arbitration shall be conducted in accordance with CIETAC's rules.  (Chuangtai Rongyuan Agreement art. 14.3; Huirongsheng Agreement art. 14.3; Huihengying Agreement art. 14.3).  Those rules grant the parties on each side of the arbitration fifteen days to select an arbitrator after receiving notice of the arbitration.  (Resp. Br., Ex. A art. 27.1 (Dkt. #28-1)). Failing that, the rules empower CIETAC to appoint an arbitrator in the defaulting party's stead.  (*Id.*).

21

That is precisely what occurred in this case.  After Petitioners commenced the arbitration, Qin and the other Arbitral Respondents failed to submit a consensus pick to CIETAC in a timely manner.  (CIETAC Award 2). Lacking the Respondents' selection, CIETAC appointed the panel itself.  (*Id.*).[7] Qin objected to this appointment in the arbitration, but CIETAC found that the selection process complied with its rules.  (*Id.* at 3).

The Court is not persuaded that Qin was denied the process contemplated by the Capital Increase Agreements.  By not nominating an arbitrator within the timeframe contemplated by CIETAC's rules, Qin forfeited his right to do so.  *See Major League Baseball Props., Inc.* v. *Corporacion de Television y Microonda Rafa, S.A.*, No. 19 Civ. 8669 (MKV), 2020 WL 5518361, at *3 (S.D.N.Y. Sept. 14, 2020) (enforcing arbitral award over similar objection); *Belize Bank Ltd.* v. *Belize*, 191 F. Supp. 3d 26, 36-37 (D.D.C. 2016) (same). The real issue here is not CIETAC's compliance with its own procedures, but rather Qin's alleged failure to receive notice of the pending arbitration.  After all, if Qin did not know about the arbitration in July 2020, he could not have timely selected an arbitrator.  But as explained in section B.2, *supra*, the Court will not overturn CIETAC's finding that Qin was properly served in June 2020 and could have timely responded to the arbitration notice.

Qin's authorities in support of his argument are inapposite.  In *Encyclopaedia Universalis*, the Second Circuit found that a foreign arbitral

---

[7]    It is not clear from the record why Petitioners also did not invoke their right to appoint an arbitrator.  What is clear, however, is that CIETAC appointed all three of the panelists.  (Resp. 56.1 ¶ 18).

award was not issued in accordance with the process agreed upon by the parties.  *See* 403 F.3d at 91.  The arbitration agreement in that case provided for a panel of two party-appointed arbitrators and allowed the arbitral tribunal to appoint a third arbitrator only if the first two disagreed on a substantive question and could not agree on the identity of a tiebreaking arbitrator.  *Id.* at 90-91.  Despite these rules, the tribunal appointed a third arbitrator without first giving the two party-appointed arbitrators an opportunity to select their preferred colleague.  *Id.* at 91.  This premature nomination "overlook[ed] the agreed-upon arbitral procedures" in violation of Article V(1)(d).  *Id.* at 91-92.  Unsurprisingly, Qin emphasizes *Encyclopaedia Universalis*'s admonition that the manner of appointing an arbitral panel is "more than a trivial matter of form."  (Resp. Br. 22).  But there was no similar skirting of procedure here; CIETAC allowed the Arbitral Respondents the full fifteen days provided by its rules before appointing the arbitral panel.  (CIETAC Award 2).

   *CEEG (Shanghai) Solar Science & Technology Co., Ltd.* v. *Lumos LLC*, 829 F.3d 1201 (10th Cir. 2016), likewise does not compel a ruling in Qin's favor.  In that case, which also involved an arbitration conducted by CIETAC in China, a Colorado-based arbitral respondent received notice of an arbitration in Chinese.  *Id.* at 1204.  By the time the respondent translated the notice to English, the deadline to nominate an arbitrator had passed.  *Id.* at 1204-05.  The Tenth Circuit refused to confirm the arbitral award, in part because the Chinese-language mailing directly contravened the parties' explicit agreement that any arbitration stemming from their contract would be conducted in

English.  *Id.* at 1203, 1207.  *CEEG* is a clear example of disregard for the rules the parties agreed would govern their dispute.  Here, as explained previously, CIETAC followed its rules governing the appointment of arbitrators.  After reviewing Qin's assertions, the Court finds that the arbitral panel was properly constituted.

Qin raises another objection to the arbitral process, this time saying that Petitioners failed to comply with their contractual obligation to attempt to settle their dispute before resorting to arbitration.  (Resp. Br. 17).  Unlike the prior objection, however, Qin did not raise this complaint to the arbitration panel. By failing to make this argument in arbitration, Qin forfeited his right to make it in this confirmation proceeding.  *See ConnTech Dev't Co.* v. *Univ. of Conn. Educ. Props., Inc.*, 102 F.3d 677, 685 (2d Cir. 1996) ("[B]y waiting … to raise this argument before the district court, [respondent] waived the right to object on the basis of [petitioner's] alleged violation of a condition precedent [to arbitration].").

Qin has not shown that "the composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties," and as such the Court may not disregard the CIETAC Award under New York Convention Article V(1)(d).

### 4.  Public Policy Considerations Support Confirming the Award

Finally, Qin points to Article V(2)(b) of the Convention, which permits courts to decline to confirm an award if "recognition or enforcement of the award would be contrary to the public policy" of the United States.  New York

24

Convention art. V(2)(b).  Given the New York Convention's preference for
enforcement and concerns that foreign courts will routinely refuse to confirm
American arbitral awards on policy grounds, this defense is construed very
narrowly.  *See Parsons*, 508 F.2d at 973-74.  It applies "only where
enforcement would violate our most basic notions of morality and justice."
*Europcar Italia, S.p.A*, 156 F.3d at 315 (internal citations and quotation marks
omitted).  Moreover, the public policy at stake must be "well defined and
dominant, and is to be ascertained by reference to the laws and legal
precedents and not from general considerations of supposed public interests."
*Yukos Capital S.A.R.L.* v. *OAO Samaraneftegaz*, 963 F. Supp. 2d 289, 299
(S.D.N.Y. 2013) (quoting *United Paperworkers Int'l Union, AFL-CIO* v. *Misco, Inc.*,
484 U.S. 29, 30 (1987)); *see also Parsons*, 508 F.2d at 974 ("To read the public
policy defense as a parochial device protective of national political interests
would seriously undermine the Convention's utility.").

Qin advances two theories of why the CIETAC Award violates U.S. public
policy, neither of which succeeds.  He first asserts that confirming the CIETAC
Award would assist Petitioners' wrongful scheme to misappropriate Chengdu
Run Yun's assets and claims that it is "against public policy to use the courts
as a means to perpetrate fraud."  (Resp. Br. 27).  But Qin does not identify any
"well-defined" basis in American law to support this broad articulation of
policy.  *See Yukos Capital S.A.R.L.*, 963 F. Supp. at 299.  Because the party
opposing confirmation of a foreign arbitral award bears the burden of proof,
*Telenor Mobile Commc'ns AS*, 584 F.3d at 405, this total lack of authority is

fatal to Qin's claim, *see DiRussa* v. *Dean Witter Reynolds Inc.*, 121 F.3d 818, 825 (2d Cir. 1997) (declining to find public policy because sources offered by respondent were "far from clear"); *see also United Paperworkers Int'l Union,* 484 U.S. at 44 (reversing finding that arbitration violated public policy because lower court "made no attempt to review existing laws and legal precedents in order to demonstrate that they establish a 'well-defined and dominant' policy").

Qin's second public policy theory is better presented.  He argues that the award cannot be enforced because it was entered by a biased arbitration panel. (Resp. Br. 28-30).  As support, he offers a United Nations guide interpreting the New York Convention as the source for this policy interest.  (*See id.* at 28 (citing U.N. COMM'N ON INT'L TRADE L., GUIDE ON CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS, at 197, U.N. Sales No. E.16.V.7 (2016)).  This guide alone likely does not define U.S. public policy; it was published by an international organization and is not codified in an American statute or caselaw.  However, the Second Circuit has acknowledged that an arbitral award obtained by fraud "might violate public policy and therefore preclude enforcement." *Europcar Italia, S.p.A.*, 156 F.3d at 315.  Thus, Qin has arguably identified a relevant policy interest.

Qin's argument fails for a different reason: he has failed to identify specific facts that would make arbitrator bias a genuine issue for trial.  He asserts that Xiuming Tao, an original member of the CIETAC panel, is a managing partner at a law firm that employs attorneys who also serve on the boards of Petitioners' parent companies, and that this affiliation predisposes

26

Tao to resolve the arbitration in Petitioners' favor.  (Resp. Br. 29).  But Qin also acknowledges that Tao resigned from the arbitration panel in September 2020 — only a month after his appointment — and did not participate in hearing or deciding the case.  (Resp. 56.1 ¶ 20).  Qin alleges that Tao nonetheless "may have significantly impacted the opinions of the other arbitrators."  (Resp. Br. 29).  While a biased arbitrator is a legitimate cause for concern, this "conclusory allegation" is not enough to create a genuine issue of disputed fact.  *Fujitsu Ltd.* v. *Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001); *see also Pompano-Windy City Partners, Ltd.* v. *Bear Stearns & Co., Inc.*, 794 F. Supp. 1265, 1278-79 (S.D.N.Y. 1992) ("[C]onclusory allegations of bias[ ] and dissatisfaction with the result of arbitration are not sufficient bases for vacating an award."); *Beljakovic* v. *Melohn Props., Inc.*, No. 04 Civ. 3694 (JMF), 2012 WL 5429438, at *3 (S.D.N.Y. Nov. 7, 2012) ("To the extent that Petitioner alleges that [the arbitrator] was biased against him, his claim fails, as he offers no evidence of [the arbitrator's] bias, partiality, or corruption beyond conclusory statements and speculation."), *aff'd*, 542 F. App'x 72 (2d Cir. 2013) (summary order).  Without a more concrete allegation of how bias infected the proceedings, a jury could not find that the arbitral award was obtained by fraud.

This is not one of the rare circumstances in which enforcing a foreign arbitral award "would violate our most basic notions of morality and justice."  *Europcar Italia, S.p.A*, 156 F.3d at 315.  Consequently, Qin's invocation of Article V(2)(b) of the New York Convention fails.

## CONCLUSION

For the foregoing reasons, Petitioners' motion for summary judgment on their petition to confirm the foreign arbitration award is GRANTED.  The Clerk of Court is directed to terminate the motion at docket entry 15.

Petitioners are hereby directed to submit a proposed judgment, consistent with the CIETAC Award, within fourteen days.  That judgment shall calculate all amounts in U.S. dollars, converted from Renminbi as of the date of submission.  *See Comm'ns Imp. Exp. S.A.* v. *Republic of the Congo*, No. 14 Misc. 187 (AJN), 2020 WL 4040753, at *2 (S.D.N.Y. July 17, 2020) (noting that, under New York law, the "judgment ... shall be converted into currency of the United States at the rate of exchange prevailing on the date of entry of the judgment or decree" (citing N.Y. Jud. Law § 27(b)).

SO ORDERED.

Dated:     September 26, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

28