# EXHIBIT G

**EASTERN CARIBBEAN SUPREME COURT**
**BRITISH VIRGIN ISLANDS**

**IN THE HIGH COURT OF JUSTICE**
**(COMMERCIAL DIVISION)**

**CLAIM NO. BVIHC (COM) 2019/0180**

**BETWEEN:**

**GREAT PANORAMA INTERNATIONAL LTD**

Claimant

**and**

**[1]    QIN HUI**

Defendant

**[2]    DAYSPRING INVESTMENTS LTD**
**[3]    KING FAME TRADING LTD**

Respondents

**Appearances:**
Mr. Robert-Jan Temmink QC, with him Mr. Richard Baird and Mr. Christopher
Bromilow of Forbes Hare for the claimant
Mr. Michael J. Fay QC of Agon Litigation for Qin Hui and Dayspring Investments
Ltd
Mr. Nicholas Burkill and Mr. Nicholas Brookes of Ogier for King Fame Trading Ltd

_____

2020: June 25, 26
August 13
_____

**JUDGMENT**

[1]     **JACK, J [Ag.]**:    On 19th December 2019 I granted the claimant ("Great
Panorama") a freezing order against the defendant ("Mr. Qin") and the two
respondents to Great Panorama's application, Dayspring Investments Ltd
("Dayspring") and King Fame Trading Ltd ("King Fame"), both BVI companies.
Before me are applications by Great Panorama for an extension of the freezing
order and cross-applications by the other parties for discharge.  Great Panorama

also wishes to amend its claim form and statement of claim to add Dayspring and King Fame as defendants, to add further causes of action and to substitute Goldteam Group Ltd ("Goldteam") for itself as claimant following an assignment of the claim on 13th January 2020.

### Delay

[2]     I deal first with the issue of delay.  As I pointed out in **VTB Bank (Public Joint Stock Co) v Miccros Group Ltd and another**:[1]

> "There seems to be developing a culture in this Territory of parties obtaining interim relief and then doing nothing to obtain final substantive relief.  That is not the purpose of granting interim remedies.  If parties do nothing once they have obtained interim relief, they can expect the Court to discharge the interim relief on that ground alone."

[3]     In the current case, Mr. Qin filed his acknowledgment of service on 24th January 2020.  He equivocated as to whether he would seek to challenge the jurisdiction of the Court or the validity of service but in the event has done neither.  Nor has he served a defence.   Mr. Temmink QC, who appeared for Great Panorama, sketched what appeared to be inadequate reasons for the failure to exercise diligence, but in the event the other parties did not take any point on delay, so I did not investigate the validity of the reasons which Mr. Temmink QC advanced for the delay.  It is of course also fair to say that the coronavirus pandemic has interfered with the ordinary conduct of litigation, particularly in cross-border matters such as the instant case.

[4]     Accordingly, I will not in this case discharge the injunction on the basis of delay.  Instead I will consider the applications and cross-applications on their merits.

### Two procedural matters

[5]     When this matter originally came before me, the only named defendant was Mr. Qin.  The two companies were named solely as respondents to the application for

---

[1] BVIHC (COM) 2018/0067 (delivered 23rd January 2020) at para [9].

an injunction. This was a reasonably common procedure in this Territory. Since the granting of the injunction in December last year, however, the Court of Appeal has handed down its decision in **Broad Idea (No 2)**, which disapproves making such orders without naming the respondents as defendants in a claim form.[2]

[6]   This is in my judgment a mere procedural defect, which, against the background of the practice which I have outlined, was an excusable mistake. It can be easily rectified (as Great Panorama are seeking to do) by adding the two companies as defendants with a pleaded case against them: CPR 26.9. I shall grant such permission.

[7]   Likewise, Great Panorama have assigned their judgment debt in Hong Kong to Goldteam Group Ltd ("Goldteam"). Goldteam now seek to be substituted as claimant. Subject to any issues about Great Panorama's liabilities for costs and under the cross-undertaking for damages given (on which I will hear the parties), the substitution appears uncontroversial.

**The facts in outline**

[8]   On 26th August 2019 Great Panorama obtained a default judgment in the Court of First Instance in Hong Kong for HK$165,300,000 plus interest. It is this judgment which Great Panorama (and now Goldteam) seek to enforce in this jurisdiction.

[9]   There are many disputed matters. The following, however, is uncontroversial. Mr. Qin is a citizen of the People's Republic of China. He uses the alias "Li Muk Lam". He was (and says, although this is disputed, that he still is) a wealthy man. A major asset was a majority, latterly 70.02 per cent, shareholding in SMI Holdings Group Ltd ("SMI"), a company listed on the Hong Kong Stock Exchange.

[10]   Mr. Qin was and is the sole shareholder in Dayspring. Dayspring's only asset is an apartment on the Tanglin Road in Singapore ("St Regis"). St Regis was bought in 2010 for the equivalent of just under US$10½ million.

---

[2] Broad Idea International Ltd v Convoy Collateral Ltd BVIHCMAP 2019/0026 (determined 29th May 2020, unreported) at paras [23], [24] and [56]

[11]     In 2010 Mr. Qin married Ms. Liu Duo, who is generally known as "Emma".  Without disrespect this is how I shall refer to her.  There are two children of the union, now aged six and nine.  Mr. Qin was the sole shareholder of King Fame.  In turn the only asset of King Fame is a large Georgian style mansion in Applegreen Drive, Old Westbury, New York ("Applegreen Drive"), which was purchased in 2011 for US$15,880,000.  By a purported deed made Thursday 30th August 2018 Mr. Qin, as legal and beneficial owner of the single share in King Fame, transferred by way of gift the share to Ms. Liu Xuemin ("Ms. Liu"), Emma's mother and therefore Mr. Qin's mother-in-law.  The transfer was registered the same day in the register of shareholders.  The deed was governed by Hong Kong law.

[12]     On Monday 3rd September 2018, trading in SMI was suspended following a public announcement "that certain subsidiaries of the Company may have been unable to repay their debts when due."[3]  In his third affidavit sworn on 16th April 2020, Mr. Qin said:

> "[T]rading was voluntarily suspended and will resume shortly.  The only hold up is the SMI Holdings needs to finalise updated financial statements for its 2018 and 2019 annual reports but as soon as this is done then trading will resume."

[13]     In fact, on 7th May 2020, three weeks later, SMI was placed in insolvent liquidation by the High Court of Hong Kong.  Mr. Qin's shares in SMI are probably worthless.  Mr. Qin has given guarantees of SMI's indebtedness in the sum of HK$333 million (about US$43 million),[4] which are debts quite separate to those the subject of the current proceedings.

**The Hong Kong set aside application**

[14]     Very shortly before argument was heard before me on the current applications, Mr. Qin issued an application in Hong Kong to set aside the default judgment.  Mr. Qin

---

[3] Bundle 4/60/89.
[4] Fan Man Seung, Vanessa, 3rd Affidavit, para [12], Bundle 2/28/202.

relied on two matters.  Firstly, he had not been properly served.  Secondly, as to the merits he says:[5]

> "The claim [against him] is entirely misconceived and appears to be based on fraudulent documentation.  The claim is said to arise out of an agreement, which I was not party to, entered into in November 2015 where Nation Field [a company owned by Mr. Yap, a former chairman of SMI] agreed to purchase 200,000,000 shares in SMI Holdings from Wise Vanguard [an Emperor Group company] for HK$200 million…  A freestanding guarantee and undertaking dated 16 November 2015 purportedly evidences my agreement to guarantee Nation Field's obligation to pay the remaining HK$180 million…  However, I did not agree to give the purported guarantee, which is said to give rise to the alleged debt in this claim, and the document appears to contain a forgery of my signature."

[15]   As to the first of these two grounds for setting aside, given that Hong Kong has a common law system, Mr. Qin may face difficulties in relation to delay.  He must have been aware of the judgment before the coronavirus caused the courts in Hong Kong to close.  In any event, service appears to have been effected in accordance with the terms of the agreement.  In relation to the second, substantive, ground, his signature on the guarantee was witnessed by a solicitor of the High Court of Hong Kong, Ms. Hom Mun Yee Caroline.  She has made a statutory declaration dated 21st April 2020[6] that Mr. Qin executed the guarantee in her presence after she had translated and explained the document to him in Cantonese.  She was admittedly the head of legal at the Emperor Group, but the solemn declaration of a solicitor is entitled to great weight.

[16]   Further the defence of forgery now sought to be run by Mr. Qin bears a striking resemblance to the defence he ran in proceedings brought against an SMI company back in 2010.  To these I now turn.

---

[5] Qin Hui, 3rd Affidavit, 16th April 2020, Bundle 2/26/181 at para [40(c)].
[6] Bundle 3E/49/4.

**The 2010 Hong Kong judgment**

[17]   These earlier proceedings concerned a loan made to SMI.   Mr. Temmink QC sought to rely on a judgment of Fok J, sitting in the Hong Kong Court of First Instance.[7]   The facts recited by the judge were these:

> "6. The plaintiff claims that, by a loan agreement in writing dated 23 April 2008…, it agreed to provide a term loan of HK\$60 million to SMI.
>
> 7. Clause 3.1(d) of the Loan Agreement provided that the plaintiff:
>> '... shall not be obliged to make the Advance to [SMI] unless it shall have received the Share Charge duly executed under seal by the [defendant] together with all documents required pursuant thereto.'
>
> 8. As required by this condition precedent, the defendant executed a share charge dated 23 April 2008… in favour of the plaintiff creating, on its face, a first fixed charge over 261,473,945 shares of SMI beneficially owned by the defendant… as security for the loan.
>
> 9. The plaintiff executed the Loan Agreement and Share Charge in reliance on board minutes of the defendant dated 22 April 2008 apparently signed by Mr. Qin Hong and Mr. Qin Hui, its directors.   Those board minutes recorded a resolution unanimously passed by the directors approving the entry into and execution of the Share Charge and certain deeds in favour of the plaintiff and authorising a Mr. Kung Yiu Fai ('Kung') to execute and do all things necessary to give effect to them.
>
> ...
> 25. On 26 January 2010 an affirmation was filed on behalf of the defendant by Mr. Tse Yuen Ming, a partner of the defendant's solicitors on the basis of instructions received by him from Mr. Qin Hui, a director of the defendant.   In that affirmation, the gist of the forgery defence was put forward for the first time.   This evidence was confirmed by Mr. Qin Hui in his own affirmation, subsequently filed on 10 February 2010.
>
> 26. The evidence was to the effect that Mr. Qin Hui and the defendant disputed the authenticity of the Share Charge and other security documents allegedly executed by the defendant in favour of the plaintiff. Mr. Qin Hui disclaimed any knowledge that the defendant's Board of Directors ever resolved to authorise Kung to execute any charge against the Shares in favour of the plaintiff.   Moreover, the existence of the Loan Agreement and the purported security documents including the Share

---

[7] Re 261,473,945 Ordinary Shares of SMI Publishing Group Limited under the Name of Strategic Media International Limited; Billion Wealth Group Ltd v Strategic Media International Ltd HCMP2586/2009 (determined 3rd May 2010).

Charge was not known to Mr. Qin Hui until these proceedings.  Mr. Qin Hui denied that the board meeting on 22 April 2008 apparently authorising Kung to execute the Share Charge ever took place and disputed the authenticity of his signature on the minutes of that meeting as well as that of Mr. Qin Hong, his brother and codirector of the defendant.

27. The crux of the defence is therefore that the board resolution of 22 April 2008 is a forgery and therefore that Kung was not in fact authorised to execute the Share Charge."

The judge then considered the fact there had been a public announcement of these matters and a transfer of shares by SMI's broker which would hardly have taken place without Mr. Qin's knowledge.  He concluded that he was:

"persuaded… that the alleged forgery defence flies in the face of the contemporaneous acts of those in control of the defendant, in particular the matters referred to above.  I therefore accept [counsel's] submission that the alleged forgery defence is not capable of belief and does not give rise to a triable defence."

[18]    Mr. Fay QC objected to the admissibility of this judgment.  He relied on section 90 and 102 of the **Evidence Act 2006**.[8]  Section 90 provides:

"(1) Subject to subsection (2) and sections 91 and 92, evidence of the decision in legal or administrative proceedings is not admissible to prove the existence of a fact that was in issue in the legal or administrative proceedings.

(2) Where evidence of a decision referred to in subsection (1) is relevant, otherwise than as mentioned in that subsection, it shall not be used for the purpose mentioned in that subsection."

[19]    Section 91 then gives exceptions in respect of grants of probate and letters of administration and in respect of criminal convictions.  Section 92 exclude the operation of sections 90 and 91 in respect of (a) laws relating to the admissibility of

---

[8] No 15 of 2006, Laws of the Virgin Islands.

criminal convictions, (b) judgments *in rem* and (c) "the law relating to *res judicata* or issue estoppel."

[20]     Section 102 (which applies to both criminal and civil cases) provides:

> "(1) Evidence that relates to the credibility of a witness is not admissible to prove that the evidence of the witness should or should not be accepted.
>
> (2) Where such evidence is relevant otherwise than as mentioned in subsection (1), that subsection does not prevent the use of the evidence to prove that the evidence of the witness should or should not be accepted."

[21]     Section 103 only applies to criminal proceedings.  Section 104 applies to both civil and crime:

> "(1) The credibility rule does not prevent the admission or use of evidence that relates to the credibility of a witness and has been adduced in cross-examination of the witness.
>
> (2) Evidence referred to in subsection (1) is not admissible if it
>      (a) is relevant only to the credibility of the witness; and
>      (b) does not have substantial probative value as to the credibility of the witness.
>
> (3) In determining whether the evidence referred to in subsection (1) has substantial probative value, the court shall, among other things, consider
>      (a) whether the evidence tends to prove that the witness knowingly or recklessly made a false representation at a time when the witness was under an obligation to tell the truth; and
>      (b) the period that has elapsed since the acts or event to which the evidence relates were done or occurred."

[22]     It can be seen that section 90 gives statutory effect to the rule in **Hollington v F Hewthorn & Co Ltd**,[9] whilst section 102 gives statutory effect to the common law rule that a cross-examiner is bound by the witness's answers to matters only going to the witness's credit.

---

[9] [1943] KB 587.

[23]     There are three points which potentially answer Mr. Fay QC's objection:

        (a) On the current applications, the claimant is not seeking to rely on the determination of Fok J "to *prove* the existence of a fact".  It relies on the judgment solely to show a good arguable case that Mr. Qin is dishonest.    *Proof* is something which is required at trial or an application for summary judgment.

        (b) In any event, even if Fok J's conclusion is inadmissible, the underlying facts recited in his judgment are admissible hearsay on an interlocutory application.    They are sufficient to show Mr. Qin's dishonesty.

        (c) Section 102 is not engaged.  The 2010 Hong Kong proceedings are relied on as similar fact evidence.  They are strikingly similar to the facts now relied on in Hong Kong to set aside the judgment.  They go to Mr. Qin's honesty, not his credibility.

It was not argued that Mr. Qin was the privy of SMI for the purposes of *res judicata* in respect of the 2010 judgment.

[24]     As to (a), I dealt with a similar section 90 objection to admissibility in **Re Sports Properties International Ltd; Danis v Dickson**:[10]

> "[36] …Mr. McCarroll SC [for Mr. Danis] sought to rely on adverse comments made by Nugee J in the English Chancery Division about Mr. Dickson in a case called **Sir Owen Glenn KNZM ONZM and another v Eric John Watson (personally and as the trustee of the Richmond Trust) and others**.[11]  Mr. Dickson was not a party to that action, but he had been the sole director of a company called Kea Investments Ltd, which was a party…
>
> [37] Mr. Morgan QC [for Mr. Dickson] objected to the admissibility of this judgment under section 90 of the **Evidence Act 2006**.  In the course of the hearing I gave an oral judgment in which I held that it was admissible on an interlocutory hearing and at trial might be cited as going to Mr. Dickson's credit.   Nonetheless, I also indicated that the weight which

---

[10] BVIHC (COM) 2019/0179 (determined 25th May 2020, following oral argument on 13th May 2020, when I gave the *ex tempore* judgment referred to).
[11] [2018] EWHC 2016 (Ch) at para [443]ff.

might be attached to it in determining the application for security for costs might be very little.  In my judgment, the observations of Nugee J go only to credit.   There is no basis for saying that the facts of **Glenn** are admissible as similar fact evidence.  On an interlocutory application, it will only be in an unusual case, that a judge has to assess credibility.  That is a matter for live evidence at trial.   Accordingly I disregard **Glenn** in deciding the current application."

[25]     I do not have access to the transcript of my oral judgment, but from recollection the reasoning was similar to (although not as lengthy as) that in **VTB Bank v Miccros** where I held:

"[84] This leaves the question whether VTB can rely on the Butcher and Robertson judgments in order at the current interlocutory stage to show a good arguable case that Eastbridge [which was not a party to the action which was the subject of those two judgments] is also a vehicle controlled by Mr. Skurikhin.  The classical approach in **Hollington v F Hewthorn & Co Ltd**, as confirmed in **Rogers v Hoyle**[12] and by the Privy Council in **Calyon v Michailaidis**[13], is that, in the absence of an estoppel *per rem judicatam*, the findings of a judge in one case are not admissible in another case.  As Christopher Clarke LJ held in **Rogers**:

'39. …The trial judge must decide the case for himself on the evidence that he receives, and in the light of the submissions on that evidence made to him.  To admit evidence of the findings of fact of another person, however distinguished, and however thorough and competent his examination of the issues may have been, risks the decision being made, at least in part, on the opinion of someone who is neither the relevant decision maker nor an expert in any relevant discipline, of which decision making is not one.  The opinion of someone who is not the trial judge is, therefore, as a matter of law, irrelevant and not one to which he ought to have regard.'

[85] However, there appears to be an exception to this rule in the case of interlocutory applications.  In **Sabbagh v Khoury**[14] there had been earlier litigation on related matters (the Masri litigation), but not between the same parties, so *res judicata* did not apply.  Carr J (as she then was) held:

---

[12] [2014] EWCA Civ 257, [2015] QB 265.
[13] [2009] UKPC 34, 2007-09 Gib LR 321.
[14] [2014] EWHC 3233 (Comm), applied by me in two cases: Advalorem Value Asset Fund Ltd v Redford at para [16] (Supreme Court of Gibraltar, decision of 4th September 2015, unreported) and Re Wardour Trading Ltd; Cohen v Nekrich 2016 Gib LR 46 at para [40].

'[202] Sana's reliance on the Masri litigation has generated much heated debate.  There is first an issue as to admissibility.  The defendants contend that, as a matter of principle, judicial findings in previous litigation are not admissible and that is the case even if, unlike in this case, they related to the same subject matter…

[203] Sana, on the other hand, contends that the rule in **Hollington v Hewthorn** does not prevent the use of findings in other litigation at an interlocutory stage.  This is because the rationale of the rule in **Hollington v Hewthorn** is to exclude findings that are no more than the opinion of another person, based on unknown facts, so as to preserve the fairness of the trial.  There is no risk to fairness of a trial if such material is introduced on the question of whether or not there is a serious issue to be tried.  Such material can assist in identifying the evidence which can reasonably be expected to be available at trial, to which a court is entitled to have regard at the interlocutory stage.  Reliance is placed on **Joint Stock Co Aeroflot – Russian Airlines v Berezovsky**[15].  There, when considering the question of whether or not there was a serious issue to be tried for the purpose of service out of the jurisdiction, Aikens LJ held that the claimant could rely on the findings of the Swiss criminal court…

[204] The defendants counter with reliance on the earlier Privy Council decision in **Calyon v Michailaidis**… [a]nd **Ferrexpo v Gilson Investments**[16]…

[206] I am inclined to agree with Sana that the findings of another court may be relied on at an interlocutory stage for the limited purpose of demonstrating whether there is a serious issue to be tried, for example in considering what material at trial there might be.  The Court of Appeal in **Joint Stock Co Aeroflot – Russian Airlines v Berezovsky**… clearly thought it appropriate to do so, and would have been well aware of the relevant principle in **Hollington v Hewthorn**.  To deploy the findings of another court in this way does not endanger a fair trial for any of the parties.  The situation in **Calyon v Michailaidis**… is distinguishable: there the findings of the Greek court were being relied on as conclusive, alternatively probative, evidence of a central plank of the Claimants' case, without more.

[207] Thus, to the extent that the Masri litigation is being used simply to inform the question of whether there is a properly

---

[15] [2013] EWCA Civ 784, [2013] 2 Lloyd's Rep 242.
[16] [2012] EWHC 721 (Comm), [2012] 1 Lloyd's Rep 588 at para [51].

arguable claim in prospect, that is, in my judgment a legitimate exercise in principle. To the extent that Sana seeks to use any findings in the Masri litigation as admissible evidence to prove a fact in issue or a fact relevant to the issue in these proceedings, I agree with the Defendants that she cannot do so (see para [28] of the judgment in **Calyon v Michailaidis**…).'

[86] In my judgment it is proper to take the Robertson judgment into account in considering whether there is a good arguable case that Eastbridge is, like Berenger, a vehicle under the effective control of Mr. Skurikhin."

[26] Now it is true that in **VTB Bank v Miccros** I was not referred to section 90 of the Evidence Act. However, in my oral judgment in **Sports Properties International** I concluded that section 90 was intended solely to give statutory effect to the rule in **Hollington v Hewthorn**, so that **Sabbagh v Khoury** could still be applied.

[27] Even if I am wrong in this and Fok J's conclusion is inadmissible, as regards point (b), the underlying facts recited in the judgment are in my judgment admissible hearsay: CPR 30.3(2). They are not a result of the judge's own view of the evidence. In other words, they are not a result of the judge hearing the evidence of two opposing witnesses and deciding which he prefers: they are the evidence themselves. If I had to reach my own conclusion based on the facts set out there and wholly ignore Fok J's conclusions, I would reach the same conclusion as Fok J. The case of forgery put forward by Mr. Qin in those proceedings did not in my judgment raise a triable issue.

[28] As to point (c), the evidence from the 2010 proceedings is relied on to show the dishonesty of Mr. Qin. Sections 102 and 104 are expressly limited to evidence impugning a witness's credibility, in other words the honesty of the witness's *testimony*. They do not apply to evidence as to the honesty of the *man*. I am in my judgment entitled to rely on this evidence adduced in this 2010 case in deciding whether the claimant has shown a good arguable case that Mr. Qin is a dishonest man. Given the striking similarity of Mr. Qin's defence to the 2010

proceedings to his defence to the current Hong Kong proceedings, the evidence is admissible in my judgment to show that.

**Chabra relief**

[29]   I turn then to the claim to a **Chabra** injunction.  The Court of Appeal in **Broad Idea (No 2)** at para 55 accepted counsel's submission as to the elements of such a claim:

> "(a) The court is to be seized of substantive proceedings against the primary defendant;
> (b) The court, being seized of the substantive proceedings, has granted or is in the process of granting a freezing order against the primary defendant;
> (c) The court must be persuaded that the evidence shows good reason to suppose that a third party is acting as an agent or nominee of the primary defendant or has assets which would be amenable to some process of execution to satisfy an eventual judgment.  Observation of the existence of a separate corporate personality continues;
> (d) There must be evidence before the court that the assets of the third party are at risk of dissipation;
> (e) The court is able to join the third party to the substantive proceedings to perfect its jurisdiction as against the third party as a non cause of action defendant ("NCAD").   The joinder allows the court to undertake the ultimate resolution of both the substantive merits and the merits of the allegations of the third party being a mere nominee or agent of the primary defendant; and
> (f) Having joined the third party the court may determine the issue of the ownership of the third party's assets before determining the substantive merits, but being seized of the substantive merits the court is bound to allow a final determination of the substantive issue."

[30]   The Court proceeded to approve the *dictum* of Sir Bernard Rix in **Lakatamia Shipping Co 30 Ltd v Nobu**[17] that:

> "…if a claimant wishes to freeze company assets of a non-defendant, he must either be prepared to make a sufficient case that the company concerned is just a money-box of the defendant and holds assets to which the defendant is beneficially entitled, and/or it has to make that company a defendant itself under the **Chabra** jurisdiction."

---

[17] [2014] EWCA Civ 636, [2015] 1 WLR 291.

[31] In the current case, there is no evidence that Dayspring is and King Fame was a nominee or agent for Mr. Qin. However, there was a dispute as to whether either is or was a "money-box". Mr. Burkill and Mr. Fay QC submitted that this referred to a situation where a company had a bank account which the principal debtor used as his own. Mr. Temmink QC submitted that this was wider than this and also covered situations where the debtor used the company for holding assets. I shall return to consider this later.

[32] Apart from the nominee/agent/moneybox type of case, our Court of Appeal approved the grant of **Chabra** relief against a company which "has assets which would be amenable to some process of execution to satisfy an eventual judgment." In the case before it, the Court of Appeal did not need to expand on what was meant by this. The shares in Broad Idea International Ltd were held 50.1 per cent by Mr. Cho (the putative judgment debtor) and 49.9 per cent by Mr. Choi (who was not a party). Thus, the only available means of execution in respect of Mr. Cho's putative debt was by a charging order over Mr. Cho's 50.1 per cent shareholding or by appointment an equitable receiver over those shares. Because the property of a company is not the property of the shareholders, neither remedy would necessarily give any power to sell the underlying assets of the company.

[33] The Court of Appeal did not need to consider the case of a 100 per cent shareholder. In such a case, the Court can appoint an equitable receiver over the judgment debtor's shares. The equitable receiver in turn can change the directors of the company and realise the value of the underlying assets of the company, either by winding up the company voluntarily, or by declaring a dividend, or (if the relevant company law permits it) making a capital distribution. I appointed an equitable receiver for that purpose in **Industrial Bank Financial Leasing Co Ltd v Xing Libin**.[18] A similar result can be achieved by obtaining a final charging order over the shares, although it is slower.

---

[18] Claim No BVIHC (COM) 0032 of 2018 (determined 28th January 2020).

[34]    Does this form of procedure constitute "some process of execution" for the purpose of granting **Chabra** relief?  The law was analysed by Chadwick P in the Cayman Court of Appeal in **Algosaibi v Saad Investments Co Ltd**.[19]   He considered nine propositions advanced by Henderson J at an earlier stage in that litigation (omitting most citations):

> "(i) The **Chabra** jurisdiction is part of the law of the Cayman Islands;
> (ii) The jurisdiction is most often exercised where there is a good arguable case that a cause-of-action defendant is the beneficial owner of assets in the possession of a non-cause-of-action defendant, but it is not confined to that situation;
> (iii) The jurisdiction is available against a non-cause-of-action defendant where a freezing order is ancillary and incidental to the effective enforcement of a prospective judgment because that defendant's assets may become available to satisfy the judgment;
> (iv) This may be so where the non-cause of action defendant has become mixed up in an attempt by the cause-of-action defendant to make himself judgment proof and the assets or their proceeds are not readily identifiable in his hands;
> (v) The important question is whether there is good reason to suppose that the cause-of-action defendant exercises substantive control over the assets in question of the non-cause-of-action defendant;
> (vi) The law in this area is evolving significantly and it is undesirable to deprive it of the necessary flexibility to address complex corporate relationships whose purpose (in whole or in part) may be to put assets beyond the reach of legitimate creditors;
> (vii) The limitation proposed in [**C Inc PLC v L and another**][20] (that there must be a causal link between the cause of action and the subsequent right to claim against the non-cause-of-action defendant) has not found support in later decisions and does not represent the current state of the law;
> (viii) On an application of this sort, one question of importance is the degree to which those challenging the injunction have complied with their disclosure obligations under it;
> (ix) Uncertainty about the true ownership of assets or whether they might be available to satisfy a future judgment may count against an applicant where it could have, but did not, shed light upon the question of ownership by making appropriate and credible disclosure."

---

[19] 2011 (1) CILR 178, Civil Appeal No 1 of 2010.

[20] [2001] 2 Lloyd's Rep 459.

[35]    Chadwick P disapproved proposition (iv), but agreed with the other propositions formulated by Henderson J.  In so doing, as can be seen, he disapproved part of the judgment of Aikens J (as he then was) in **C Inc PLC** case, but he did approve these propositions advanced by Aikens J in that case:

> "(1) The purpose of a freezing order is to ensure that the orders of the Court are effectively enforced.
>
> (2) A freezing order will usually be granted against a defendant against whom there is a claim for substantive relief.  The order will cover assets of which he is the beneficial owner.  But the Court has the power to grant freezing orders against third parties...
> …
> (5) If there is a claim for substantive relief by A against B... or A has obtained a judgment against B (in the English Court), then the English Court can grant a freezing order against the assets of C.  But, generally, it must be arguable that those assets, even if in C's name, are, in fact, beneficially owned by B.
>
> (6) The crucial question is whether the Court can go one stage further.  Does it have the power to grant a freezing order against the assets of C when: (i) A has a substantive right against B (e.g. in the form of a judgment); (ii) the assets of C are not, even arguably, beneficially owned by B.  The answer, to my mind, depends on how one interprets the phrases 'ancillary' and 'incidental to and dependent upon' used by Lords Browne-Wilkinson and Mustill in the **Channel Tunnel** case.[21]  In the **Cardile** case[22] the High Court of Australia has, effectively, given those phrases a broad interpretation.  But, critically, the High Court of Australia held that the right of A to a freezing order against C is dependent upon A having a right against B and that right itself giving rise to a right that B can exercise against C and its assets.  Therefore the freezing order sought by A against C is 'incidental to' A's substantive right against B and it is also 'dependent upon' that right."

[36]    Chadwick P also approved the following passage of the judgment of Warren J in **Basra v Poole**,[23] dealing with claims under insolvency legislation which might be the subject of **Chabra** relief:

---

[21] Channel Tunnel Group Ltd v Balfour Beatty Construction Ltd [1993] AC 334.
[22] Cardile v Led Builders Pty Ltd [1999] HCA 18, 198 CLR 380.
[23] [2007] EWHC 3528 (Ch) at para [9].

"The basis for this relief was that the directors might well be liable to the company at the suit of the yet to be appointed liquidator.  It was just and equitable to freeze their assets to prevent their dissipation before such a liquidator had been able to act.  Even so, the applicant would need to show a good arguable case for one of the following: (a) assets being held by the third party belonging to the defendant; (b) a disposition of assets by the defendant to the third party liable to be set aside under section 423 of the **Insolvency Act 1986** [24] [the equivalent of section 81 of our **Insolvency Act 2003**][25], which concerns transactions defrauding creditors; or (c) an impending insolvency in the course of which the trustee in bankruptcy or liquidator would be able to recover for the benefit of creditors, for instance, where the transfer is at an undervalue or constitutes a preference."

[37]     Chadwick P summarised the principles at para [33]:

"The fact that the potential judgment debtor (the CAD) has substantial control over assets which are held by a party against whom no cause of action is alleged (the NCAD) — say, because the NCAD can be expected to act in accordance with the wishes or directions of the CAD (whether or not it could be compelled to do so) — is likely to be of critical importance in relation to the question whether there is a real risk that the assets will be dissipated or otherwise put beyond the reach of the claimant.  But, as it seems to me, the existence of substantial control is not, of itself, enough to meet the first of the two requirements just mentioned.  It is not enough that the CAD could, if it chose, cause the assets held by the NCAD to be used to satisfy the judgment.  It is necessary that the court be satisfied that there is good reason to suppose either (i) that the CAD can be compelled (through some process of enforcement) to cause the assets held by the NCAD to be used for that purpose; or (ii) that there is some other process of enforcement by which the claimant can obtain recourse to the assets held by the NCAD."

[38]     In my judgment, in a case like Dayspring, the ability of the Court to appoint an equitable receiver over Mr. Qin's 100 per cent shareholding is sufficient to support the grant of a **Chabra** injunction.  Applying Aikens J's test, "A [Great Panorama/Goldteam] having a right against B [Mr. Qin] and that right itself giving

---

[24] 1986 c 45.
[25] No 5 of 2003, Laws of the Virgin Islands.

rise to a right that B [Mr. Qin] can exercise against C [Dayspring] and its assets" means **Chabra** relief is available.

[39]     Similarly, if it can be shown that the transfer of King Fame to Ms. Liu was void or is liable to be set aside under insolvency legislation, that too would be sufficient to support a **Chabra** injunction against King Fame: see the passage in **Basra v Poole** set out above.

[40]     In each case, of course, the other elements needed to grant a **Chabra** relief, such as the risk of dissipation, need to be considered, but in principle **Chabra** relief is available.

**Moneybox**

[41]     Strictly speaking, there is no need for me to decide the "moneybox" issue, but it was fully argued before me and may be relevant if any appeal is brought.   The starting point here is to note that there is a major difference between on the one hand assets caught by **Mareva** injunctions or freezing orders and on the other hand assets against which execution can be made.   The former are wider than the latter.   Since **Chabra** orders are a species of **Mareva**, the **Mareva** test applies in my judgment to **Chabra** defendants.

[42]     A defendant subject to a freezing order is invariably required to disclose his assets.   Now theoretically it would be possible to limit a freezing order solely to assets which are available for execution in due course.   Experience has, however, shown that defendants subject to freezing orders are not always entirely candid in revealing their assets.   It has therefore been necessary to expand the classes of asset subject to freezing orders in order to prevent dishonest defendants escaping their obligations too easily.   The current form of freezing order in the (English) **Commercial Court Guide**[26] provides that the order:

> "applies to all the Respondent's assets whether or not they are in its, her or his own name, whether they are solely or jointly owned and whether the

---
[26] 10th Ed, 2017 at Appendix 11, p 122.

19

> Respondent is interested in them legally, beneficially or otherwise.  For the purpose of this order the Respondent's assets include any asset which it, she or he has the power, directly or indirectly, to dispose of or deal with as if it were its, her or his own.  The Respondent is to be regarded as having such power if a third party holds or controls the asset in accordance with its, her or his direct or indirect instructions."

[43]   It can readily be seen that these classes of assets are not necessarily all available for execution.  However, if a defendant could, for example, aver that, although he had the legal title to an asset, he held the asset on trust for another, that would afford a straightforward route to evasion.  The Courts are very familiar with defendants whose personal ownership of assets might be described as "now you see it, now you don't": see, for example, my discussion in **Miccros** at paras [63] and [64].  The English approach is pre-emptively to freeze assets in the debtor's power and control and then litigate about their availability for execution later.

[44]   This is in my judgment the correct approach when considering what constitutes a "moneybox".  At the pre-judgment stage, the question is whether an asset put in the company against which **Chabra** relief is sought falls within the broad category of assets which are subject to a freezing order in the standard English commercial form containing the provision I have cited.  I therefore reject the submission that it is confined solely to bank accounts (although such cases are indeed covered).  Any company into which a putative debtor puts assets is, at the pre-judgment stage, potentially the subject of being named as a **Chabra** defendant.  It is only at the post-judgment stage that the question arises as to whether the judgment creditor has direct enforcement powers against the assets (because they are beneficially owned by the judgment debtor) or must go down the indirect execution route of appointing an equitable receiver or seeking a charging order over the shares (because the assets are beneficially owned by the company) or has no remedy at all (because, for example, the shares or the underlying assets are held on a valid discretionary trust).

[45]    In the current case, Mr. Qin remained the sole director of King Fame after the purported transfer of the share to Ms. Liu.  As such he retained control of Applegreen Drive.  I shall consider, what, if any, remedy should be granted against King Fame below, but the fact that he remained a director was in my judgment sufficient on its own to mean that Applegreen Drive fell within the English standard form definition of assets subject to a freezing order.  That was sufficient to make King Fame a "moneybox" for the purpose of **Chabra** relief.

[46]    In practice, a trading company will not be a "moneybox" in any meaningful sense. It will be able to trade its assets under the usual carve-out in a freezing order for transactions in the ordinary course of business.  A "moneybox" will usually be a company merely holding assets, as King Fame does here.

### Risk of dissipation

[47]    I turn then to the risk of dissipation.  Pereira CJ in **Broad Idea (No 2)** said:

> [59] This brings me to consider whether the learned judge properly concluded, based on the evidence, that Broad Idea's assets were at risk of dissipation.  It is well settled that an applicant for a freezing order must provide solid evidence of a real (as opposed to fanciful) risk of dissipation. Evidence which merely shows a possibility of a risk of dissipation or is speculative is insufficient."

She then cited **The Niedersachsen**[27] and **Mitsuji Konoshita and another v JTrust Asia Pte Ltd**,[28] before approving this passage from the judgment of Gloster LJ in **Holyoake v Candy**:[29]

> "There was some debate as to what was the correct test to establish that there was a risk of dissipation such as to make it just and convenient to grant a conventional freezing injunction.  However, the threshold in relation to conventional freezing orders is well established.  There must be a real risk, judged objectively, that a future judgment would not be met because of unjustifiable dissipation of assets.  But it is not every risk of a

---

[27] Ninemia Maritime Corporation v Trave Schiffahrtsgesellschaft mbH und Co KG. ("The Niedersachsen") [1983] 1 WLR 1412 (CA only); [1984] 1 All ER 398, (Mustill J) at p 400, (CA) at p 415.
[28] BVIHCMAP2018/0047 and BVIHCMAP2018/0020 (delivered 18th December 2018, unreported).
[29] [2017] EWCA Civ 92, [2018] Ch 297 at para [34].

> judgment being unsatisfied which can justify freezing order relief.  Solid
> evidence will be required to support a conclusion that relief is justified,
> although precisely what that entails in any given case will necessarily vary
> according to the individual circumstances."

[48]    In the current case, the risk of dissipation is shown by solid evidence.  The transfer of King Fame to Ms. Liu just days before Mr. Qin's financial affairs started unravelling with the suspension of SMI on the Hong Kong stock exchange is in my judgment such evidence.

[49]    The explanation given for the transfer is that Mr. Qin's marriage to Emma had been in difficulties.  Emma wanted financial security by having the beneficial ownership of the family home in America, Applegreen Drive, transferred to her. She and her mother took tax advice from Mr. Jason Wang.  He is a certified public accountant practising in New York.  He advised that, because Ms. Liu was not a US citizen, it would be advantageous for a transfer to be to her rather to her daughter.  The discussions had started in late 2017.  His evidence[30] is:

> "Based on my discussions with Ms. Liu and [Emma], it is my
> understanding that the purpose of the transfer of King Fame was to
> protect Applegreen Drive for [Emma] and her children in the event that Mr.
> Qin and [Emma] dissolved their marriage and Mr. Qin elected to establish
> more permanent residency in Singapore or Hong Kong."

[50]    Mr. Wang is not giving independent evidence that the Qins' marriage was in difficulties; he is merely reporting what he was told.  Mr. Qin, Ms. Liu and Emma all have an interest in saying the transfer was part of the resolution of some matrimonial difficulties, so their evidence is potentially self-serving.  The evidence of the execution of the deed of trust on 30th August 2018 is that all three, as well as the two children, met in Greece on what appears to have been a family holiday.

---

[30] Bundle 2/23/148.

[51]     In fact, however, whether there had been matrimonial difficulties or not is in my judgment irrelevant.  Spouses take each other "for richer, for poorer".  Obligations to creditors take priority over inter-spousal claims.  The timing of the transfer is solid evidence in my judgment of Mr. Qin actively dissipating his assets.  Coupled with the good arguable case that he is a dishonest man, in my judgment there is a real risk that assets will disappear.

[52]     That conclusion is sufficient to grant **Chabra** relief against Dayspring (subject to consideration of the complaints in relation to the grant of relief *ex parte*).  The case against King Fame is more complicated because of the transfer to Ms. Liu.  To this I now turn.

**The case against King Fame**

[53]     There are a number of ways in which the case against King Fame can be put.  I have already mentioned the argument that the company was Mr. Qin's "moneybox" for holding Applegreen Drive, so that under the pre-judgment test for assets subject to a freezing order it is caught.  However, in order in due course to enforce against Applegreen Drive, the claimant would need to show one of four things.  The first possibility is that Applegreen Drive was held on trust for Mr. Qin; the second that Ms. Liu held the share in King Fame on trust for Mr. Qin; the third that the initial transfer of US$15,880,000 is liable to set aside under insolvency legislation; and the fourth that the transfer of the share to Ms. Liu is liable to be set aside under insolvency legislation.  I shall examine each of these possibilities in turn.

[54]     As to the first, there is no evidence of any type of express trust in favour of Mr. Qin.  There might be some form of resulting trust arising from Mr. Qin paying the purchase price for Applegreen Drive.  The conveyance of the property to King Fame is not in evidence, nor is there any evidence as to the New York law of resulting trusts.  In the absence of evidence on these points, the first possibility does not in my judgment reach the threshold of being a good arguable case ("one which is more than barely capable of serious argument, but not necessarily one

which the judge considers would have a better than 50 per cent chance of success").

[55]    As to the second, the existence of any trust of the share in favour of Mr. Qin is belied by the terms of the deed of gift.  It is only if the deed of gift is a sham that any question of a trust could arise.  It is often difficult to establish that a legal document is a sham: **Snook v London and West Riding Investments Ltd**.[31] Here, however, there is some evidence to support such a case.  Firstly¸ if this was an attempt at dissipation, then it may be possible to infer that the deed of gift was not the true expression of the parties' intentions.  Secondly, the signatures of Mr. Qin and Ms. Liu on the deed of trust were both witnessed by Emma, rather than some independent person.  This raises the question how seriously the parties took the making of the deed.  Thirdly, there may be an issue with the formal validity of the deed.  The photograph of the deed signed by the three, which was sent by Emma on social media to the solicitor who drafted the deed at Squire Paton Boggs, does not show any seals having been affixed, which implies that the wafer seals were affixed later.  This may, as a matter of Hong Kong law, render the deed invalid.  (Issues of late sealing are usually "cured" by the doctrine of estoppel, but this may not be possible in the case of a deed of gift.)  Fourthly, Mr. Qin has continued to visit New York.   There is no evidence of current matrimonial difficulties, so he presumably stays at Applegreen Drive, which in any event is the family home.

[56]    These considerations in my judgment reach the good arguable case threshold.

[57]    The third and fourth possibilities involve a consideration of the relevant insolvency legislation.  Insofar as the law of this Territory applies, there are provisions of two Acts which are potentially applicable: the **Fraudulent Conveyances Act 1571**[32] and section 81 of this Territory's **Conveyancing and Law of Property Act**

---

[31] [1967] 2 QB 786.
[32] 13 Eliz I c. 5.

**1961**.[33]   There is a question as to whether the 1571 Act is still in force in this Territory.  In **Miccros** I said:

> "[48] [Section 81 of the 1961 Act] covers much the same ground as the earlier statute.  The 1961 provision is taken word-for-word from section 172 of the **Law of Property Act 1925** (UK)[34] (a section which has in turn since been replaced by section 423 of the **Insolvency Act 1986** (UK)[35]).  The 1925 Act expressly repealed the 1571 Act: see the Seventh Schedule to the 1925 Act.   The 1961 Act does not.   In my judgment that is significant.  In the modern era it is very rare that the doctrine of implied repeal can apply, because no professional parliamentary draftsman or woman would leave such an important question at large.   This is particularly the case with a Statute of such importance as the 1571 Act.  If the legislator had meant to repeal the 1571 Act, it would have said so.  It did not, so the Act in my judgment is still in force."

[58]   That conclusion I drew without adversarial argument.   Mr. Burkill sought to persuade me that I was wrong.  He relied on **Commissioner of Taxation v Oswal (No 6)**,[36] a decision of the Federal Court of Australia for the proposition that a later Act would impliedly repeal the 1571 Act.  Gilmour J was dealing with the Western Australian **Property Law Act 1969**.[37]  He said: "Section 89 replaced, in Western Australia, the statute 13 Eliz 1 c 5."  It is true that the 1969 Act (like the 1961 Act) does not expressly repeal the 1571 Act, but there are still a number of difficulties with Mr. Burkill's submission.   Firstly, section 89 of the Western Australian legislation was part of a bigger Part IX which might be said to set out a code for setting aside transactions in fraud of creditors.   The argument for implied repeal was thus stronger than with the single section of the 1961 Act.   Secondly, the implied repeal point does not appear to have been argued.   Rather the judge treated the point as part of his *tour d'horizon* of Australian state legislation replacing the 1571 Act.   Thirdly, the reception of English statutes into Australia is not straightforward.  I would want more information on the history of the reception

---

[33] Cap 220, Revised Laws of the Virgin Islands.
[34] 15 & 16 Geo V c 20.
[35] 1986 c 45.
[36] [2016] FCA 762 at para [37].
[37] 1969 c 32, Laws of Western Australia.

of Imperial legislation (and its repeal) and on statutory interpretation in Western Australia to reach a view on whether the only explanation for Gilmour J's view is the theory of implied repeal.

[59]    The issue is not free from doubt and it may be further research would find good arguments for finding the 1571 Act is repealed in this jurisdiction.  At present, however, I adhere to the view I expressed in **Miccros** that the 1571 Act is still in force.

[60]    Mr. Temmink QC did not take me to any case-law on the 1571 Act.  In particular, I am not sure about the territorial effect of the Act.  My recollection is that, so long as the Court had personal jurisdiction over the defendant against whom relief was sought, the Act was potentially applicable, no matter where the impugned transaction took place.  However, I may be wrong.  There are textbooks on the 1571 Act,[38] but I was not taken to any of them.

[61]    As to the substance of the case, Mr. Temmink QC submitted that the initial advance of the purchase price to King Fame was an attempt to hide assets.  There are difficulties with this submission.  Mr. Qin (or one of his companies: there is no evidence where precisely the money came from) transferred the $15,880,000 to King Fame and in return received an increase in the value of the share in King Fame resulting from the acquisition of Applegreen Drive, which precisely matched the financial contribution.  No monies were dissipated.  However, Mr. Temmink QC has just convinced me that he meets the **Niedersachsen** "good arguable case" test on the basis that Mr. Qin was in financial difficulties in 2011 (see the 2010 Hong Kong case discussed above).  Moving monies into a BVI company for the purchase of a property in the United States, whilst facing financial ruin in Hong Kong, may be sufficiently "devised and contrived of malice, fraud, covin, collusion

---

[38] E.g. Orlando F Bump, Fraudulent Conveyances: A Treatise on Conveyances intended by Debtors to Defraud Creditors (1872, reprinted 2000 by Beard Books) and Fredrick Scott Wait, A Treatise on Fraudulent Conveyances and Creditors' Bills (1884, reprinted 2000 by Beard Books).  Pre-1926 editions of Dicey on the Conflict of Laws (1st Ed, 1896) may also have relevant materials.

or guile to the end, purpose and intent to delay, hinder or defraud creditors" as to be set aside under the 1571 Act.

[62]    Mr. Burkill raised an issue as to limitation.  However, he did not develop this point, nor cite any authority.  I do not therefore refuse relief on the basis that any claim is statute-barred.

[63]    An attack on the gift of the share in King Fame to Ms. Liu appears to be more straightforward.  The gift was made only days before SMI's shares were suspended, when Mr. Qin must have known of the company's financial difficulties.  The deed of gift itself is governed by Hong Kong law.  No evidence has been adduced of Hong Kong insolvency law, but as a common law country I assume it will have some successor to the 1571 Act, so that the deed of gift is potentially liable to be set aside.  Moreover, even if the deed of gift is governed by Hong Kong law, the transfer of the share is governed by BVI law, so the 1571 and 1961 Acts potentially bite.  If the view I have expressed of the territorial breadth of the 1571 Act is correct, then the deed may stand to be set aside as matter of BVI law as well, if proceedings are served on Ms. Liu.

[64]    At present, however, no amended pleading has been settled making such a claim, nor has any application to add Ms. Liu as a defendant been made.  Unless and until an amended case is presented, I shall not examine this basis for a claim further.

[65]    I turn then to the risk of dissipation in relation to King Fame.  This risk is in my judgment even higher than with Dayspring.  The second and fourth possibilities for attacking the transfer to Ms. Liu result in the transfer of the share in King Fame being reversed.  That, however, would not affect any transfer made in the meantime of King Fame's assets, in particular Applegreen Drive.  Ms. Liu and Mr. Qin would have every incentive to convey Applegreen Drive away from King Fame, whilst they still had control of King Fame's assets.  Even a gift of Applegreen Drive to another company controlled by Ms. Liu might not, as a matter

27

of law, be capable of reversal following the setting aside of the deed of gift or the transfer of the King Fame share.  No legal mechanism is apparent to me as to how a setting aside of the King Fame share transfer would result in any transfer of Applegreen Drive also being set aside.

[66]    Thus, in relation to King Fame I will grant **Chabra** relief, but again subject to consideration of the respondents' objections to the way the claimant obtained relief *ex parte*.

[67]    For completeness, I should mention that Great Panorama criticised Mr. Qin's disclosure and sought to rely on this as further evidence of the risk of dissipation. Mr. Qin denies any non-disclosure and I have not considered it necessary to reach any conclusion of this point, which in any event was not pressed in oral argument.

### Setting aside the *ex parte* injunction

[68]    I heard Great Panorama's application for a freezing order against Mr. Qin with consequential **Chabra** relief against the two companies on 19th December 2019. This application was made *ex parte*.   Mr. Robert Nader represented Great Panorama.  The respondents to the application say that the presentation of the application and, what are said to have been, breaches of Great Panorama's duties of full and frank disclosure are such that I should discharge the injunction granted then and refuse to reimpose an injunction.

[69]    I should say at once that I have little personal recollection of the application.  Many applications for freezing orders come before this Court.  However, I have been shown a transcript of what occurred.[39]  It is unclear what documents were before me, since the hearing began with a discussion of what had happened to the bundle.  Nonetheless I had clearly read (possibly from the e-litigation portal) at least the application, the skeleton, the pleadings and the affidavit evidence. Whether I would have read the certificate of urgency is doubtful.  Once the matter

---

[39] Bundle 4/62/324.

is listed before the judge the certificate of urgency is spent, so there would have been no reason to do so.

[70] A party's duty making an *ex parte* application is well-established.   The *locus classicus* is the judgment of Ralph Gibson LJ in **Brink's Mat Ltd v Elcombe**:[40]

> "(1) The duty of the applicant is to make 'a full and fair disclosure of all the material facts.'
>
> (2) The material facts are those which it is material for the judge to know in dealing with the application as made: materiality is to be decided by the court and not by the assessment of the applicant or his legal advisers.
>
> (3) The applicant must make proper inquiries before making the application. The duty of disclosure therefore applies not only to material facts known to the applicant but also to any additional facts which he would have known if he had made such inquiries.
>
> (4) The extent of the inquiries which will be held to be proper, and therefore necessary, must depend on all the circumstances of the case including (a) the nature of the case which the applicant is making when he makes the application; and (b) the order for which application is made and the probable effect of the order on the defendant: see, for example, the examination by Scott J[41] of the possible effect of an **Anton Piller** order; and (c) the degree of legitimate urgency and the time available for the making of inquiries.
>
> (5) If material non-disclosure is established the court will be 'astute to ensure that a plaintiff who obtains [an ex parte injunction] without full disclosure… is deprived of any advantage he may have derived by that breach of duty.'
>
> (6) Whether the fact not disclosed is of sufficient materiality to justify or require immediate discharge of the order without examination of the merits depends on the importance of the fact to the issues which were to be decided by the judge on the application.   The answer to the question whether the non-disclosure was innocent, in the sense that the fact was not known to the applicant or that its relevance was not perceived, is an important consideration but not decisive by reason of the duty on the applicant to make all proper inquiries and to give careful consideration to the case being presented.

---

[40] [1988] 1 WLR 1350 at p 1356, citations omitted.
[41] Columbia Picture Industries Inc. v Robinson [1987] Ch 38.

(7) Finally, it 'is not for every omission that the injunction will be automatically discharged.  A *locus poenitentiae* may sometimes be afforded.'  The court has a discretion, notwithstanding proof of material non-disclosure which justifies or requires the immediate discharge of the ex parte order, nevertheless to continue the order, or to make a new order on terms

> 'when the whole of the facts, including that of the original non-disclosure, are before [the court, it] may well grant… a second injunction if the original non-disclosure was innocent and if an injunction could properly be granted even had the facts been disclosed.'"

[71]    This was approved by our Court of Appeal in **Enzo Addari v Edy Gay Addari**[42] and most recently in **Paraskevaides and another v Citco Trust Corp and others**,[43] where Carrington JA said:

> "[31] …The onus is on an applicant for *ex parte* relief to comply with the obligation to make full and frank disclosure as *ex parte* applications are, generally speaking, inconsistent with the adversarial nature of court proceedings under our system of law which usually permits a respondent to be heard before an order is made against them.  The key elements are that the duty is not only to disclose what the party or their legal advisers considers to be material but what one reasonably should expect a court to consider to be material in the exercise of its discretion whether to grant the order being sought.  This requires not only objective consideration of the matters that the party puts before the court, but also an active duty to make proper inquiries so as to determine whether there is other material that may available for him to place before the court on the application. This is because even an innocent non-disclosure on account of a party not being aware of the fact or not realizing its materiality may be a factor against him whereas a deliberate non-disclosure will always be a factor against him.
>
> [32] A distinction may perhaps be made here between material that is known and material that ought to have been known by an applicant.  The extent of the obligation differs between the two categories of material.  With respect to the former, the duty appears understandably to be more absolute.  Whereas for the latter, the duty is to make proper inquiries as to the existence of further material facts.  The extent of this obligation to make such inquiries is dependent on all the circumstances including the

---

[42] Civil Appeal No 2 of 2005 (determined 27th June 2005).
[43] BVIHCMAP 2018/0046 (determined 30th March 2020).  The citation given for Addari in Paraskevaides is to a later appeal in the same case, but the judgment detailed in the previous footnote is the one intended.

nature of the case being advanced, the order being sought, the effects of such an order, if granted, on both the applicant and potential respondent and the interplay between the degree of urgency of the application and the time available for making such inquiries.

[33] Once it has been established that there has been non-disclosure of a material fact, and the duty is in relation to facts, the Court must ensure that the party who failed to disclose is stripped of any advantage that he gained from that breach of his duty.  This may not always result in the discharge of the ex parte order but, even if it does, the Court may nevertheless grant a fresh order if the non-disclosure was innocent only and the balance of convenience in light of all the material facts of which the court is aware demands that a new injunction should be granted. However, the consequences of non-disclosure are not necessarily as severe if the court finds that the non-disclosure relates to a fact that is of lesser importance to the issues to be determined in order to grant the relief being sought."

[72]    An unusual feature of the current case is that the primary basis on which I have now found solid evidence of a risk of dissipation, the transfer of the share in King Fame to Ms. Liu, was one which was not relied on at the *ex parte* hearing.  The primary basis relied on at the *ex parte* hearing, namely that Applegreen Drive and St Regis were on the market at suspiciously low prices, had much less weight attached to it at the *inter partes* hearing.  The reason for this change in approach is straightforward.  Great Panorama did not know of the transfer of the King Fame share until it saw the respondents' evidence.  That was stronger evidence of the risk of dissipation than the evidence available of the marketing of Applegreen Drive and St Regis.  The respondents say that I was deliberately misled at the *ex parte* hearing.  Great Panorama was wrong about Applegreen Drive and St Regis having been on the market.  This, they say, is a serious breach of Great Panorama's duties.  I turn first to the facts.

[73]    On the application for the *ex parte* injunction, the following documents mention the marketing of Applegreen Drive and St Regis.  First, the certificate of urgency (which I may not have read) said: "Those properties appear recently to have been

listed for sale at far below their market value."[44]   Second, the notice of application[45] said:

> "Investigations have uncovered evidence that Mr. Qin is in the process of liquidating his assets.  King Fame listed its New York property for sale in April 2019 for an asking price almost half the amount for which it purchased the property in 2011.  Another New York property, owned by a Bahamian company of which it is highly likely that Mr. Qin is the beneficial owner, remains on the market.  It appears that the Singapore property may be on the market as well at a heavy discount."

The Bahamian company played little rôle at the *ex parte* hearing or on the *inter partes* hearing, so I shall not consider it further.

[74]   Third, Mr. Kitchell Osman Bin in his first affidavit[46] says:

> "25. …I obtained reports on Mr. Qin's overseas assets from an investigative firm, K2 Intelligence.  Copies of these are [in the exhibit].  Relevantly they disclosed the following:"

and he then gives details of Dayspring, King Fame and the Bahamian company together with their assets.

> "26. The fact that all three of these properties appear to have been listed for sale this year — and in two cases apparently far below market value — provides good reasons to be concerned that Mr. Qin may be in the process of dissipating his assets.  As noted above, he has given no indication that this might be for the purpose of paying his judgment debt.  Rather, it is more likely that he is seeking to support his lifestyle where he has absconded in Chana, following the collapse of his business empire."

[75]   I was not taken at the *ex parte* hearing to the K2 reports themselves, although these were exhibited to Mr. Kitchell's affidavit.  The first is dated 25th October 2019.[47]  This identifies Applegreen Drive as owned by King Fame, which in turn

[44] Bundle 4/54/1.
[45] Bundle 4/58/21.
[46] Bundle 4/59/39-40.
[47] Bundle 4/60/148, subsequent quotes are at 152 and 157.

was reported as owned by Mr. Qin.  It continued: "According to a local property website, the property was recently offered for sale at USD 7.557 million before being taken off the market."  Later in the report K2 said: "The property was listed for sale in April 2019 with an asking price of USD 8,348,400."  A footnote identifies a webpage at Realtor.com.  The different asking prices are unexplained.

[76]  K2's second report is dated 26th November 2019.[48]  It reports that Singapore Land Authority records show Dayspring as the owner of St Regis.  It continues:

> "An apartment in the same building… has been up for sale for SGD 5,380,000 (USD 3.9 million) since the beginning of November 2019, according to a Singaporean real-estate listings website.  [A footnote refers to the website.]  While we cannot confirm that this property for sale is [St Regis], it is possible, particularly given Qin Hui's recent financial difficulties and the fact that the two US properties have also recently been offered for sale."

[77]  The skeleton for the *ex parte* hearing begins by saying that there was "strong evidence" of beneficial ownership of Dayspring and King Fame whilst there was "also evidence" of Applegreen Drive and St Regel being marketed.  Later it says:[49]

> "The New York property owned by King Fame was listed for sale at far below its market value in April 2019, and it appears that the Singapore property owned by Dayspring may also be on the market right now at a greatly reduced price than what the company paid for it.  There is strong evidence that Mr. Qin is the beneficial owner of those companies…"

[78]  The transcript of the hearing on 19th December 2019[50] records this:

> "Mr. Nader [for Great Panorama] at page 9 of the transcript: [F]or full and frank disclosure purposes I should say that if you've seen the evidence, it's really a belief that we articulate, we don't have a tremendous amount of backing up.
> …

---

[48] Bundle 4/60/167, with quotation at 174.
[49] Bundle 4/61/314 at 315, para 4, and at 319, para 18.
[50] Bundle 4/62/324, subsequent quotes at 332, 334 and 335-336.

> Mr. Nader at page 11: The last question is whether the Court is prepared to grant a freezing injunction in aid of this enforcement process.
> The Court: And you say there is an obvious risk of dissipation because he is actually trying to sell these properties.
>
> …
> Mr. Nader at page 12: There is the fact that he appears to be hiding and then as you said, there is the fact that K2 Intelligence have identified certainly that the asset of King Fame Trading Ltd, that's the American house, has been on the market recently for about half, I think, what was paid for it.  They have also identified in respect of the Singapore property that it may be for sale.  They can see that a flat, an apartment, you probably could say, in that building is for sale.  They can't say with certainty that it is that and the risk is that what will happen is a fire sale, the money — I should say actually again for full and frank purposes there is a mortgage over the Singapore property in favour of UBS.  But whatever monies result from those sale[s] go to Mr. Qin.  He is in China and we have little prospect of accessing those in the circumstances."

[79]   Now there is in the papers for the *inter partes* hearing a print out of the Realtor.com webpage for Applegreen Drive downloaded on 24th February 2020.[51] This is the webpage identified by K2 in their first report.  Under "property history" it says: "This property was sold once in the last 10 years.  Mar 7, 2011 Sold for $15,880,000.   Dec 1, 2010 Listed for $20,000,000. History data displayed is obtained from public records and/or MLS feeds from the local jurisdiction.  Contact REALTOR® directly in order to obtain latest information."  Under "property details", it says: "Status: off market."

[80]   This screenshot does not show what K2 says they found in October 2019.  K2 did not take any screenshot of the webpage, so we do not know what they would have seen when they downloaded the webpage.  However, it is clear that they did not just invent the figure of $8,348,400.   This is because Mr. Qin in his second affidavit[52] says:

> "The first report notes that [Applegreen Drive] was listed for sale in April 2019 with an asking price of USD 8,348,400, but that it had subsequently been withdrawn from the market without any sale having taken place.

---

[51] Bundle 3A/36/421.
[52] Bundle 2/17/89 at para 35.

However, that was an error and the house was never on the market.  The link to Realtor.com which is referenced in the K2 report simply shows the house and says it has an 'estimated value of $8,348,400'.  This appears to have been based on an estimate taken from the value of houses in the area.  There is nothing at all to suggest that the house was on the market.  Indeed, the website just seems to be one that gives information about houses and their values in different locations."

[81]   Mr. Qin does not seem to have taken a screenshot either.  What he is saying is also inconsistent with the only screenshot we do have, because there is no estimated value of Applegreen Drive given on that screenshot.  Nor does the figure of $8,348,400 appear on the extant screenshot at all.

[82]   The Court is normally reluctant to resolve this type of dispute on affidavit evidence without cross-examination.  However, here it is said that the Court was deliberately misled.  If that allegation is established, then it has a very material impact on the Court's decision whether to discharge the *ex parte* injunction and whether to reimpose an injunction following the discharge: see the passages from **Paraskevaides** above.  I therefore consider that I have to do the best I can on the evidence adduced by the parties.

[83]   K2 have no reason to want to invent the fact that Applegreen Drive had been on the market.  The figure of $8,348,400 is, as I have said, not an invented one.  It is what Mr. Qin says was on the website.  However, Mr. Qin's case that the $8,348,400 was the estimated value of Applegreen Drive is in my judgment improbable.  It would mean a nearly 50 per cent drop in the property's value since its purchase in 2011.  There is nothing on the available screenshot of the webpage to suggest that there was any such drop in real estate prices in the area.  Further, Ms. Liu says about $8.5 million has been spent on improving the property: see her first affidavit.[53]   Such an investment would normally enhance the value of a property.  I am mindful of the fact that there is an inconsistency in K2's evidence as to whether the offer price was $7,557,000 or $8,348,400, and that either price is

---

[53] Bundle 2/13/21 at para 6.

an oddly precise figure.  However, it is common ground that the latter figure was indeed on the website.  I have to decide on balance of probabilities whether $8,348,400 was an offer price or an estimate of value.  Mr. Qin has an obvious interest in establishing that Great Panorama misled me.  Balancing all these considerations, I prefer the evidence of K2 to that of Mr. Qin and find that the property was indeed offered at a fire sale price in April 2019.

[84]  In these circumstances, on balance of probabilities I refuse to find that Great Panorama deliberately misled me at the *ex parte* hearing by wrongly asserting that Applegreen Drive had been placed on the market in April 2019 at $8,348,400.  By Great Panorama, I include K2, Mr. Kitchell and their legal representatives.

[85]  The respondents criticise Great Panorama and its legal representatives for not checking what was on the Realtor.com website themselves and taking a screenshot.  This last criticism might of course equally be levied at Mr. Qin, who by the time he was doing his research was aware of the forensic importance of what was on the webpage.  In the light of my finding of fact that the property was marketed, any want of care in failing to check the website is not causative of any misleading of the Court.

[86]  The respondents criticise the evidence of Mr. Kitchell that Mr. Qin had "effectively gone into hiding in mainland China".  Mr. Qin has produced immigration stamps showing that he was in fact moving internationally, including to Hong Kong and the United States.  I accept that Mr. Kitchell's averment as to Mr. Qin's hiding was in fact incorrect.  However, Mr. Kitchell gives a detailed explanation in his third affidavit of the reasons for his belief.[54]  Without his being cross-examined, I have no basis on which I can doubt that Mr. Kitchell did indeed have that belief.  The facts he states would justify such a belief.  There were no further steps which Great Panorama could have sensibly taken to check Mr. Qin's whereabouts.  I find that there was no deliberate or negligent misstatement to the Court on the *ex parte* hearing.

---

[54] Bundle 2/15/35 at paras 7 and 8.

[87]    Lastly, the respondents criticise the presentation made by Mr. Nader to me.   In
particular, they rely on a failure speedily to correct an error under which I laboured.
At page 11 of the transcript, it will be recalled I said: "And you say there is an
obvious risk of dissipation because he is actually trying to sell these properties."
This overstated the evidence.   Mr. Nader did correct me (see the passage I have
cited from page 12 of the transcript), but Mr. Burkill and Mr. Fay QC submitted that
the correction was too late.

[88]    This in my judgment is requiring too much of an advocate.   As I said in **Renova
Industries Ltd and others v Emmerson International Corp and other**:[55]

> "The Vekselberg Parties make a general complaint that the style of
> advocacy on the *ex parte* applications was unnecessarily aggressive and
> that this was incompatible with a fair presentation of the absent parties'
> case.   With hindsight it would have been much better if [leading counsel]
> had split the advocacy with his first junior, so that [the latter] could have
> presented the points which the Vekselberg Parties and ABC would have
> wished to make, had they been present.   However, if there was a fair and
> even-handed presentation of the substantive points which should have
> been drawn to the Court's attention on the *ex parte* applications, the fact
> that the case for the applicants for the freezing orders was presented
> aggressively would not in my judgment be a free-standing ground for
> setting aside the *ex parte* orders.   The Court is not well-placed to make,
> effectively artistic, judgments on whether an advocate is 'aggressive'
> rather than merely 'firm' or 'doughty' or 'persistent'.   Every judge will have
> his or her own view on the style of advocates.   By contrast, it can assess
> whether there has been a fair presentation of the absent side's case
> reasonably easily."

[89]    In my judgment the correction which Mr. Nader made of my misapprehension was
sufficient to meet the duties laid upon him on an *ex parte* application.

[90]    The respondents also criticise Great Panorama for its reliance on the K2 reports.
These were reports from a private investigator.   The duty of care assumed in the
reports was only to Dechert LLP, Great Panorama's lawyers.   There was no

---

[55] BVIHC (COM) 2013/0160 (determined 19th June 2019) at para [131].

declaration of truthfulness given to the Court.  It was not, they submit, a balanced report.  In my judgment these matters go merely to weight.  There is no adequate evidence that any further or different investigations would have revealed matters which would have been exculpatory.  If the transfer of the King Fame share had been discovered, that would have been damning rather than exculpatory.

[91]    The only exception is in relation to St Regis, where it might have been possible to have a dummy purchaser arrange a viewing to confirm whether the apartment on sale was indeed St Regis.  However, there is no evidence how easy arranging a viewing would have been.  Estate agents selling über-prime properties are usually very wary of time-wasters and very protective of the privacy of their clients.  In the event, appropriately little weight was put on the potential marketing of St Regis by Mr. Nader at the *ex parte* hearing.   He expressly flagged up the evidential weakness of his case in relation to St Regis.

[92]    Lastly, the respondents say that the application for the freezing order and **Chabra** relief should have been made *inter partes*.   This is because the assets of Dayspring and King Fame were real property, which cannot be disposed of quickly.  I do not accept that it was inappropriate to deal with the matter *ex parte*. There are steps, such as the creation of charges or the exchange of contracts (coupled with the grant by the vendor of a non-rescindable power of attorney to the purchaser), which a debtor can take very quickly to make enforcement against assets difficult.  In any event, it was for me hearing the application to decide whether to adjourn it to be heard *inter partes*.   No blame attaches to Great Panorama.

[93]    Looking at matters overall, in my judgment, Great Panorama was not in breach of its duties of full and frank disclosure on the *ex parte* application before me. Accordingly I decline to discharge the order I made on that occasion.

[94]    I should add that even if I am wrong in some of my conclusions and should discharge the injunction originally granted, this would have been an appropriate

case for reimposing the injunction.  If I am wrong in finding that Applegreen Drive had been marketed in April 2019, the error would have been that of K2.  No doubt K2 should have double-checked the website, but their failure to do so would have been negligent rather than deliberate.  Maybe Great Panorama's lawyers should have checked the website, although this smacks of hindsight, but again this would have fallen in the category of that which they ought to have done, rather than any deliberate breach of their duties.  It would in my judgment be disproportionate to refuse to reinstate the injunction in the circumstances of this case.  If no relief is granted against King Fame, there is a very real prospect of Goldteam being unable to execute a judgment against Applegreen Drive, a property which is likely to be worth greatly in excess of the $15.88 million for which it was purchased.  Any breach of Great Panorama's duties of full and frank disclosure would have been at the lower end of the scale.  In the exercise of my discretion I would have reimposed the injunction.

### Conclusion

[95]   Accordingly, I refuse to discharge the injunction.  When I had this draft circulated, I indicated that I would hear the parties on costs and on what further directions I should give.  I need hardly say that when giving directions this Court would not have countenanced the sloth displayed by the claimant in the prosecution of this action to date.  In the event, I considered written submissions.

### Postscript

[96]   I had a copy of this judgment distributed in draft to the parties as long ago as 13th July with a request for corrections and an agreed order by 17th July.  Corrections were provided by then, but counsel could not agree the form of order.  They requested a short oral hearing, but counsel's availability was such that none could be arranged before the end of term.  I accordingly gave directions for written submissions, the last of which I received on 10th August.

[97]   After circulating my draft judgment, on 17th July 2020 Ogier on behalf of King Fame filed a witness statement from Mr. Nicholas Brookes.  Ogier invited me to

reopen part of my judgment on the basis of this new evidence.  I indicated that I would refuse to read the witness statement without a formal application being made on behalf of King Fame.

[98]    The law on judges changing their orders is now clear.  It is open to a judge to change the outcome of a case at any time before the judge's order is sealed: **Re L (Children) (Preliminary Finding: Power to Reverse)**,[56] substantially widening the **Barrell** jurisdiction.[57]  The judge also has the power to admit further evidence. For obvious reasons, this is an exceptional jurisdiction.  The purpose of distributing a judgment so that parties can correct any errors.  It is not to permit the parties to reargue their cases or fill in evidential *lacunae*: **Outlook Asset Management LP and others v Capstone Corporate Ltd and others**.[58]

[99]    The day that evidence was filed, at my direction my assistant sent an email saying that I did not consider it appropriate for me to read the witness statement "without an application being made on which the other parties can comment."  I pointed out that the "circulation of a draft judgment is not intended as an opportunity for parties to adduce further evidence."  If an application had been made it would have given Great Panorama and Goldteam an opportunity to make submissions on the proposed new evidence and, if so advised, answer it with further evidence.  King Fame made no application, so that in my judgment is the end of the matter.  I decline to read the proposed new evidence without a formal application.

[100]   I should add that from what little I have been able to glean from Mr. Burkill's comments, it appears that the proposed fresh evidence comprises a further screenshot of the realtor.com webpage for Applegreen Drive, but dating from after the distribution of the draft judgment.  It apparently shows an estimated value of Applegreen Drive.  However, insofar as the true value of Applegreen Drive is relevant, the Court would usually expect expert valuation evidence rather than the notoriously unreliable figures which real estate websites can generate.  Moreover

---

[56] [2013] UKSC 8, [2013] 1 WLR 634.
[57] See Re Barrell Enterprises [1973] 1 WLR 19.
[58] BVIHCMAP 2018/0016 (determined 11th February 2019) at para [36]ff.

the evidence would appear to have only a limited relevance to the question of whose evidence I prefer on whether $8,348,400 was an offer price or an estimate of value.  As a matter of discretion, even if I had not directed King Fame to issue an application, I would have refused to entertain the new evidence.  There must be some finality to interlocutory applications.

[101]   I turn then to costs.  Mr. Burkill and Mr. Fay QC submit that until Dayspring and King Fame were added as defendants (rather than respondents) the Court had no jurisdiction to grant **Chabra** relief.  I disagree.  The Court always had jurisdiction to grant **Chabra** relief; Great Panorama's failure to add them as defendants was a venial sin, easily remedied once **Broad Idea (No 2)** showed their divergence from the path of righteousness.  In any event, negligible costs were caused by their being named as respondents rather than defendants.   This point is wholly unrelated to the underlying merits of the application for **Chabra** relief.

[102]   Looking at the different heads of costs, there are firstly the costs of substituting Goldteam for Great Panorama.  Such costs must usually be borne by the party making the substitution.  In this case, however, the defendants raised an issue as to whether as a matter of Hong Kong law a judgment debt could be assigned. This necessitated Great Panorama obtaining an expert report on Hong Kong law. In my judgment, this was unreasonable behaviour on the part of the defendants. This territory is one of the few jurisdictions which do not allow the legal assignment of debts.  Even if (which I doubt) the defendants thought there might be some genuine argument about the validity in Hong Kong law of the assignment from Great Panorama to Goldteam, all the firms involved in this case have Hong Kong offices which would have provided easy access to Hong Kong lawyers who could have given a quick and easy answer.  The sole effect of insisting that Great Panorama obtain an expert report was to rack up costs.  The defendants' costs of the substitution application will be insignificant compared to the costs of the substantive applications.  Therefore, I shall order that there be no order for costs on the substitution application, save that the defendants do pay the claimant's costs of and in the obtaining of expert evidence of Hong Kong law.

41

[103]   A claimant is entitled to amend its pleadings once before the date of the first case management conference (which has not yet occurred).  The defendants complain that Great Panorama and Goldteam are now on their fourth draft amended pleading.  That is not an unreasonable complaint but, unless and until a claimant actually serves its amended pleading, the drafts are as if written on water.  The defendants particularly complain that Ms. Liu has been added as a defendant, before any application has been made to serve her outside the jurisdiction.  I fail to see how this can prevent the claimant making the amendment.  Likewise the defendants complain that, when arguing the case for the continuation of the injunction, Great Panorama was relying on an earlier version of the proposed amended pleadings.  They succeeded on the earlier version and have not abandoned any of the averments made in those proposed pleadings.  Again, I do not see why it is objectionable for them now to try and widen their case, for example by adding Ms. Liu as a party based on a fresh cause of action.  The claimant must, however, bear its costs of the amendments.

[104]   As to the costs of the *ex parte* application for the **Chabra** injunction, the parties are agreed that these should be costs in the case and I would in any event have made that order.  As to the costs of the applications for continuation and for discharge, in my judgment Great Panorama has been successful.  In particular, the serious allegation that the Court was misled on the *ex parte* application has failed.  In my judgment, the three defendants should pay those costs.


**Adrian Jack**
Commercial Court Judge [Ag.]


**By the Court**


**Registrar**