# EXHIBIT H



# Court of First Instance

You are here:  HKLII >> Databases >> Court of First Instance >> 2021 >> [2021] HKCFI 2422

Database Search | Name Search | Recent Decisions | Noteup | LawCite | MS Word Format | Corrigendum 1 (Word Format) | Context | No Context | Help

# GOLDTEAM GROUP LTD v. QIN HUI [2021] HKCFI 2422; [2021] 5 HKC 708; HCA 1217/2019 (18 August 2021)

HCA 1217/2019

[2021] HKCFI 2422

**IN THE HIGH COURT OF THE**

**HONG KONG SPECIAL ADMINISTRATIVE REGION**

**COURT OF FIRST INSTANCE**

ACTION NO 1217 OF 2019

_____

BETWEEN

|  |  |  |
|---|---|---|
|  | GOLDTEAM GROUP LIMITED | Plaintiff |
|  | and |  |
|  | QIN HUI (覃輝) | Defendant |

_____

Before:      Hon Linda Chan J in Chambers

Date of Hearing:        5 August 2021
Date of Decision:       18 August 2021
Date of Corrigendum: 2 November 2021

_____

C O R R I G E N D U M

_____

Please note the following amendment in the Decision dated 18 August 2021: -

1. In paragraph 50, lines S-T should read "…such holding is, with the greatest respect to the leaned Judge…".

(Hilary Yu)

for Registrar, High Court

HCA 1217/2019

[2021] HKCFI 2422

# IN THE HIGH COURT OF THE

# HONG KONG SPECIAL ADMINISTRATIVE REGION

# COURT OF FIRST INSTANCE

ACTION NO 1217 OF 2019

_____

BETWEEN

|  |  |  |
|---|---|---|
| | GOLDTEAM GROUP LIMITED | Plaintiff |
| | and | |
| | QIN HUI (覃輝) | Defendant |

_____

Before: Hon Linda Chan J in Chambers

Date of Hearing: 5 August 2021

Date of Decision: 18 August 2021

_____

D E C I S I O N

_____

1. There is before the Court an appeal brought by the defendant ("**D**") against the order of Master Jonathan Wong dated 19 January 2021 dismissing the Summons dated 22 June 2020 (as amended on 1 September 2020) ("**Summons**") to set aside the "Default Judgment" (as defined in §17 below).

2. In this matter, D filed all the substantive affirmations in Chinese which, in turn, referred to many documents in Chinese. No attempt has been made by D's solicitors to provide any English translation on any of the documents in Chinese. This is most undesirable. Not only does it restrict the pool of judges who can hear the matter, it also imposes an unnecessary burden on the Court in having to translate the contents of the documents when writing the decision. The practitioners are well aware that this is not the proper way to prepare an application. If there are good grounds to justify dispensation with translation of documents (none has been shown here), the solicitors should apply to the Court for such direction in a timely manner. Failure to do so may result in adjournment of the hearing with costs to be awarded against the party (or their legal advisers) in default.

A. Factual background

Qin_00000027

3. Goldteam Group Limited ("**P**") is a company within a group of companies in Hong Kong known as "Emperor Group". It is the assignee of the rights under the "Loan Agreement" (as defined in §5 below). Apart from this action, there are other ongoing litigations between D and the companies within the Emperor Group.

4. D holds a passport issued by the Mainland authority. He also holds a HKID card in the name of Li Muk Lam (李木林) which bears a date of birth different from that stated in his passport. D was the major shareholder of ⬅ **SMI Holdings Group Limited** ➡ ("**SMI**"), a company previously listed on the Stock Exchange of Hong Kong Limited, holding 70.02% of its issued shares. Although D did not hold any formal position in SMI, he was the controlling shareholder of SMI and had been involved in running the companies within the SMI Group[1].

> (1) Until 25 October 2019 when SMI's registered office was changed to Room 1102, Lee Garden One, 33 Hysan Avenue ("**Lee Garden Address**"), the registered office was at Room 6701, The Center, 99 Queen's Road Central ("**Center Address**").
>
> (2) Before its demise, SMI had a number of subsidiaries including SMI Investment (HK) Ltd ("**SMI Investment**") and SMI Culture & Travel Group Holdings Ltd.
>
> (3) SMI was wound up by the Court on 7 May 2020 and liquidators were appointed on 12 May 2020.

5. By a loan agreement (in Chinese) dated 26 June 2018 made between Mr Cheung Chung Kiu (as lender) ("**Cheung**") and D (as borrower) ("**Loan Agreement**"), the parties agreed as follows:

> (1) The correspondence address of D is the Center Address;
>
> (2) Cheung will advance a HK$150 million loan to D ("**Loan**") on 26 June 2018, with interest at 2% per month, and D will pay monthly interest of HK$3 million on the Loan;
>
> (3) D will repay the Loan together with any unpaid interest within 3 months, that is, by 26 September 2018;
>
> (4) D acknowledges that Cheung does not engage in money lending business, and Cheung agreed to advance the Loan to D on a friendly basis; and
>
> (5) The Agreement is governed by Hong Kong law.

6. The Loan was paid to D in full on 26 June 2018 by way of a cheque. Two days later, on 28 June 2018, D paid HK$110 million into a margin account opened in the name of SMI Investment at Emperor Securities Ltd ("**Emperor Securities**").

7. D did not repay the Loan by its due date, but paid interest in the aggregate amount of HK$22 million by 30 April 2019.

8. By a deed of assignment dated 25 June 2019, Cheung assigned "the Loan and all outstanding accrued interests [*sic*] thereon together with all rights, titles and benefits of [Cheung] derived on the Loan and the Loan Agreement" to Great Panorama International Limited ("**GPIL**") for HK$75 million ("**1st Assignment**").

9. By letters dated 26 June 2019 and 3 July 2019 Messrs YF Lam & Co ("**YFL**"), on behalf of GPIL, gave notice of the 1st Assignment to D and demanded D to pay HK$164 million, being the amount due as at the date of the letter. The letters were sent to the Center Address and addressed to D.

10. By another letter dated 3 July 2019 sent to the Center Address, YFL referred to D's default and demanded D to pay the amount due within the next 3 days and enclosed a copy of a notice of the 1st Assignment.

11. On 8 July 2019, GPIL issued the writ in this action claiming HK$165.3 million, being the Loan plus interest accrued from 26 January 2019 to the date of the writ. On the same day, the writ was served on D by registered post at the Center Address. In the affirmation of Wong Tin Lok Jason filed on 30 July 2019 ("**Aff of Service**"), the Center Address was described as D's "usual or last known address". The writ has never been returned to P.

12. D produced statements of travel records obtained from the Immigration Department which show that for the period from 1 July 2019 to 31 October 2019:

> (1) there was no record of arrival or departure recorded under the name of "Qin Hui"; and
>
> (2) there were 4 arrival and 4 departure records under the name of "Li Muk Lam", which show that he (a) arrived Hong Kong on 22 July 2019 and left on the same day; (b) arrived Hong Kong on 23 July 2019 and left on the same day; (c) arrived Hong Kong again the same evening of 23 July 2019 and left on 24 July 2019; and (d) arrived Hong Kong on 21 October 2019 and left on 22 October 2019.

13. On 12 July 2019, there was a meeting ("**1st Meeting**") between Mr Eric Yung ("**Yung**"), solicitor for GPIL, Mr Kitchell Osman Bin, director of GPIL, Mr Kevin Chan ("**Chan**"), assistant to Chairman of SMI, and Mr Kenneth Jack Shang ("**Shang**"), Executive Director of SMI[2]. On 22 July 2019, the same parties held a further meeting ("**2nd Meeting**").

14. Although the parties disagree on whether certain statements were made by Shang during the 1st and 2nd Meetings, it is clear that prior to the 1st Meeting, D was already aware that GPIL had issued a writ against him and the purpose of the 1st Meeting was to discuss GPIL's claim. This can be seen from §§7-15 of an affirmation made by Shang on behalf of D in the "BVI Proceedings" (as defined in §18 below) on 7 April 2020 ("**Shang's BVI Aff**"):

> "7. The 12 July 2019 meeting was an initial fact gathering meeting for myself and [Chan] <u>to determine the basis of [GPIL's] claim</u> and to identify the individuals that control [GPIL] …
>
> 8. <u>Prior to this meeting, I had little background on [GPIL's] claim against [D]</u>, and was not aware that the claim related to an alleged debt that Mr Chuang (through [GPIL]) claimed to have purchased from [Cheung].
>
> 9. … <u>The purpose of the 12 July 2019 meeting was to obtain facts regarding [GPIL's] claim, and to have a better understanding of why [GPIL] had brought a lawsuit against [D]</u>. Any preliminary discussions about possible ways [GPIL's] claim could be addressed, were simply that, preliminary discussions.
>
> 10. [D] did not authorize me to present any settlement proposals to [GPIL]/Mr Osman Bin, and no settlement proposal was offered at the 12 July 2019 meeting …
>
> 11. …
>
> 12. Indeed, <u>I work closely with [D]</u> and I am aware that he regularly travels between Singapore, Hong Kong, mainland China and the United States for both business and personal reasons.
>
> 13. During the 22 July 2019 meeting, I explained to Mr Osman Bin that [<u>D] was extremely busy running SMI Group</u>, that he was regularly travelling throughout Asia

to meet with investors, and that I did not know when [D] would be returning to Hong Kong …

14. … <u>Our preliminary discussions were intended to provide me with a better understanding of [GPIL's] claim so that I could later relay the information to [D] for his consideration</u>.

15. … At the conclusion of the 22 July 2019 meeting, <u>I offered to set up a meeting between [D], Mr Chuang and Mr Osman Bin</u> in Beijing or Shenzhen to discuss [GPIL's] claim." (underlined added)

15. D did not file any notice of intention to defend. On 30 July 2019, P applied for default judgment against D.

16. In answer to the requisitions raised by the Registrar dated 15 August 2019, P filed the affirmation of Yung Chun Wan on 19 August 2019 ("**Yung 1st**") wherein he referred to the Aff of Service and confirmed that in the opinion of P, the writ would have come to the knowledge of D "within 7 days thereafter, i.e. on 15th July 2019".

17. On 26 August 209, a default judgment was entered against D requiring him to pay GPIL the sum of HK$165.3 million and interest on the Loan from 9 July 2019 to 26 August 2019 at 2% per month and, thereafter, at judgment rate until payment together with costs at HK$11,045 ("**Default Judgment**").

18. On 16 December 2019, GPIL commenced proceedings in the British Virgin Islands to enforce the Default Judgment against D ("**BVI Proceedings**"). On 19 December 2019, GPIL obtained an *ex parte* freezing order in the BVI Proceedings against D, Dayspring Investments Ltd ("**Dayspring**") [3] and King Fame Trading Ltd ("**King Fame**") [4], both are BVI companies whose shares were registered in D's name, up to the value of GPIL's claim together with an ancillary disclosure order against them ("**BVI Injunction**"). The BVI Injunction was granted against Dayspring and King Fame under the *Chabra* jurisdiction.

19. D received the claim form together with the statement of claim in the BVI Proceedings delivered to the Center Address and the Lee Garden Address on 20 December 2019, as stated in the Acknowledgment of Service filed by Messrs Harneys on behalf of D in the BVI Proceedings on 24 January 2020 ("**BVI AS**").

20. By a deed of assignment dated 13 January 2020, GPIL assigned all the rights, benefit, title, interests and cause of action in and under (1) the Loan Agreement, (2) this action and (3) the BVI Proceedings to P for HK$117 million ("**2nd Assignment**"). Notice of assignment was sent to D at the Center Address and the Lee Garden address on the same day as the 2nd Assignment.

21. On 24 February 2020, P was ordered to be substituted as the plaintiff in this action.

22. On 22 June 2020, D issued the Summons.

23. On 19 January 2021, Master Jonathan Wong dismissed the Summons with costs. D lodged the present appeal on 2 February 2021.

24. After a contested hearing which took place on 25-26 June 2020, Jack J in his judgment dated 13 August 2020 ("**August Judgment**") continued the BVI Injunction and dismissed the defendants' application to discharge the BVI Injunction with costs against them.

B. Applicable principles

25. An appeal from the master to the judge in chambers is dealt with by way of a rehearing of the application which led to the order under appeal, and the judge treats the matter as though

it came before him for the first time. The judge is in no way fettered by the previous exercise of the master's discretion. Fresh points may be raised before the judge which were not raised or taken before the master (*Hong Kong Civil Procedure 2021*, §§58/1/2, 58/1/5).

26. Where a default judgment was obtained irregularly, the judgment would be set aside as of right, and the Court does not have to consider the merits of the proposed defence although the Court will not shut its eyes to the surrounding circumstances and why things went wrong and has a residual discretion to impose terms for setting aside an irregular judgment having regard to the parties' conduct. In particular, the Court may set aside an irregular judgment on condition that the monies owing should be paid into Court where there has been substantial delay in making the application and the defendant has not shown any defence on the merits to the plaintiff's claim (*Po Kwong Marble Factory Ltd v Wah Yee Decoration Co Ltd* [1996] 4 HKC 157 (CA); *Hong Kong Civil Procedure 2021*, Vol 1, §13/9/4(2)(d), §13/9/10 and §13/9/18).

27. By contrast, in an application to set aside a regular default judgment, the major consideration is whether the defendant has shown a defence on the merits. For this purpose, the defendant must show that he has "a real prospect of success". In the exercise of the discretion under the rule, the Court will have regard to all relevant circumstances in order to see where the justice of the case lies. The factors include why the default occurred, the defendant's conduct after he had notice of the proceedings, an explanation for the time taken where there has been delay in making the application, and any prejudice that would be caused to the plaintiff or to third parties if the default judgment were to be set aside (*Hong Kong Civil Procedure 2021*, Vol 1, §§13/9/13, 13/9/14).

C. Discussion

28. Mr Anson Wong SC (leading Ms Rosa Lee) contends that the Default Judgment should be set aside without any condition for the following reasons:

> (1) At the time the writ was served on D by registered post, D was not present within the jurisdiction. As such, there can be no valid service under Order 10 rule 1(2) of the Rules of the High Court ("**RHC**") (No Valid Service Ground).
>
> (2) Even if (which is not accepted) D's subsequent knowledge of the writ is relevant, the burden is on P to show on a balance of probabilities that D has acquired knowledge of the writ prior to or during 22-23 July 2019 while he was within the jurisdiction. P fails to discharge such burden (No Knowledge of Writ Ground).
>
> (3) There was no undue delay in issuing the Summons as D only knew of the writ in late December 2019. Due to the coronavirus pandemic, and the substantial time and efforts required to prepare instructions and communicate with his legal teams in relation to this action and the other actions between D and the Emperor Group, D was only able to issue the Summons in June 2020 (No Delay Ground).
>
> (4) D has a meritorious defence which "could well be established at trial" (Meritorious Defence Ground).

C1. No Valid Service Ground

29. Mr Wong submits that the starting point is that a writ must be served personally on the defendant, as provided in Order 10 rule 1(1) of RHC. Although Order 10 rule 1(2)(a)-(b) provides alternative routes for service of a writ, such service would only be valid if, at the time of service, the defendant was within the jurisdiction. It is irrelevant that the defendant subsequently came back to the jurisdiction or that the writ was not returned to the plaintiff. Reliance is placed on:

> (1) The wordings of Order 10 rule 1(2) which requires the writ to be served on a defendant "within the jurisdiction";

Qin_00000031

(2) The Court of Appeal's judgment in *Deng Minghui v Chau Shuk Ling* [2007] 1 HKLRD 905, at §§11, 14-15, 22, 38;

(3) *Luen Tat Watch Band Manufacturer Ltd v Li Shu Chung* [2020] HKCFI 984, §§24-27, where Keith Yeung J applied and followed the ratio in *Deng Minghui* and held that service of a writ on the defendant by insertion into the letter box of his usual or last known address was irregular as the defendant was not within the jurisdiction at the time of service; and

(4) *Emperor Prestige Credit Limited v King Pak Fu* [2021] HKCFI 403[5], a case where the defendant was not in Hong Kong on the day the writ was served by insertion into the letter box of the defendant's usual or last known address. Au-Yeung J held (§§23-29) that the service was invalid, and was not salvaged by Order 10 rule 1(3)(a), which only governs the date of service in this way:

"23. Applying *Deng Minghui*, service under Order 10, rule 1(2) was not valid. It did not matter that the Plaintiff knew and/or believed that the HK Address was the Defendant's only or usual or last known address. <u>Nor did it matter that the Defendant acquired knowledge of the writ during the time he was out of Hong Kong and brought that knowledge with him on the day he came within Hong Kong on 23 August 2019</u>.

…

26. With respect to Mr Ismail, Order 10, rule 1(3)(a) governs the date of service. To ascertain the date of service before meeting the requirement of serving a defendant within the jurisdiction is putting the cart before the horse. *Barclays Bank v Hahn* does not assist the Plaintiff.

…

29. … Applying *Deng Minghui*, which is binding on this Court, the Defendant's acquisition of knowledge of the writ was irrelevant as he was out of jurisdiction at the time of service." (underlined added)

30. Mr CY Li SC (leading Mr Justin Ismail), counsel for P, accepts that as D was not within the jurisdiction at the time or on the seventh day after the writ was sent to the Center Address, P cannot rely on the deemed date of service stipulated in Order 10 rule 1(3)(a). Instead, P bears the burden to prove, on a balance of probabilities, that D was within the jurisdiction *and* had knowledge of the writ before the Default Judgment was entered against him.

31. Mr Li submits that the combined effect of Order 10 rule 1(2)(a) and (3)(a) is that if at the time of service of the writ, the defendant was within the jurisdiction, he would be deemed to have been served on the seventh day after the writ was sent to his usual or last known address. However, if the defendant shows that he was not within the jurisdiction at the time of service, there can be no deemed service, and the plaintiff bears the burden to show that the defendant came within the jurisdiction at some later point of time *and* had knowledge of the writ. Service occurs at the moment when presence within the jurisdiction and knowledge of the writ coincide. Reliance is placed on *Barclays Bank of Swaziland Ltd v Hahn* [1989] 1 WLR 506, 510F-G, 511E-512B, per Lord Brightman; *India Videogram Association Ltd v Patel and ors* [1991] 1 WLR 173 at 175; *Wing Lung Bank Ltd v Ho Man Iam* [1999] 3 HKC 368 at 372B-F; *City & Country Properties Ltd v Kamali* [2007] 1 WLR 1219, §§3, 5, 8, per May LJ, §28, per Neuberger LJ; *Booth* (2002) 32 HKLJ 135, at 147; *Du Huizhen v Chen Mei Huan*, HCA 1176/2012, 15 July 2014, §§28-33; *Christow Corp Trust v Asiacom International Holdings Ltd* [2015] 2 HKLRD 1134, at §§16-26, 29-30; and *Chan Yeuk Ping v Wang Wei Ming* [2019] HKCFI 1634, at §§13-15, §§24, 29.

32. Mr Li contends that *Emperor Prestige* was wrongly decided as it was based on an incomplete reading of *Barclays Bank of Swaziland*, and applied *Deng Minghui* which was

distinguishable given that the defendant in that case never came within the jurisdiction.

33. For the reasons set out below, I agree with Mr Li's submissions that where the defendant was outside the jurisdiction at the time the writ was served in accordance with Order 10 rule 1(2), service occurs at the moment when the defendant's presence within the jurisdiction and knowledge of the writ coincide.

34. Order 10 rule 1(2)-(3) provide as follows:

> "(2) A writ for service on <u>a defendant within the jurisdiction</u> may, instead of being served personally on him, be served:
>
>> (a) by sending a copy of the writ by registered post to the defendant at his usual or last known address, or
>>
>> (b) if there is a letter box for that address, by inserting through the letter box a copy of the writ enclosed in a sealed envelope addressed to the defendant.
>
> (3) Where a writ is served in accordance with paragraph (2)—
>
>> (a) the date of service shall, <u>unless the contrary is shown</u>, be deemed to be the seventh day (ignoring Order 3, rule 2(5)) after the date on which the copy was sent to, or as the case may be, inserted through the letter box for, the address in question;
>>
>> (b) any affidavit proving due service of the writ must contain a statement to the effect that –
>>
>>> (i) in the opinion of the deponent (or, if the deponent is the plaintiff's solicitor or an employee of that solicitor, in the opinion of the plaintiff) the copy of the writ, if sent to, or as the case may be, inserted through the letter box for, the address in question, will have come to the knowledge of the defendant within 7 days thereafter; and
>>>
>>> (ii) in the case of service by post, the copy of the writ has not been returned to the plaintiff through the post undelivered to the addressee." (underlined added)

35. Order 10 rule 1(2) enables a writ instead of being served personally, to be served by 2 alternative modes prescribed in Order 10 rule 1(2)(a)-(b) namely:

> (1) by sending a copy of the writ by registered post to the defendant at his usual or last known address pursuant to Order 10 rule 1(2)(a) ("**Postal Mode**"), or
>
> (2) by inserting through the letter box of the defendant's usual or last known address a copy of the writ pursuant to Order 10 rule 1(2)(b) ("**Insertion Mode**").

36. The following discussion only deals with the approach of the Court in considering the validity of service of the writ effected by the Postal Mode or the Insertion Mode when the defendant was outside the jurisdiction at the time of service.

37. As I see it, there are 4 possible scenarios which fall for consideration, depending on whether the defendant came within the jurisdiction after the writ was served up to the end of the relevant period ("**Relevant Period**")[6] and whether the defendant acquired knowledge of the writ during that period:

(1) The defendant was outside the jurisdiction at the time the writ was served by Postal Mode or Insertion Mode and *never* came within the jurisdiction during the Relevant Period and had *no knowledge* of the writ (Scenario 1).

(2) The defendant was outside the jurisdiction at the time the writ was served by Postal Mode or Insertion Mode and *never* came within the jurisdiction during the Relevant Period, but *had knowledge* of the writ whilst outside the jurisdiction (Scenario 2)

(3) The defendant was outside the jurisdiction at the time the writ was served by Postal Mode or Insertion Mode but *came within* the jurisdiction during the Relevant Period, and had *no knowledge* of the writ during the Relevant Period (Scenario 3).

(4) The defendant was outside the jurisdiction at the time the writ was served by Postal Mode or Insertion Mode but *came within* the jurisdiction during the Relevant Period, and *had knowledge* of the writ during the Relevant Period (Scenario 4).

38. Each of the above scenarios was analysed and addressed by Lord Brightman in *Barclays Bank of Swaziland*, whose ratio have been consistently applied and followed by the courts in Hong Kong.

(1) In that case, the plaintiff issued a writ against the defendant claiming some £12 million under a guarantee. The defendant and his wife lived in various places but the defendant's wife rented a flat in England since 1985. At 15:30 on 14 April 1987, the plaintiff's agent inserted a copy of the writ in a sealed envelope through the letter box of the flat. The defendant was *outside* the jurisdiction at the time the writ was served, though he came within the jurisdiction some 2 hours later (at 17:27), having crossed the French coast at 17:05. Upon his arrival, the defendant was warned by the caretaker of his flat that the envelope had been put through the letter box. He did not go to the flat and returned to Geneva the next day.

(2) The Court of Appeal held that the words "A writ for service on a defendant within the jurisdiction" are descriptive of the writ and its service and not of the defendant. The language of Order 10 does not require the presence of the defendant within the jurisdiction when the writ was served through the Postal Mode[7]. In the circumstances, the defendant had been duly served. The defendant appealed to the House of Lords and argued that service of the writ by the Postal Mode was irregular as he was outside the jurisdiction at the time the writ was served at the flat.

(3) The House of Lords dismissed the appeal albeit for different reasons. The ratio has been sufficiently summarised in the headnote:

"Held, dismissing the appeal, that for the purposes of Ord.10, r.1(2) the defendant had to be within the jurisdiction at the time of service of the writ; that in the circumstances the writ was properly served on the defendant under Ord. 10 r.1(2)(b) since the plaintiff could show for the purposes of Ord. 10, r.1(3)(a) that the deemed service of the writ was not 21 April 1987, seven days after its insertion through the letter box at the address where the defendant was to stay, but 14 April, when there could be no doubt that the copy writ came to the knowledge of the defendant when he was within the jurisdiction" (underlined added)

39. Under **Scenario 1 and 2**, service would be invalid, even if the plaintiff can show that the defendant acquired knowledge of the writ. This was explained by Lord Brightman (510H-511C) as follows:

"My Lords, I accept the appellant's proposition that the defendant must be within the jurisdiction at the time when the writ is served, and I do not find it possible to agree the Court of Appeal's approach. This approach would mean that a writ could

validly be served under Order 10 on a defendant who had once had an address in England but had permanently left this country and settled elsewhere, by inserting the copy writ through the letter box of his last address, provided that the plaintiff was able within seven days to communicate to the defendant the existence of the copy writ; for in such circumstances the plaintiff could properly depose that the copy writ would have come to the knowledge of the defendant within seven days after it was left in the letter box of his last known address. <u>This appears to me to outflank Order 11 (relating to service of process outside the jurisdiction) in every case where the defendant was formerly resident in this country and is capable of being contacted abroad within seven days</u>. I feel no doubt that the words 'within the jurisdiction' apply to the defendant, and not to the writ for service". (underlined added)

40. Under **Scenario 3 and 4**, service would be valid if, and only if, the plaintiff can show that the defendant came *within* the jurisdiction *and* had knowledge of the writ during the Relevant Period. No reliance can be placed on the deemed date of service under Order 10 rule 1(3)(a), and the plaintiff has to prove that the defendant had knowledge of the writ during the Relevant Period. This can be seen from the speech of Lord Brightman (at 511C-G):

> "My Lords, I entirely applaud the common sense of the decision of the Court of Appeal, but I prefer to reach the same destination by another route. I think that <u>the clue to the problem is to be found in paragraph 3(a) of Ord. 10, r. 1</u>. This provides, inter alia, that the date of service is to be the seventh day after the date on which the copy writ was inserted through the letter box for the address in question 'unless the contrary is shown.' It follows from the exception that there may be circumstances where the date of service is not the date of letter box insertion. I therefore ask myself, in what circumstances might a plaintiff or defendant be able to show that the seventh day after the date of insertion through the letter box was not the date of service; do such circumstances exist in the present case; and if so, what date of service takes the place of the deemed date of service?
>
> My Lords, in the case of letter box service <u>I can think of nothing which is capable of giving content to the expression 'unless the contrary is shown' save that it refers to the defendant's knowledge of the existence of the writ</u>, nor was the appellant's counsel able to suggest any other solution. Indeed, it is the obvious solution because the purpose of serving a writ is to give the defendant knowledge of the existence of proceedings against him; that is exactly what a defendant acquires when a writ is served on him personally; and <u>it is exactly what I would expect that procedural rules would require when service is impersonal and not personal</u>.
>
> So I answer the first question which I have posed by saying that a plaintiff or a defendant may displace the deemed date of service <u>by proving that the defendant acquired knowledge of the writ at some other date</u>.
>
> I turn therefore to my second question, and ask myself whether in the instant case the bank can 'show the contrary,' i.e. establish that the deemed date of service (namely 21 April) ought to be displaced by some other date. In my opinion the answer is clearly, 'yes', and that date is 14 April. For on that day, after Mr Hahn had landed at Heathrow, he acquired knowledge of the copy writ …
>
> In the result the bank is able to show the contrary, and establish without a scintilla of doubt that <u>the copy writ came to the knowledge of Mr Hahn late in the afternoon of 14 April, when he was within the jurisdiction. The writ was therefore properly served on him under Ord. 10, r. 1(2)(b) on that day</u>." (underlined added)

41. The effect of the ratio in *Barclays Bank of Swaziland* is to allow the plaintiff to prove valid service by showing that the defendant subsequently came within the jurisdiction and had knowledge of the writ (i.e. Scenario 4) is confirmed in *India Videogram*.

Qin_00000035

(1) In that case, the writ was served on the defendant (Mrs Patel) by Insertion Mode on 5 September 1988 while she was outside the jurisdiction. The defendant returned to the jurisdiction on 29 May 1989 and obtained knowledge of the writ before it expired (on 30 August 1989) (see 174D-G).

(2) Hoffmann J (as he then was) held that service of the writ was invalid as the plaintiff had failed to file the affidavit mandated by Order 10 rule 1(3)(b)(i) "in circumstances in which the writ could not have come to the knowledge of the defendant within a period of seven days" (175C-E).

(3) His Lordship went on to consider whether it was open to the plaintiff to prove valid service if the defendant subsequently came within the jurisdiction and acquired knowledge of the writ (i.e. Scenario 4) and said this (175D-G):

"In this case there is the additional difficulty that, throughout the relevant period of seven days and for a considerable time thereafter, Mrs Patel was outside the jurisdiction. In *Barclays Bank of Swaziland Ltd v Hahn* [1989] 1 WLR 506 the House of Lords decided that a defendant must be served within the jurisdiction at the time when a writ is served on him in accordance with Ord. 10, r.1. As the decision shows, however, it does not follow that the defendant has to be within the jurisdiction at the time when the envelope is put through the letter box, or at the expiry of the seven-day period which, under rule 1(3)(a) is deemed, unless the contrary is shown, to be the date of service. In *Hahn*'s case the defendant was not within the jurisdiction on either of those dates. But the House of Lords found as a fact that the writ had come to his knowledge at an intervening point when he was in England. That intervening moment when presence in England and knowledge of the writ coincided was held by the House to be the date on which service was actually shown to have taken place." (underlined added)

42. In *Deng Minghui v Chau Shuk Ling*, the Court of Appeal held that:

(1) If a defendant was not within the jurisdiction at the time of service and *never* came within the jurisdiction before the default judgment was entered, the plaintiff would not be able to establish valid service merely by showing that the defendant had acquired knowledge of the writ whilst he was outside the jurisdiction (§11);

(2) *Penrose Industries Ltd v Tam Yan Lung*, HCA 5783/2000, 10 May 2001 where Yeung J (as he then was) held that "irrespective of where the defendant was at the time of the service, if he had actually acquired knowledge of the proceedings he should not be allowed to complain about the service not being irregular and effective" was wrongly decided (§§14-15, 38); and

(3) If a writ was not properly served in the first place but subsequently came to the defendant's notice, such notice did not make the service proper (§22).

43. In my view, what the Court of Appeal decided in *Deng Minghui* was that there would be no valid service if the defendant never came within the jurisdiction, irrespective of whether the defendant had knowledge of the writ. This is a case where the Court of Appeal applied Lord Brightman's holdings on Scenario 1 and 2. The question whether there was valid service under Scenario 3 and 4 did not arise for consideration, and the Court of Appeal did not decide the point.

44. My view that service of the writ occurs at the moment when the defendant came within the jurisdiction and had knowledge of the writ is reinforced by the following authorities cited by Mr Li.

45. In *Wing Lung Bank Ltd v Ho Man Iam*, the defendant was outside the jurisdiction when service was effected (1 April 1995) but came within the jurisdiction between 5 and 7 April 1995. There was no sufficient evidence that the defendant acquired knowledge of the writ prior

Qin_00000036

to the default judgment. Keith J (as he then was) noted that in *Barclays Bank of Swaziland*, the House of Lord held (at 511B) that unless the defendant is within the jurisdiction at the time of service, the service is invalid. However, one has to take into account of the words "unless the contrary is shown" in Order 10 rule 1(3)(a). It was held in *Barclays Bank of Swaziland* (at 511F) that the effect of these words is that the deemed date of service may be displaced by proof that the defendant acquired knowledge of the writ on some other date whilst he was within the jurisdiction. As the plaintiff did not suggest that the defendant knew of the writ prior to the default judgment, service was held to be irregular (see 372B-F). This is a case on Scenario 3.

46. In *Booth* [(2002) 32 HKLJ 135](#), the learned author, after analysing the provisions under Order 10 rule 1 and the cases decided in England and in Hong Kong (at 138-143, 145-146), concluded (at 147) as follows:

> "The Hong Kong courts have adopted a number of general principles that have been consistently applied when interpreting the procedural rules. First, the defendant must be within the jurisdiction for service to take place. For this purpose, <u>the defendant need not be physically present within the jurisdiction at the precise moment the writ is sent or placed through the letter box. Provided that the defendant receives actual notice of the proceedings (whether whilst abroad or on return to the jurisdiction), service will take place at the intervening moment when presence and knowledge coincide. Thus, actual knowledge of the proceedings is as essential an ingredient as presence within the jurisdiction.</u> Second, the writ must have been sent or placed through the letter box of the defendant's last known address. However, it is pointless for a plaintiff to try and effect service at such an address where he knows that the defendant is no longer working or residing. Third, the plaintiff is required to file an affidavit proving due service. Such an affidavit may be the subject of scrutiny by the court and the plaintiff must have reasonable grounds for believing that the process will come to the defendant's notice within seven days otherwise service will not be allowed to stand.
>
> Finally, the cases emphasise that if a defendant establishes that at no time did he ever receive notice of the writ, service will not have been validly effected at all. Thus, even where the plaintiff has complied with all the technical requirements of Order 10, rule 1(2), he will falter at this final hurdle if the defendant shows that he never received notice of the writ. It is therefore <u>this key element of notice that lies at the core of the rules governing service in Hong Kong and which provides the necessary foundation for the courts to assert jurisdiction over an individual served with originating process in Hong Kong</u>." (underlined added)

47. In *Du Huizhen v Chen Mei Huan*, §§28-33, the defendant was not within jurisdiction at the time of the service but came within the jurisdiction 11 days later. DHCJ Wilson Chan (as he then was) found that the defendant had acquired knowledge of the writ some time before she was admittedly within the jurisdiction (§24). Applying the principle expounded in *Barclays Bank of Swaziland* (at 511D-512B), the writ was validly served on the defendant on the date when she came within jurisdiction. After analysing Lord Brightman's speech in *Barclays Bank of Swaziland* (§§28-31), the learned Judge concluded that "the writ was held to have been properly served on the defendant on 14 April, not because that was the date on which the writ was inserted through the letter box, but because that was the day on which the writ came to the knowledge of the defendant (after the same had been inserted through the letter box), when he was within the jurisdiction". This is a case on Scenario 4.

48. In *Christow Corp Trust v Asiacom International Holdings Ltd*, the defendant was not within jurisdiction at the time of service but returned to Hong Kong subsequently and stayed for 2 months. Master Harold Leong distinguished *Deng Minghui* on the basis that the defendant never returned to the jurisdiction. He applied the principles in *Barclays Bank of Swaziland* and *Du Huizhen* and held that the service of the writ was effected on the date the 2nd defendant

Qin_00000037

returned to Hong Kong and acquired knowledge of the writ (§§16-26, 29-30). This is a case on Scenario 4.

49. In *Chan Yeuk Ping v Wang Wei Ming* [2019] HKCFI 1634, Wilson Chan J applied the principles in *Christow Corp Trust* and held that it is not enough for the defendant to show that he was not within jurisdiction at the time of service. "The real issue is whether on a balance of probabilities, the defendant had acquired knowledge of the existence of the OS when he was within the jurisdiction before the plaintiff obtained the [default judgment]" (§§13-15). On the fact, the default judgment was set aside as the defendant had deposed that he was unaware of the proceedings until after the default judgment and the materials relied on by the plaintiff did not cast doubt on the defendant's evidence that he had not acquired knowledge of the existence of the OS before the plaintiff obtained the default judgment (§§24, 29). This is a case on Scenario 3.

50. *Emperor Prestige* is the only authority (cited by counsel) where the Court held that once it is shown that the defendant was outside the jurisdiction at the time of service, the plaintiff would not be able to show valid service even if the defendant subsequently came within the jurisdiction and acquired knowledge of the writ during the Relevant Period (i.e. Scenario 4). It seems to me that such holding is, without the greatest respect to the learned Judge, inconsistent with the ratio in *Barclays Bank of Swaziland* (discussed in §40 above).

51. In summary, there can be valid service under Order 10 rule 1(2) if the defendant was outside the jurisdiction at the time the writ was served by Postal Mode or Insertion Mode but he subsequently came within the jurisdiction *and* had knowledge of the writ during the Relevant Period. Service would be effected at the time when the defendant's presence within the jurisdiction and his knowledge of the writ coincide.

52. As D has adduced immigration records to show that he was outside the jurisdiction at the time the writ was served by the Postal Mode on 8 July 2019 and only came within the jurisdiction on 22 July 2019, P has to prove that D had knowledge of the writ during the Relevant Period.

53. I turn to consider whether D had knowledge of the writ before the Default Judgment was entered against him.

C2. No Knowledge of Writ Ground

54. In my view, there is clear evidence to show that D had acquired knowledge of the writ prior to the 1st Meeting held on 12 July 2019:

> (1) The Center Address has been used by D as his correspondence address in the Loan Agreement. D never informed the lender, be it Cheung or his assignees, that his correspondence address has been changed.
>
> (2) The writ was served at the Center Address, which was then the registered office of SMI. Although D did not hold any formal position in SMI, according to Shang, D had been "extremely busy running SMI Group" (see §14 above). It is inconceivable that D would not visit the Center Office for the purpose of running the business of SMI Group.
>
> (3) In the BVI AS filed in the BVI Proceedings on 24 January 2020, it was stated that D received GPIL's claim form delivered to the Center Address and the Lee Garden Address on 20 December 2019, the same day it was delivered to the Center Address. I do not accept D's belated assertion that the information stated in the BVI AS was inaccurate.
>
> (4) There is no suggestion that prior to the 1st Meeting, there were any other claims made by GPIL against D. In the words of Shang, GPIL's claim "related to an

Qin_00000038

alleged debt … purchased from [Cheung]". This could only have been a reference to the writ issued by GPIL in this action.

(5) More importantly, it is clear from Shang's BVI Aff in particular, his repeated references to "[GPIL's claim]" and the "lawsuit" against D, that prior to the 1st Meeting, D had already been told about the writ. According to Shang, the very purpose of the 1st Meeting was for Shang and Chan to obtain facts relating to GPIL's claim and determine the basis of such claim.

(6) It is also clear that Shang and Chan had been asked by D to attend the 1st Meeting as his representatives to discuss GPIL's claim. This is because unless they had been asked by D to do so, there would be no reason for them to attend the 1st Meeting as they had nothing to do with the writ. This is reinforced by §§14-15 of Shang's BVI Aff, where he said he would relate the information about GPIL's claim to D, and he offered to set up a meeting between D and others to discuss GPIL's claim.

55. Other than referring to the assertion made by D and Shang to the effect that "the true meaning of what D and Mr Shang intended to say [in Shang's BVI Aff] was lost in translation, as both D and Mr Shang were non-English users", Mr Wong is unable to refute any of the evidence identified in the preceding paragraph. I have no hesitation in rejecting the assertions made by D and Shang. D relied on Shang's BVI Aff in seeking to discharge the BVI Injunction granted by the court in the BVI. There has not been any attempt on D's part to amend the contents of Shang's BVI Aff in any way. It lies ill in their mouth to assert that the contents of Shang's BVI Aff did not accurately reflect what Shang said on oath.

56. As D had already acquired knowledge of the writ prior to the 1st Meeting held on 12 July 2019 whilst he was outside the jurisdiction, service of the writ took place at the time D came within the jurisdiction on 22 July 2019.

57. It follows that the Default Judgment was regular.

C3. No Delay Ground

58. This point is not determinative of the issue as to whether the Default Judgment was a regular judgment or whether D has a meritorious defence to P's claim.

59. In any event, I consider that there was inordinate delay on the part of D in issuing the Summons. It is clear that D had knowledge of the writ prior to the 1st Meeting held on 12 July 2019 but he did not take any step to file any acknowledgment of service and allowed the Default Judgment to be entered against him. Even after D had admittedly learnt of the Default Judgment, he still did not take any step to set aside the Default Judgment. I do not accept the flimsy reasons put forward by D to explain his inaction, when he was able to act swiftly by filing the BVI AS on 24 January 2020, followed by applying to discharge the BVI Injunction.

60. Even if, contrary to my view, the Default Judgment is irregular and should be set aside, I would impose as a condition for setting aside the Default Judgment by requiring D to pay the full amount of the judgment in Court within the next 21 days.

C4. Meritorious Defence Ground

61. The defence, as pleaded in the draft Defence and described in D's 1st and 3rd Affirmations, is very convoluted and confusing, not least because they are written in Chinese and without any English translation.

62. Mr Wong summarises D's case as follows:

Qin_00000039

(1) In early 2017, D and Mr Yeung (a business friend of D) verbally agreed that Mr Yeung would assist D in acquiring 200 million shares in SMI ("**SMI Shares**") at HK$200 million. Mr Yeung further represented to D that Emperor Securities owned 200 million shares in SMI which could be transferred to D, and that payment for the SMI Shares could be made by instalment, with a down payment of HK$20,000,000.

(2) On 12 January 2017 D handed 2 cheques of HK$10 million each, to Eternally Smart Limited, said to be a company designated by Mr Yeung.

(3) Between 12 January 2017 and 10 June 2018, D procured various payments to be made to Mr Yeung by passing signed cheques to Mr Yeung without the name of the payees, and Mr Yeung or his agents then filled in the name of the payees.

(4) Despite these payments, Mr Yeung failed to procure Emperor Securities to transfer any of the SMI Shares to D.

(5) D and Mr Yeung did not have sufficient liquidity to complete the purchase of the SMI Shares from Emperor Securities, whereupon D and Mr Yeung verbally agreed that:

> (a) D would, on behalf of Mr Yeung, borrow money from Cheung and transfer the same to Mr Yeung so that he could acquire the SMI Shares for D.
>
> (b) If Mr Yeung transfer the SMI Shares to D, D shall be obliged to repay the loan and any accrued interest to Cheung.
>
> (c) If Mr Yeung failed to transfer the SMI Shares to D, Mr Yeung would be solely responsible for repaying the loan to Mr Cheung. Further, Mr Yeung shall repay D the difference between the consideration payable for the SMI Shares and the loan borrowed from Cheung.

(6) Mr Yeung guaranteed Cheung that he would be responsible for all repayment obligations if he failed to transfer the SMI Shares to D, and specifically requested Cheung to advance the Loan. In consideration of the aforesaid and the close friendship between the parties, Cheung and D signed the Loan Agreement.

63. Based on the above allegations, D says that the Loan Agreement "forms part of the wider tripartite agreement" made between D, Cheung and Mr Yeung under which Mr Yeung alone is liable to repay the Loan to Cheung in the event that he failed to transfer the SMI Shares to D. Pursuant to the alleged "tripartite agreement":

> (1) On 27 June 2018, Mr Yeung (*via* another person) obtained a cheque from Cheung for $150 million and passed the same to D. As D has already paid Mr. Yeung $90 million,[8] D issued a cheque for HK$110 million to Mr Yeung, which was then deposited into a margin account maintained by SMI Investment at Emperor Securities.
>
> (2) In anticipation of Mr Yeung transferring the SMI Shares to him, D made interest payments to Cheung in the total sum of $22 million.

64. In breach of the alleged "tripartite agreement" and despite D's repeated requests, Mr Yeung failed to transfer any of the SMI Shares to D. Consequently, D is not obliged to repay the Loan to Cheung. As Cheung did not want to be embroiled in the dispute between D and Mr Yeung, he agreed to waive interest and treat D's payment of HK$22 million as partial repayment of the principal. D was subsequently informed by Cheung that Mr Yeung had repaid the outstanding principal of HK$130 million to Cheung.

65. For the above reasons:

(1) there is no contractual basis for Cheung (and his assignees) to seek repayment from D under the Loan Agreement;

(2) Mr Yeung owed D a total sum of $72 million, consisting of (a) HK$22 million repaid by D to Cheung and (b) HK$50 million (HK$90 million previously paid by D to Mr Yeung's designated companies, less $40 million retained by D from the Loan).

66. Further, the Loan is potentially not assignable given the non-assignability of the alleged "tripartite agreement". Reliance is placed on *Chitty on Contracts,* 33rd ed, at §§19-055 and 19-057.

67. In my view, the defence put forward by D is wholly incredible and in any event, does not constitute a valid defence.

68. First and foremost, the allegations advanced by D, even if established, do not constitute a valid defence to P's claim.

69. It is well established that where, as here, persons of full age and understanding are bound by the documents they signed unless they can establish a recognised legal basis to disown such documents. The principles were stated by Ribeiro PJ in *Ming Shiu Chung & ors v Ming Shiu Sum & ors* (2006) 9 HKCFAR 334 at §§84-87:

> "84. … It is in law highly material to ask how or why the father nevertheless signed the documents. Reliance is universally placed on signatures appended to documents by persons of full age and understanding as signifying the signatory's assent or adherence to what that document states. Where such a person has signed a document which purports to have legal effect, the law has never regarded it as enough to show that he signed without knowing its contents for the document to be disavowed. It is an everyday occurrence that people sign documents without reading the small (or even the large) print and therefore sign without actually knowing the terms (or all the terms) of the document signed. But they are held to the documents which they have chosen to sign unless there is shown to be a recognized legal basis for concluding that their apparent consent has been in some way vitiated or that reliance on that document by some other person falls into some category of unconscionable conduct justifying relief in equity.
>
> 85. Thus, in *Saunders v Anglia Building Society* [1971] AC 1004 at 1016, Lord Reid warned against an approach, like that of the Court of Appeal, which inverts the general rule:
>
>> 'We find in many of the authorities statements that a man's deed is not his deed if his mind does not go with his pen. But that is far too wide. It would cover cases where the man had taken no precautions at all, and there was no ground for his belief that he was signing something different from that which in fact he signed. I think that it is the wrong approach to start from that wide statement and then whittle it down by excluding cases where the remedy will not be granted. It is for the person who seeks the remedy to show that he should have it.'
>
> 86. And in *Bank of China (Hong Kong) Ltd v Fung Chin Kan* (2002) 5 HKCFAR 515 at 533, Litton NPJ acknowledged:
>
>> '… the fundamental principle that, generally speaking, when a person signs a legal document, he or she is bound by the act of signature: As a matter of general law, it is no defence to say that he or she did not understand the contents of a legal document; that person takes the chance of being bound by its terms, as he or she can take the simple

Qin_00000041

precaution of not signing until its contents have been fully explained and understood.'

87. The vitiating factors at common law include fraud, mistake, misrepresentation, *non est factum*, duress, undue influence and lack of mental capacity: see, for instance, *Blay v Pollard and Morris* [1930] 1 KB 628; and *Gillman v Gillman* (1946) 174 LT 272. <u>To disown a signed legal document, facts constituting the particular vitiating factor relied on must be pleaded and established by the evidence. …</u>" (underlined added)

70. In the present case, what is alleged by D is that despite the fact that he signed the Loan Agreement, he is not liable to repay the Loan as he had reached other oral agreements with Mr Yeung wherein the latter agreed to assume the liability to repay the Loan. This is not a case where D seeks to disown the Loan Agreement on the basis that there is a recognised legal basis which vitiates the Loan Agreement vis-à-vis the counterparty (Cheung). It is no defence for D to say that another person not named in the Loan Agreement (Mr Yeung) is liable to repay the Loan because of some collateral agreements made between him and Mr Yeung. On D's own case, the obvious person to sue is Mr Yeung, not Cheung or the subsequent assignees of the Loan Agreement.

71. In any event, the defence advanced by D in this action bears all the hallmarks of a recent fabrication and is incredible.

72. First, the defence is based on D's bare assertions. There is not a shred of document in support of D's allegations. Although copies of some cheques have been produced by D, there is nothing on those cheques to show Mr Yeung's involvement, let alone that the alleged oral agreements said to have been made with D. It is inconceivable that a sophisticated businessman like D would have agreed to sign the Loan Agreement and assumed the liability to repay the Loan without insisting on the alleged "tripartite agreement" to be put in writing.

73. Second, the allegation that D borrowed the Loan "on behalf of Mr Yeung" and D "transferred the same to Mr Yeung so that he could acquire the SMI Shares for D" is contradicted by the fact that (1) D admittedly retained HK$40 million out of the Loan, and (2) the remaining HK$110 million was not transferred to Mr Yeung, but paid into SMI Investment's margin account maintained with Emperor Securities (and hence used by SMI Investment, rather than Mr Yeung).

74. Third, the allegations made by D are materially different from the allegations he made in the BVI Proceedings. As noted in August Judgment (§14), D made the following allegations against P:

> "The claim [against him] is entirely misconceived and appears to be based on fraudulent documentation. The claim is said to arise out of an agreement, which I was not party to, entered into in November 2015 where Nation Field [a company owned by Mr Yap, a former chairman of SMI] agreed to purchase 200,000,000 shares in SMI Holdings from Wise Vanguard [an Emperor Group company] for HK$200 million … A freestanding guarantee and undertaking dated 16 November 2015 purportedly evidences my agreement to guarantee Nation Field's obligation to pay the remaining HK$180 million … However, I did not agree to give the purported guarantee, which is said to give rise to the alleged debt in this claim, and the document appears to contain a forgery of my signature."

75. After a fully contested hearing, Jack J held that the allegations of forgery relied on by D in setting aside the Default Judgment bore striking similarity with the allegations he made in HCMP 2586/2009, where Fok J (as he then was) concluded that the alleged forgery defence advanced by D filed "in the face of contemporaneous acts of those in control of the defendant", and were not capable of belief and did not give rise to a triable defence. As the findings and the underlying facts recited in Fok J's decision are admissible evidence, P has shown a good arguable case that D is a dishonest man (see §§14 – 28 of August Judgment).

Qin_00000042

76. It is irrelevant that those findings are not admissible or not binding on this Court (assuming Mr Wong's submission is right[9]). This Court can certainly take into account the allegations made by the parties on oath in the BVI Proceedings in deciding whether the allegations put forward by the same parties in this action are credible. In my view, the fact that D put forward a completely different defence in the BVI Proceedings reinforces my view that the allegations advanced by D in this action are incredible and do not give rise to an arguable defence.

D. Disposition and costs

77. In conclusion, the Default Judgment is a regular judgment. D fails to show that he has any defence on merit to P's claim. It follows that the Master was right in dismissing the Summons. D's appeal is dismissed.

78. As for costs, I make a costs order *nisi* that the costs of and occasioned by D's appeal be paid by D to P forthwith, with certificate for 2 counsel. The costs will be assessed by way of gross sum assessment. P shall lodge the statement of costs within the next 3 days of this Decision, and D shall lodge its comments, if any, on the statement, within the next 3 days thereafter. Time to run during summer vacation.

(Linda Chan)
Judge of the Court of First Instance
High Court

Mr CY Li, SC leading Mr Justin Ismail, instructed by Woo, Kwan, Lee & Lo, for the plaintiff

Mr Anson Wong, SC leading Ms Rosa Lee, instructed by Stephenson Harwood, for the defendant

---

[1] As stated in Shang's BVI Affirmation. See §14

[2] Shang became Chairman of SMI with effect from 19 February 2020. Prior to his appointment, Dr Lo Wing Yan William was Chairman of SMI from 18 January 2019 until he resigned with effect from 1 April 2019

[3] Dayspring held an apartment on Tanglin Road in Singapore bought in 2010 for US$10.5 million

[4] King Fame held a large Georgian style mansion in Applegreen Drive, Old Westbury, New York bought in 2011 for US$15.88 million. In the BVI Proceedings, D claimed that the shares in King Fame had been transferred to Ms Liu (D's wife) prior to the grant of the BVI Injunction although he remained a director of King Fame

[5] The plaintiff's application for leave to appeal was dismissed (*Emperor Prestige Credit Limited* v *King Pak Fu* [2021] HKCFI 1013)

[6] Which, in the case of an application to set aside a default judgment, would be the date the default judgment was entered against the defendant. There may be other relevant dates for other purposes. For example, in an application to discharge an injunction on the ground that the writ (and the order) had not been served on the defendant, it would be the date when the writ expired or the date when the application was made (as appropriate).

[7] See *Barclays Bank of Swaziland*, at 510C-F

[8] A table listing out the payments procured by D to Mr Yeung's designated companies for the purpose of the acquisition of the SMI Shares is appended to the Draft Defence.

Qin_00000043

[9] Citing *China Medical Technologies, Inc (in Liq) & Ors v Bi Xiao Qiong* [2020] HKCA 541 at §13

---

**HKLII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback
URL: *http://www.hklii.hk/eng/hk/cases/hkcfi/2021/2422.html*

Qin_00000044