UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
HUZHOU CHUANGTAI RONGYUAN
INVESTMENT MANAGEMENT
PARTNERSHIP, HUZHOU HUIHENGYING
EQUITY INVESTMENT PARTNERSHIP, and
HUZHOU HUIRONGSHENG EQUITY
INVESTMENT PARTNERSHIP,

              Petitioners,

              v.

HUI QIN,

              Respondent.
------------------------------------------------------------------x

1:21-cv-09221 (KPF)

**DECLARATION OF SARAH M. MADIGAN IN SUPPORT OF PETITIONERS' THIRD
MOTION TO COMPEL (RE: ORDERS OF APRIL 18, 2023 AND AUGUST 17, 2023),
FOR ORDER TO SHOW CAUSE AND RENEWED MOTION FOR CONTEMPT
AGAINST RESPONDENT HUI QIN**

1. I am an attorney at Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"). Pillsbury represents Petitioners Huzhou Chuangtai Rongyuan Investment Management Partnership, Huzhou Huihengying Equity Investment Partnership, and Huzhou Huirongsheng Equity Investment Partnership (collectively, "Petitioners") in the above-captioned action.

2. I am licensed and in good standing to practice law in the State of New York.

3. I submit this declaration in support of Petitioners' Third Motion to Compel (Re: Orders of April 18, 2023 and August 17, 2023), for Order to Show Cause and Renewed Motion for Contempt against Respondent Hui Qin.

**The Court's Statements at the August 17, 2023 Hearing**

4. I attended the hearing on Petitioners' Renewed Motion to Compel, for Sanctions, and for an Order of Civil Contempt before the Honorable Katherine Polk Failla on August 17, 2023 at 3:00pm.

5. At the hearing, Petitioners' counsel circulated a chart of the 17 categories of documents this Court ordered produced on April 18, 2023. This Court then reviewed the chart with Qin's counsel. The chart showed that 10 categories of documents listed as completely outstanding and six categories listed as partially outstanding. Qin's counsel agreed that the chart was accurate.

6. As reflected on the record of the August 17, 2023 hearing, Judge Failla questioned Qin about his Cathay Bank account in the United States. Qin stated that the only active bank account he has is his Cathay Bank account. Qin stated that he had not used it in a while. Qin stated that it contains a few thousand dollars. He confirmed that was all the money he had in the whole world as of that day and that all his other accounts had been closed. Qin stated that the Cathay Bank account is his only open bank account.

7. As reflected on the record of the August 17, 2023 hearing, Qin's counsel and Petitioners' counsel discussed the amount of funds paid on behalf of Qin to counsel.

8. As reflected on the record of the August 17, 2023 hearing, Judge Failla stated that the ongoing discovery issues were troubling, especially because Qin had not produced certain responsive documents in accordance with the April 18 Order, and also because Qin's attorneys also did not even know whether those documents existed.

9. As reflected on the record of the August 17, 2023 hearing, Judge Failla stated she was very seriously considering detaining/incarcerating Qin for contempt.

10. As reflected on the record of the August 17, 2023 hearing, the Court found that Qin had willfully not abided with its orders and that Qin "lied" to the Court and "lied" at his depositions.

4853-6307-8009

11. The Court has found Qin to be in contempt of its orders, pending its final ruling and order.

12. Towards the end of the August 17, 2023 hearing, the Court ordered Qin to turn his U.S. phone and Chinese phone over to forensic specialist Tino Kyprianou of Setec Investigations. The Court turned possession of the Chinese phone over to Mr. Kyprianou. The Court stated it was the courtroom deputy's understanding that Qin's U.S. phone was in Mr. Zhang's possession. Mr. Zhang then said he misspoke when he told her that Qin had brought both of his phones to the courtroom. The Court asked Qin's counsel where Qin's U.S. phone was. Qin's attorneys spoke among themselves. They then told the Court that the U.S. phone was located at Seiden's law office. The Court then ordered the parties to collect Qin's cell phone, with Petitioners' counsel accompanying Qin, Qin's counsel, and Mr. Kyprianou in order to observe the turnover of the phone.

13. The Court made it clear that Mr. Kyprianou should have both phones in his possession that evening.

14. In a colloquy with Mr. Kyprianou, the Court confirmed that Qin should cooperate with providing Mr. Kyprianou access to the phones, including by providing whatever Mr. Kyprianou needed to unlock the phones, such as passwords.

15. Mr. Kyprianou asked the Court to clarify that Qin must specifically provide his iCloud passwords. The Court ordered Qin to do so.

16. Qin's counsel did not oppose this order.

17. Qin, who attended the hearing with a translator, did not protest any aspect of the order, and did not claim he lacks any of his own passwords.

4853-6307-8009

**The Device Collection Process**

18. The hearing concluded around 6:30pm.

19. Ms. Fangwei Wang, another associate attorney at Pillsbury, and I agreed to accompany Mr. Kyprianou, Qin, and his counsel (Amiad Kushner, Jennifer Blecher, and Tony Zhang) to their offices directly after the hearing let out.

20. As we passed through courthouse security, Qin's attorneys demanded, not to Ms. Wang and me, but to Mr. Kyprianou, that Qin get the phone back as soon as possible the following morning.

21. After we collected our possessions from courthouse security, we then gathered at the plaza across the street from the courthouse with Qin's attorneys, Qin, and Mr. Kyprianou. We were there for approximately twenty minutes. It was not clear why we were waiting. Qin's attorneys appeared to be taking no action to get us to their office.

22. While we waited at the plaza, Mr. Zhang was on the phone. It is my understanding that Mr. Zhang was making calls to discuss something about Qin's U.S. phone, but I did not hear what he was saying or know how many calls he made, or to whom.

23. Ms. Blecher told me that they did not want to "waste our time" if the phone was not actually in Seiden's office. I stated we would rather waste our time and go check for the phone, as the Court's order was clear.

24. Qin's attorneys proposed that Qin leave us, and that he go to his lodgings directly from the courthouse. I said Qin should not leave, citing the order the Court had just given. Mr. Kushner questioned my understanding of the Court's order, asking whether the Court really ordered Qin not to leave. Mr. Kyprianou explained we needed Qin for his login information.

25. Everyone took the same car, which Ms. Wang called, to Seiden's office.

4853-6307-8009

26. Based on Ms. Wang's Lyft records, the car ride to the office lasted from 7:04pm to 7:19pm. During the car ride, Qin was yelling in Chinese. I do not speak Chinese, so I do not know what he was saying. His attorneys did not translate what he was saying.

27. Qin continued yelling and was belligerent throughout the entire course of the evening, including in the car and throughout the device collection process at Seiden's offices. His attorneys generally did not translate what he was yelling. However, I could tell that Qin's yelling and belligerent behavior was directed at Ms. Wang and me. More than once over the course of the evening, Mr. Zhang translated Qin's statements that he does not trust Petitioners or Pillsbury. Also more than once over the course of the evening, Mr. Zhang conveyed Qin's insistence that Ms. Wang and I should not look at Qin's phones because Qin does not trust us.

28. We arrived at Seiden's office building around 7:19pm.

29. Everyone took the same elevator up to Seiden's office.

30. Mr. Zhang immediately claimed he had located Qin's U.S. phone in a conference room, and we asked Qin to unlock the phone.

31. Qin told Mr. Kyprianou the passcode to unlock his U.S. phone. My understanding is that the Chinese phone is not password-protected.

32. As soon as the phone was unlocked, Qin seized it. Qin and his attorneys asked if he could make arrangements for that evening such as dinner and lodging. It was my understanding that Qin wanted to do so before Mr. Kyprianou imaged the phones.

33. Qin's attorneys expressed disbelief that I would not let Qin leave our presence or contact others before Mr. Kyprianou imaged the phones. Qin became visibly angry when I insisted that Qin turn his phone over to Mr. Kyprianou before contacting others. Around 7:23pm, I called Andrew C. Smith and put him on speaker phone with the whole room, and, with Mr.

4853-6307-8009

Smith on the phone, we stated that Qin could make arrangements for the evening but, during the device collection process, Qin could only make phone calls in front of Ms. Wang because she speaks Chinese. It was explained that we did not want Qin to secretly instruct others to remotely wipe the data on his phones. The call with Mr. Smith lasted until approximately 7:25pm.

34. Throughout the evening Qin repeatedly attempted to grab his phone away from Mr. Kyprianou while Mr. Kyprianou was analyzing it. I had to ask Mr. Zhang to have Qin stop grabbing his phone while Mr. Kyprianou was working.

35. At 7:29pm, we changed the settings on both the U.S. and Chinese phones to English so that Mr. Kyprianou could better work upon them.

36. At approximately 7:32pm, when we requested Qin's iCloud information for the iCloud account that appeared to be logged in on his U.S. phone (which was the only iCloud account we were aware of at the time), Qin stated he did not know his iCloud password.

37. Mr. Kyprianou changed the iCloud password apparently connected to Qin's U.S. phone. It is my understanding that Mr. Kyprianou did so in order to obtain backup data and that changing the password would prevent data from being deleted or changed while he was collecting it.

38. During this process, Qin continued to yell. Purportedly translating what Qin was yelling, Mr. Zhang asked that I not stand so close to Mr. Kyprianou because Qin does not trust me and I might see all of Qin's information and credentials while Mr. Kyprianou was changing the password. I moved away from where Mr. Kyprianou was writing down the credentials but kept Qin's devices in view.

39. Due to Qin's continual shouting, it was very difficult to hear Mr. Kyprianou as he attempted to request assistance with unlocking certain features of the phone.

40. At some point during the discussion of Qin's iCloud password connected with his U.S. phone, Mr. Kushner left Seiden's office for the evening.

41. Ms. Blecher and Mr. Zhang were present for the entire evening.

42. We also requested Qin's login information for his Gmail account, KarlQin5555@gmail.com.

43. Qin claimed (through translation) that he did not know his Gmail password. Qin's attorneys also claimed that they did not know his Gmail password either.

44. Mr. Kyprianou informed us that if we did not have the password, the only way to access Qin's Gmail account was by changing the password.

45. We asked Qin and his attorneys how to obtain Qin's Gmail password. Qin apparently told his attorneys that his assistant Kevin has the Gmail password.

46. Mr. Kyprianou first attempted to recover the password for Qin's Gmail account. It is my understanding that a request to recover Qin's Gmail account password would result in a verification code being sent to a phone number ending in 86, to Qin's Gmail address, or to an additional email address that I am informed is associated with Emma Duo Liu.

47. Qin did not take any actions to assist in recovering his Gmail password. Qin claimed (through translation) that he did not know who had a phone number ending in 86. It is my understanding Qin claimed he did not know which phone number would have received his password recovery request.

48. Qin's attorneys claimed that they were not aware of any numbers for Qin's contacts or family that ended in 86. I asked Qin's attorneys to search their records for any number ending in 86. They appeared to search Qin's own interrogatory responses, but they reported that they could not locate any such number.

4853-6307-8009

49. In the meantime, we requested login information for all other messaging applications on Qin's phones, like WeChat and WhatsApp.

50. Qin's U.S. phone was already logged in to WeChat, but neither Qin nor his attorneys claimed they could provide the password to it. It is my understanding that Mr. Kyprianou needed the WeChat password in order to access backup data and that changing the password would prevent data from being deleted or changed while he was collecting it.

51. Because Qin did not know his WeChat password even though he was already logged in, Mr. Zhang and Mr. Kyprianou changed the password to Qin's WeChat account.

52. Qin's attorneys repeatedly questioned why we needed Qin's login credentials, asserting that Mr. Kyprianou already had physical possession of the phones. Mr. Kyprianou, Ms. Wang, and I explained Qin's accounts could have information backed up on the cloud and not on the phones that we would need a password to access.

53. It is my understanding that the WhatsApp account did not have a password, but that any backup to the WhatsApp account may be stored in Qin's Google Drive, which would be accessible with Qin's Gmail password.

54. In my presence, Mr. Zhang wrote down a few numbers from Qin's U.S. phone, including what I was told was Boss Cao/Cao Jing's number.

55. Around 8:17pm, we turned back to the issue of obtaining Qin's Gmail password.

56. Attached hereto as **Exhibit 1** is what I understand to be a true and correct copy of an email exchange, dated January 28, 2023, between Qin (using his Gmail account) and Citibank Singapore. Attached hereto as **Exhibit 2** is what I understand to be a true and correct copy of an email exchange, dated February 1, 2023, between Qin (using his Gmail account) and Standard Chartered Hong Kong. I asked Mr. Zhang how Qin had accessed his Gmail account when

requesting his records from the banks. Mr. Zhang said Qin asked someone for his Gmail credentials, but Mr. Zhang claimed that neither he nor Qin recalled who Qin had asked at that time. From this, I understand that Qin is able to log into his Gmail account, or ask someone to do so for him, and must therefore know his Gmail password or at least how to obtain it.

57. It is my understanding from Qin and his counsel that no devices were at that time logged in to the Gmail account.

58. Mr. Kyprianou told me he was unable to access the Gmail account because he lacked the password.

59. At around 8:34pm, we had Mr. Kyprianou take the U.S. phone off airplane mode so that he could access WeChat to have Mr. Zhang call Qin's assistant Kevin, in Qin and Ms. Wang's presence, to ask for the password. It is my understanding that Mr. Zhang called Kevin on speaker phone. The phone rang, but Kevin did not pick up. Mr. Zhang then wrote what I understood to be a message in Chinese to Kevin on behalf of Qin asking Kevin for the Gmail password, which Ms. Wang reviewed.

60. After we were done contacting Kevin, I understand that Mr. Kyprianou put the phone back on airplane mode. Mr. Kyprianou told me he would image the phones as they were when they were turned over to him that day, and then, after the data was preserved, he would go off airplane mode briefly to see if Kevin had messaged him back with the Gmail password.

61. At approximately 8:37pm, Ms. Wang, Mr. Kyprianou, and I left Seiden's offices.

**Documents**

62. Attached hereto as **Exhibit 3** is a true and correct copy of correspondence between Petitioners' counsel and Seiden, dated August 18-19, 2023.

63.     Attached hereto as **Exhibit 4** is a true and correct copy of what I understand to be Seiden's Objections and Responses to Petitioners' Second Subpoena Duces Tecum.

64.     Attached hereto as **Exhibit 5** is a true and correct copy of what I understand to be a document produced by Seiden in this action with Bates number SLG_000052.

65.     Attached hereto as **Exhibit 6** is a true and correct copy of what I understand to be a document produced by Seiden in this action with Bates number SLG_000053.

66.     Attached hereto as **Exhibit 7** is a true and correct copy of what I understand to be a document produced by Seiden in this action with Bates number SLG_000054.

67.     Attached hereto as **Exhibit 8** is a true and correct copy of what I understand to be a document produced by Seiden in this action with Bates numbers SLG_000033-36.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. Executed on August 21, 2023.

                                                                Sarah M. Madigan

4853-6307-8009