UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x
Huzhou Chuangtai Rongyuan Investment :
Management Partnership, Huzhou Huihengying :
Equity Investment Partnership, and Huzhou : 1:21:cv-09221-KPF
Huirongsheng Equity Investment Partnership, :
: **DECLARATION OF**
Petitioners, : **JENNIFER BLECHER**
:
-v.- :
:
Hui Qin, :
:
Respondent. :
:
---------------------------------------------------------------------x

I, JENNIFER BLECHER, declare as follows:

1. I am a senior counsel at the law firm of Seiden Law LLP ("Seiden Law"), which is counsel for Respondent Hui Qin, ("Qin") in the above-captioned matter. I am duly admitted to practice in the State of New York and admitted to this Court. I make this declaration based upon my own personal knowledge and documents in the possession of my firm.

2. I submit this declaration in opposition to Petitioners' Third Motion to Compel (Re: Orders of April 18, 2023 and August 17, 2023) for Order to Show Cause and Renewed Motion for Contempt against Qin. (ECF 222-223, the "Third Contempt Motion").

3. I personally attended the hearing on Petitioners' Renewed Motion to Compel, for Sanctions, and for Civil Contempt before the Honorable Katherine Polk Failla on August 17, 2023 at 3:00 pm (EST) in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.

4. Prior to joining Seiden Law, I worked as an Assistant United States Attorney for the U.S. Attorney's Office in the District of the Virgin Islands. As an AUSA, I worked on many matters

1

that involved the seizure and imaging of mobile devices by members of law enforcement with occasional assistance from the Computer Crime and Intellectual Property Section of the U.S. Department of Justice. I have general knowledge regarding the process of mobile device data extraction and analysis. The extraction devices used in these matters were manufactured by Cellebrite.

5. I do not speak or understand Chinese and have no direct personal knowledge of any statements made by Qin before or during the cell phone collection in this matter. My only knowledge of such matters comes from translations provided by my co-counsel Xintong ("Tony") Zhang, who is a native speaker.

6. I argued on behalf of Qin at the August 17, 2023 hearing before this Court. During argument, I was asked whether Qin would consent to surrendering his iPhone that has a Chinese SIM card to Petitioners' hired forensic firm for imaging. I said that he would. The Chinese phone is not currently used by Qin and was given to Seiden Law by Qin and brought by Seiden attorneys to the courthouse on the day of argument. It was brought in by Mr. Zhang and held by the U.S. Marshals on the first floor of the building during argument, pursuant to the Southern District of New York's electronic device policy. The Chinese phone is referred to as the "Old Phone" in the declaration submitted by Petitioners' forensic agent, Tino Kyprianou, and for the Court's convenience I use the same terminology in this Declaration.

7. Qin currently uses a different iPhone with a U.S. SIM card, which is referred to as the "New Phone" in Mr. Kyprianou's declaration, and for the Court's convenience I use the same terminology in this Declaration. I understand that Qin does not currently have a permanent residence and uses the New Phone to arrange nightly lodging for himself, which changes from day

to day. I also understand that at the time of the argument, Qin's children were at summer camp in Europe and that he used the New Phone to communicate with them.

8. During the August 17, 2023 hearing, I was also asked whether Qin would consent to turning over the New Phone to Petitioners' forensic agent for imaging. I responded that he did not object but that arrangements would have to be made regarding timing because Qin currently uses the New Phone to assist in managing his daily affairs.

9. Qin met with my co-counsel and I at the office of Seiden Law on August 17, 2023 prior to the hearing. He had the New Phone in his possession during that meeting. We took a car together down to the courthouse. I assumed that he had brought the New Phone with him to the hearing.

10. At the conclusion of the August 17, 2023 hearing, the Court (which had at some point retrieved the Old Phone from the marshals) handed the Old Phone directly to Mr. Kyprianou.

11. The Court asked Mr. Kyprianou how long the imaging of the phones would take. Mr. Kyprianou stated that imaging a phone generally would take only a few hours.

12. The Court asked where the New Phone was and said that it would order the New Phone handed over that evening to Mr. Kyprianou for imaging. It was at that time that we learned that Qin had not brought the New Phone to the hearing. Based on translation, my understanding is that Qin said he had left the New Phone at the Seiden Law office and the Court ordered the New Phone retrieved from the office in the presence of counsel for Petitioners.

13. After the hearing and after counsel for both parties retrieved items from the marshals at the separate courthouse entrances, Mr. Kyprianou, myself, Mr. Zhang, Seiden Law partner Amiad Kushner, and Pillsbury attorneys Sarah Madigan and Fangwei Wang met outside across the street from the courthouse.

14. During that time, I asked Mr. Kyprianou if he could prioritize imaging of the New Phone before the Old Phone, so that it could be returned to Qin sooner because he needs it to conduct his daily affairs and contact his children. Mr. Kyprianou said that he would.

15. During that time, I also asked Mr. Zhang what Qin had said about where the New Phone was and whether Qin was sure he had left it in the office. I suggested that we contact other attorneys or staff who might still be in the office to see if they could confirm that the New Phone was there so that we did not waste Petitioners' time. Mr. Zhang made calls and informed me that he was speaking to one person, Olivia (there are two Olivias who work in the office so I am not sure which) who had recently left the office but offered to head back, if necessary. I sent a WhatsApp message to the Seiden Law internal group asking if anyone was still in the office. A screenshot of that message is attached hereto as **Exhibit A**.

16. After a few minutes no one had responded. We determined that we were not going to get an answer regarding whether the New Phone was there and began discussing how we would travel to the office with Petitioners' counsel. We decided to take a car. I began ordering an Uber, but Mr. Zhang stated that he had already ordered an Uber. Ms. Wang then stated that she had already ordered a Lyft, so Mr. Zhang canceled his order. During the car ride, I did not observe either of Petitioners' counsel taking notes of any conversations.

17. When we arrived at the Seiden Law office, I walked directly toward the office of the partner in which we had met with Qin earlier that day to check for the New Phone, but I heard that the New Phone was located in the conference room at the entrance of the office. I joined everyone in the conference room and was present for most of the remainder of the collection, although I occasionally stepped out and went to my office.

18. While in the conference room, I observed Mr. Kyprianou ask Qin for the passcode to access the New Phone. Qin gave it to him. Mr. Kyprianou stated that he had successfully unlocked the phone and put the device in airplane mode, which means it could not connect to any wifi or cellular networks. Mr. Kyprianou began reviewing the New Phone.

19. At various intervals, Mr. Kyprianou asked for the passwords to certain applications, including WeChat and WhatsApp. Mr. Zhang translated Qin's response, which was that he did not know the passwords.

20. I asked Mr. Kyprianou if he needed the passwords from Qin and whether he could obtain the passwords from the New Phone's Keychain application. The Keychain is what an iPhone uses to store passwords for various accounts and what an iPhone uses to "autofill" passwords when opening applications or logging into websites. At no point did I, as Petitioners contend, ask Mr. Kyprianou why he needed passwords at all. Mr. Kyprianou stated that the Keychain does not store iCloud passwords and that he would have to obtain it from Qin. I told Mr. Kyprianou that I did not believe that this was correct because I recalled getting my iCloud password from my Keychain recently, given that I rarely use iCloud.

21. I used my own iPhone to open the Keychain and see if I could obtain my iCloud password. I was able to and I displayed my own password to everyone in the room. I again asked why we did not do the same for the New Phone. Mr. Kyprianou handed me the New Phone and I opened Keychain. At that time, I observed that Keychain on the New Phone was not configured to save any passwords. However, within seconds the New Phone sent a "push notification" asking if the user wanted to reset the iCloud password. Doing so required the New Phone to use its facial recognition function. Qin used the function to enable the iCloud password to be reset, and Mr. Kyprianou proceeded to reset the password.

22. While Mr. Kyprianou was writing down the new password on a notepad, Qin began speaking. Mr. Zhang stated that Qin was not comfortable with Petitioners' attorneys standing behind Mr. Kyprianou and seeing the new password. Mr. Zhang asked Ms. Madigan and Ms. Wang if they could move away from Mr. Kyprianou. They refused at first but eventually stepped a small bit away. During the evening, however, Ms. Madigan and Ms. Wang continued to walk behind Mr. Kyprianou and watch what he was doing. Qin was visibly unhappy about this. Mr. Zhang stated at other times that Qin wanted to copy the phone numbers of friends off of the New Phone so that he could contact them later and arrange his stay for the evening. Ms. Madigan and Ms. Wang objected to this. They said they did not want him calling anyone, even though Mr. Kyprianou had physical possession of both phones and had put them in airplane mode.

23. At one point, Qin walked out of the room. I observed Ms. Madigan instruct Ms. Wang to follow him because Ms. Wang understood Chinese, and to listen to what he was saying. Ms. Wang proceeded to do so. Ms. Madigan stated that she was concerned that Qin might call someone who might remotely access the phone. Mr. Kyprianou stated that the devices were in airplane mode.

24. Mr. Kyprianou asked about the WeChat password. Qin also did not know it. However, it was possible to reset the WeChat password using the phone. Mr. Kyprianou worked with Mr. Zhang to do so, which I understand was necessary because of Chinese characters in the application. Mr. Zhang wrote down the new WeChat password for Mr. Kyprianou.

25. Mr. Kyprianou asked about the WhatsApp password for the New Phone. This prompted a discussion among everyone in the room regarding whether WhatsApp even requires a password, because it is tied to a specific phone number. Mr. Kyprianou noted that the WhatsApp application was not locked. I checked WhatsApp on my own phone and confirmed that it did not

ask for any password nor was any password field included in the account details of the application. Mr. Kyprianou concluded that no password was necessary to access WhatsApp data.

26.     Mr. Kyprianou asked about Qin's Gmail password. Mr. Kyprianou stated that there was no Gmail application on the New Phone but that he wanted the password for the account. Mr. Kyprianou opened a web browser and went to Gmail.com to try and log in to Qin's email account. Mr. Zhang translated for Qin and stated that Qin did not know the password. Mr. Kyprianou and I attempted to use the password reset function through the web browser. However, the default option to reset the password required sending a passcode to a phone number that was displayed as asterisks with the numbers "86" at the end. Petitioners' counsel asked Mr. Kyprianou whether that was Qin's phone number and Mr. Kyprianou stated that it was not. I recall that Mr. Zhang, translating for Qin, said that Qin did not know whose number the reset verification code would go to. I asked Mr. Zhang to pull up Qin's interrogatory responses, which contained contact information for various individuals, to see if we could identify the phone number. Once the document was pulled up, I used Ctrl-S to search it for "86" in view of Petitioners' counsel. The only hits were for area codes and not for the end of any phone number.

27.     Ms. Wang suggested clicking the "alternate recovery" link to reset the password. When clicked on, it displayed two email addresses designated to receive password reset links. Neither email was Qin's, and one appeared to have Duo Liu's name in it. Because we could not access either the recovery phone number nor the emails, we abandoned efforts to reset the Gmail password.

28.     Qin was asked who would know the password. Through Mr. Zhang, Qin stated that he thought his friend Kevin would have it. Ms. Wang demanded that we call Kevin using Qin's WeChat application to ask him for it. Mr. Zhang attempted the call, but no one answered. Ms.

7

Wang then demanded that a message be sent to Kevin through WeChat asking for the password. Mr. Zhang typed out and sent the message. Mr. Kyprianou put the phone back on airplane mode and said that after he imaged the device, he would briefly take it off airplane mode to see if Kevin had responded with a password he could then test.

29. Mr. Kyprianou continued to review both the New Phone and the Old Phone to see if there were other applications he wanted passwords for. He stated in particular that he did not see any iCloud account associated with the Old Phone. This prompted some discussion about whether Chinese iPhones can connect to iCloud. Mr. Kyprianou also stated that he did not identify any Gmail data on the Old Phone.

30. At some point during the evening, I asked Mr. Kyprianou what device he was using to image the phones. He stated that he was using a Cellebrite device.

31. When Mr. Kyprianou was satisfied that he had the information he needed (and subject to the outstanding Gmail information), he took the phones and left. This occurred around 8:30 p.m. Prior to leaving, I asked him about when we could expect to receive the phones back. Mr. Kyprianou stated it would be done sometime the following day, and mentioned using a courier to return them.

32. The following day, I heard nothing from Petitioners regarding the phones. Around 11 a.m., I emailed them asking for a status update as well as for Mr. Kyprianou's contact information. A copy of my email to Petitioners' counsel is attached hereto as **Exhibit B**. As is clear from the email, I made no demand for immediate return of the phones.

33. Five hours passed and I received no response. I sent a follow-up email around 4 p.m. A copy of my email to Petitioners' counsel is attached hereto as **Exhibit C**.

34. Shortly after, I received a response from Petitioners' counsel noting that I had not copied the two junior associates they had sent to observe the phone collection, and that they would be responding shortly. A copy of that email is attached hereto as **Exhibit D**.

35. Around 4:30 p.m., I received an email from Ms. Madigan stating that the Gmail passwords sent by Kevin had not worked, and also demanding additional passwords for a separate Gmail address that Ms. Madigan claimed was identified by Mr. Kyprianou on one of the phones as well as an iCloud email account. Ms. Madigan also stated that Mr. Kyprianou had "identified" Duo Liu as the owner of the phone number ending in 86 that could be used to reset the Gmail password and demanded that Qin contact Liu to reset the password. Ms. Madigan stated that the phones would not be returned until this information was provided. A copy of Ms. Madigan's email is attached hereto as **Exhibit E**.

36. Mr. Zhang conferred with Qin, and I was informed that Qin did not recognize either of these accounts and did not know the passwords. I was also informed that Qin had tried to call Ms. Liu, who was in Europe with their children, and that she had not picked up.

37. The statements in Ms. Madigan's email did not indicate that Mr. Kyprianou had been unable to make a copy of any data on the cell phones. Indeed, based on my own experience in dealing with mobile device data collection, the only password needed to copy a phone's contents is the device passcode, which Qin had provided for the New Phone (the Old Phone was unlocked). Not once in my experience dealing with mobile device data collection was I ever told that data could not be copied off of a cell phone because of a missing application password. Rather, my understanding is that once a copy of the data is made, that copy can then be put through special software, such as Cellebrite Physical Analyzer, to analyze and "parse" the data, which at that time may require a password. Additionally, Mr. Kyprianou had stated that there was no Gmail

9

application on Qin's phone and in my presence had instead tried to log in to Gmail using a web browser, or in other words, access Gmail data not stored on either of Qin's phones. Similarly, iCloud data and email is not stored on cell phones but rather online in the cloud. It was therefore unclear to me why Petitioners had claimed that they needed to retain physical devices that all evidence indicated they had already obtained complete copies of. I therefore sent an email to Mr. Kyprianou that evening with technical questions to ascertain whether there was any forensic reason he needed to maintain custody of the phones, one of which Qin used to engage in his daily activities and to communicate with his children and the lack of which was causing disruption to his life. I also asked for more specific information about what relationship the identified email accounts had to the phones, given that there were no Gmail applications on the devices. A copy of my email to Mr. Kyprianou is attached hereto as **Exhibit F.**

38. Mr. Kyprianou never responded to my email.

39. The following morning (on August 19), I sent an email to Petitioners' counsel asking them to confirm whether there was any forensic reason they needed to maintain custody of the physical devices and stating that, if not, they were required to return the phones. I informed Petitioners' counsel that it was improper to confiscate the phones as apparent leverage to obtain additional information from Qin that had nothing to do with the two phones, including information that was in the possession of third parties. I also informed Petitioners' counsel that Qin did not recognize the emails and did not know the passwords. At no point did I state that Qin refused to provide that information or would refuse to do so going forward. The focus of the emails was the return of the physical devices and whether Petitioners had any reason to continue to possess them. A copy of my August 19, 2023 email is attached hereto as **Exhibit G**.

40. Late that afternoon, I received a response from Petitioners' counsel that again did not confirm that they had been unable to copy any data off of the phones, and reaffirmed that they would not return the phones until Qin provided them the information they were demanding. Petitioners' counsel further stated that it was "inappropriate" to ask Mr. Kyprianou basic questions to ascertain whether there was any forensic necessity or benefit to retaining the physical devices.

41. On Monday afternoon, August 21, 2023, Petitioners sought leave of Court to file a motion to compel against Ms. Liu. In their filings, they included misrepresentations regarding our prior exchange over the weekend. They also asserted that East West Bank's apparent freeze of an account belonging to Ms. Liu was evidence that Qin was the true owner of that account, because Petitioners claimed they had only filed a notice seeking restraint of Qin's assets. Petitioners further alleged that Liu went "silent" after that email exchange, in their view because she knew she had been caught commingling assets with Qin.

42. As an exhibit to their August 21, 2023 letter, Petitioners attached an email exchange with Angus Ni, counsel for Ms. Liu. In that email, Ni referenced a schedule that had been attached to Petitioners' restraining notice that had named Ms. Liu. Seiden Law had not been served with that document. I asked Mr. Zhang to contact Petitioners to obtain a copy. Petitioners' counsel responded with a scanned copy of a hardcopy document they had purported to send to Seiden Law, but it had been sent to the firm's old address. The schedule was an information subpoena that included various definitions including "judgment debtor affiliated person." The first name on that list was Emma Duo Liu. A copy of the schedule is attached hereto as **Exhibit H**.

43. I arranged a call with Angus Ni. Ni explained that after he heard that Ms. Liu's account had been restrained, that he contacted the bank and the bank provided him with a copy of Petitioners' subpoena, including **Exhibit H**. The bank had assumed that the names in the

11

"judgment debtor affiliated person" list were also subject to the restraining notice and therefore had frozen Ms. Liu's account. Ni explained to the bank that Ms. Liu was not subject to the restraining notice and the bank subsequently unfroze Ms. Liu's account. Ni suggested that that was probably why Petitioners were claiming that Ms. Liu had gone "silent": there was no need for further correspondence because the account was no longer restrained.

44. In light of the false representations made by Petitioners in their Monday filing, I sent an additional follow-up email to them again around 8 p.m. reiterating that they had not identified any reason they needed to retain Qin's phones, that the Court had not authorized them to hold the phones longer than necessary to image them and that they had no other legal right to do so, and that if they would not identify any need to retain them, that the phones should be returned. A copy of my August 21, 2023 email to Petitioners is attached as **Exhibit I**.

45. At no point between August 18 at 11 a.m. and the time of this writing, including in their Third Contempt Motion filed at midnight on August 22, have Petitioners identified a single kilobyte of data that Mr. Kyprianou was unable to copy off of Qin's phones, nor have they identified any reason why they need to retain physical possession of them. Mr. Kyprianou's declaration identifies three email accounts he is seeking passwords to access: two Gmail accounts, an application Mr. Kyprianou stated on August 18th, and has not since recanted, is not installed on either of Qin's phones, and an iCloud email address which public records from Apple state are stored in the cloud and not locally on iCloud.

46. At no point in any correspondence I have affixed to this Declaration nor otherwise did I assert that Qin was refusing to provide or attempt to provide the requested additional passwords.

12

Dated: New York, New York
      August 23, 2023

                                        By: **/s/ Jennifer Blecher**
                                               Jennifer Blecher
                                               SEIDEN LAW LLP
                                               322 Eighth Avenue, Suite 1200
                                               New York, New York 10001
                                               (646) 766-1764