N8H8HUZA

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    HUZHOU CHUANGTAI RONGYUAN
     INVESTMENT MANAGEMENT
4    PARTNERSHIP, *et al.*,

5                    Petitioners,

6             v.                            21 Cv. 9221 (KPF)

7    HUI QIN,

8                    Respondent.            Argument

9    ------------------------------x
                                            New York, N.Y.
10                                          August 17, 2023
                                            3:15 p.m.
11
     Before:
12
                         HON. KATHERINE POLK FAILLA,
13
                                            District Judge
14
                              APPEARANCES
15
     PILLSBURY WINTHROP SHAW PITTMAN LLP
16        Attorneys for Petitioners
     BY:  GEOFFREY R. SANT
17        CAROL LEE
          ANDREW C. SMITH
18
     SEIDEN LAW GROUP LLP
19        Attorney for Respondent
     BY:  JENNIFER H. BLECHER
20        XINTONG ZHANG
          AMIAD M. KUSHNER
21

22   Also present:  SHI FENG, Interpreter (Mandarin)

23

24

25

N8H8HUZA

1              (In open court; case called)

2              THE DEPUTY CLERK:  Counsel, please state your name for

3      the record, starting with the plaintiffs.

4              MR. SANT:  Jeffrey Sant for plaintiffs.

5              MS. LEE:  Carol Lee for plaintiff.

6              MR. SMITH:  Andrew Smith for petitioners.

7              THE COURT:  Thank you very much.

8              I understand I will be hearing from Mr. Sant in the

9      first instance.  Is that correct?

10             MR. SANT:  If your Honor permits, we would like to

11     divide up the presentation.  Is that okay?

12             THE COURT:  It might be.  Let me understand, please.

13             Welcome back.

14             MR. ZHANG:  I'm sorry, your Honor.  I was trying to

15     pick up the translator.  She went to the wrong entry.

16             THE COURT:  Will I know in advance how the labor has

17     been divided or will it just depend on my questions, sir?

18             MR. SANT:  If your Honor permits us to do a

19     presentation, we were thinking that I would present on the

20     document spoliation and how that requires a contempt finding.

21     Ms. Lee is ready to present on his refusal to give straight

22     answers in the depositions, which requires an adverse inference

23     finding.  And Mr. Smith is ready to present on the relief that

24     we are seeking in general.

25             THE COURT:  I see.  I won't immediately reject your

N8H8HUZA

1    thoughtful proposal.  What I will say is I want you to

2    understand that I have in fact read all of the written

3    materials, so I don't want you to repeat what is said.  You can

4    refer to it and say, as I mentioned in our brief, but I don't

5    want you to repeat yourself.

6              At the back table, you're welcome to introduce

7    yourselves.

8              MS. BLECHER:  Jennifer Blecher for respondent.

9              MR. ZHANG:  Xintong Zhang for respondent.

10             THE COURT:  And Mr. Kushner.

11             MR. KUSHNER:  Amiad Kushner for Mr. Qin.

12             THE COURT:  Ms. Blecher, do I understand you're taking

13   the lead this afternoon or is there a similar division of

14   labor.

15             MS. BLECHER:  There is no division of labor.  I will

16   be handling all topics, your Honor.

17             THE COURT:  Thank you.

18             Counsel, when we last spoke substantively on this

19   issue, I believe I expressed a concern that I had, or maybe

20   just an issue that I had about the question of my jurisdiction.

21   I am aware that there is in fact an ongoing appeal up at the

22   Second Circuit regarding the --

23             MS. BLECHER:  Our translator, your Honor.

24             THE COURT:  Good afternoon.

25             THE INTERPRETER:  Good afternoon, your Honor.

N8H8HUZA

```
1              THE COURT:  I will resume.

2              I was concerned and I wanted to understand the degree

3   to which the pending appeal impacted my ability to hear further

4   motion practice in this case.  And having looked at a number of

5   issues and a number of sources, it does appear to me that I do

6   have jurisdiction, and no one here seems to contest that I do.

7   I did want to make sure that I had it, and it would seem to me

8   that I have it because I retain the right, even after the

9   filing of a valid notice of appeal, I retain the right to

10  enforce the judgment if the judgment has not been stayed or

11  superseded.  It has not been in either case, and so, therefore,

12  I feel I am comfortable going forward.  Once again, I will tell

13  the parties, if you wake up tomorrow and think that I do not

14  have jurisdiction, someone ought to tell me quickly.  All of

15  the research that I have done suggests that I have

16  jurisdiction, so I wanted to begin with that.

17             I also wanted to make sure I understood the state of

18  play in this case, and here's what I mean by that.  Based on

19  all of the materials that I have reviewed in preparation for

20  this conference, I am understanding petitioners to be telling

21  me that since my order in April, there has been no, if you

22  will, forward progress with respect to discovery.  There has

23  been additional depositions, but there have been no additional

24  documents produced; there has been no additional information

25  provided at the depositions.  And what I understand the
```

N8H8HUZA

1  respondents to be saying is that Mr. Qin has produced all that

2  he can.  So to the extent that there has been no forward

3  progress, as I have described it, in discovery since our last

4  proceeding, since my last order in the case, that is simply

5  because there is nothing else to give.

6          So perhaps I can begin there.  Mr. Sant, do I

7  understand your position correctly?

8          You are Mr. Sant, correct?

9          MR. SANT:  Yes, your Honor.

10          THE COURT:  I will try that again.  The position that

11  I understand you to be saying is, you have gotten nothing of

12  substance since my April order, which is why you have renewed

13  your motion.

14          MR. SANT:  Your Honor, that is correct.  In fact, we

15  have created a demonstrative, if your Honor would like to see

16  it, going through each of the 17 categories.

17          THE COURT:  Is that something that was given to me as

18  an exhibit to a prior matter or is it something you prepared

19  for today?

20          MR. SANT:  We prepared it for today.  We thought it

21  might be helpful.

22          THE COURT:  I will ask you to pass it to me and also

23  to the folks at the back table if you haven't already done so

24  already.  Thank you.

25          MR. SANT:  So, as your Honor can see from the

N8H8HUZA

1   demonstrative, there were 17 --

2              THE COURT:  Is there an extra copy?

3              MR. SANT:  Yes, your Honor.

4              THE COURT:  Let's continue.

5              MR. SANT:  I will just briefly summarize what this

6   shows.  Your Honor in the April 18 order set forth 17

7   categories of documents, which Mr. Qin must produce within

8   three days.  He produced no documents whatsoever within those

9   three days.  Since then he has only produced a smattering of

10  documents.

11             And as one can see from looking at the chart, the

12  categories in red are completely unproduced, not a single page

13  has been produced.  The categories that have been highlighted

14  in yellow, this is the third column status, are partially

15  outstanding.  And the sad thing is that partially in most cases

16  means almost completely outstanding.

17             The only really significant production that Mr. Qin

18  made was a handful, truly a handful of screenshots of some

19  communications he had with some people.

20             So if you look at category number 13, Mr. Qin produced

21  six pages of screenshots of messages with all of these

22  different individuals that this Court ordered production for.

23  Six pages of screenshots is on its face absurd.

24             Then in category number 15, all communications for

25  these different individuals, again, he has produced a handful

N8H8HUZA

1    of screenshots.

2            In category number 14, the total number of screenshots

3    was 12 pages of screenshots.

4            So the production is beyond minimal, your Honor.  And

5    everything is completely outstanding.

6            I would just highlight one item in particular.  Mr.

7    Qin produced no new bank records since this Court's April 18

8    order.

9            THE COURT:  He has indicated that that's because he

10   has been told that he has to go to the physical bank in order

11   to get those records.

12           MR. SANT:  I would be happy to respond to that point

13   directly.  But prior to doing so, I would like to point out

14   that the bank account that he produced some records for is the

15   Cathay Bank, which is allegedly still open and which only

16   possesses $500 as of the November 2022 bank statement that he

17   produced.  He has produced no new monthly statements since,

18   despite our request for it.  And this is not a bank where he

19   allegedly needs to go to Hong Kong.  He produced up to

20   November, but he refuses to produce additional bank records.

21   It is just very confusing why he would not produce those

22   immediately upon the April 18 order.

23           Turning to your Honor's question, we don't believe at

24   all that he needs to go to Hong Kong to obtain records.  There

25   is really no support for it whatsoever.  The communications

N8H8HUZA

1    that were produced by Seiden between Mr. Qin and the banks, the

2    banks say that he can obtain these records by doing a video

3    chat function or other functions.  There is a WeChat message,

4    one of the very few that Mr. Qin produced, where one of his

5    assistants says that he tried to collect records from one bank

6    in Hong Kong and wasn't able to do so and says, Mr. Qin, you

7    need to come do it yourself.  I don't think that means that he

8    needs to go to Hong Kong.  It just means that his friend can't

9    get the records for him.

10          THE COURT:  I was wondering what that meant because I

11   thought that was being offered to me as proof that he needed to

12   go to Hong Kong, whereas I understood it as it might be more

13   convenient for you to show up and do this than to use another

14   method.  I didn't see it as a restriction, but I will hear from

15   respondents to tell me if they view it otherwise.

16          I will let you continue, sir.

17          MR. SANT:  Your Honor, basically, what we are seeking

18   here today is what we think is the minimum necessary relief to

19   force Mr. Qin to comply with this Court's orders and to remedy

20   his spoliation, withholding of records, in violation of this

21   Court's orders.

22          Rule 37(b)(2)(C) mandates attorneys' fees for any

23   order of contempt.  But the reality here, your Honor, is that

24   we all know that's not going to be effective in causing Mr. Qin

25   to comply.  This Court already in its April 18 order ordered

N8H8HUZA

monetary sanctions and Mr. Qin did not comply with the April 18
order.

         Also, Mr. Qin is not paying a judgment that is half a
billion dollars.  Any sanctions of attorneys' fees to him is a
couple of days of interest on a judgment that he is not paying
already.  His whole point it seems to be to evade producing
records that could allow collection on his judgment.  I don't
see how the fees can accomplish the goal of getting him to
comply.

         So that's why we have other relief requested, your
Honor.  First of all, we ask that this Court order seizure of
Mr. Qin's devices.  I would point your Honor to paragraph 38 of
Qin's July 7 declaration that's attached to their opposition,
where he "did not object to petitioners' intention to have a
marshal collect it."

         So this is not opposed, your Honor.  And we brought a
forensic specialist with us today, a Mr. Tino Kyprianou from
Setec Investigations.  He's available to formally collect any
devices that Mr. Qin brought with him to court.  And to the
extent he did not bring devices to court, we would request this
Court order the marshals to seize any phones, computers, or
electronic devices that are not here today.

         Your Honor kindly permitted me to summarize some of
the key points in our briefs, and I will try to be very brief,
as your Honor requested.  If any of us were to try to present

N8H8HUZA

1    in a lecture, for example, the perfect example of a case

2    requiring a contempt, or meriting a contempt finding, we might

3    come up with what is before us today, which is:  The Court has

4    already found respondent violated the Court's clear orders; the

5    Court has already found contempt was warranted but gave

6    respondent another chance; respondent produced no new documents

7    by this Court's deadline; respondent instead destroyed the very

8    records this Court ordered produced; respondent has not paid a

9    penny of a half billion dollar judgment, despite living in

10   multiple penthouses and Long Island mansions; and this Court

11   already found his claim of poverty "defies belief."

12           Those are the facts here.  This Court ordered, as I

13   mentioned, Mr. Qin to produce documents within three days.  He

14   produced no documents within three days.  And that alone, if

15   there was nothing else that happened, that alone merits

16   contempt.

17           I will briefly respond to opposing counsel.  They said

18   that the April 18 order was merely requiring some kind of

19   response by the 21st.

20           THE COURT:  No, it was not.

21           MR. SANT:  Then I will skip any other comments on

22   that.

23           On page 10, line 16 to 20 of the April 18 order, this

24   Court ordered production of "information about bank accounts,

25   credit cards, and trusts controlled by respondent, as well as

N8H8HUZA

1   documentation of his income, property, and vehicles."  Again,

2   bank accounts, credit cards, and trusts, income and vehicles.

3          THE COURT:  Sir, I hate to go back, but I am going to

4   have to go back.  Could you tell me, please, again where the

5   citation that you read to me regarding the devices is located.

6   It took me a moment to pull up the opposition in this case.

7          MR. SANT:  It's in Mr. Qin's declaration.

8          THE COURT:  What paragraph, please?

9          MR. SANT:  Paragraph 38.

10          THE COURT:  Thank you so much.

11          MR. SANT:  He says that we know where the devices are

12   located, which I assume he means his home.  And he invites the

13   marshals to collect it.  The exact quote by Mr. Qin is "did not

14   object to petitioners' intention to have the marshal collect

15   it."

16          THE COURT:  What I am understanding this to be, sir, I

17   am understanding that, at some point in the past, Mr. Qin said

18   to you, and it looks to be at his deposition that he said,

19   here's where the phone is and you can have the marshal collect

20   it, which is different than saying he brought it today and he's

21   willing to give it up.  I think I am reading that correctly.

22   Yes, sir?

23          MR. SANT:  Your Honor is correct.  Obviously, we have

24   no ability to order the marshals to do anything.  That's why we

25   are here today.  We are asking your Honor to order the marshals

N8H8HUZA

1    to take the actions that Mr. Qin himself invited.

2                If I may continue.  I just quoted from the April 18

3    order.  The topics were bank accounts, credit cards, and

4    trusts, income and vehicles.  Those were all your Honor's

5    enumerated categories of documents, and Mr. Qin produced no new

6    documents in any of these categories; not just by the 21st, but

7    in the four months since this Court's order.  No new bank

8    accounts, no credit cards, no trust information, no income, no

9    vehicles.

10               Mr. Qin has destroyed more than he has produced in

11   each of these categories.  Qin was given three days to produce

12   all records, but he hasn't done it in four months.

13               Qin testified to receiving 300 million Hong Kong

14   dollars in three separate bank accounts.  And, sadly, it

15   doesn't surprise us that those are the three bank accounts, or

16   among the bank accounts that he has not produced any records

17   for whatsoever.

18               In many cases, Mr. Qin and his counsel did not even

19   seek records until after our January 9 premotion conference

20   letter, and in some cases even after this Court's April 18

21   order.  I will direct the Court's attention to writing the

22   banks in January after the premotion conference letter, and Qin

23   e-mails his immigration counsel on April 28, a week after this

24   Court's deadline for production.

25               Worse, Qin deleted and destroyed the very records this

N8H8HUZA

1  Court ordered produced up to and through the deadlines set by

2  this Court.  This doesn't just merit contempt, it frankly is

3  contempt.

4          Mr. Qin spent a lot of time in his brief arguing that

5  he has some kind of justifications for destroying records.

6          THE COURT:  Well, there are a couple of arguments that

7  are being made, and I am wondering, sir, whether you would like

8  to address them now in this portion of the hearing or whether

9  you want to let them be articulated by the defense before you

10  respond to them.

11          For example, there is a suggestion that what you

12  should have done was to try and seize assets that were

13  available, that you should have taken efforts to get materials

14  and information from third parties, including the third parties

15  whose names you sought, things of that nature.  There is a

16  suggestion that there is more that you could have done, and yet

17  there is almost -- and I am using this term colloquially --

18  there is almost an exhaustion requirement before you can come

19  in and seek contempt.  So I would like you to speak about that.

20          Also, and, candidly, to my recollection for the first

21  time, there seems to be the introduction of information about

22  your clients' ties or not to the Chinese Communist Party.

23  Again, I don't remember hearing about this at any point in the

24  past two years until now, but if you would like to speak to any

25  of those issues, I will hear from you now.

N8H8HUZA

1          MR. SANT:  Your Honor, I don't think that these are

2     worth responding to.

3          THE COURT:  Okay.  Then don't.  I am not going to make

4     you.

5          MR. SANT:  If the Court has any concerns, we are happy

6     to respond, of course, and we will be guided by the Court's

7     directions.

8          The Court already pointed out just a moment ago that

9     your Honor didn't hear any reference to the supposed Communist

10    Party issue until now that this motion has been filed for

11    contempt, and that says everything already.  This is an

12    eleventh-hour Hail Mary attempt to distract attention from his

13    own misconduct.

14         THE COURT:  I don't mean to chuckle, sir.  I am just

15    trying to figure out how many metaphors you can string

16    together, the eleventh-hour Hail Mary.

17         MR. SANT:  Your Honor, as we pointed out in our brief,

18    this idea that he is afraid of China or that he is afraid of

19    Hong Kong makes no sense.  Before he came up with this new

20    argument, in his deposition testimony he repeatedly talked

21    about all his ties and importance in China; how he has

22    important contacts, he can influence people.  He talked about

23    how he wished he had invested in Hong Kong real estate.  If he

24    is afraid to go to Hong Kong, these make no sense, these

25    comments and statements that he made when he was filibustering

N8H8HUZA

1    during his deposition testimony.  It is simply something that

2    he has come up with now to try to distract the Court's

3    attention, and I think it's quite transparent.  But if the

4    Court has any concerns, we will be happy to answer anything

5    that the Court wants to know.

6            THE COURT:  I appreciate the fact that you are letting

7    me set your oral argument.  I'm not sure that's the wisest

8    move.

9            Earlier you said that one of the things you wanted was

10   the seizure of his devices.  I wrote number 1 next to it,

11   assuming that there would be a number 2 and a number 3 coming

12   on.  You're not asking -- well, you are asking for attorneys'

13   fees, and I understand why.  I am not giving them to you just

14   yet, but I understand why.  You're not asking, as I understand

15   it, for monetary sanctions.  Your view is that they simply

16   would not be coercive.

17           You want me to jail the man.  And you want me to take

18   certain facts in your favor.  Do I understand that correctly?

19           MR. SANT:  Your Honor, I agree, but I would put a

20   twist on it.  We don't actually want him to be incarcerated.

21   What we would like for him to do is to comply with this Court's

22   orders.

23           THE COURT:  Okay.  Among the things you have told me I

24   can do is to detain the man.  So I assume you're telling me

25   that because that is in fact what you want.  If you don't want

N8H8HUZA

1    that, if what you really just want are these factual findings,

2    then tell me.  I just want to know, as I am getting all of this

3    information, as I prepare to speak to the back table, what is

4    it that you want today from me.

5           MR. SANT:  Your Honor, we have actually prepared a

6    draft order, if your Honor would be willing to review it, which

7    lays out exactly what we are seeking, but I can let your Honor

8    know orally as well.

9           THE COURT:  Please.

10          MR. SANT:  First, it's mandatory that if the Court

11   rules that Mr. Qin is in contempt, then there would be

12   attorneys' fees.  In addition, we would like to have his

13   electronic devices, including his phones, seized so they can be

14   forensically imaged and we can attempt to recover the

15   information that Mr. Qin deleted and destroyed.

16          We ask that this Court incarcerate Mr. Qin until he

17   complies with this Court's April 18 order, which set forth the

18   documents that he must produce.  And until he complies with

19   this Court's April 18 order, and this Court's other orders,

20   then he can be released.

21          We would be happy to set a status conference quickly

22   after incarceration.  We are not looking to have him stay

23   incarcerated.  What we would like to do is to force him to

24   comply, which he clearly will not do --

25          THE COURT:  According to his deposition testimony,

N8H8HUZA

1    there is some suggestion at least, and it may be puffery, even

2    jail is not going to make him.  I can shoot him and it wouldn't

3    cause him to comply.

4             No, gentlemen, I am not asking you to do that.

5             So you are seeking incarceration.

6             MR. SANT:  Yes, your Honor, until he complies.

7             THE COURT:  If I may, just because I want to be sure I

8    understand the requests.

9             You're asking me to take certain things as given, to

10   find certain facts in your favor.  If I do that, why do you

11   need the incarceration?  Also, if I do that, what are you going

12   to do with them?  And I am not saying that to be facetious.  Is

13   it the basis for a turnover petition that you would be making?

14   Is it the basis for some sort of asset seizure?  What happens

15   if there is a third party who holds a different view and has

16   this information?  I am just trying to understand where we are

17   going from today.  I know what happens with detention.  I know

18   how that works.  I am not sure I know what happens with respect

19   to the factual findings you're asking me to make.

20            MR. SANT:  Thank you, your Honor.

21            If I may, I will attempt to respond to the Court, but

22   Mr. Smith here is actually the one who is --

23            THE COURT:  I will wait for him.  That's fine.  Just

24   know, everybody at the front table, someone is going to have to

25   tell me that story, because I do want to understand.

N8H8HUZA

1          Are there other things you would like me to know, sir,

2   before you turn over the reins to somebody else at your table?

3          MR. SANT:  I think at this point, your Honor, if you

4   permit, I will allow my colleague, Carol Lee, to discuss the

5   deposition testimony and why that also requires adverse

6   inferences.

7          THE COURT:  Thank you.

8          Ms. Lee.

9          MS. LEE:  Your Honor, besides the document spoliation,

10  Qin also violated this Court's order compelling his deposition

11  and requiring him to answer all questions.  Mr. Qin's

12  recalcitrance and lack of cooperation further supports an order

13  of civil contempt and findings of adverse inferences.  He

14  claims that he has sat for over 20 hours of deposition

15  testimony.  But as this Court knows, at his deposition he

16  refused to answer questions.  He filibustered and he gave

17  conflicting answers to questions that he did answer.

18          So, we are not getting any answers to the most basic

19  questions, such as where he lives, despite his claiming that he

20  has sat for so many hours at depositions.  We are also not

21  getting any information as to where he got all this money to

22  pay for his lavish lifestyle.

23          THE COURT:  Is that really the question that you wish

24  to ask?  You have a judgment, you wish to have assets to

25  satisfy the judgment.  I would think your focus is simply on

N8H8HUZA

 1    what assets does he have today and what assets -- and I am not

 2    saying this happened -- he may have had but transferred to

 3    other people.  Is that correct?

 4           MS. LEE:  That's exactly correct, your Honor.  We have

 5    been trying to get that information from Mr. Qin, but we are

 6    not getting any answers from him whatsoever at his depositions.

 7           So, basically, his depositions created more questions

 8    than answers.  And because he has not been forthcoming with his

 9    knowledge about various entities with which he associated, we

10    can only assume that the various dealings involving those

11    entities are a sham.

12           THE COURT:  Well, that is what you are asking me to

13    find.  I am not sure I am there.

14           I am correct, am I not, that his wife or former wife,

15    for ease of reference I am calling her his wife, is going to be

16    deposed in the month of October?  Is that correct?

17           MS. LEE:  We have ordered her deposition to happen

18    before October 5, and currently we don't have a set date for

19    her because of her supposed travel to Europe.

20           THE COURT:  My question is, do you believe that there

21    is any utility in waiting until her deposition?  Because I was

22    told, for example, that she may be in possession of certain

23    immigration records.  Should I wait to hear what she has to

24    say, and if you believe not, tell me why.

25           MS. LEE:  Your Honor, we believe we don't have to wait

N8H8HUZA

1    for her deposition because she is not -- we served a document

2    subpoena on her more than two months ago, and as of today we

3    still have not received a single page of documents from her.

4             THE COURT:  You have not received documents.  Have you

5    received objections from her attorney?

6             MS. LEE:  We have received written responses and her

7    responses have represented that she will be producing the

8    documents by mid-July, so that was already a month and a half

9    ago, and as of today we still have not received a single page

10   of documents.

11            THE COURT:  When was the last time anyone at the front

12   table had a conversation with the wife or her counsel regarding

13   the production of documents?

14            MS. LEE:  If the Court permits, I will let Mr. Smith

15   answer this question.

16            THE COURT:  Yes.  I just wondered if anyone reached

17   out to counsel after mid-July to say where are these documents.

18            MR. SMITH:  Yes, your Honor, we did.  We spoke with

19   Angus Lee who represents Ms. Liu.  Shortly after your Honor

20   temporarily postponed her scheduled deposition that had been

21   ordered and then postponed, we said nothing, well, nothing in

22   that order stops the necessity for producing documents under

23   the document subpoena.  After that they said that they would be

24   planning to assert the same grounds upon which they asserted in

25   sealed submissions to your Honor, so we are not privy to them,

N8H8HUZA

1   in terms of refusing to produce documents.  We said that that

2   was not appropriate, and followed up recently and have said,

3   now that the deposition has been scheduled, and no relief has

4   been sought or granted with respect to the documents, that they

5   should produce the documents immediately.

6        In fact, just this week we have had a series of

7   back-and-forths with Mr. Ni, and we have told him that if he

8   does not produce documents, we will have to unfortunately bring

9   a motion to compel, which you may see.  He has represented to

10  us that he needs more time.  He has not said categorically, and

11  that's why it has been difficult, in terms of coming to your

12  Honor to seek relief, because we have been getting a bit of

13  back-and-forth from him saying, well, we are not sure what we

14  are going to do, I need to consult with her other lawyers.

15       In fact, one of the last communications we received

16  from Ms. Liu's counsel said, well, her deposition isn't going

17  to take place until early October so we have plenty of time.

18  And we responded and made clear, No, these documents are

19  already a month and a half overdue; we refuse to wait for

20  another month and a half.  And that communication was from us,

21  I believe yesterday, and still unresponded.  So you likely will

22  see a motion from us with respect to that.

23       So, to answer your question that you posed to my

24  colleague, should we wait to hear from Ms. Liu, well, we

25  believe that we are going to be getting the same thing, and we

N8H8HUZA

1      don't want to wait until October, to then not have documents,

2      to have evasive answers.  They have already provided

3      conflicting information through either informal or

4      communications such as her responses to the document requests.

5      For instance, she says that Mr. Qin did in fact create these

6      trusts and has the documents.  He says, she should have the

7      documents.  So we expect that she is going to say, I don't have

8      the documents.

9              THE COURT:  But there also has been a suggestion, even

10     if they had responsive documents, you're not getting them

11     because they are going to assert the same grounds that were

12     asserted to me in an *ex parte* submission.

13             MR. SMITH:  That's exactly right.  The mere fact that

14     you have allowed the deposition to go forward does not mean

15     that we are going to hear "take five" after every question, or

16     plead the Fifth.

17             So we don't know what we will get from her.  So that's

18     a more fulsome response to why this Court should not wait.

19             THE COURT:  Just so I understand, there is a little

20     bit of a stalemate here, correct?  Ms. Liu's counsel is saying,

21     well, we were not sure we had to produce anything, but we are

22     not moving to quash.  And your view is, there needs to be

23     production.  Each of you thinks the other needs to make an

24     application to me.

25             MR. SMITH:  Correct with one caveat.  We have said,

N8H8HUZA

1    either confirm you are going to produce or we will file this

2    motion.  So you will get a motion from us.  We are not

3    satisfied with that stalemate.  We obviously were preoccupied a

4    bit with this application.

5            THE COURT:  Also fair.  It sounds like you're telling

6    me that another reason why it's not worth waiting is that you

7    can wait until her deposition, you're not getting any

8    documents, you may not get any answers either.

9            MR. SMITH:  Correct.

10           And also, your Honor, documents that we believe that

11   she has that we want to get are not the full universe of

12   documents.  For instance, we don't expect her to produce the

13   Cathay Bank records, which we know he has.  Again, that is

14   documents that we have not received.  The last document we

15   received in that bank account was in November.  And during our

16   April 20 meet-and-confer with counsel, we made clear that we

17   were requesting up-to-date documents from the Cathay Bank.  So

18   they can't come here and say, we didn't know you wanted us to

19   refresh that.  That has been expressly communicated to counsel

20   and still we have heard nothing.  There is no reason why.  He

21   should be able to produce those this afternoon.

22           Coming back to -- I'm sorry.

23           THE COURT:  It's fine if there is something else you

24   want to tell me.  At some point I am going back to Ms. Lee,

25   correct?

N8H8HUZA

1          MS. LEE:  I will turn it over to Mr. Smith.

2          THE COURT:  I will hear from whoever has the

3     information.

4          Mr. Smith, please continue.

5          MR. SMITH:  I wanted to address the issue that you had

6     raised with respect to, well, if I grant you adverse

7     inferences, then you don't need incarceration, or vice versa.

8          THE COURT:  I have folks here who at least can

9     facilitate the process of detention.  It's just a question of

10    whether I ask them to or not.

11         MR. SMITH:  And the reason we are asking for both is

12    this.  We know that he has destroyed documents, and we believe

13    that those documents would be favorable to us, and therefore we

14    are entitled to an adverse inference.  And we know that he has

15    not produced documents that would be helpful to us, but he is

16    not going to produce them.  So your granting adverse inferences

17    to us today will not help us get that additional information

18    which will be helpful to enforce our judgment.

19         So, there are two sets of relief, but they are not

20    mutually exclusive.  They are actually specifically fashioned

21    to address two different types of issues.  And that's why we

22    think incarceration is really the only way that we will get him

23    to turn over documents and information that there is no reason

24    why he should not have produced to date.  We know that they

25    exist.  And in certain cases we know they exist because he has

N8H8HUZA

1    denied having certain information in written responses to

2    discovery requests, and then we discover at his deposition that

3    he does have -- for instance, had an aircraft or current cars

4    that he owns in China.  These are all things that up until one

5    of his more recent depositions he was saying he has no records

6    with respect to because he doesn't have any of those things.

7    Well, now we know he does.  And the only way to get him to

8    comply with your order is incarceration.  Monetary damages

9    doesn't mean anything to him.

10        THE COURT:  Just on the point of destroying documents,

11   obviously, those are very serious allegations, and I remember

12   there has been a discussion about destruction of phones,

13   repeated destruction of phones, and I guess that is one area.

14   I know there was a rather inflammatory video -- pardon the

15   pun -- of lighting money on fire.

16        I want to make sure I understand the basis for your

17   claim that he has destroyed documents.  Is it the WeChat images

18   that he has deleted?

19        MR. SMITH:  It is his own testimony.  And we have

20   multiple examples.

21        THE COURT:  Let me hear what you believe has been

22   destroyed.  Again, there is some suggestion from the defense

23   that maybe these things have been overstated, maybe there are

24   statements -- for example, the destruction of a phone doesn't

25   necessarily destroy all of the information within the phone.

N8H8HUZA

1          MR. SMITH:  Correct.  We heard for the first time that

2    the documents that they actually produced to us were off of the

3    damaged phone, in the opposition to contempt.  It really

4    doesn't matter which phone he gets it off of.  We just want the

5    information.

6          So we were reporting what he testified to.  In

7    response to our questions about information that he may have on

8    a phone, his response was, I smashed that phone.  It's a

9    reasonable inference that we thought he was saying that he had

10   destroyed that device.  Then he said he had it.  So we still

11   want information off that.  That's not the basis for the

12   destruction.  It's the actual deletion of the e-mails.

13         Your Honor referenced their attempt to downplay the

14   significance of what they have and have not produced.  Frankly,

15   I think that we have downplayed the significance.  Because he

16   has an e-mail address.  We have not received a single e-mail.

17   He has testified that three of his assistants have access to

18   this e-mail account.  We have not received any communications

19   that they sent using this e-mail account on his behalf or

20   anything else.

21         THE COURT:  He has an e-mail address from which you

22   have received not one single e-mail?

23         MR. SMITH:  Not one single e-mail.

24         THE COURT:  And it's an e-mail that his assistants

25   have access to?  When you say that, do you mean that his

N8H8HUZA

1   assistants contact him at that e-mail address or that they are

2   able to send e-mails under that e-mail address?

3          MR. SMITH:  If they have access to it, I assume that

4   they send e-mails on his behalf.  And it's his testimony that

5   we are relying on.  So we asked him about his e-mail address.

6   Why haven't you produced e-mails?  I don't have a computer.  I

7   don't use it.  Why do you have an e-mail address?  My

8   assistants use the e-mail address.  Which assistants use it?

9   He identified three.

10         By the way, your Honor, this is all detailed in

11   appendix 3, and why we think that there is an adverse

12   inference, who these people are, what they have access to; and,

13   notably, this was essentially not addressed or referenced in

14   their opposition, tellingly I would add.  But if you turn to

15   page 3 of that, it's appendix 3 to the Carol Lee declaration.

16   It's at ECF 176-14.

17         So, on page 3, we have an excerpt there in support of

18   this.  This is his -- actually, it was in his supplemental

19   declaration.  So it was a written response.  And he says, "To

20   clarify, I do have an e-mail address."  And he lists his e-mail

21   address.  "To the best of my knowledge, Shirley Wen, Kevin

22   Wong, and Yong Zhang have access to my e-mail account."  And I

23   believe there is also testimony, too, that my colleague has

24   found.

25         MR. SANT:  If the Court would like to hear, I can read

N8H8HUZA

1    the deposition testimony.

2            THE COURT:  It's not necessary.  Thank you.

3            MR. SMITH:  So, your Honor, getting back to the point

4    that I am trying to make, they say this is all irrelevant, what

5    does it matter that he deleted some WeChat communications with

6    people that he calls assistants, but really they are just

7    friends because he doesn't pay them, the same way that he

8    doesn't have any money.  These people arrange for his hotel

9    rooms and arrange for other things.  One of the friends or

10   assistants that they produced, it's either four or one page.

11   Either way, this is the person that he was communicating with

12   respect to tax returns.  Also, there was another one where he

13   sent his consulting agreement to them.

14           So, the whole universe of communications that we have

15   received is set forth in a chart in paragraph 38 of the Lee

16   declaration.  And it's ten pages from one person, four pages,

17   two pages, and then a single page from three other people, two

18   of which are his assistants.  Not a single e-mail and a

19   spattering of this.  And just to be clear, we asked for

20   communications over a five-year period.  So he didn't delete a

21   communication here and a communication there.  And these are

22   screenshot as well.

23           So, the reason that we know he deleted information is

24   because he told us that.  We assumed that he deleted something.

25   But I don't think he deleted everything except for these three

N8H8HUZA

1   things.  That's why we want the devices seized and be scanned,

2   not only to see if they can recover any deleted information,

3   but also to see if there are communications that haven't been

4   produced yet that would otherwise be responsive.  Because the

5   representation that they make that he deleted a few, what he

6   characterizes as irrelevant communications doesn't make sense

7   when he produces one page from a person that is his assistant,

8   that has access to his e-mail account, that deals with his

9   taxes, that he communicated with him with regard to his

10  consulting agreement, and there is only one page.  He deleted

11  them all.

12          So, that's my response to their argument that we are

13  overstating this.  I think we are understating the complete

14  derth of any real information that has been produced to us.

15          They also argue that simply because these assistants

16  have access to his e-mail account does not mean that they would

17  likely communicate, quote, regarding Qin's financial situation

18  and major transactions.  This is at page 24 of their

19  opposition.  But that begs the question:  Then who does?

20  Somebody has to.  Mr. Qin doesn't go through life for the last

21  five years doing big business transactions without some

22  communications related to those assets and transactions and his

23  holdings.  We have nothing.  And we know it's either out there

24  or he has deleted it.  And the two major remedies that we are

25  seeking address both of those.

N8H8HUZA

1          THE COURT:  Let me speak with Ms. Blecher.  Thank you

2     very much.

3          MS. BLECHER:  Your Honor, would you just like me to

4     begin?

5          THE COURT:  Please.  And if it's easier to speak from

6     the podium, you're welcome to do so.

7          MS. BLECHER:  Your Honor, maybe the best place to

8     start is where your Honor started, which is to give you the

9     current posture with respect to respondent's position.

10          THE COURT:  Yes.

11          MS. BLECHER:  I don't want to say that the position is

12     that there is nothing else possible that could ever be

13     produced.  There are questions here regarding who has

14     possession of the relevant documents, what exists, and to what

15     extent that Mr. Qin, who has been trying diligently to obtain

16     materials from certain third parties, is able to come into

17     possession.  If that's the case, he would be very happy to

18     produce them.

19          Just to touch on a few specific items.  With respect

20     to the Cathay Bank account, that account is still open.  I

21     guess I will just fall on my sword for more recent monthly

22     statements.  Mr. Qin has no objection to producing those.

23          THE COURT:  Then why are we here?  How difficult could

24     it be?  Are you suggesting, for example, that petitioners

25     didn't tell you they wanted up-to-date statements?  I find that

N8H8HUZA

1   difficult to believe given the ferocity in which they have

2   reached out to me.  It would be very shocking if you said I

3   didn't know until today that they wanted more recent

4   statements.

5           MS. BLECHER:  Your Honor, what I would say is that

6   there had been an earlier production, and I think that in the

7   briefing and the discussion of numerous items that were at

8   issue in the first motion, that were requested in the

9   supplemental requests, that there was a lot of focus on a lot

10  of items that had not been produced and that Mr. Qin could not

11  get access to that we were trying to get access to.  And with

12  respect to the Cathay Bank statements, that is the one account

13  that remains open, there was just an oversight in terms of

14  bringing it up to date for those additional three months.

15          THE COURT:  I guess why I find that so difficult to

16  believe is that you're being effectively besieged by

17  petitioners' counsel.  They are filing all of these motions.

18  They are asking for your client to be remanded today at the end

19  of this proceeding.  And I would have thought that if a lot of

20  your answers were, we don't really know what information there

21  is, and we can't go to China to get this information, we can't

22  go to Hong Kong to get this information, or this is information

23  in the possession of an estranged wife and we can't get it from

24  her, you have the banks records, I would have thought you would

25  have at least tried to make a good faith showing, here are bank

N8H8HUZA

1   records.  We don't have them.  You haven't produced them.  I

2   just find it difficult to believe that you would sit on actual

3   responsive documents, but we are here.

4        I also don't find especially satisfactory this idea

5   that there are questions regarding who has possession regarding

6   what exists and regarding what extent your client can have

7   access to these documents.  We have been discussing this since

8   the beginning of the year.  We had a full-throated, complete

9   discussion about this in April, and there is nothing but

10  excuses.  So I find it impossible to believe that folks who

11  didn't know until after my April order, which used words like

12  "contempt," that actually your client didn't have the ability

13  to access these materials.  So please tell me why I should not

14  be as skeptical as I currently am about the opposition

15  submission.

16       MS. BLECHER:  Your Honor, there are a lot of

17  categories of documents at issue, and I was trying to address

18  the simple ones first.  There are documents, such as the

19  documents from the banks in Hong Kong.  Those accounts were

20  closed by the banks.  They were not closed by Mr. Qin.  And he

21  tried to reach out and obtain those documents.  There has been

22  a big point of contention in this case regarding Mr. Qin's use

23  of the word "assistant."  He has provided testimony numerous

24  times that these people, he refers to them as assistants

25  because they are people who are helping him with various

N8H8HUZA

1    things.

2              THE COURT:  I have also seen the petitioners'

3    responsive reply challenging the lost-in-translation argument

4    you're now making to me.

5              Let me ask this question.  Right now today how much

6    money is in the Cathay Bank account?  Is it $500?

7              MS. BLECHER:  I don't have possession of the statement

8    at the moment.

9              THE COURT:  You must have seen it at some point.

10             MS. BLECHER:  I actually have not, your Honor.  The

11   point is, the discussion I had earlier with Mr. Qin is, we have

12   to continue to update that production and can you give us those

13   bank statements so that we can update it, and he has no problem

14   with doing that.

15             THE COURT:  Please speak to your client and find out

16   how much money today is in the Cathay Bank account.  You can

17   walk right over to him.

18             MS. BLECHER:  Mr. Zhang will have to do it because I

19   do not speak Chinese.

20             THE COURT:  Someone do it.

21             THE DEFENDANT:  A few thousand dollars.  I have not

22   used this account for so long.

23             THE COURT:  In November of 2022 there was

24   approximately $500.  There is now a few thousand dollars in

25   that account?

N8H8HUZA

1          THE DEFENDANT:  A few months ago I was paid a fee

2    ending a contract and release me.  That's the last payment.

3          THE COURT:  He received a payment to complete a

4    contract or to release him from a contract?

5          THE INTERPRETER:  Yes, release him, like break off the

6    contract.

7          THE COURT:  I see.  Approximately how much was that

8    payment?

9          THE DEFENDANT:  They deduct from the credit card they

10   give to me that I spend over the limit.  After that deduction,

11   probably a few thousand dollars.

12         THE COURT:  I am not sure what was just said.  You're

13   saying a credit card debt was paid, and then in addition to

14   that there was several thousand dollars?

15         THE DEFENDANT:  So we end the contract at that time

16   and they gave me a consulting fee, but they deduct the amount

17   that I spent over the limit of the company credit card

18   allowance, and there is a remaining few thousand dollars and

19   that was the amount that was passed into the account.

20         THE COURT:  How much was the consulting fee and how

21   much was the overage on the credit card?

22         THE DEFENDANT:  They pay me a consulting fee about a

23   little bit over $4,000 per month.  And the reason for

24   overspending on the credit card limit is because there was some

25   important clients coming domestically from China, and we had

N8H8HUZA

1    two to three meals and probably spend about, like, $10,000, and

2    that was over the limit.

3         THE COURT:  Did you say $4,000 per month on the

4    consulting fee or a different number than that?  I wanted to

5    make sure I heard you correctly.

6         THE DEFENDANT:  4,000 per month.

7         THE COURT:  I see.  So now, what is left from the

8    payment for the termination of that contract is at the Cathay

9    Bank account?

10        THE DEFENDANT:  Yes.  And I only have this one bank

11   account.

12        THE COURT:  That's all the money he has in the world,

13   all of the cash to which he has access in the whole world?

14        THE DEFENDANT:  Today, yeah.  And all the other

15   accounts were closed.

16        THE COURT:  Ms. Blecher, how is your client living?

17   Please don't tell me on the terminated $4,000 on the

18   consultancy agreement.

19        MS. BLECHER:  The consultancy fee was discussed during

20   Mr. Qin's deposition.  There seems to be, based on the way that

21   petitioners have copied or spliced a lot of his testimony, Mr.

22   Qin has testified consistently during his deposition that he

23   does not have an address.  Instead, I do believe it is

24   contested that he comes from a background where, at least at

25   one point, he was very politically well connected in China.  Of

N8H8HUZA

1    course, he used to have quite a bit of money, and during that

2    time he developed relationships with various individuals in

3    China and elsewhere.  And since he has fallen on hard times

4    financially, he has testified that it's effectively a situation

5    where he is kind of bouncing from place to place to place,

6    sometimes it's with a friend who lives on the Upper East Side,

7    there is a friend who lives in Battery Park, there is a friend

8    who lives in Flushing.  This was the subject of deposition

9    testimony.

10            THE COURT:  Please understand I have read the

11   deposition testimony.  I just find it incredible.  There was

12   some suggestion at some earlier point in this case that he had

13   some ownership interest in these properties.  Now I am told

14   that he is living on the kindness of strangers, or the kindness

15   of friends.  I find that just so difficult to believe.

16            MS. BLECHER:  Your Honor, I think that it's important

17   to take into account, I certainly don't have a relevant

18   background in certain of the circles that Mr. Qin -- the

19   cultural background, and I certainly don't have friends that

20   have the kind of resources that Mr. Qin has.  So it may seem

21   that being destitute, when you have a lot of wealthy friends,

22   is obviously not as rough of a situation as it would be for a

23   lot of us, including me, if I were to find myself in that

24   situation.  Some of these people are friends.  He also does

25   have children who live in a house on Long Island.

N8H8HUZA

1          THE COURT:  But he tells me he visits his wife, but he

2     doesn't have the temerity to ask her for the documents that she

3     is keeping at that house.  That makes no sense to me either.

4          MS. BLECHER:  Your Honor, Mr. Qin has asked her on

5     certain occasions for the documents.  To be clear, it's a very

6     large property and Mr. Qin testified that he does not stay in

7     the main house.  He typically stays out by the pool or in the

8     sauna.  So these materials are in the house, and petitioners'

9     counsel had even suggested that because he might be able to go

10    inside the house and grab documents, that this would somehow be

11    considered a practical ability to access for discovery

12    purposes.  Ms. Liu has had some serious health issues in recent

13    time, and so he definitely has stated during deposition that

14    there have been occasions where, because of these health

15    issues, or because of particular flare-ups in interpersonal

16    problems, he did not want to ask her at that particular time

17    but will try to ask her again.

18          On the whole, and for better or for worse, Mr. Qin

19    just engaged in a real-time practice in the conduct of his

20    financial affairs that was not subject to detailed record

21    keeping, was not especially sophisticated, was done via a lot

22    of informal oral arrangements.  It appears to be the case that

23    Ms. Liu is the opposite in that regard.  She seems to have

24    quite a few documents, and that kind of left Mr. Qin in a

25    frustrating position because he wants to comply with the

N8H8HUZA

1    Court's order and he wants to provide all the responsive

2    information that he has.

3            He did used to have quite a large number of assets.

4    As your Honor is no doubt aware, he kind of got looped into an

5    award that really was a contractual dispute between his company

6    and petitioners.  He ended up on the hook for that and he has

7    since been under a deluge of creditors.  The underlying award

8    in this case is not the only legal issue that befell his

9    company.

10           So he has been under a deluge of judgment creditors.

11   He had to dispose of the assets.  Mr. Qin submitted a

12   declaration on this earlier in the case.  The vast majority of

13   his net worth was tied up in the stock ownership of these

14   companies.  He did receive significant dividends in 2017 and

15   2018, which petitioners referred to earlier, these hundreds of

16   millions of Hong Kong dollars that he had, and he did freely

17   spend that money during that time.  And he did testify that he

18   had to get rid of a lot of the things that he bought, including

19   the plane and the boat, because he had stock that was worth a

20   lot of money, and then the assets of his company, he has

21   testified, or he has stated in the declaration, and argued this

22   in the arbitration proceeding, that somebody who worked for

23   petitioners caused the value producing assets of his company to

24   be stripped from his company, leaving him with a shell entity

25   that was worthless.  And then that same petitioner showed up

N8H8HUZA

1    and asked to have shares bought back that were worthless

2    because all the movie theaters that were owned by his company

3    had been effectively stolen from the company.

4              THE COURT:  That was an argument rejected by the

5    arbitrators.

6              MS. BLECHER:  Your Honor, I believe the reason the

7    arbitrators rejected that argument was because it concerned the

8    parent company who was not a party to the proceeding.

9    Certainly we are not here to relitigate the subject matter of

10   the proceedings.  It's not an appropriate basis for revisiting

11   it.  I only bring it up because the point there is, what assets

12   does Mr. Qin have and what records does he have?  And

13   petitioners have continued to point to the fact that at one

14   point he did have a significant amount of money to paint him as

15   someone who is very financially sophisticated, and someone who

16   must therefore be hiding assets and documents, and must have

17   all these records, when the reality is that Mr. Qin does not.

18             He testified to this during deposition, that he does

19   not have a lot of education.  He grew up in a military family

20   and he married into a government family, developed political

21   connections, which kind of put him on a path to amassing for

22   some time a large amount of wealth.  But that did not bring

23   with it a financial sophistication or the sudden sense to start

24   keeping detailed financial records, or even doing things like

25   having contracts translated into Chinese before he signed them.

N8H8HUZA

1          So the way that petitioners have described --

2          THE COURT:  The problem with what you're saying to me

3     is, first of all, that you preface a lot of the facts by saying

4     "respondent has testified," which doesn't necessarily mean that

5     is the fact.  When you read the deposition in its totality, it

6     is internally inconsistent, and not all of that can be ascribed

7     to problems with the translation.

8          The difficulty that I have is that your client said to

9     me in a conference that, now that he understood my orders, he

10    would abide by them, but then he didn't.  Your client has said

11    a number of things, but then they just haven't come true.  And

12    it is also distressing to get new arguments in connection with

13    the opposition that I have never heard in two years of having

14    the case.  So I am trying very hard to listen to the arguments

15    that you're making to me, but they seem at times outweighed or

16    undermined by the very statements your client has made at his

17    deposition.

18         MS. BLECHER:  Your Honor, I do believe that there are

19    some translation issues.  Again, I do not speak Chinese, but

20    that's my understanding, is that some things either got lost in

21    translation -- not because the translation was bad, but because

22    of the way Mr. Qin talks may not be -- or the background that

23    he comes from when he is talking about certain things do not

24    necessarily translate.

25         For example, I had mentioned earlier, your Honor, the

N8H8HUZA

```
1    issue of the word "assistant."  And you mentioned in the reply,
2    I guess it's an expert affirmation.  Again, I am not in a
3    position to comment on the linguistics of the word, which I
4    believe is zhuli.  But the issue here is not the linguistics.
5    The issue is, what does Mr. Qin mean when he uses a particular
6    word and what are the facts?  The individuals that he describes
7    as assistants throughout his deposition --
8              THE COURT:  One moment, please.  I am asking your
9    client to turn the microphone away so I don't hear the
10   simultaneous translation.
11             Please continue.
12             MS. BLECHER:  He described a number of individuals;
13   they were the subject of one of the attachments for information
14   to the original sanctions motion.  Individuals that are
15   identified as assistants include a 77-year-old man who owns a
16   series of nightclubs in Singapore.  There was another
17   businessman who owns a jewelry store.  Petitioners claim there
18   must be responsive information from Ali Weng, because Ali Weng
19   communicated with investors in the Lido nightclub.  One of
20   those investors was Ali Weng.  These are people who have
21   significant means and their own businesses.  And whether it's
22   consistent with proper linguistic practice or not, when Mr. Qin
23   is using that word, what he is trying to say is, I need help
24   with a certain thing and there are people who I can trust to
25   reach out to who will help me with a particular issue.
```

N8H8HUZA

1          So, the idea that these people are paid assistants, or

2     employees of Mr. Qin, that are somehow hiding information, or

3     that would be in possession of all of this financial

4     transaction information that petitioners believe exist, based I

5     am not really sure on what, they just assume that it must

6     because he had significant assets at one point, these people

7     are not his employees.  Again, they are friends.

8          And I certainly do not run in circles where I can get

9     the kind of help that Mr. Qin has stated that he is able to

10     get, but I also do not have the background, the political

11     connections, and I certainly haven't spent the last 20 years

12     giving money or helping people out with various situations.  So

13     when Mr. Qin is saying that he has developed these

14     relationships that allow him to ask somebody, can I stay at

15     your house, or can you help me get dinner, or can you foot the

16     bill for a hotel, it may not seem realistic to a lot of people,

17     but he did consistently testify about these things.

18          And to the extent there are issues with consistency in

19     the transcripts, I will say the January 30 deposition and the

20     April 24 deposition were almost exactly the same, in terms of

21     the questions and subject matters that were covered, to the

22     point that at one point Mr. Qin said, you asked me this last

23     time, you asked me this last time, and petitioners' counsel

24     said, well, I am just checking to make sure what you said was

25     accurate.  And the answers were the same from deposition to

N8H8HUZA

1    deposition.

2             So, for the most part, the statements that Mr. Qin

3    made with respect to who lent him money on a particular

4    occasion, who he had a phone conversation with, stayed the

5    same.  The discrepancies that petitioners have pointed out

6    include things like the fact that Mr. Qin said at one point, I

7    don't have someone's contact information, and at the deposition

8    he pulls out his phone and he has the contact information.

9             There are two reasons why that is the case.  The first

10   is that there were a handful of instances where Mr. Qin

11   actually went out of his way to ask a mutual friend for the

12   contact information of someone he did not have it for so that

13   he could do a better job of complying with your Honor's order.

14            The other reason, and this is also a misstatement that

15   petitioners make in their papers, is Mr. Qin did say at his

16   deposition on a handful of occasions, I don't remember this

17   person's name.  And what he was saying in each of those

18   excerpts is that in Chinese, or at least with the people that

19   Mr. Qin interacts with, it's common to use honorifics or

20   diminutives, such as boss, president, or this word *xiao*, which

21   I understand means little, to use that before someone's name.

22   And so you refer to someone as Boss Cao or Boss Han instead of

23   by their first name.  So when he sees a name like Cao Ging, he

24   doesn't immediately recognize that Cao Ging is the same person

25   that he knows as Boss Cao.

N8H8HUZA

1      So, at his deposition he says, I don't recognize, I

2  forget this person's first name, but he knows who is being

3  spoken about, but he may not have recognized the name on

4  petitioners' request, and he may not have had the same name on

5  his phone when he's looking for a person's name.  So there were

6  a handful of instances where it became clear to him during the

7  deposition, based on context, Oh, the person I thought was Boss

8  Cao is actually Cao Ging.  And now he is able to look at his

9  phone and provide that information.  And he did take his phone

10  out numerous times during the deposition, and he was handed a

11  piece of paper and he wrote down all the contact information

12  for these various individuals.

13      So, things like this that are described as

14  discrepancies between his interrogatory responses, or between

15  one day of testimony and the next, are actually reflecting a

16  change in the information that he has or in his understanding

17  of the information that's being sought.

18      THE COURT:  Let's talk, please, about the issue of

19  document destruction.

20      According to petitioners, your client has admitted to

21  deleting WeChat messages and e-mails.  Is that true?

22      MS. BLECHER:  Your Honor, in the abstract, he has

23  deleted in his lifetime WeChats.

24      THE COURT:  Including after this case was filed.

25      MS. BLECHER:  After this case was filed, Mr. Qin did

N8H8HUZA

1    delete texts involving this individual Coco Jeung who was

2    raised -- he was messengering with her during the January 30

3    deposition.  It was a personal matter, and he apparently was

4    embarrassed by the nature of her work or something that she had

5    done, and he deleted her completely from his phone because he

6    didn't want to interact with her anymore.  So he did do that,

7    that did take place, he testified, a few days after the January

8    30 deposition.  So it did not occur after the issuance of this

9    Court's order.  It did not happen after the written demand from

10   petitioners for that information.

11            Overall, however, there is an issue, when you're

12   dealing with spoliation, alleged spoliation and destruction of

13   evidence, with respect to whether there is an obligation at the

14   time the documents are destroyed.  So what Mr. Qin testified to

15   is that throughout his life he has not necessarily maintained

16   all the chats that people send him, or text messages that

17   people may send him on a given occasion.

18            He did testify that in May 2022, he had an issue that

19   I believe involved something that he understood to be that the

20   CCP had hacked his phone, or he believed that something strange

21   had happened to his phone, and there was also news regarding a

22   relative of his that was sentenced to death in China, and so he

23   stopped using WeChat.  He had deleted messages and stopped

24   using WeChat because my understanding is that the Chinese

25   government monitors it and he did not want to be communicating

N8H8HUZA

1    with them over that app.

2          He did also say, though, as a general matter, and

3    consistent with his practice historically, he doesn't do a ton

4    of texting to begin with.  He said that he does a lot of

5    communication by phone; and particularly since May 2022, that

6    he was trying to do all of his communication by phone because

7    he did not want his messages being tracked.

8          And so, when your Honor issues an order saying,

9    produce all these chats, there is a question of how many

10   existed in the first place, but some have long been deleted for

11   reasons completely unrelated to the litigation.  The Coco Jeung

12   texts are their own issue, and Mr. Qin had his own personal

13   reasons for doing that.  And surely it's questionable why a

14   person he was trying to have dinner with on a given night is

15   relevant to the litigation.

16         THE COURT:  By the same token, it was so important

17   that he had to actually, in the middle of the deposition -- and

18   please don't say during a break -- when the deposition resumed,

19   he had to engage in communications with her and then the

20   deletion of those communications.  You can say it's not

21   relevant.  I wonder why it was relevant enough that he

22   interrupted his deposition to do it.

23         But you're saying, since this litigation was filed,

24   the only messages he has deleted are related to Coco Jeung?

25         MS. BLECHER:  Coco Jeung is the individual.  That is

N8H8HUZA

1    my understanding.

2            Petitioners have repeatedly invoked this smashed

3    phone.  And Mr. Qin testified, and I can read the testimony,

4    that the phone was still intact, you could still download data

5    off of it, and that it was not damaged.  That's at 665, from

6    20-25.  He said, "This is the only method I can use in the

7    United States.  However, I can download information from the

8    phone that I smashed.  It was just a little smashed.  It

9    wasn't, like, destruction of the phone."

10           THE COURT:  So when he said several hundred pages

11   earlier, "I probably misspoke yesterday.  I threw it away.  I

12   smashed it.  I have a habit of smashing my phone.  I think I

13   have probably smashed more than ten phones in my entire life.

14   I smashed the phone, after my first deposition, of course,"

15   what do I make of that?

16           MS. BLECHER:  Your Honor, I believe it's the same

17   phone that's being discussed.  He believed it had been hacked

18   and he threw it at the wall.  He said he was suddenly unable to

19   make outgoing calls.  He thought it was just tied to some CCP

20   monitoring of the phone.

21           THE COURT:  But there is disconnect.  You have been

22   telling me that smashing the phone was a reaction to his

23   concern about it being hacked, but I shouldn't worry because he

24   is able to access everything in any event despite the phone

25   being smashed.  I am not sure which it is.

N8H8HUZA

1          MS. BLECHER:  Your Honor, it depends on what the

2     question is.  If we are dealing with an issue of spoliation of

3     evidence, there was no spoliation of evidence.  If the issue is

4     the contempt and the noncompliance with an order, the

5     destruction of the phone did predate -- the smashing of the

6     phone did predate your Honor's order.  He did testify that he

7     did it about two months prior to the April 24 deposition.  And

8     he also testified that he understood the importance of the

9     Court's order, and that he would adhere to it, and that he

10    would not -- as counsel explained this to him as well, that

11    because there had now been a court order, that he had to take

12    it more seriously, and not just in a fit of anger or

13    frustration throw the phone in a way that might cause damage to

14    it.  But for spoliation purposes, there is no indication that

15    what he did was designed or done with the intent to remove

16    information or take information out of petitioners' hands.  At

17    most, it's irresponsible or just something done out of

18    frustration, but the evidence was not destroyed, the evidence

19    was not lost based on the physical action of throwing the

20    phone, and it was not done with the intent to deprive the

21    petitioners.

22          THE COURT:  Therefore, your client will consent to the

23    seizure of his devices?

24          MS. BLECHER:  I was actually about to raise that.

25          So, Mr. Qin is fine with the -- I am speaking right

N8H8HUZA

now about the -- because he has the two phones.  He has his US

phone and his Chinese phone.  The Chinese phone is the one that

was smashed.  He does not use that anymore and that can

certainly be seized.  With respect to his other phone, I don't

know that there would necessarily be an objection.  As I

stated, he is sort of day-by-day reaching out to people to kind

of live his life.  So I don't know to the extent that it can be

turned over this second if he doesn't have arrangements to go

somewhere, but I don't think that there would be an objection

to arrange for that to happen.

THE COURT:  Some time ago you spoke with me about his

interactions with his wife, estranged wife, and that because of

health issues, and because of perhaps interpersonal

difficulties, he did not press to receive documents from her.

Did I understand your statements correctly?

MS. BLECHER:  Your Honor, it's correct that on

particular occasions petitioners asked, can you do something

right now, and he said right now -- I am not going to talk

about her health issues.  He named the specific issue and said,

for that reason, I had asked her previously, I don't want to

ask her right now, I will wait a couple of weeks and try again.

THE COURT:  The reason why I am asking is, accepting

that there may be health issues and accepting there may be some

points of dispute or enmity in their relationship, it would be

surprising to me that your client would come to court today

N8H8HUZA

1   with the very real prospect of getting remanded rather than ask

2   his estranged wife for access to these documents.  That's the

3   thing I'm having difficulty understanding.  However nice he

4   wants to be, if it is his freedom on the line, why is he not

5   asking her for these materials?

6          MS. BLECHER:  Your Honor, these statements were made

7   in late April.  He has asked her again.

8          THE COURT:  And?

9          MS. BLECHER:  To my knowledge, nothing has

10   materialized.

11          THE COURT:  Is that because they don't exist or

12   because she has decided not to give them to him?

13          MS. BLECHER:  When your Honor says don't exist, for

14   example, we talked about the immigration paperwork.  We don't

15   know necessarily whether they are still there or not still

16   there.  All that Mr. Qin knows is Ms. Liu handled getting that

17   filed and that she would have it.  I think there might be

18   questions as to whether it's still there or not still there,

19   but I don't think that Mr. Qin is in a position to make a

20   definitive statement one way or the other.

21          THE COURT:  And that's troubling to me, because as you

22   have noted just a moment ago, these issues really just flared

23   up in April, and I thought I issued what I called a definitive

24   order on the matter; and yet, not only can you not produce or

25   have not produced these documents, you can't even tell me

N8H8HUZA

1    today, which is August, whether these documents exist.

2              I suspect, because my next question to you would be:

3    Are there additional tax records?  Do they exist and they just

4    haven't been produced, or do they not even exist?  And with

5    respect to the bank records, are you telling me there are no

6    other bank records at all to produce?

7              MS. BLECHER:  With respect to the texts, Mr. Zhang,

8    who speaks the language, went through to look for relevant

9    messages.  And so those, to the extent that they were there,

10   have been produced.

11             To the extent we are considering this a rolling

12   production --

13             THE COURT:  It shouldn't be a rolling production at

14   this stage of the game.  It should have been done long before

15   today.

16             MS. BLECHER:  What I am saying is, if there was a

17   message yesterday that may be responsive to or may have been

18   with one of the individuals they asked about, does that exist,

19   I can't tell you right now.

20             THE COURT:  You may have misheard me.  I was asking

21   about tax materials, not texts.

22             MS. BLECHER:  That's my mistake.  The tax records,

23   2020 and 2021 were produced.  Mr. Qin had not filed his 2022

24   tax return as of the time of his deposition.  And I did ask Mr.

25   Qin about this before we came here today, and he said he did

N8H8HUZA

1    about a week ago file his 2022 return.  He requested it from

2    his counsel and we will be providing that to petitioners.

3    That's the US return.

4              THE COURT:  Are there other returns that he is filing?

5              MS. BLECHER:  I am not aware of any additional

6    returns, amendments, etc.  The outstanding one was 2022 and

7    that has just recently been filed.

8              THE COURT:  With respect to the bank records, did I

9    understand from your earlier discussions that there are no

10   other bank accounts in which he has any interest, beneficial or

11   otherwise, and therefore there are no additional bank records

12   to produce?

13             MS. BLECHER:  With the exception of the updating of

14   the Cathay Bank records.

15             THE COURT:  Yes, of course.  I am trying to understand

16   why there is this argument about him needing to go to China to

17   update records if indeed these accounts were closed more than

18   five years ago.

19             MS. BLECHER:  These accounts were closed.  If I

20   remember correctly, it's in 2018 or '19 that the Hong Kong

21   accounts were closed.  It coincided with the collapse of his

22   stock value.

23             There were accounts that were closed earlier.  There

24   was one closed at UBS a number of years earlier.  The Hong Kong

25   accounts -- Standard Chartered account, JP Morgan Chase

N8H8HUZA

1    account -- were closed in 2018 or 2019.  And the issue is,

2    because they are closed, and because Mr. Qin does not have

3    immediate online access, that he has to request the records for

4    those accounts from the banks.  And he tried to have someone

5    contact them electronically, I believe there was a form.  He

6    had someone -- I will use the term assistant, but it's someone

7    who helps him in Hong Kong -- I believe Kevin Wong, to go to

8    the bank, can you see if you can get the documents.  And it was

9    Kevin Wong who relayed back that they are saying you have to

10   come to Hong Kong to get them.  So our understanding is that he

11   cannot get the Hong Kong account records.

12            THE COURT:  Is that in the messages that were produced

13   in this matter?  Again, if it's the exchange that I have been

14   looking at, I didn't understand it to say that.  I understood

15   Mr. Wong to be saying, it might be easier if Mr. Qin were to go

16   to the physical bank branch in Hong Kong or China to get them.

17   I didn't understand him to be saying that's the only way to get

18   them.

19            MS. BLECHER:  Mr. Qin has phone conversations with

20   Kevin Wong, so it's not necessarily the case that written is

21   the only discussion about the matter.  Mr. Qin's understanding,

22   based on what was communicated to him by Kevin Wong, is that he

23   needs to go to Hong Kong to obtain these documents.  And the

24   reason why -- your Honor started this entire discussion with

25   what is the position of respondent -- is he has diligently

N8H8HUZA

1      tried to get these records.

2              So, with respect to the Hong Kong records, he tried to

3      get them; he was denied access.  I believe he has tried to

4      contact the banks directly and not gotten a response.  So he

5      just has to rely on what is conveyed back to him by Mr. Wong in

6      Hong Kong.

7              With respect to the US bank account, the open account,

8      we will supplement.  There is a closed account, and he did

9      request the bank records from that account.  And, as we

10     explained, we received and produced statements going back five

11     years until the account was closed.  We had mentioned in our

12     opposition that that's consistent with requirements in the US,

13     under Bank Secrecy Act laws, to maintain records for five

14     years.  But Mr. Qin has no personal knowledge of whether JP

15     Morgan has additional statements somewhere.  All that Mr. Qin

16     can say is he reached out to the bank to get statements for

17     this account and the bank provided him with the statements, and

18     all of those were provided to petitioners.  And so there is

19     nothing more for him to do in that regard.

20             THE COURT:  I have a couple of sort of overarching

21     questions and one is:  What was surprising to me about your

22     opposition was the extent to which you sought to reflect onto

23     petitioners the obligation to obtain certain materials.  You

24     suggested that a contempt proceeding could not be brought

25     because, for example, there were other assets that could be

N8H8HUZA

1   seized or at least inquired into, there were third parties that

2   could be questioned, there were other avenues that could be

3   taken to get the materials, that petitioners could reach out to

4   banks and to the third parties to get the information that your

5   client couldn't produce.  And I found that curious because I

6   did not think there was that requirement in contempt law.

7           What you're telling me today is that your client has

8   done all that he could do.  Why then, if that is the case, do

9   you feel compelled to push onto petitioners the obligation for

10  getting these materials?

11          MS. BLECHER:  Your Honor, it is overarchingly a

12  contempt motion, but there is a request for a specific remedy

13  in there that is not a traditional contempt remedy, it's more a

14  discovery violation remedy, which is what petitioners call

15  adverse findings or adverse inferences.  And an important

16  component of that is, if there is not bad faith in the

17  destruction of documents, to what extent there is prejudice to

18  the other side.

19          And, also, even in the situation where you're dealing

20  with a contempt motion, one of the issues there is it's

21  supposed to remedy some injury, some harm that has accrued to

22  the moving party.  That's what the point of contempt is, that

23  there is some harm that has been suffered by the moving party

24  and that some sanction may be appropriate to compel the other

25  party to address that.

N8H8HUZA

1          And there was also a request for fees, etc. that all

2    go to the harm that has been there.  So one issue that is

3    relevant to that is, if Mr. Qin has during his deposition

4    identified numerous assets, and these are assets that

5    petitioners point to in their moving papers, such as these two

6    cars that are in China and Hong Kong, if they have identified

7    the bank account, they are asking about the Cathay Bank

8    account, why haven't they tried to restrain assets?  If they

9    are claiming that denial or the fact that they haven't obtained

10   information about specific assets that they are interested in

11   has prejudiced them, shouldn't there be an indication that they

12   have been taking steps to satisfy their judgment using the

13   assets that have been made available to them?

14         To go back to the spoliation question, there is this

15   prejudice issue, but there also is this question of you can't

16   have a contempt motion and you can't have spoliation for the

17   failure to produce documents that do not exist.  There cannot

18   be an adverse inference for a specific finding unless the

19   movant demonstrates that there is some basis to believe that

20   the evidence existed and that it would have supported the

21   inference that they are looking for.

22         And in many of these cases, some of these are

23   corporate cases where you have corporate defendants or

24   corporate parties that have very clearcut preservation

25   policies.  But some of these are cases where a person testifies

N8H8HUZA

1    that a certain document exists, and then it hasn't been

2    produced, and then there is a reasonable basis to believe that

3    that document existed and it may have been spoiliated, or to

4    support the finding that the documents that you claim are

5    missing would have supported the finding or the inference that

6    the petitioners are asking for.

7         If they have not sought discovery from some of these

8    assistants -- during Mr. Qin's deposition, he said this person

9    is going to be in New York.  He mentioned a couple of people

10   that are in New York.  If there is no attempt by the

11   petitioners to get any information from any other party, there

12   seems to be lacking a basis to assert that documents existed

13   and were destroyed, and, also, that the documents we allege

14   were destroyed would have contained information that is

15   favorable to us.

16        So, there's various reasons why the lack of

17   third-party discovery prevents a spoliation finding, prevents

18   an adverse inference suggestion even if there had been

19   spoliation that occurred.  And there is certainly case law,

20   which we cited in our opposition brief, to the effect of, where

21   certain information can be obtained from another party, that a

22   spoliation finding is unwarranted, and also, in some cases,

23   that a contempt finding is unwarranted.

24        THE COURT:  In your opposition, you suggested that

25   petitioners could not ask the Court to draw adverse inferences

N8H8HUZA

post-judgment.  In their reply, they provided citations to

Federal Rule of Civil Procedure 37 and to several cases

indicating that adverse inferences were available

post-judgment.  Do you agree with that or do you still contest

that?  And that's the legal question, not the factual question,

as to whether they are warranted.

          MS. BLECHER:  To be clear, the Court has broad

discretion to fashion a remedy in both the Rule 37 and the Rule

69 context.  And there is not any rule, any statute, any bar,

that respondents are aware of, that there could never be an

adverse inference in the post-judgment context.  The question

is whether it's appropriate in this context.

          The petitioner cited a number of cases in their reply

brief for the proposition that this remedy could be available,

and none of those cases involve a situation where a finding of

a fraudulent conveyance or a transfer with the intent to hinder

or defraud creditors was found in the post-judgment context.

They cited a Western District of Virginia case, *RLI Insurance

Co.*, and in that case, the court made a finding that,

generally, an adverse inference could be available against the

debtor in a subsequent future proceeding against the same

debtor with respect to the same judgment.  In a Northern

District of California case, this arises under a special

provision of California law that allows a judgment to be

amended to add an alter ego debtor to the judgment, and the

N8H8HUZA

entity that was sought to be added was a party to that

proceeding.  So in that context, the court found it permissible

to draw an adverse inference against a party to the proceeding.

          The problem here is that the petitioners are asking

for an adverse inference that Mr. Qin transferred property with

the intent to defraud creditors.  There are a number of factual

issues with that claim, but as a legal matter, unlike the

California case that they cited, New York law is clear that an

action to undo a fraudulent conveyance can only be brought in a

separate post-judgment proceeding.  That applies to both a

fraudulent conveyance and also to assess alter ego liability

for a judgment against a judgment creditor.  And I can give

your Honor a cite, which is *Nykool A.B. v. Pacific Fruit, Inc.*,

2012 WL 1255019, at *5-*8 (S.D.N.Y. 2012).  This case itself is

actually a report and recommendation, and I mention it because

it actually collects New York state law and Second Circuit law

all on this topic.  It said that remedy that they are seeking

ultimately, which is to undo these transfers or assess alter

ego liability, needs to be brought against Ms. Liu or against

these trusts.  It requires a separate defendant who is not a

party to this proceeding.  But yet they are asking this Court

to draw an adverse inference with respect to Mr. Qin.  It

carries no effect with respect to Mr. Qin.  It can only be used

in a separate proceeding, and it is unclear how they intend to

do that.  If they need to commence a new proceeding, are they

N8H8HUZA

going to try to collaterally estop Ms. Liu from challenging

whether this was a bona fide transfer for value?  She is going

to say, and she'll be right, that she did not have a full and

fair opportunity to litigate that fact question in the context

of this proceeding.

So, if it serves no purpose in this proceeding, it

cannot be simply imported, indeed, it would not be fair to

import it into another proceeding in which the other party to

the fraudulent transfer was not participating and was not a

party.  So the reason that we stated in our opposition that it

made no sense in this case, it should not be available, is

because there literally is no proceeding here where that

inference or the finding that they are asking the Court to draw

can actually be utilized.

Your Honor, they did make an argument that Mr. Qin is

somehow a beneficiary of the fraudulent transfer because he

gets to keep the assets for himself.  The cases that they cite

for that all deal with a provision of the New York's debtor and

creditor laws that allow money damages to be awarded against

somebody who personally benefits from facilitating a fraudulent

transfer.  And so those all involve findings against officers

or shareholders of a corporation where the corporation was the

debtor.  They did not cite any cases that stand for the

proposition that you can eviscerate this principle that a

fraudulent conveyance action needs to be brought against the

N8H8HUZA

1    transferee.  If it were the case that the transferor is also a

2    beneficiary, there would be no need for that rule; it would

3    apply to every single case.

4            THE COURT:  I would ask you to please turn to the

5    chart that I was handed this afternoon at the beginning of the

6    proceeding.  If you're able to do so, I would ask you to go

7    through each category and either agree or disagree with the

8    status that is listed.

9            MS. BLECHER:  Number 1, the bank records of Qin, as I

10   stated earlier, there are additional records from Cathay that

11   we will produce.  They have also requested bank records of

12   certain entities, etc. and Mr. Qin does not have -- he says he

13   is not associated with these entities and doesn't have that

14   information.  So I would agree it's partially outstanding with

15   respect to the Cathay Bank statements.

16           American Express records of Qin and St. Tome --

17           THE COURT:  I can't hear you.  I just ask you to be a

18   little slower and a little louder.

19           MS. BLECHER:  I will just do them by number.

20           Number 2, Mr. Qin I think tried to get American

21   Express records, but that's overseas and was unable to get

22   them.  St. Tome is not an entity that Mr. Qin claims any

23   ownership or control interest in.  I believe it's the same

24   entity that paid him maybe the $4,000 consulting fee that was

25   discussed earlier.  So he does not have access to those

N8H8HUZA

1   documents.

2          Number 3, Mr. Qin does not have them.  So when

3   petitioners say completely outstanding, we don't agree.  There

4   is just nothing that he has to produce.  He has no recollection

5   of doing anything with respect to a trust in 2009, and did not

6   recognize the particular trusts that were discussed in this

7   litigation and the entities that petitioners are trying to seek

8   alter ego liability for.

9          Number 4 I addressed earlier.  Mr. Qin has continued

10  to ask.  For purposes of a contempt motion, he just continues

11  to ask.  He cannot make the documents materialize.  So it

12  remains outstanding, but it's not especially clear what else

13  Mr. Qin can do.

14         Number 5 is partially outstanding because he has

15  recently filed his 2022 return and that will be provided to

16  petitioners.

17         The schedule of assets, this is a claim that

18  petitioners make.  They simply accuse Mr. Qin of fabricating a

19  document.

20         THE COURT:  That document with one asset, that's the

21  schedule of assets?

22         MS. BLECHER:  Your Honor, the document was provided by

23  Ms. Liu to Mr. Qin.  It is Mr. Qin's understanding and

24  recollection that the only asset transferred, owned by King

25  Fane, was that property, and that he transferred that share as

N8H8HUZA

1  part of the divorce agreement.  So he has turned over what was

2  provided to him.  It's not inconsistent with his recollection

3  of what was --

4              THE COURT:  He recalled three or four pages.  He gave

5  one thing.

6              MS. BLECHER:  Mr. Qin seemed to have a practice of

7  asking people to simply tell him what is in a document that is

8  not written in a language that he understands.  The document

9  was in English.  He had someone speaking English reading it for

10  him.  He does not know, looking at the English version, this is

11  the contract and this part is the schedule of assets.  He

12  testified that the document was three or four pages.

13  Petitioners kept asking him about the schedule and he said

14  three or four pages.  He said he could not understand what it

15  said because it was in English.  But he said the document was

16  about three or four pages, the document that was produced with

17  the schedule of assets is about three or four pages.  So there

18  is not an inconsistency there.  Petitioners want to keep

19  interpreting what he said as meaning that the schedule itself

20  was three or four pages.  It was not in a language he can

21  understand when he saw that document, and he would not be in a

22  position to be able to distinguish between the body of the

23  document and the schedule.

24              With respect to number 6, he has produced what was

25  given to him.  I don't know that he can represent this is the

N8H8HUZA

1    actual schedule.  What he can represent is this is what was

2    provided to him by a counterparty of that agreement.

3         Number 7, Mr. Qin is going to be producing his most

4    recent tax returns, so that seems to fall under this topic.

5         He has testified regarding his consulting agreement or

6    arrangements that he tried to enter into.

7         THE COURT:  The consulting agreement was oral, there

8    is no written documentation of it?

9         MS. BLECHER:  The St. Tome agreement is the subject of

10   a separate line item here, number 8.  The consulting agreement

11   with St. Tome, there was a written consulting agreement that is

12   a document that, to Mr. Qin's best recollection, was placed

13   into storage in a storage unit in Hong Kong; and then when SMI

14   failed to pay the bill, because it had no more money, the

15   storage unit disposed of everything that was in the unit.

16        THE COURT:  I didn't quite understand that.  Where is

17   the storage unit?

18        MS. BLECHER:  In Hong Kong.

19        THE COURT:  And there were no efforts to pay whatever

20   debt there was to the storage unit so they wouldn't take and

21   destroy what was in it?

22        MS. BLECHER:  The storage unit was SMI's unit.  The

23   company was stripped of its assets.  I am not sure if there was

24   anyone sitting around who cared at that point from SMI.  It's

25   subject to numerous claims from creditors.  It was stripped of

N8H8HUZA

1    its actual revenue-producing assets.  So it does not appear to

2    be the case that there was an SMI representative that wanted to

3    pay that bill.

4              As far as Mr. Qin, I don't know that he was aware that

5    the agreement was being put into a storage unit that was an SMI

6    storage unit.  I think his understanding was it was just being

7    put somewhere for safekeeping, and then he subsequently learned

8    it was in an SMI unit and that the unit's contents had been

9    disposed of because SMI had not paid the bill.  So it's

10   outstanding, but I am not aware there is any agreement for Mr.

11   Qin to produce because his understanding is it's been disposed

12   of by the storage unit.

13             The agreement is with a company St. Tome, with which

14   Ms. Liu has an affiliation.  He also identified two individuals

15   in Hong Kong that are, I believe, directors, that they have

16   some affiliation with it.  So it's possible that there is a

17   third party that has another copy of the agreement.  Mr. Qin no

18   longer has his copy.

19             THE COURT:  Mr. Qin no longer has his copy?

20             MS. BLECHER:  Of the consulting agreement.

21             THE COURT:  Does not or does?

22             MS. BLECHER:  Does not.

23             THE COURT:  So that's the answer to number 8.

24             MS. BLECHER:  That's number 8, your Honor.

25             THE COURT:  When he is receiving money from St. Tome,

N8H8HUZA

1   is it a direct deposit?  Is there any sort of indication as to

2   why he is receiving $4,000 a month?  Are there credit card

3   bills attendant to the credit card that seem to be related with

4   the company that he may have overspent on that resulted in the

5   deduction of funds?

6            MS. BLECHER:  The credit card is a company credit card

7   and Mr. Qin is supposed to use it for company expenses.  I

8   believe he did testify during his deposition that he may have

9   used it on one or two occasions to stay at a hotel on a night

10  when he did not have somewhere to stay.  But it is a company

11  card.  He said he does not get the bills.  Presumably, the

12  bills go to the company.  I can't answer that question

13  affirmatively, your Honor.  I just know he does not get those

14  bills.  But if the company gets them, it would make sense that

15  the company would deduct from any payments being made to him,

16  whatever the balance is on those cards.

17           THE COURT:  Number 9.

18           MS. BLECHER:  Mr. Qin, he did testify he used to own a

19  plane and a boat.  He bought them around 2017 or 2018 when he

20  did have a lot of money.  There was some confusion on the last

21  day of Mr. Qin's deposition, but he did testify that he had

22  disposed of these assets because, again, when SMI collapsed, he

23  had a lot of creditors coming at him and he had no more money.

24           This is specific to the watercraft or the aircraft.

25  He does have two cars in Beijing.  I don't believe he has any

N8H8HUZA

1    records associated with those to produce.  The cars are there.

2    I believe he invited the petitioners to go and get them, if

3    they want them, but he doesn't have documents to give them

4    about those two cars.

5         With respect to the boat and the plane, he says he

6    does not have any documentation regarding the sale, that it was

7    somehow used to satisfy a debt that was -- petitioners are not

8    the only creditors that have come to Mr. Qin's door in the wake

9    of the collapse of his company.  And my understanding is the

10   boat and the plane were used to satisfy some other creditor

11   obligation.

12        THE COURT:  And the Rolls Royce is here in the States?

13        MS. BLECHER:  There are a few cars in the States, your

14   Honor, and Mr. Qin is not an owner of them.  The Rolls Royce,

15   he referred to it as a company car.  I believe the company is

16   St. Tome.

17        THE COURT:  This is the company in which his wife has

18   an interest?

19        MS. BLECHER:  His wife does have an interest in that

20   company.

21        THE COURT:  Is there someone other than his wife who

22   has an interest in this company?

23        MS. BLECHER:  He identified two specific individuals

24   in Hong Kong who also had an interest.  He also identified a

25   man named Frank who had a former interest.  Yong Zhang was one

N8H8HUZA

1    of the people.  I forget the name of the other individual.  He

2    said there were three people that he would talk to about St.

3    Tome.  And there used to be someone named Frank who has since

4    left the company.

5          The Rolls Royce is the company car.  Then there is a

6    Benz Jeep that Mr. Qin says belongs to his younger brother, who

7    is a movie producer, and apparently has residences and cars

8    scattered around.  But he does keep a car in the city, he keeps

9    a car in New York.  And Mr. Qin does drive it on occasion, but

10   he does not own the car and does not have records regarding the

11   Benz Jeep.  Mr. Qin does not have any other vehicles.  He did

12   testify that he will occasionally borrow a car from a friend,

13   but he does not own any vehicles in New York or in the US.  He

14   has the two cars that are in -- one in Beijing and one in Hong

15   Kong.

16          I can move on to number 11, but to be honest, I'm not

17   really sure --

18          THE COURT:  I am at number 10.

19          MS. BLECHER:  Given that the following real property

20   is not identified on the chart, I don't recall specifically

21   which of the properties this is referring to.

22          THE COURT:  I'm imagining it's the Applegreen property

23   and the Plaza Penthouse.

24          MS. BLECHER:  Your Honor, Mr. Qin has been consistent

25   in stating that he did not ever own the Plaza apartments, that

N8H8HUZA

those were purchased by Ms. Liu or some entity affiliated with

Ms. Liu.  He does not claim to live there.  He stated that he

has stayed there on occasion, that he will reach out and get

permission to stay.  He does not keep clothes there.  He does

not have any documents to provide regarding the Plaza 2003 or

Plaza 2009.

        35 Applegreen he has no knowledge of at all.  It's

unclear what that property even is.  He is only aware of an

address at 39 Applegreen.

        With respect to 39 Applegreen, he provided the deed of

gift that concerned the BVI entity that owned that property, as

well as a property transfer tax form associated with that

transaction, which I believe is in 2018.  He does not have

anything else that qualifies as a lease agreement.  It's not

his property.  He transferred it in 2018 to Ms. Liu's mother

pursuant to their divorce decree.  So there is nothing else

that Mr. Qin has to produce.

        THE COURT:  And the Rector Place property?  Was it 377

Rector?

        MS. BLECHER:  377 Rector Place is owned by another

Mr. Han, who is a friend of Mr. Qin, and he stays with him

sometimes.  I believe he has used it maybe to receive mail at

some point.  He does not own that property.

        THE COURT:  He is in the City of New York right now.

Where is he staying tonight?

N8H8HUZA

1          MS. BLECHER:  I don't think I have asked him where he

2     is staying tonight.  He did say that he spent last night at the

3     84th Street, the Upper East Side address.  The one associated

4     with Mr. Cao, I believe is the -- with Boss Cao.  I can't

5     answer.

6          THE COURT:  All right.

7          There is nothing to give for number 11.

8          MS. BLECHER:  I am not even sure I understand what

9     number 11 is asking for.  So I am going to say there is nothing

10    to give for number 11.

11         THE COURT:  Number 12.

12         MS. BLECHER:  Number 12, Mr. Qin testified he does not

13    own any of these properties.  He does not have any records

14    regarding the property tax, at least any time in the past five

15    years.  He did previously own some of these properties.  I

16    don't think he still has any records from that time, but I

17    believe he produced some public records he was able to dig up,

18    because he was trying to be helpful, even though public records

19    are not the most helpful things to produce.  He has nothing to

20    produce on property taxes because he doesn't own the properties

21    and doesn't pay the taxes on them.

22         Number 13, Mr. Qin has produced the messages that he

23    identified.  He did testify that he generally communicates

24    via --

25         THE COURT:  I think you may be misunderstanding me.  I

N8H8HUZA

1    am asking you to either agree or disagree with the status that

2    is given.  If, for example, more things have been produced than

3    they say have been produced, please tell me.  If they have

4    accurately identified what has been produced, tell me.

5           MS. BLECHER:  I think it's accurate the items that

6    have been produced in response to 13.  We obviously disagree

7    with the contention that it's incomplete.  He went through and

8    identified the text messages and those are what he had.  To the

9    extent there may have been some in the past, he said he

10   normally does this by phone, those no longer exist.  And so

11   there is not anything additional to produce.  Again, as I

12   mentioned earlier, if there is a new message from yesterday,

13   maybe that exists.  But as far as, there was an order, Mr. Qin

14   went through to find responsive information, that's what he

15   found, and there is nothing else to add to that.

16          It's the same thing for number 14.  If there were not

17   communications produced, it's because Mr. Qin did not have text

18   communications.  He may have communicated by phone, but he did

19   not have anything responsive, any communications with Frank or

20   Ren Hongqi.  And it is correct that there were screenshots

21   produced showing communications with Han.  And I believe there

22   were some screenshots of a check that Huang Binjun had written

23   to pay some of Qin's Amex bills.  I believe that was in WeChat

24   as well.

25          Number 15, their note I believe is accurate.  Given

N8H8HUZA

1    that Mr. Han and Huang Binjun are in 15 as well, it's the same

2    messages that are referenced in 14.  So their description is

3    accurate and Mr. Qin does not have additional WeChat messages

4    with those individuals.

5         Number 16, their note is accurate.  Mr. Qin does not

6    have a copy of this document.  I think he tried in the past to

7    get a copy of the document and has not been successful, but he

8    does not have a copy to provide.

9         And number 17, their note is accurate.  Mr. Qin does

10   not have any documents from the FBI.  He testified that he was

11   shown, I think, the warrant, but it was never given to him, and

12   he doesn't have any other documents related to that FBI raid.

13        THE COURT:  When was the last time your client went to

14   Beijing or any part of China?

15        MS. BLECHER:  I don't know if I am in a position to

16   answer that question.

17        THE COURT:  I am sure there is someone at the table

18   who is.

19        MS. BLECHER:  I'm saying I may need to phone a friend.

20        THE DEFENDANT:  So, your Honor, last time I went to

21   China was the Chinese New Year, according to the lunar

22   calendar, January 3, 2020, according to the lunar calendar.

23        THE COURT:  January 3, 2020.

24        THE DEFENDANT:  According to the Chinese calendar.

25   Roughly, around February 3, 2020.

N8H8HUZA

1          THE COURT:  February 3rd of 2020.

2          Is there a different answer if the question is when

3     was the last time he went to Hong Kong?

4          THE DEFENDANT:  I went there February 3, 2020, and

5     three days later, roughly, on February 6, 2020, I fly back to

6     New York.

7          THE COURT:  Ms. Blecher, you have indicated to me

8     earlier that petitioners, you believe, have not met their

9     burden of demonstrating a basis for me to find either

10    spoliation or the factual predicate that would permit an

11    adverse inference.  In connection with this proceeding, I

12    received, and I believe Ms. Lee included it as an exhibit, an

13    appendix 3 of proposed adverse inferences.  It includes both a

14    requested adverse inference for the missing or destroyed

15    documents and the information that the missing or destroyed

16    documents would contain.

17         Now, I don't believe you have actually contested any

18    of these.  So you have told me in sort of a broad-brush fashion

19    that they have not demonstrated it, but they have put this

20    together.  So I don't know whether what you're saying is

21    everything here is wrong, or you're accepting for purposes of

22    this argument that what is contained in this appendix is

23    correct, but it is insufficient, or something else.

24         MS. BLECHER:  Your Honor is correct that we did not

25    prepare a similar appendix going bullet point by bullet point

N8H8HUZA

1    in response, because a lot of these actually repeat the same

2    language over and over again.  We did address it more generally

3    in the body of the brief, which is to say that, certainly, if

4    there is a document that is missing, we are not contesting

5    that.  The issue is there is no basis to assume that the

6    document existed and was destroyed or withheld.

7           And then in the third column, the enumeration that

8    missing or destroyed documents would contain, the bullet points

9    generally contain very speculative and tenuous connections.

10   The first one, Ali Weng is Qin's assistant and as his assistant

11   would participate and know about Qin's major financial

12   transactions, we have already discussed the use of the word

13   assistant does not mean --

14          THE COURT:  I am not accepting your use of the word

15   assistant.  So I am actually accepting the petitioners' use of

16   the word assistant.

17          MS. BLECHER:  It's not my use, but that's what Mr.

18   Qin, as a factual matter, has testified, is that these people

19   are not his assistants.

20          Nevertheless, the mere fact that somebody has assisted

21   him on a particular occasion, with respect to a particular

22   item, does not naturally lead to the conclusion that, if there

23   are no chats with this person, that therefore there must have

24   been chats and those chats must have contained messages that

25   indicate that a transfer that took place -- the first one is 16

N8H8HUZA

Hickory Drive, that was transferred to his sister, I believe,

back in 2011 or 2012 initially.

    So, they are asking the Court to find that transfers

that happened years before -- there was even an underlying

dispute in the arbitration -- were made to defraud creditors

that could not even be contemplated at that time.  It doesn't

make sense as a factual matter.  It's not legally a fraudulent

transfer.  You can't act with intent to defraud a creditor that

doesn't exist.  And the idea that because somebody -- even

accepting, which we did not, that assistant means assistant,

assistants help with all sorts of things.  It's wildly

speculative and overbroad to draw a conclusion that the absence

of communication with a particular person who has assisted Mr.

Qin on a different occasion would be documents demonstrating

that this specific property and the transfer of this specific

property was done with fraudulent intent.  There is no direct

connection between the relationships they purport to draw.

    In the second bullet, it says that Ali Weng helped

arrange places for Mr. Qin to stay and would therefore be aware

of changes in Qin's housing situation.  How does that lead to a

conclusion that Mr. Weng would have documents that indicate

that a transfer of property from years ago was made with the

fraudulent intent to prevent creditors from reaching them.

There is no natural connection between helping somebody find a

place to stay and having intimate knowledge as to the purpose

N8H8HUZA

1    of a transfer of a specific piece of property.

2              The third bullet is the same.  Ali Weng deals with

3    Qin's personal matters and therefore would have been involved

4    in Qin's transactions regarding 16 Hickory Drive.

5              These are wildly overbroad and speculative conclusions

6    that they are asking the Court to draw.  And in order to get an

7    adverse inference instruction, the movant has to demonstrate

8    that there is a reasonable basis to believe that the documents

9    that were not produced, had they been produced, would have

10   supported the inference that they are asking the Court to draw.

11   And similar language goes throughout this document.

12             THE COURT:  I will just note for petitioners that I

13   think your adverse inference number 4 might be missing a few

14   words.  Because mine ends, it just speaks of purported

15   transfers of funds.  Perhaps you meant to say "were made with

16   fraudulent intent," but I don't have that.

17             Ms. Blecher, are you telling me that detaining your

18   client as a matter of coercive contempt would not be fruitful

19   because your client has no more documents to produce, could not

20   find any more documents to produce, there is just nothing else

21   there, other than those very limited categories of things that

22   you spoke to me today about, including tax returns and a couple

23   of more current Cathay Bank records?  You're telling me as an

24   officer of the court that there is nothing else out there?

25             MS. BLECHER:  I am telling your Honor based on his

N8H8HUZA

1    representations --

2             THE COURT:  I want you to put yourself out there.

3    It's not enough for me to put your client.  I guess I don't

4    know how good of a job you did at communicating with your

5    client the significance of this.  Because I am considering very

6    seriously detaining him, but you're going to tell me, as a

7    coercive measure, it won't result in the production of

8    additional documents because you say there are no additional

9    documents to produce.

10            MS. BLECHER:  Mr. Qin wants to comply with the Court's

11   order, and he has taken reasonably diligent steps to try and do

12   that.  He wants to do that.  And as part of that process, he

13   has reached out and tried to obtain documents that he does not

14   have because he generally just doesn't have a history of

15   keeping good records of his business dealings.  So he has

16   reached out to third parties to try and get documents, and what

17   he has been able to get is what he has produced.

18            To the extent that he is able to get anything else, it

19   would be nothing more than a matter of fortuity that something

20   else materializes, because he has made all the effort that he

21   can make to try to get these materials.  And so incarceration

22   would not serve the purpose of compelling further compliance

23   because it's not possible for him to do any more than just

24   repeating the same things that he has already done.

25            THE COURT:  So when he says, "I will never pay.  Even

N8H8HUZA

```
1   if you shoot me dead right now or you lock me up in jail or you
2   put me in jail, I will not," I should not worry about that?  It
3   just seems to me like contempt.
4           MS. BLECHER:  Your Honor, Mr. Qin made certain
5   statements --
6           THE COURT:  Under oath at his deposition.
7           MS. BLECHER:  He also made statements under oath at
8   his deposition that if the marshals showed up at his house to
9   take assets, that he would gladly turn them over and that he
10  would respect the law.  He was asked specific questions by
11  petitioners' counsel about whether he understood that he was
12  required to comply and to turn over assets, and he specifically
13  asked petitioners, why are we even wasting time with these
14  questions when they could just come and take the assets?  He is
15  not going to disobey an order, and he was not intending to
16  convey -- I believe he even said on the record at one point
17  that when he used the phrase "shoot me," he understood people
18  were not interpreting it the way he meant it.
19          THE COURT:  And when he videotaped himself burning
20  money?
21          MS. BLECHER:  My understanding is he is not the one in
22  the videotape burning the money, but he did have a videotape of
23  it.  And the background of that is that there was an associate
24  that was in town, and he had given money for the Chinese Lunar
25  New Year to, I believe it was General Lui, and General Lui
```

N8H8HUZA

returned the money and the money was in Mr. Qin's apartment. And General Lui was later accused of some kind of bribery, or something along those lines, and Mr. Qin was afraid that the money in his home in an envelope that had General Lui's name on it would constitute evidence that could be used against Mr. Lui improperly, even though it was just supposed to be a Chinese Lunar New Year gift.  So he asked somebody to burn the money.

         The point Mr. Qin was making in that colloquy is there was a broader conversation regarding how the size of a transaction that your Honor or I might think is relatively large is small to him, and he was commenting on, I don't care about money, I have burned money to protect my family.  That was the point.

         THE COURT:  There is a disconnect, though, between your current representations to me that your client has no assets and has fallen on hard times and your statement just a moment ago that he conceives of transactions in numbers larger than we can think of and therefore it was not a big deal to him to burn that money.  I don't think there is a way you can reconcile that.

         MS. BLECHER:  I am not sure that I can, your Honor. Mr. Qin used to be very wealthy and operates in a different headspace than a lot of other people.

         THE COURT:  I don't think it justifies his discovery productions in this case.

N8H8HUZA

1          I am going to take a break.  I will see you all in

2     about 15 minutes.  Thank you very much.

3          (Recess)

4          THE COURT:  I know I kept you here longer.  I will

5     hear from the folks at the front table if they wish to say

6     anything briefly in reply.

7          MR. SANT:  Your Honor, if you so permit, I will allow

8     my colleague to respond to a couple of the legal points.

9          THE COURT:  That will be Mr. Smith.

10          MR. SANT:  Yes, your Honor.

11          MR. SMITH:  Your Honor, we had referenced a proposed

12     order.  I don't know if you're interested in seeing it.

13          THE COURT:  You can show it to me and to the others.

14     I don't know that I am signing any orders this evening.  We

15     will talk about that.

16          MR. SMITH:  Your Honor, I just wanted to address, as

17     Mr. Sant mentioned, a couple of legal points, with respect to

18     the two major remedies that we are seeking today, adverse

19     inference as well as incarceration until he purges his

20     contempt.

21          With respect to incarceration, what we have heard

22     today and what you have heard through our papers is very

23     similar to *Schwarz v. ThinkStrategy Capital Management*.  That's

24     a July 1, 2015 Southern District decision in which the

25     defendant there was civilly incarcerated.  And the facts there

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N8H8HUZA

```
1    are very similar, and they have been alluded to earlier in this

2    case.  And that's where the Court found that the defendant

3    offered only a fanciful tale of unparalleled charity and

4    generosity by his friends.  And what the facts were there are

5    very similar as to here.  There, there was a Porsche that the

6    defendant said was merely a company car.  Here we have heard

7    that the Rolls Royce that he drives around in is a company car

8    of St. Tome.  Of course, St. Tome is the entity that his wife

9    created and is the entity that he has a credit card for.  By

10   the way, we have not received any of those credit card records.

11          THE COURT:  It's because he says he doesn't have

12   access to them because it's the company of other people.

13          MR. SMITH:  Exactly.  Again, it's what he says versus

14   reality.

15          So, the Schwarz decision also said that,

16   quote-unquote, loans received from family and friends in an

17   amount of approximately $720,000 over the course of

18   approximately three years was unbelievable.  Here, we have

19   records that have been produced from the Schwed firm as well as

20   Seiden Law, and they have been paid over a million dollars in

21   legal fees, and those fees come from --

22          THE COURT:  Sir, could you repeat the sentence?  I

23   heard you, but I didn't hear you fully.

24          MR. SMITH:  The point that I am making, just to tee it

25   up a bit more clearly, is that in the Schwarz case they found
```

N8H8HUZA

1    unbelievable over a period of close to three years receiving,

2    quote-unquote, loans from friends and family to cover expenses

3    totaling approximately $720,000.  Here, we have documentary

4    evidence that he has received, either he has characterized it

5    as loans from various entities or friends to cover over a

6    million dollars in legal fees to the Schwed firm and Seiden

7    Law.  So we believe that that is also evidence that he has no

8    money to be unbelievable.

9         THE COURT:  According to the deposition, who paid

10   these legal fees, friends?

11        MR. SMITH:  Not just in his deposition.  We actually

12   subpoenaed the firms.  So they have to give us the records.

13        So, the most recent records we received from Seiden

14   Law in June show one transfer from China, and this was for a

15   little over $40,000; another was from Singapore for $20,000;

16   and one that was from the West Coast, from California, for

17   $30,000.  And these are entities that we have not actually

18   known about prior to receiving these documents.

19        THE COURT:  Although you will excuse my math, but that

20   gets you $90,000.  You're saying there's a million dollars in

21   legal fees.

22        MR. SMITH:  That is correct.  As between those two

23   firms.  I happen to have these, in terms of the location of

24   them, where they get these funds.

25        In our meet-and-confer with respect to discovery

N8H8HUZA

```
 1   responses from Seiden Law specifically, when asked if there are
 2   any other documents with respect to the source of these assets,
 3   do you have communications from either your client Qin or from
 4   the entities themselves where this money is coming from or does
 5   it just show up, apparently it just shows up.  They had no
 6   other documents.  We have the wire transfers they produced to
 7   us.
 8            THE COURT:  Ms. Blecher, who is paying these fees?
 9            MS. BLECHER:  Your Honor --
10            THE COURT:  Are you telling me that's privileged
11   information?
12            MS. BLECHER:  Not at all, your Honor.  I think some of
13   it might be above my pay grade.
14            THE COURT:  Whoever at the table can tell me, can tell
15   me.
16            MS. BLECHER:  I am aware of certain of the entities
17   that paid that have been discussed at depositions and what
18   those are.  I don't know if there is additional information
19   that can be provided.  On the whole, Mr. Qin, again, as I
20   stated earlier, has to ask people to help him pay for certain
21   expenses, borrow money.
22            THE COURT:  It's one thing to sleep on someone's couch
23   for the night, and something else to have them pay a million
24   dollars in legal fees.  How many entities are paying the fees
25   for this case?
```

N8H8HUZA

1             Mr. Zhang.

2             MR. ZHANG:  I do believe we received approximately, in

3     toto, approximately 200K or a little more.

4             THE COURT:  Say that again.

5             MR. ZHANG:  200,000 or a little bit more on this case.

6     We have an outstanding bill we produced as well.  We have

7     outstanding 440,000 unpaid invoice.

8             THE COURT:  Outstanding 440,000.  But you have gotten

9     200,000 paid, sir?

10            MR. ZHANG:  That's my best recollection.

11            THE COURT:  From whom, sir?

12            MR. ZHANG:  As petitioner indicated, a wire transfer

13    with a note, attorney's fees for Qin.  So we collect it into

14    account against Mr. Qin's unpaid invoice.

15            THE COURT:  Do you not know where that money is coming

16    from?

17            MR. ZHANG:  I do recall there was one payment came

18    from St. Fortune Group.  And I do recall, as petitioner point

19    out, two payment from Hong Kong and Singapore with the

20    comments, payment for Mr. Qin's attorney's fees.

21            THE COURT:  And you're not sure where it's coming

22    from?

23            MR. ZHANG:  We could only identify payer's name and

24    bank account, and we have produced it to petitioners.

25            THE COURT:  St. Fortune is the company that's

N8H8HUZA

1    controlled by his estranged wife's father, yes?

2              MR. ZHANG:  St. Fortune was controlled by two

3    individuals, Mr. Qin's ex-wife and Mr. Qin's ex-wife's father.

4              THE COURT:  Family members.

5              I am just saying, not that I have ever been divorced,

6    but I can't imagine, if I were, that my former husband, which I

7    have difficulty even saying, would be paying a million dollars

8    of my legal fees.

9              MR. ZHANG:  Only payment we received from Mr. Qin's

10   ex-wife or ex-wife's father is that 50K from St. Fortune.

11             THE COURT:  Sir, I am not sure why Mr. Kushner finds

12   this funny and is laughing, but he'll tell me at some later

13   point.

14             Sir, you're $440,000 in the hole and you're still

15   continuing to represent him.

16             MR. ZHANG:  Yes.  Because this case already been here.

17   Ethically we can't drop him off at this moment.

18             THE COURT:  Interesting.

19             Mr. Smith, please continue.

20             MR. SMITH:  The million dollar figure includes the

21   amount that the Schwed firm has been paid as well.

22             THE COURT:  I understand, sir.  I don't have them

23   here.

24             MR. SMITH:  That's correct.

25             So, I just wanted to point that out with respect to

N8H8HUZA

1    our motion for contempt.  We think it is appropriate here.  We

2    think that he needs to be incarcerated until he can purge his

3    contempt, particularly with respect to getting documents, but

4    also at least paying, he can pay his lawyers; he has been

5    ordered to pay our fees as well.

6           With respect to adverse inferences, Ms. Blecher also

7    said that those are not available here, and she referenced one

8    of the cases that petitioners cite in their papers, the

9    recently decided July 2022 case out of the Western District of

10   Virginia, the *RLI Insurance Company v. Nexus Services*.  In

11   fact, that case has similar facts to this case as well.  It was

12   a defendant that had failed to comply with two post-judgment

13   discovery orders.  And in that case, the counsel came forward

14   and said, I'm sorry, we just haven't gotten to producing some

15   documents, it's not a priority, and they were producing a

16   little bit of documents.  But what the judgment creditors

17   wanted were historical documents to figure out where the money

18   had gone.  That's the words that counsel used in that case.

19   They said, We are here today to figure out how they were

20   treating companies, how they were making transfers during this

21   period, to figure out where all this money went, that they were

22   collecting for years and then squirreling away, so that we can

23   pull it back in the litigation.  They hadn't produced any of

24   those documents.  The court there found it appropriate in the

25   post-judgment context to make an adverse inference.  And there,

N8H8HUZA

```
1    the adverse inference was much broader than any of the

2    inferences that we were seeking in our moving papers.  And it

3    was characterized dismissively by counsel for Qin but, in fact,

4    they made a finding there that they were entitled to an

5    inference that such discovery that had not been provided would

6    have been adverse to any defenses raised by the defendants

7    there in any litigation related to collection on the judgment.

8            And that's what we are attempting to do here.  And

9    that's why I thought it would be helpful to provide you with

10   the proposed order here because, really, we were trying to be

11   more specific than we need to be.  What we simply want is an

12   adverse inference that in future enforcement litigation any

13   inferences should be drawn against Qin when he has destroyed

14   evidence or withheld evidence.

15           So, in paragraph 5 of the proposed order, you will see

16   that, putting aside whether it is a fraudulent transfer, these

17   transfers were sham transactions, with respect to King Fane,

18   St. Tome, and PH 2003 Unit LLC, and St. Grand Ceremony LLC.

19           THE COURT:  What counsel was saying --

20           MR. SMITH:  We have no evidence to actually tie

21   that --

22           THE COURT:  Let me finish.

23           What counsel was saying was that it made no sense

24   because, at the time the transfers were taking place, he did

25   not know who these creditors would be; they hadn't yet become
```

N8H8HUZA

1    creditors.

2             MR. SMITH:  Perhaps in some cases, but not in the case

3    of the penthouses.  In the case of the penthouse, that was

4    purchased using a $27 million loan by Luxury Team Inc. and PH

5    2003 Unit LLC, which we believe to be Qin's entities.  The

6    address for them were at the Applegreen Drive address.  And in

7    Ms. Liu's responses to the discovery requests, she identified

8    various entities that she formed and she controlled.  And these

9    two particular, she said they were created for the purpose of

10   purchasing properties, but she didn't say that she created or

11   owned them.  So we believe it to be Qin.

12            However, on March 28, 2001, the loans were transferred

13   over --

14            THE COURT:  May I hear the date again?

15            MR. SMITH:  March 28, 2021, the loans were transferred

16   over to St. Grand Ceremony LLC, which in fact is an entity that

17   Ms. Liu, Qin's estranged wife, owns.  And that date is

18   significant because on 4/21/2021, the arbitration award in this

19   case was entered.  So within a week there was a massive

20   transfer of equity in the Penthouse Plazas.  And the loan

21   guarantors there were Ms. Liu, and then JP Morgan Chase Trust

22   as a trustee of the GLE Trust, which we believe is another one

23   of the trusts that were set up to divert assets from Mr. Qin to

24   avoid his creditors, including our clients.

25            And this is just an example.  There's a lot of

N8H8HUZA

1   evidence that supports the inference.  But we are not asking

2   for a declaratory judgment against even Mr. Qin.  We are asking

3   for an adverse finding that, in absence of documents that he

4   should have and that he should have produced, or that he in

5   fact destroyed, all inferences should be made against him.

6          Now, to Ms. Blecher's point, in any future litigation

7   in which we attempt to apply these adverse inferences, we are

8   not asking for anybody to come in to be precluded from that.

9   So the question of whether or not there is an offensive

10  non-mutual issue preclusion --

11         THE COURT:  That is my concern.

12         MR. SMITH:  -- will depend on what excuse the entities

13  give in the subsequent litigation.  And we are not asking you

14  to decide that.  She is asking you to decide that.  She is

15  saying, well, in any future litigation it will be meaningless.

16  But we are not asking for a determination of any future

17  litigation.  We are asking for a factual finding that, in the

18  absence of any evidence being produced, which he should have

19  and that has been destroyed here, that an inference should be

20  drawn against Qin.

21         Now, if an entity comes in, or if Ms. Liu comes in,

22  that's a presumption.  They can rebut that presumption.  But

23  that's why it's helpful and important to us.  Because there

24  must be some remedy for the violation of this Court's orders.

25  He can't just destroy evidence or withhold evidence or the real

N8H8HUZA

1    nature of these type of transactions.

2           By the way, a $27 million mortgage taken out initially

3    by these two entities, the amount of money that you have to

4    have shown a bank, but that was before the bank transferred the

5    mortgage over to an entity controlled by Ms. Liu.

6           So, clearly, there is money there.  And this gets to

7    one of the early points that Ms. Blecher made.  It was in

8    response to --

9           THE COURT:  I believe it's Blee-cher, sir.

10          MR. SMITH:  I apologize.

11          -- how is your client living?  And her overarching

12   response, before both of you drilled down a bit, she said that

13   he had fallen on hard times; that he had a lot of money, but

14   now he doesn't anymore.  Well, if that were the case, where did

15   the money go?  We want to know where the money went.  He didn't

16   just go from having a lot of money to having no records of

17   that.  We are asking for the last five years.  The last five

18   years covers when he had a lot of money.

19          So, in fact, if he had bank accounts, they were

20   drained to pay assets to creditors, he doesn't have them, or

21   they were transferred in some manner, which he can say was

22   legitimate, as gifts or anything else, that's fine.  The

23   problem is they don't have any answer to that.  They just said

24   he has fallen on hard times and we don't know where the money

25   went.  He sold an airplane.  That's not where a billion dollars

N8H8HUZA

1    went.

2             So I just wanted to touch on those two specific points

3    with respect to the remedies.  And my colleague, Mr. Sant,

4    wanted to address just a couple of the factual issues as well,

5    if you would indulge us.

6             THE COURT:  Briefly.

7             MR. SANT:  Your Honor, if any of these you don't need

8    to hear information about because you're satisfied, I will be

9    happy to skip them.

10            The first point that Ms. Blecher raised was that there

11   was some kind of unawareness of the issue about the ongoing

12   Cathay Bank statements.  I just wanted to highlight, in our

13   reply on page 3 we write, "Qin produced no" -- and it's

14   underlined and in italics -- "Cathay statements for the past

15   seven months despite demand from petitioners."

16            Then in the attached Lee declaration, paragraph 5

17   states, "Qin has only produced his Cathay Bank records through

18   November 2022."  And it goes on.

19            THE COURT:  She indicated that was an oversight.

20            MR. SANT:  It seems hard to imagine how somebody could

21   read the brief and not see that, but I will move on to the next

22   one.

23            We heard that his only active bank account allegedly

24   had 500, now has a few thousand, that he hasn't used in a long

25   time, which raises the question again, how does he live?  It

N8H8HUZA

1    doesn't make any sense.

2           He claimed that he used some of the funds that came in

3    to pay off certain credit cards.  Again, no credit cards have

4    been produced.

5           THE COURT:  Again, I am not saying I agree with this,

6    or I accept this, but what was said to us was that there was a

7    corporate credit card of St. Tome, and he just doesn't get the

8    bills for it.  Which is, indeed, a great credit card to have,

9    if you can spend and not get the bills.

10          MR. SANT:  I would love to have that credit card.  It

11   sounds like it has amazing features.

12          I would note that he claimed to have received this

13   payment from some kind of agreement ending his consultancy.

14   That seems to be the same St. Tome consultancy.

15          THE COURT:  Yes.  You have not seen this agreement?

16          MR. SANT:  No.  It hasn't been produced.

17          THE COURT:  He says he doesn't have his copy of it.

18          MR. SANT:  He doesn't have the original St. Tome

19   agreement, which he first said he sent to Singapore.  Then he

20   said he did have one in the United States but he didn't have

21   space for it.  But then he sent it to a storage unit in Hong

22   Kong, and then it was destroyed.  And now, somehow he has an

23   agreement paying him money to end this consulting agreement,

24   yet he can't get a copy of the actual consulting agreement?

25   And this is a company run by his wife who he lives with, and

N8H8HUZA

1    it's not on any computer where they can print it out?  I will

2    move on.

3            Standard Chartered.  He claims that he can't get these

4    records that are in Hong Kong.  I would just direct the Court's

5    attention to our reply in support of the motion to compel.  It

6    is exhibit 3 to the Lee declaration.  The e-mail here from

7    Standard Chartered is not asking him to come to Hong Kong.

8            THE COURT:  The Lee declaration or the Lee reply

9    declaration?

10           MR. SANT:  It's the reply declaration.  It's exhibit

11   3.

12           THE COURT:  I am looking at it now.

13           MR. SANT:  And there's other ones.  This was just an

14   example.  But this is an example from Standard Chartered Hong

15   Kong, and one can see that it comes from Therise Chan, Standard

16   Chartered Hong Kong.  And it says you can get access just by

17   doing a chat with a live agent feature over the internet.

18   There is no demand here to come to Hong Kong.

19           So, we heard about the deletions, and the argument was

20   that he didn't delete anything of note.  I would direct the

21   Court's attention to deposition transcript page 383, line 9, to

22   384, line 22, in which Qin testified that he "deleted most"

23   contacts and communications when he "hired Seiden Law" in May

24   or June 2022, and he "deleted a lot of things on WeChat then."

25           Again, we subpoenaed Seiden Law seeking any litigation

N8H8HUZA

1    holds ever sent to Qin and none were produced.  We don't

2    believe he ever received one.

3            I will move on to the next topic.  I guess there is

4    nothing to say here because opposing counsel agrees there is no

5    bar to adverse inferences in the post-judgment context.

6            In terms of the contradictory testimony, I will just

7    direct your attention to footnote 2 to our reply brief.  We

8    provide a whole bunch of examples of inconsistent and

9    contradictory testimony, none of which was contested.

10           THE COURT:  What footnote?

11           MR. SANT:  It is footnote 2 on page 2 to our reply

12   brief.  We gave examples including -- it's just amazing, your

13   Honor.

14           "I do know St. Fortune."  "I don't know.  I have never

15   heard of it."

16           It's all a series of statements.

17           "Sometimes I use Uber."  "I don't even know how to

18   call Uber."

19           "I don't travel."  "I have not traveled."

20           Here is an ellipsis.  "I take my children to the

21   summer camp in Geneva every year."

22           THE COURT:  I see.

23           MR. SANT:  I will move on.

24           I will skip this point.  I think it's not necessary to

25   make it.

N8H8HUZA

1          I heard some argument that maybe the three to four

2     pages was a reference to the entire length of the transcript.

3     We quoted at length this segment of the deposition testimony.

4     We would simply direct the Court's attention to our original

5     motion to compel, page 17.  I won't read it for your Honor,

6     except for the beginning it says, "How many pages was the

7     attachment?"  And it goes on and on.  So this was an instance

8     where he was asked three to four times just to make sure we are

9     talking about the attachment here.  And he keeps saying, yeah,

10    the attachment.  It's just not believable that he somehow

11    thought it was the entire document.

12         I will skip again this one.

13         We heard that opposing counsel did not disagree with

14    any information on the chart, which shows he has not complied

15    with this Court's orders.

16         Regarding his travel back and forth to China.  He was

17    questioned about this during his deposition.  He did not say

18    anything about, I'm afraid of China, I got out of China.  What

19    he said was he left because of the pandemic.  He said he left

20    on the final day of the lockdown.  He was told that the

21    lockdown was coming and the final day he got out.  And this is

22    on page 105 of his deposition transcript.

23         His testimony a moment ago, whether it was accidental

24    or intentional, it was incorrect in his testimony, he said that

25    he was still in China in March.  He just testified his last

N8H8HUZA

1    time was in February.  Perhaps that was an accident and he

2    misremembered.

3            I heard that you can't draw an adverse inference about

4    his assistant Ali knowing what homes he has, because why would

5    he know that just because he arranges places to stay.  Your

6    Honor, the person who helps you arrange places to stay probably

7    knows what homes you have.  I am not sure why that person would

8    not know.  But in addition to that, Ali also handles Qin's tax

9    returns and other financial information.  Mr. Qin testified

10   that he would send this information to Ali by WeChat.  And, of

11   course, all those records are gone.

12           I believe your Honor has already assessed Mr. Qin's

13   credibility through question and answer, but we certainly

14   invite the Court to ask any further questions that the Court

15   may feel is necessary to assess his credibility.  We would love

16   to understand why it is that he has no records that predate

17   this Court's April 18 order other than a couple of holiday

18   messages from December.  All the other messages are after this

19   Court's order requiring him to produce communications.

20           If this Court would indulge me for a moment, I will

21   just say what I think is really happening, your Honor.  I think

22   Qin is still married.  I think that he has papered over some

23   transactions, but these are all shams.  He is transferring his

24   assets to his mother-in-law and his wife, and that's why he

25   refuses to produce all these records because he knows what they

N8H8HUZA

```
 1   will show.  This is also why he doesn't produce his immigration
 2   records because it shows he is married.
 3             THE COURT:  Did he not say in his deposition that he
 4   was sort of maintaining the facade of the marriage for
 5   immigration purposes?
 6             MR. SANT:  I believe he confessed to it.  Not only
 7   that.  He confessed that he wanted to continue doing this.
 8             In our original motion to compel, your Honor, we
 9   excerpted, and I won't read it for your Honor, but we excerpted
10   a portion of Ms. Lee's deposition of Mr. Qin, where effectively
11   she says:
12             "Did you tell the truth in your tax return?
13             "Yes.
14             "And your tax return says you live at 39 Applegreen
15   Drive?
16             "Yes.
17             "And that's the truth, isn't it?
18             "No."
19             I don't know how to respond to that.  This is what we
20   have had for the entire length of his deposition, is this kind
21   of self-contradictory answers that make no sense.
22             I would just like to make one final point and then I
23   will sit down, your Honor.  I heard about the burning money,
24   that this was allegedly done because it could constitute
25   evidence, and so they burned the money because somebody could
```

N8H8HUZA

1   misinterpret that cash because it had General Lui's name on the

2   envelope.

3            Your Honor, you can just burn the envelope.  This

4   doesn't make any sense.  And if you want to get rid of

5   evidence, why are you filming yourself doing it, and then

6   you're sending this video back and forth by the very phone

7   messages that you claim the CCP is looking at.  It doesn't make

8   any sense.  Nothing he says can be trusted.  Again, I simply

9   invite the Court to --

10           THE COURT:  I need you to tone down the drama.

11           MR. SANT:  In any case, I said that was my last

12   comment.  I will stick by my word.  Thank you.

13           MR. SMITH:  Your Honor, I apologize.

14           THE COURT:  I do want you to come to an end.

15           MR. SMITH:  This will be an end.  It was just an

16   oversight.  I handed you the proposed order, but then never

17   really referenced it.  I won't go through it.  Most of the

18   pertinent information has been covered.  The one thing that we

19   do add there for your consideration is assistance by the US

20   marshals to actually go to these premises where he said that he

21   stays and where he has identified that he has property, and

22   potentially records, to go in and seize any electronic devices,

23   that he may not have brought to the court today, for imaging.

24   And then also, in addition to that, various financial papers or

25   records that we may see there that could be responsive to our

N8H8HUZA

1    production.  We have added some language there, protection, in

2    case we had something that is not Mr. Qin's and we would

3    videotape.  That's one protection that we have added there, in

4    anticipation of objections to going into those properties and

5    seeking those items.

6           So we respectfully request that relief as well.

7           THE COURT:  Thank you.

8           Mr. Smith, let me please understand something.  Am I

9    correct, and the answer may very well be no, am I correct that

10   there is not perfect consistency between the adverse inferences

11   that are requested in appendix 3 and the adverse inferences

12   contained in paragraph 5 of your proposed order?

13          MR. SMITH:  That is correct.  We thought we would

14   simplify them.

15          THE COURT:  You aim low.

16          MR. SMITH:  This addresses the potential criticism

17   that we got from Ms. Blecher that specific adverse inferences

18   with respect to specific causes of action may be improper.

19   Really, here, we are saying that, absent documents showing that

20   these transactions were legitimate, they should be deemed sham

21   transactions.  Again, obviously subject to, in any subsequent

22   litigation which we would be applying those adverse findings,

23   subject to rebuttal by any other party.

24          With respect to (c), that's specific to the evidence

25   that we are trying to find with respect to trusts, and we do

N8H8HUZA

1  believe or we hope that we will be successful in identifying

2  some of those trusts, either through evidence compelled from

3  Mr. Qin or his estranged wife.  We say there "or money had and

4  received," in parentheses, which is essentially the common law

5  equivalent of constructive trust.  You have heard about BVI

6  entities.  So if we needed to enforce these inferences in

7  foreign jurisdictions, that's just an explanation about

8  language that was not in other papers.

9              THE COURT:  Thank you.

10             Counsel at the front table, do you believe there is a

11 dispute between the parties as to the legal standards for the

12 imposition of sanctions, the circumstances under which I can

13 find contempt and the circumstances under which an adverse

14 inference can be drawn?

15             And I will ask the question a little more pointedly,

16 and then I will ask Ms. Blecher at the back table.  I have law

17 here.  Do you wish me to read it into the record or do the

18 parties agree with what the legal standards are for the

19 imposition of sanctions for contempt and for an adverse

20 inference?  I gave all of those in my April decision.  So I

21 don't think I need to give it again.

22             MR. SMITH:  Petitioners certainly waive any necessity

23 to read into the record the standards.  We certainly agree with

24 the Court's articulation.

25             THE COURT:  Ms. Blecher.

N8H8HUZA

1          MS. BLECHER:  I think the parties are in agreement as

2     to the overall standard for each of these specific cases.  If

3     one element is not present for what would be required in that

4     circumstance we might disagree on, but overall, what the Court

5     needs to find I think we are in agreement.

6          THE COURT:  This is not a complete decision.  But

7     based on everything I have heard today, and based on the

8     materials I have received, I largely reject the explanations

9     given to me by respondent and his counsel for what has

10    happened.  And I do believe that he has not abided by my

11    orders.  He has willfully not abided by my orders.  He has done

12    everything possible to avoid abiding by my orders.  And he has

13    lied to me and he has lied at his deposition.  So I do find

14    that there are violations of my prior discovery orders, and I

15    also find that he is contempt.  And the issue then is, what are

16    the sanctions available to me?

17         I do intend to find certain adverse inferences.  We

18    can do it whether we call them inferences or facts.  I was

19    looking at what was in appendix 3.  I agree with Ms. Blecher

20    that it is not entirely clear to me that each one of those is

21    something that I can find at this stage and on this record.

22         So I am going to take that component of my decision

23    under advisement and figure out which of the things that are

24    now sought in the proposed order are things where I can find

25    not only that there is contempt or a discovery violation, but

N8H8HUZA

1  where the appropriate sanction is the adverse inference that is

2  requested in paragraph 5 of the proposed order.  So that is

3  something that is still under consideration.

4      The issue of remand is very much a live issue.  But

5  for several reasons, including the lateness of the hour, I am

6  not going to remand Mr. Qin at this time.  But I am still

7  thinking about it.  I have not decided against it.  I just want

8  to have an opportunity to look at everything that has been

9  given to me.

10      I am going to ask the parties to do certain things.  I

11  am going to ask petitioners' counsel to e-mail the proposed

12  order to chambers so that I can work with it and modify it if

13  need be.  I am going to ask respondent to obtain a copy of this

14  transcript on an expedited basis.  And by expedited, I am not

15  saying tonight or tomorrow, but within a week or two, so that I

16  can have it with me and work with it.

17      There is an issue that was addressed earlier.  It was

18  an issue about producing tax returns and additional bank

19  records that have come to light.  I imagine that will be done

20  within a week.

21      Then there is the issue about devices.  My

22  understanding is that Mr. Qin has a device here in the

23  courthouse somewhere, but something tells me I don't have it up

24  with me.  And to be clear, whatever that device is is going to

25  the gentleman in the gallery for imaging tonight.  And I

N8H8HUZA

| | |
|---|---|
| 1 | presume as well, because you have already agreed to do so, that |
| 2 | what is known as the Chinese phone will also be produced to the |
| 3 | gentleman in the gallery from Setec Investigations. |
| 4 | MS. BLECHER:  Your Honor, I am sorry to interrupt.  I |
| 5 | believe that phone is actually down with the marshals. |
| 6 | THE COURT:  Let me ask these questions. |
| 7 | Mr. Zhang, I thought I understood from conversations |
| 8 | you had with my deputy that you have his current phone.  Did |
| 9 | you misspeak? |
| 10 | MR. ZHANG:  I misspoke.  I don't have his current |
| 11 | phone. |
| 12 | THE COURT:  You have the former phone, which is in my |
| 13 | hand, which I can turn over to the gentleman from Setec for his |
| 14 | imaging.  And understand that you all, those in the back table, |
| 15 | will be responsible for giving him the information that he |
| 16 | needs to access this.  So I hope your client remembers the |
| 17 | password that was used for this phone.  I am allowing you to |
| 18 | make arrangements with Mr. Setec to retrieve the phone whenever |
| 19 | it is appropriate. |
| 20 | Where is his current phone, sir? |
| 21 | MR. ZHANG:  I don't have the answer to that. |
| 22 | THE COURT:  Talk to your client and tell me. |
| 23 | THE DEFENDANT:  Because I was informed before I came |
| 24 | here that I cannot take my phone in with me, so I left my phone |
| 25 | with theirs. |

N8H8HUZA

1              MR. ZHANG:  It's not in my office.

2              THE COURT:  Would you chat with your colleagues and

3       figure out where this phone is right now.  And someone report

4       back to me where the phone is.  Thank you.

5              Mr. Zhang, I am quite confused because my deputy has a

6       firm recollection of you saying you kept his phone in your bag.

7              MR. ZHANG:  I think I misspoke.  I just had that phone

8       with me today.

9              THE COURT:  You have no bag with you now?

10             MR. ZHANG:  No.

11             THE COURT:  Having consulted with your colleagues,

12      where is Mr. Qin's phone?

13             MR. ZHANG:  He said it's highly likely he put it in

14      the conference room in the firm.  Because we did tell him that

15      the court does prohibit him to bring a phone unless he has

16      attorney license or permitted by the Court.

17             THE COURT:  It is your belief that it is somewhere in

18      your office?

19             MR. ZHANG:  Somewhere in our firm.

20             THE COURT:  Where are your physical offices, sir?

21             MR. ZHANG:  My office is 322 Eighth Avenue.

22             THE COURT:  I guess I am confused.  If you advised

23      your client you couldn't bring phones, why did you bring this

24      phone?

25             MS. BLECHER:  Mr. Qin was in our office before we came

N8H8HUZA

1     here, and he said separately on the way or when we were

2     walking, Oh, I want to give you this phone to have, and we did

3     not then take it and put it away.  So that kind of came here

4     with us.

5              THE COURT:  All right.

6              Mr. Smith, the gentleman from Setec is named what,

7     please?

8              MR. KYPRIANOU:  Tino Kyprianou, T-i-n-o,

9     K-y-p-r-i-a-n-o-u.

10             THE COURT:  Thank you.

11             Mr. Kyprianou, let me please understand the process by

12    which this phone is imaged.  You will be speaking with the

13    folks at respondent's counsel table to get information about

14    the password, and you will be explaining to them, I imagine,

15    that there will be something done to the password to prevent

16    someone from remoting in while you're doing your work?

17             MR. KYPRIANOU:  We have to put it on airplane mode and

18    take it off WiFi.

19             THE COURT:  How long does the imaging process take?

20             MR. KYPRIANOU:  It all depends what kind of phone it

21    is and how much information is in there.  If it's an Android

22    phone, it might take five, six hours.  If it's an iPhone, it

23    might take less.

24             THE COURT:  I believe it to be an iPhone.

25             MR. KYPRIANOU:  It might take, maybe, two or three

N8H8HUZA

1    hours.

2            THE COURT:  Sir, does someone have the ability to

3    accompany respondent's counsel to their office to pick up the

4    other phone?

5            MR. SMITH:  Absolutely.  And we would go with Mr.

6    Kyprianou.

7            THE COURT:  So that will be this evening.  I will let

8    you all figure out who draws the short or long straw to

9    accompany him back to the office.

10           I am going to hand the phone to my deputy so that you

11   can all see me hand it to Mr. Kyprianou.

12           MR. KYPRIANOU:  Can we take it back to our lab and do

13   it?

14           THE COURT:  You can take it back to your lab, sir.  I

15   want you to have both phones in your possession this evening.

16           MR. SMITH:  Also, I understand your Honor's order to

17   be directing respondent to provide Mr. Kyprianou with all

18   necessary passwords, access codes?

19           THE COURT:  Yes.  All of those things.  It's not worth

20   it for him to have the device if he can't access it.

21           That's enough for one evening.

22           MR. KYPRIANOU:  We can have the password here, but if

23   there are any messages on the iCloud, then we need the password

24   for that as well to access the iCloud.

25           THE COURT:  I would expect that the iCloud passwords

N8H8HUZA

1    will be given in addition to the password to access the phone.

2              Thank you everyone for your time, which has been quite

3    extensive this afternoon.  You will hear from me going forward.

4              Thank you.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25