**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

HUZHOU CHUANGTAI RONGYUAN     :
INVESTMENT MANAGEMENT     :
PARTNERSHIP, HUZHOU HUIHENGYING     :
EQUITY INVESTMENT PARTNERSHIP, and     :
HUZHOU HUIRONGSHENG EQUITY     :
INVESTMENT PARTNERSHIP,     :
    :    1:21-cv-09221 (KPF)
        Petitioners,     :
    :
        v.     :
    :
HUI QIN,     :
    :
        Respondent.     :
    :

---------------------------------------------------------------- x

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONERS'**
**SECOND MOTION FOR ATTORNEYS' FEES AND COSTS**

## **TABLE OF CONTENTS**

**Page(s)**

I.  INTRODUCTION ............................................................................................. 1

II. BACKGROUND .............................................................................................. 2

    A.  Qin and Seiden Conceal Emails and Lie to the Court About Missing Emails ............................................................................................................ 6

    B.  Seiden's Failure to Collect Phone Data .................................................. 8

    C.  Seiden's Failure to Collect Bank Records ............................................. 9

    D.  Seiden's Failure to Collect Immigration Records.................................. 13

III. ARGUMENT .................................................................................................. 15

    A.  Monetary Sanctions Are Mandatory with a Contempt Order. .............. 15

    B.  Qin's Extreme Misconduct Caused Petitioners' Attorneys' Fees......... 19

    C.  Seiden is Jointly and Severally Liable for Qin's Misconduct............... 20

    D.  Petitioners' Fees Are Reasonable. ........................................................ 24

IV. CONCLUSION ................................................................................................ 25

## <u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*A.V.E.L.A., Inc. v. Est. of Monroe*,
  No. 12 Civ. 4828 KPF JCF, 2014 WL 715540 (S.D.N.Y. Feb. 24, 2014) ............................15

*Armament, Sys. & Procedures, Inc. v. IQ H.K. Ltd.*,
  546 F.Supp.2d 646 (E.D.Wis. 2008).................................................................................24, 25

*Balcor Real Estate v. Walentas-Phoenix Corp.*,
  73 F.3d 150 (7th Cir. 1996) .......................................................................................................24

*CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*,
  342 F.R.D. 84 (S.D.N.Y. 2022) ...........................................................................................18, 19

*Ceglia v. Zuckerberg*,
  No. 10–CV–00569A (LF), 2012 WL 503810 (W.D.N.Y. Feb. 12, 2012)...........................25

*Chambers v. NASCO, Inc.*,
  501 U.S. 32 (1991)................................................................................................................18, 19

*Chesa Int'l, Ltd. v. Fashion Assocs., Inc.*,
  425 F. Supp. 234 (S.D.N.Y. 1977), *aff'd*, 573 F.2d 1288 (2d Cir. 1977)..............................24

*Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*,
  602 F.2d 1062 (2d Cir. 1979)......................................................................................................15

*Matter of Cont'l Illinois Sec. Litig.*,
  962 F.2d 566 (7th Cir. 1992) ................................................................................................24, 25

*Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*,
  No. 1:17-CV-00519-DCN, 2021 WL 2444157 (D. Idaho June 15, 2021) ...........................20

*Disabled Patriots of Am. v. Niagara Grp. Hotels, LLC*,
  No. 07 Civ. 284S, 2008 WL 941712 (W.D.N.Y. Apr. 4, 2008) .......................................15, 16

*Farmers Co-op Co. v. Senske & Son Transfer Co.*,
  572 F.3d 492 (8th Cir. 2009) ......................................................................................................19

*Fendi Adele v. Filene's Basement, Inc.*,
  No. 06 Civ. 244 RMB MHD, 2009 WL 855955 (S.D.N.Y. Mar. 24, 2009) .........................15

*Fla. Rock Indus. v. United States*,
  9 Cl. Ct. 285 (1985) ....................................................................................................................25

*Fox v. Vice*,
  563 U.S. 826 (2011)..............................................................................................................19, 20

*Google LLC v. Starovikov*,
    21CV10260, 2023 WL 2344935 (S.D.N.Y. Mar. 3, 2023)................................18, 19

*USA v. Hui*,
    No. 2:23-mj-00865-JMW (E.D.N.Y.)......................................................1, 9, 14

*Matthews v. Wis. Energy Corp.*,
    642 F.3d 565 (7th Cir. 2011) ...........................................................................24

*Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*,
    No. 00 CIV. 3613 (LAP), 2004 WL 1943099 (S.D.N.Y. Aug. 27, 2004)..............................22

*Middleton v. Green Cycle Hous., Inc.*,
    No. 15MC0023, 2017 WL 715747 (S.D.N.Y. Feb. 23, 2017)....................................16, 17, 19

*Miller v. Midpoint Resol. Grp. LLC*,
    No. CV-08-3791 TCP AKT, 2009 WL 2001329 (E.D.N.Y. July 7, 2009) ............................21

*Ophir v. Goldstein*,
    No. 86 CIV. 2963 (WK), 1990 WL 284519 (S.D.N.Y. Oct. 10, 1990)............................21, 23

*Rezende v. Citigroup Glob. Markets, Inc.*,
    09CV9392 (HB), 2011 WL 1584603 (S.D.N.Y. Apr. 27, 2011).....................................18, 19

*Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.*,
    No. 85 CIV. 5399-CSH, 1987 WL 6905 (S.D.N.Y. Feb. 10, 1987).......................................23

*Tse v. UBS Fin. Servs., Inc.*,
    568 F. Supp. 2d 274 (S.D.N.Y. 2008)....................................................................16

*Underdog Trucking, L.L.C. v. Verizon Servs. Corp.*,
    273 F.R.D. 372 (S.D.N.Y. 2011) .........................................................................16

*Walker v. Carter*,
    No. 12CV05384ALCRLE, 2017 WL 3668585 (S.D.N.Y. July 12, 2017),
    *aff'd sub nom.* Walker v. Burke, 739 F. App'x 72 (2d Cir. 2018)...........................................22

*Weitzman v. Stein*,
    98 F.3d 717 (2d Cir. 1996)..........................................................................16, 19

## Rules and Regulations

Federal Rules of Civil Procedure
    Rule 37 ....................................................................................16, 23, 24, 25
    Rule 37(a)(5).......................................................................................1
    Rule 37(a)(5)(A) ............................................................................15, 16, 21
    Rule 37(b)(2)(C) ...........................................................................1, 15, 21

Pursuant to Fed. R. Civ. P. 37(a)(5) and 37(b)(2)(C), Petitioners respectfully submit this memorandum of law in support of their motion for an award of fees, costs, and interest.

## I.   __INTRODUCTION__

This Court found that Respondent Hui Qin ("Qin") "has willfully not abided by [the Court's] orders," "has done everything possible to avoid abiding by [the Court's] orders," "has lied to [the Court] and [] lied at his deposition," has committed "violations of [the Court's] prior discovery orders," and "is [in] contempt." Dkt. 237-1 ("Contempt Hearing") at 101:11-15. An award of fees is mandatory for any contempt order, where a discovery motion is granted, or where documents are produced after the discovery motion is filed. Likewise, a fee award is mandatory here because (1) Qin *still* has not produced all records ordered by this Court; (2) Qin admitted he mass-deleted his WeChat messages when he "hired Seiden Law," Dkt. 237-1 93:23-34; (3) this Court found "strong evidence" that Qin "engaged in the spoliation of evidence," *see* Aug. 24, 2023 Order at 1; (4) the U.S. has charged Qin criminally with using aliases (and the government's request for detention alleges Qin used fake IDs to travel internationally, open secret bank accounts, and make multimillion-dollar transfers), *see USA v. Hui*, No. 2:23-mj-00865-JMW (E.D.N.Y.); and (5) Qin produced none of these bank accounts or related records.

This court can and should hold Qin's counsel, Seiden Law LLP ("Seiden"), jointly and severally liable. Seiden oversaw Qin's post-judgment discovery when Qin "violated each and every one of this Court's discovery orders, beginning with the Court's November 1, 2022 Order [more than one year ago]." *See* Aug. 24, 2023 Order at 1. On January 20, 2023, this Court held: "I think it should be clear that I don't think Respondent's counsel has satisfied their obligations." *See* 1/20/23 Tr. at 46:21-23. In April 2023, this Court held that Seiden has "no excuse for not conducting a thorough investigation." Dkt. 136 at 26:11-15. This Court set a final deadline of April

21, 2023, for producing all documents. But Seiden and Qin produced *no* new documents by this deadline. By failing to promptly collect documents, Seiden provided Qin with the time and opportunity to "engage[] in the spoliation of evidence." Prior to the Contempt Hearing, Seiden did not produce a single email for Qin. Instead, Seiden falsely represented to this Court that Qin "does not use email." Dkt. 219 at 2. Eventually, Seiden produced thousands of emails that Seiden told this Court did not exist—including Seiden's emails to Qin.

Petitioners' fees are reasonable. Qin claims he has no money while funneling over $1 million to at least four law firms, including ▮▮▮▮ to his newest counsel, Aidala Bertuna & Kamins, P.C. ("Aidala"). Qin pays Aidala *law clerks* higher hourly rates than Petitioners pay their attorneys who are *partners*. This Court should hold Qin and Seiden jointly and severally liable.

## II.   **<u>BACKGROUND</u>**

For a year, Qin has continuously "violated each and every one" of this Court's discovery orders, including orders issued on November 1, 2022 (expediting discovery); January 23, 2023 (setting deposition); January 30, 2023 (compelling Qin to answer questions); April 18, 2023 (compelling production of documents by April 21); and August 17, 2023 (compelling production of documents and passwords). *See* Aug. 24, 2023 Order at 1; Dkts. 64; 106-1; 100; 108-11; 136; 237-1; 243. This Court twice sanctioned Qin for violating discovery orders (Dkts. 136 at 17:8-11; 243 at 3) and held Qin in contempt twice. Dkt. 237-1 at 101:17-102:3; 243 at 2.

As early as April 18, 2023, this Court found Qin "repeatedly and intentionally violated the Court's discovery orders and that sanctions are warranted," Dkt. 136 at 17:9-11; Qin "troublingly" gave "conflicting and sometimes incredible responses to document requests," *id.* at 18:19-20; his productions are "woefully inadequate," *id.* at 12-13; he "violated the Court's order compelling his deposition;" and "[t]ime and again . . . has done . . . not even[] the bare minimum to be able to

feign cooperation," *id.* at 20:4-25. The Court reasoned that "a contempt finding could be justified"

as of April 18, and "[f]urther noncompliance . . . will simply not be tolerated." *Id.* at 23:11-13;

24:3-12. The Court then compelled Qin to produce documents "in full" by "no later than April 21,

2023," warning that "[p]artial responses" such as "a single tax return, a single bank statement . . .

constitute a violation of [the Court's] order." *Id.* at 15:10-20.

      In response, Qin produced *nothing* by the Court's April 21 deadline. Petitioners filed their

Renewed Contempt Motion on June 21, 2023 (Dkts. 172-76). The Court then held:

> [Qin] has not abided by my orders. He has willfully not abided by my orders. He
> has done everything possible to avoid abiding by my orders. And he has lied to me
> and he has lied at his deposition. So I do find that there are violations of my prior
> discovery orders, and I also find that he is [in] contempt.

Dkt. 237-1 at 101:6-16. Qin violated orders after promising he understood them. This Court held:

"[Qin] said to me . . . he understood my orders, he would abide by them, but then he didn't. Your

client has said a number of things, but then they just haven't come true." *Id.* at 40:8-17.

      Seiden has overseen post-judgment discovery as Qin "violated each and every one of this

Court's discovery orders." Aug. 24, 2023 Order at 1. In exchange, Qin paid Seiden and his other

law firms over $1 million, funneling money through third parties to evade collection. Between

February and August 2023, Seiden received $██████ through third parties. *See* Ex. A (████████

████████████████)[1] Ex. B (████████████████); Ex. C (████

████████); Ex. D (████████████ and ████████████████

████). Qin recently funneled ████ to his newest counsel, Aidala, on top of paying

████ to Seiden (*see* Exs. K-M) and paid six-figure amounts to Hong Kong counsel and the

Xue Firm. *See* Exs. J, N, O.  At the Contempt Hearing, Seiden insisted Qin "has to ask people to

---

[1] Citations to the "Lee Decl." and "Ex. __" are to the Declaration of Carol Lee filed herewith and exhibits thereto.

help him pay," which the Court found incredible: "It's one thing to sleep on someone's couch for the night, and something else to have them pay a million dollars in legal fees." Dkt. 237-1 at 83:20-24. The Court asked Seiden eight variations of the question "Do you not know where that money is coming from?" *Id.* at 83:24-85:18. Seiden failed to answer.[2]

For a year, this Court has warned Seiden to comply with its discovery obligations. On November 18, 2022, the Court put Seiden "on notice" and put on Seiden's "radar screen" the "very serious belief that Mr. Qin is going to not only hide his assets but also hide from his attorneys the documents and the information that *they need in order to comply with their duties*." *See* Dkt. 85 at 13:11-22 (emphasis added). In January 2023, this Court stated that it had granted the November motion "*in reliance on a representation from incoming counsel for respondent, the Seiden Law Group, that it . . . would promptly produce all responsive documents*." Dkt. 136 at 5:20-25 (emphasis added). Yet Seiden failed to produce "a single document in the three months following the entry of judgment." *Id.* at 6:17-19. Accordingly, this Court found Seiden had violated its representation: "[Y]ou had said to me at [the November] conference that these things were gathered together, they were going to be produced. They haven't been." *Id.* at 24:13-28:15. *See also id.* at 46:21-23 ("[I]t should be clear that I don't think Respondent's counsel has satisfied their obligations."). Seiden's failure to promptly collect documents gave Qin time and opportunity to "engage[] in the spoliation of evidence."

The Court compelled Qin to produce documents "in full" by "no later than April 21, 2023," warning that "[the Court] expects [Seiden] to diligently ensure respondent's compliance with his

---

[2] *See* Dkt. 237-1 at 83:24-85:18. The Court asked such questions as "How many entities are paying the fees for this case?" and "And you're not sure where it's coming from?" Seiden could only recall one specific payor (St. Fortune), stating that "as petitioner[s] point out, two payments [came] from Hong Kong and Singapore, with the comments, payment for Mr. Qin's attorney's fees." Seiden also admitted that, "[a]s petitioner indicated," the payments are simply "a wire transfer with a note, attorney's fees for Qin. So we collect it into account against Mr. Qin's unpaid invoice."

discovery obligations. . . . Failure to do so may result in future sanctions, including sanctions against the Seiden Law Firm." Dkt. 136 at 27:1-9. Yet Seiden and Qin produced *no* new documents by the Court's deadline. The Court had warned that "[p]artial responses" such as "a single tax return, a single bank statement . . . will constitute a violation of this order." *Id.* at 15:10-20. Seiden frivolously argued that this only required Seiden to file new objections. *See* Dkt. 192 at 15 (Seiden's argument); Dkt. 237-1 at 10:17-20 (THE COURT: "No it was not.").

At the August 17, 2023 Contempt Hearing, Petitioners provided the Court a demonstrative chart showing that—four months after the Court's April 21, 2023 deadline—Qin had not produced all documents in *any* of the 17 categories ordered by the Court. *For 11 out of 17 categories, not a single document had been produced*. Seiden conceded all this at the Contempt Hearing:

> "Number 1, the bank records. . . . I would agree it's partially outstanding.";
> "Number 2, Mr. Qin . . . was unable to get them."; "Number 3, Mr. Qin does
> not have them."; "Number 4 . . . remains outstanding."; "Number 5 is partially
> outstanding."; "With respect to number 6 . . . I don't know that he can represent
> this is the actual schedule."; "Number 7, Mr. Qin is going to be producing his
> most recent tax returns."; "The St. Tome agreement. . . . number 8. . . . it's
> outstanding, but . . . it's been disposed of [*i.e.*, destroyed]."; "With respect to
> the boat and the plane [responsive to number 9], he says he does not have any
> documentation."; "He does not have any documents . . . regarding the Plaza
> 2003 or Plaza 2009 [responsive to number 10]."; "[T]here is nothing to give for
> number 11."; "Number 12 . . . he does not have any records."; "I think it's
> accurate [as to number] 13."; "It's the same thing for number 14."; "Number
> 15, their note I believe is accurate."; "Number 16, their note is accurate."; "And
> number 17, their note is accurate."

Dkt. 237-1 at 61:9-72:12. This Court stated: "I just find it difficult to believe that you would sit on actual responsive documents, but we are here." *Id.* at 32:1-3. "I would have thought you would have at least tried to make a good faith showing," but "[y]ou haven't produced them"; Seiden's explanations are "nothing but excuses," and "impossible to believe." *Id.* at 31:24-32:10.

Months after being found in contempt, Qin *still* has not produced all records listed in the April 18 Order. Since November 2022, Qin and Seiden have either violated or appealed every one

of this Court's orders. Qin's *ongoing* contempt of the April 18 Order and violation of "each and every one" of this Court's orders support awarding all Petitioners' fees and costs.

A.     **Qin and Seiden Conceal Emails and Lie to the Court About Missing Emails**

On November 1, 2022, this Court expedited discovery due to the "serious risk that [Qin] may try to delay Petitioners' ability to collect on the Judgment." Dkt. 64 at 2. Yet in the following three months (prior to the pre-motion conference), the following half-year (prior to the Court's deadline for production), and the following nine months (prior to the Court's first and second contempt orders), Seiden and Qin produced *no emails* sent to or from Qin.

Seiden knew Qin used email. Mr. Xue of the Xue Firm represented he "communicated with Mr. Qin . . . via email"; "hundreds" of emails existed between Qin and Mr. Xue; and Mr. Xue informed Qin of his withdrawal by email. Dkts. 74 at 2; 74-1; 80 at 1, 5; 87 at 6. On January 19, 2023, Seiden's Mr. Zhang represented he "use[d] [Qin's] Gmail account to email . . . Hong Kong banks and . . . was able to send out the emails" to those banks. Dkt. 233 ¶ 32. These emails, sent by Mr. Zhang (and not Qin), are the only emails produced prior to this Court's contempt orders. Thus, Seiden accessed Qin's email account, sent emails from his account, and was counsel of record when Mr. Xue was communicating with Qin by email.

And yet, eleven days after Seiden accessed his email, Qin swore that ███████████ " my e-mail address; " ███████████████████ "; and ███████████████████ " or " ███████████████ ." Dkt. 108-11 at 108:19-20, 140:20-22, 141:19-142:2. After failing to produce a single email by the Court's deadline, Qin testified: ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ Dkt. 176-9 at 260:3-10,

301:12-13; Dkt. 176-10 at 430:10-11, 430:19, 467:24-25, 574:13, 576:25-577:2, 577:12-13.

At the Contempt Hearing, Seiden represented to the Court that Qin does not have "these records," claiming "the reality is that Mr. Qin does not" (Dkt. 237-1 at 39:16-17), and "it would be *nothing more than a matter of fortuity that something else materializes*, because he has made all the effort that he can make to try to get these materials." *Id.* at 77:18-21 (emphasis added). Seiden falsely told this Court on August 21, 2023 that Qin "does not use email." Dkt. 219 at 2; *see also id.* at 6 n.6 ("Qin has repeatedly and consistently testified that he does not use email."). But Seiden had accessed Qin's email account, knew Qin had emails, and knew of their obligation to collect and produce emails. Seven months after this Court found it "clear" that Seiden had not "satisfied their obligations" (*see* 1/20/23 Tr. at 46:21-23), Seiden had not reviewed or produced *any* of Qin's emails, falsely claiming Qin "does not use email."

This Court's first contempt order required Qin to reveal "all necessary passwords" so a forensic specialist could preserve Qin's remaining emails. Dkt. 237-1 at 106:14-107:1. The Court held Seiden "responsible" for compliance. *Id.* at 103:12-19. When Qin failed to provide all his passwords, this Court issued a second contempt order. Qin then argued, through Seiden, that he could not recall or recover his email password (even though Seiden accessed Qin's email in January and regularly communicated with Qin by email). Seiden filed heaps of paper (sur-replies, a motion for reconsideration, demand for sanctions, an appeal) to block turnover of Qin's email password, never explaining why it fought to block collection of emails if Qin "does not use email."

Qin, of course, uses email. Forced to review and produce Qin's emails, Seiden has now produced ***thousands*** of pages of emails. Seiden had been communicating with Qin ***by email over the entire course of this litigation, including at least as recently as August 2, 2023***. Exs. E-G; Lee Decl. ¶ 33. Qin also sends emails. Lee Decl. ¶ 32 (metadata showing emails sent from Qin's

Gmail account between May 1, 2022 and April 10, 2023). Now that Petitioners' forensic expert has imaged his email, Qin and Seiden have been forced to produce these emails on a rolling basis, with the most recent production made on November 13, 2023. Petitioners are only now – *a full year after they were requested* – reviewing these thousands of pages of emails that were withheld.

**B.      Seiden's Failure to Collect Phone Data**

Qin failed to produce any WeChat or text messages prior to this Court's April 21 deadline. On February 13, 2023, Seiden claimed to be "working with Mr. Qin to run a search on his WeChat and WhatsApp communication records" and Qin "expects to produce additional documents no later than next week." Dkt. 108-9 at 3. But none were produced the following week. Or the week after that. Or the next month. Or by the Court's subsequent April 21 deadline. Dkt. 207 ¶ 34.

Qin then testified he had produced nothing because "████████████████████ ████████████████████████" Dkt. 176-10 at 465:8-10. Seiden admitted they failed to extract any messages and had not engaged a vendor despite missing the Court's deadline. Dkts. 236 ¶¶ 5-6; 236-1. That same day, Petitioners sent Seiden a recommended vendor. The following month (on May 3), Qin testified he had not hired a "████████████" despite knowing he "████████████" one, giving the excuse that it was too costly. Dkt. 176-11 at 576:4-10.

In August 2023, *four months after the April Order and after this Court's second contempt order*, Qin finally hired a software expert *for the sole purpose of asking the Court to reconsider its second contempt order and to instead sanction Petitioners* for trying to collect Qin's emails. *See* Dkt. 275. When seeking sanctions against Petitioners, Qin could afford an expert. But when complying with the Court's discovery orders, he had no money.

At the Contempt Hearing, Seiden admitted that, "[a]fter this case was filed, Mr. Qin did delete texts," Dkt. 237-1 at 44:22-45:3 ("he has deleted . . . WeChats"). Qin could delete records

precisely because Seiden failed to preserve or produce them. Qin testified that when he "hired Seiden Law" in this action, he mass-deleted WeChat communications. *Id.* at 93:23-34. Seiden apparently never sent any litigation hold notice.

### C.   Seiden's Failure to Collect Bank Records

At the Contempt Hearing, the Court noted that "it would be very shocking" if Seiden did not "know" Petitioners want "recent statements" from banks or if Seiden continued to "sit on actual responsive documents," "but," the Court observed, "we are here." Dkt. 237-1 at 31:2-32:3. The same thing is happening now. *After* this Court's August 18, 2023 contempt order, Seiden finally produced Cathay Bank records through August 11, 2023. But having done that, Seiden ceased making further productions. Seiden failed to produce the Cathay Bank statements issued on September 11, October 11, and November 11. *See* Ex. H.

The U.S. government recently filed a criminal complaint against Qin and successfully moved for detention, alleging that while Qin "was returning from Hong Kong to New York, [he] was found in possession" of a fake Hong Kong ID with Qin's photograph and the alias "Li Muk Lam"; Qin admitted "he purchased the Li alias from a PRC government official"; "he knew that his possession and use of the Li alias was 'illegal'"; he also had "a PRC identification card . . ., credit cards, a Hong Kong passport" with the Li alias that he used "to wire transfer approximately $5 million" (apparently to Emma Duo Liu). *See Hui*, No. 2:23-mj-00865-JMW (E.D.N.Y.), Dkt. 5 at 2. Qin has not produced records reflecting the $5 million transfers or Li Muk Lam credit cards.

Moreover, despite "extensively discussing his use of false identification documents with the FBI," Qin *then* "elected to fraudulently obtain a Florida Driver's License" under an alias by telling "a lie" while "under penalty of perjury." *Id*. at 2-3. Qin used his "fraudulently-obtained Florida Driver's License" at Chase and Cathay Bank to make "$440,000 in wire transfers from a

bank account held in the name of the Li alias" to a Chase account sometime "between April 2021 and May 2021"; in total, Qin wired "at least $5.4 million [in] funds . . . in the name of the Li alias between 2017 and 2021." *Id.* at 3. That is, $5.4 million in wire transfers using the Li alias are apparently evidenced on Qin's Chase statements in 2017 and 2021. Yet Qin refused to produce Chase statements for 2017 or for 2021. Qin claimed the 2017 statements (apparently obtained by the federal government) no longer exist, and vaguely asserted that the Chase account "█████████

█████████████" *See* Ex. I; Dkts. 192 at 14-15, 108-11 at 174:17-21. The last statement produced by Qin (December 2020) shows Qin's Chase account *remains open* with a balance. *See* Ex. I at 141. Qin intentionally withheld statements for 2017 and 2021 because those are the years the federal government identified millions of dollars flowing through Qin's account. As this Court held, Qin and Seiden's failure to produce records are "impossible to believe"; "just difficult to believe"; and "nothing but excuses." Dkt. 237-1 at 31:24-32:10.

At the Contempt Hearing, Qin asserted that his only declared active account, at Cathay Bank, holds a "few thousand dollars," adding: "I have not used this account for so long." *Id.* at 33:21-22. It "defies belief" that Qin leads his lavish lifestyle while his only declared bank account held just ██████ as of August 11, 2023. *See* Ex. H at 21. Other than one ███ withdrawal and a payment of ████ (to his accountant and for taxes), Qin's last payment from his Cathay Bank account was for ██████ to the Glen Oaks Country Club on October 11, 2022. Dkt. 108-10 at Qin_0000582, 584; Ex. H at 2, 21. It "defies belief" that Qin has no other funds, has lived for a year on nothing, and yet saw fit to drain 73% of his bank account to pay ██████ to a country club.

It is impossible to live Qin's lifestyle for a year on ███ . This Court held: "It defies belief that [Qin] can live the lifestyle he leads and have no money." Dkt. 106-1 at 46:21-47:5. Qin's stories of "living on the kindness of strangers, or the kindness of friends," are "incredible" and

"difficult to believe." Dkt. 237-1 at 36:10-15; *see also id.* at 35:16-18 ("THE COURT: Ms. Blecher, how is your client living? Please don't tell me on the terminated $4,000 on the consultancy agreement."). Qin and his counsel claimed at the Contempt Hearing that Qin had received a $4,000 termination fee for his consultancy agreement, but no such payment entered Qin's Cathay Bank account. This payment must have gone to another, undeclared account controlled by Qin.

It further "defies belief" (Dkt. 106-1 at 46:25-47:5) that Qin could pay his counsel over one million dollars if Qin only has a few thousand dollars. In addition to other payments, Qin arranged payments of ███████ to Aidala (*see* Ex. J) and ███████ to Seiden (*see* Exs. K-M); Qin and his associates paid the Xue Firm at least ███████ (*see* Exs. N-O); Qin signed a June 2023 retainer agreement with Hong Kong counsel agreeing to pay a fixed fee of ███████ ███████ ) and hourly rates ranging ███████ ) to ███████ ) (*see* Ex. P at 1); and Qin apparently added two counsel to his legal team in this action in or around May 2023 (*see* Exs. G, Q). Qin managed to pay Seiden in July and August of 2023, and Aidala in September and October of 2023. *See* Exs. D, J; *see also* Dkt. 237-1. at 85:14-15 (THE COURT: "Sir, you're $440,000 in the hole and you're continuing to represent him. . . . Interesting.").

Despite a court order expediting discovery and despite the Court's reliance in November 2022 on Seiden's representation that it "would promptly produce all responsive documents," Seiden collected no bank records for three months. Then, at the January 20, 2023 pre-motion conference, Seiden misled the Court, claiming it had "been very diligent" in seeking responsive documents since "mid October" 2022, that it had "been in touch with all these banks" but "[t]here's a process. . . . So it is going to take a little bit of time." Dkt. 106-1 at 26:10-24; 28:13-15; 30:1-6. In fact, Seiden *first* attempted to obtain records from banks only *after* Petitioners filed their January 9, 2023 pre-motion letter. *See* Exs. R, S at 1, T at 1, U & V (Seiden communications with Citibank

and Standard Chartered). On January 18, 2023 (nine days *after* Petitioners' pre-motion letter and *two days before the court conference*), Seiden wrote to Citibank: "[P]lease provide us with the requirements and procedure to obtain the client's bank statements[.]" Ex. V. Likewise, Seiden first contacted Standard Chartered only after the January 9 pre-motion letter. *See* Ex. U. Seiden failed to seek records, but misrepresented itself as "very diligent" since "mid October."

Seiden further misled this Court by claiming that "banks" had given "not really a good response" to their records request. Dkt. 106-1 at 42:7. But one of Seiden's first message to banks, days before the conference, merely requested "the requirements" to obtain bank statements. Ex. V. Seiden's claim they were "trying to work it out, especially for the bank accounts," Dkt. 106-1 at 45:19-20, falsely implies Seiden was engaged in protracted negotiations to acquire bank records. No such thing was underway. The banks responded immediately and told Seiden to call or use a live chat to seek records. *See* Exs. R-U. Three months later, this Court entered sanctions and compelled production; four months after that, this Court twice found Qin in contempt. *Seiden still has not produced complete records for a single bank.* Qin produced *incomplete* records for Cathay Bank and Chase. He produced no account records for his aliases.

Qin also produced no records for any non-U.S. bank. Dkt. 207 ¶¶ 4-10. Despite claiming Qin could not obtain records in Hong Kong, Qin chose to spoliate the St. Tome consultancy agreement by sending it to Hong Kong, where it was destroyed. Qin testified that ███████████ ████████████████████████████████████████████████████████████████████████████ (Dkt. 176-9 at 297:18-298:3; Dkt. 176-10 at 403:14-404:9). Qin engaged Hong Kong counsel on June 27, 2023, allegedly to collect bank records, but five months later has produced no Hong Kong records. Ex. P; Dkt. 219 at 1. Seiden never mentioned Hong Kong counsel at the Contempt Hearing in response to the Court's questions. *See*, *e.g.*, Dkt. 237-1. at 52:15-54:19.

Qin admits receiving ▮▮▮▮▮ Hong Kong dollars in dividends between 2015 and 2017 into accounts at "Standard Chartered Bank," "HSBC," and "another bank I cannot recall." Dkt. 176-11 531:19-24; 533:5-9. Yet, Qin produced no records from these three banks.

Incredibly, Petitioners discovered in Qin's most recent production – made two weeks ago, on November 13, 2023 – a text message chain between Qin and Citibank disclosing ***five previously undisclosed bank accounts***. Ex. BB. The text messages are dated August 10, 2023 – one week before the Contempt Hearing, during which Qin's counsel represented "it would be *nothing more than a matter of fortuity that something else materializes*, because [Qin] has made all the effort that he can make to try to get these materials." Dkt. 237-1 at 77:18-21 (emphasis added). That statement has been proven false. If Seiden simply had abided by their discovery obligations and representations to this Court, this information would have been collected, imaged and produced without Petitioners having to expend hundreds of thousands of dollars in fees and costs to enforce their discovery requests and this Court's multiple orders directing the same. Instead, a full year after this Court granted expedited discovery, Petitioners are only learning about these accounts, for which no bank records have been produced.

### D.    Seiden's Failure to Collect Immigration Records.

Seiden did not seek records from Qin's immigration attorney until a week *after* the Court's production deadline. Seiden first emailed the immigration attorney on April 28, 2023. Dkt. 176-3 at 1 ("Pursuant to the Court's order, Mr. Qin is required to produce his immigration petition documents..."). Over ten weeks earlier, on February 13, Seiden had already "obtained Mr. Qin's authorization to directly communicate with [his] immigration attorney." Dkt. 108-9 at 3. Seiden waited two months to contact the attorney. Today—*seven months after this Court's deadline* and *three months after this Court held Qin in contempt*—Seiden has produced no "immigration petition

documents" or any other immigration records—not even an unredacted version of Qin's passport (which Seiden has possessed for at least eight months). *See* Dkt. 115-4 (Seiden submitting *redacted* passport as exhibit despite never producing it to Petitioners).

The federal government's criminal case alerted Seiden two months ago that Qin traveled internationally using fake names, but Seiden has still produced no travel records relating to the "Li Muk Lam" alias. Qin lied at his deposition and testified that ███████   and ███ ███████████████████████████████████████████████████ Dkt. 237-1 at 94:11-21. Qin also lied about the "Li Muk Lam" alias at his deposition. *See* Dkt. 108-11 at 202:3-6 (claiming he ████████████████████████████████████████████████ ████████████████████████ Qin has produced no records regarding his aliases: no bank records, no immigration records, and no credit card records. *See Hui*, Dkt. 5 at 3 (Qin "used the Li alias when traveling from . . . Farmingdale, New York to Finland and from JFK to China").

Qin continues to violate this Court's orders. At the Contempt Hearing, Qin's counsel claimed Qin "has made all the effort that he can make," with nothing left to be produced. Dkt. 237-1 at 52:23-53:11. Qin had not yet produced any of his thousands of emails, and he still has not produced any of the records referenced in the government's complaint. Seiden had not "satisfied their obligations" in January 2023, *see* 1/20/23 Tr. at 46:21-23, and ten months later has still not satisfied them. Qin and Seiden misled this Court, failed to collect documents promptly, violated orders, and concealed critical evidence. Seiden's failure to timely gather records gave Qin the extra time and opportunity to destroy them. Seiden admitted that Qin "has deleted" WeChat communications, including "[a]fter this case was filed." Dkt. 237-1 at 44:22-45:3.

Qin paid Seiden and other counsel vast sums during post-judgment discovery even as Qin "lied" to the Court, Dkt. 137-1 at 101:13, made "woefully inadequate" productions, Dkt. 136 at

14

17:12-13, and did "everything possible to avoid abiding by" the Court's orders, *id.* at 101:11-12. Qin and Seiden produced "nothing but excuses" but failed to produce the documents "[w]e have been discussing" "since the beginning of the year." *See* Dkt. 237-1 at 32:7-10. Qin and Seiden (i) sought reconsideration; (ii) appealed; and/or (iii) violated "each and every" order of this Court.

## III.   ARGUMENT

### A.   Monetary Sanctions Are Mandatory with a Contempt Order.

As this Court previously held: "Under Rule 37(a)(5)(A), the Court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both, to pay the movant's reasonable expenses incurred in making the motion, including attorneys' fees." Dkt. 136 at 21:7-13. Rule 37(b)(2)(C) mandates an award against the "disobedient party, the attorney advising that party, or both" for violating court orders. This Court found violations of its discovery orders and contempt, thus mandating a fee award under both Rule 37(a)(5)(A) and 37(b)(2)(C). *See* Dkt. 237-1 at 101:13-14 ("I do find that there are violations of my prior discovery orders, and I also find that [Qin] is [in] contempt."); *see also* August 18, 2023 Minute Entry (finding Qin in contempt).

Qin remains in violation of the Court's discovery orders. But sanctions are mandatory even if the party in contempt eventually complies with discovery. *Fendi Adele v. Filene's Basement, Inc.*, No. 06 Civ. 244 RMB MHD, 2009 WL 855955, at *5 (S.D.N.Y. Mar. 24, 2009); *see also*, *e.g.*, *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1068 (2d Cir. 1979) ("[P]laintiff's hopelessly belated compliance should not be accorded great weight. Any other conclusion would encourage dilatory tactics."); *A.V.E.L.A., Inc. v. Est. of Monroe*, No. 12 Civ. 4828 KPF JCF, 2014 WL 715540, at *7 (S.D.N.Y. Feb. 24, 2014); *Disabled Patriots of Am. v. Niagara Grp. Hotels, LLC*, No. 07 Civ. 284S, 2008 WL 941712, at *3 (W.D.N.Y. Apr. 4,

2008); *Underdog Trucking, L.L.C. v. Verizon Servs. Corp.,* 273 F.R.D. 372, 377 (S.D.N.Y. 2011)

(citing 7 Moore's Federal Practice, §37.23 (Dkt. 149-8)).

This Court found that Qin acted willfully in thwarting post-judgment discovery. Dkt. 237-

1 at 101:11-15. Even if Qin had not acted willfully, sanctions are mandatory under Rule

37(a)(5)(A) because Qin failed to produce relevant documents (*e.g.*, emails, his 2022 tax return,

certain bank records) until after briefing on the Renewed Contempt Motion. *See, e.g., Disabled

Patriots*, 2008 WL 941712, at *3; *Underdog Trucking*, 273 F.R.D. at 377; Dkt. 237-1 at 102:17-

20. Fee reimbursement is an automatic "if-then" mandate of Rule 37. *See also Tse v. UBS Fin.

Servs., Inc*., 568 F. Supp. 2d 274, 321 (S.D.N.Y. 2008) ("Sanctions are appropriate '[w]hen a party

seeks to frustrate [discovery] by … preventing disclosure of facts.'"). Attorneys' fees are "the

mildest" sanctions because they merely put the winning party back in its financial position prior

to the misconduct necessitating the motion. *Underdog Trucking,* 273 F.R.D. at 379. Here,

Petitioners spent ███████ in fees and ███████ in costs to obtain documents that should have

been produced a year ago without the need for motions and contempt briefing. Lee Decl. ¶ 37.

Reimbursement of this amount is "the mildest" possible sanctions for Qin's willful misconduct.

"Where the contemnor has demonstrated willful misconduct, a court 'would need to

articulate persuasive grounds for any denial of compensation for the reasonable legal costs of the

victim of contempt' in order to survive appellate review." *Middleton v. Green Cycle Hous., Inc.*,

No. 15MC0023, 2017 WL 715747, at *8 (S.D.N.Y. Feb. 23, 2017) (quoting *Weitzman v. Stein*, 98

F.3d 717, 719 (2d Cir. 1996)). Qin *continues* to defy this Court's orders, withholding documents

*after* this Court's April 18, 2023 sanctions order, *after* this Court's August 18, 2023 contempt

order, and *after* this Court's August 24, 2023 second contempt order. Having been held in contempt

twice and sanctioned twice, Qin should be ordered to pay all fees for the August 18 contempt

motion. Qin defies court orders to avoid paying a $479 million judgment. Qin made a financial calculation that fee awards are preferable to allowing Petitioners to collect.

Petitioners' fees are reasonable in comparison to the amounts awarded by other courts in this Circuit. Half a decade ago, a court awarded **$722,095.80** in fees and costs for conduct mirroring Qin's, including disobeying subpoenas and failing to produce discovery. *Middleton v. Green Cycle Hous., Inc.*, No. 15MC0023, 2017 WL 715747, at*9-10 (S.D.N.Y. Feb. 23, 2017). In *Middleton*, the defendant made four false statements under oath. *See id.* at *5. Here, Qin told scores of falsehoods under oath. *See*, *e.g.*, Dkt.111 at 5-23. As in *Middleton*, this Court should find that:

> [Defendant] and his attorney have not acted as truth-tellers. They have not taken their responsibilities . . . to the Court under the law seriously. Statements made in . . . recent submissions to me are at odds with statements in declarations previously submitted. Statements he made under oath in his deposition are at odds with the facts as we've come to know them. . . . I have every reason to believe that monies are being hidden from the Court right now.

*Id.* The *Middleton* court ordered defense counsel to pay over the legal fees it had received (at a time the defendant falsely claimed inability to pay the judgment). *Middleton*, 2017 WL 715747, at *6. *Middleton* awarded fees not only for the contempt briefing but for *all of plaintiff's discovery efforts*, including plaintiff's "costly motion practice, discovery, asset tracing and analysis, preparation and service of restraining orders and information subpoenas on third parties, and other judicial enforcement measures." *Id.* at *8-9. Here, Petitioners only seek fees actually incurred in the contempt briefing and hearing. *Middleton* awarded fees equal to about half of their $1,859,200 judgment. Here, Petitioners' fees are one-tenth of one percent of their judgment.

On April 18, 2023, this Court's sanctions order required Qin to pay Petitioners' fees for the sanctions motion, and for Qin's deposition. Briefing on the amount of fees for the sanctions motion concluded on June 12, 2023. *See* Dkts. 167-169. That motion is pending.[3] As stated in that

---

[3] On April 18, 2023, this Court ordered Qin to pay Petitioners' fees in briefing in the motion for sanctions (and fees

motion, courts in this Circuit regularly award half a million dollars or more for such motions. *See* Dkt. 166 at 1 (citing *Google LLC v. Starovikov*, 21CV10260 (DLC), 2023 WL 2344935, at *3 (S.D.N.Y. Mar. 3, 2023) (awarding **$525,673.81**); *CBF Industria de Gusa S/A v. AMCI Holdings, Inc.*, 342 F.R.D. 84, 93 (S.D.N.Y. 2022) (**$497,523.62**); *Rezende v. Citigroup Glob. Markets, Inc.*, 09CV9392 (HB), 2011 WL 1584603, at *7 (S.D.N.Y. Apr. 27, 2011) (**$638,364.38**)). These cases, one from a dozen years ago, all awarded far more than the fees Petitioners seek here. The gap is greater with inflation. Thirty years ago, the Supreme Court affirmed **$996,644.65** in fees and costs in a contempt case. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 40 (1991).

Petitioners negotiated a fixed hourly rate of ▮▮▮ for all attorneys. Dkt. 168 at 4-5; Lee Decl. ¶ 36. This rate is indisputably reasonable. In comparison, Qin pays his newest counsel (Aidala) fixed hourly rates of ▮▮▮ for partners, ▮▮▮ for associates and *law clerks*, and ▮▮▮ for paralegals and assistants. *See* Ex. J. Qin pays *law clerks nearly $100 more per hour than what Petitioners pay for attorneys who are partners*.

Qin may argue that imposing a fee award is futile because he will not pay. But Qin paid his lawyers over $1 million, including recent payments of approximately ▮▮▮▮▮▮▮ dollars to Aidala. Qin pays fees to *oppose* this Court's orders but will not pay to *comply* with them. This, too, is contempt. As this Court held: "So when he says, 'I will never pay. Even if you shoot me dead right now or you lock me up in jail or you put me in jail, I will not,' . . . [i]t just seems to me like contempt." 8/17/2023 Tr. at 77:25-78:6; *id*. at 16:25-17:3 (THE COURT: "According to his deposition testimony, . . . even jail is not going to make him [comply].")

Prior to filing this brief, Petitioners offered to settle the amount of this award. *See* Ex. W.

---

and costs for a renewed deposition). The amount of the attorney fee award for the briefing was fully briefed as of June 12, 2023 and is pending. *See* Dkts. 148-152 (motion), 166-69 (reply). Petitioners noted the fee award sought was likely far too small to effectively penalize or deter Qin's evasion of a $470+ million judgment. Dkt. 168 at 3 n.5; *see also* Writ of Execution issued on November 21, 2023 ($479 million).

Seiden never responded. Lee Decl. ¶ 40. Previously, Petitioners sought to settle the first sanctions fee award, offering a discount exceeding 50%. Seiden responded that Qin could only pay $5,000 a month, and also demanded an 80% discount. *See* Dkts. 150 ¶¶ 7-11, 150-1 at 1. Yet Qin recently paid Aidala nearly ▮▮▮▮▮ in one month while paying Seiden even more. *See* Exs. L, J.

This Court should order Qin to reimburse Petitioners' ▮▮▮▮▮ in fees and ▮▮▮▮▮ in costs for litigating the contempt motion. As in *Middleton*, this Court could apply its discretion to order Qin to also reimburse all Petitioners' post-judgment fees and costs, or to order Seiden to pay over to Petitioners the funds Qin has laundered to counsel through intermediaries. *See Middleton*, 2017 WL 715747, at *8-9. "[T]rial courts enjoy considerable discretion in determining the appropriate amount of attorney fees." *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996).

Nevertheless, to simplify briefing, expedite resolution, and avoid Seiden's *ad hominem* attacks, Petitioners hereby propose a 50% discount on their actual fees. This results in an award of ▮▮▮▮▮ in fees and ▮▮▮▮▮ in costs. Lee Decl. ¶¶ 38-39. This is one-half of the awards in *Google*, *CBF*, and *Rezende*, one-third of the award in *Middleton*, and one-fourth of the award in *Chambers*. It is also less than the nearly ▮▮▮▮▮ Qin has recently paid Aidala in September and October of 2023, and what Qin paid Seiden.

### B.    Qin's Extreme Misconduct Caused Petitioners' Attorneys' Fees.

When fees are "caused by . . . misdeeds," the "Court need not directly address the reasonableness of the outside counsel's bills." *In re GMC*, 110 F.3d 1003, 1017 (4th Cir. 1997). This is because "the calculation will be relatively simple: what did [the injured party] pay…?" *Id.*; *see also*, *e.g.*, *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009) (reimbursing 110% of fees due to misconduct). A unanimous Supreme Court held that those who "acted wrongly" must reimburse all "expenses attributable" to misconduct. *Fox v. Vice*, 563 U.S.

826, 838 (2011) ("We emphasize, as we have before, that a determination of fees 'should not result in a second major litigation.'") (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). A court awards what a party "would not have incurred but for [the other side's] discovery misconduct." *Dickinson Frozen Foods, Inc. v. FPS Food Process Sols. Corp.*, No. 1:17-CV-00519-DCN, 2021 WL 2444157, at *12 (D. Idaho June 15, 2021).

Qin's misconduct caused all fees here. *Qin produced no new records* by the Court's April 21, 2023, deadline. Dkt. 144 at 1. He flouted depositions. *Id.* He produced no emails, even denying he used email, until this Court's second contempt order. Dkt. 237-1 at 102:21-107:1. Qin lied at the Contempt Hearing. *See id.* at 33:5-35:15, 72:13-73:6.[4] This Court held: Qin "has willfully not abided by my orders. . . . And he has lied to me and he has lied at his deposition." Dkt. 237-1 at 101:11-13. Qin violated the August 18 contempt order as soon as it was issued, forcing this Court to issue a second contempt order just seven days after the first. Qin violated "each and every one" of this Court's discovery orders, and he persists in his violations. This Court found "strong evidence" that Qin "engaged in the spoliation of evidence." Dkt. 243 at 2. Qin misses deadlines, violates orders, lies to this Court, and pays none of the judgment while laundering over $1 million to counsel to endlessly reargue court orders: Qin filed two unauthorized sur-replies to the Contempt Order (Dkts. 219; 259), moved to reconsider the Court's August 24 contempt order (Dkt. 271), and appealed that order (Dkts. 298; 299). Qin spends massive sums opposing this Court's rulings while producing little until threatened with imprisonment.

### C.   <u>Seiden is Jointly and Severally Liable for Qin's Misconduct.</u>

"Discovery is run largely by attorneys, and the court and the judicial process depend upon

---

[4] Qin's belatedly produced Cathay Bank statements contradict Qin's statements at the Contempt Hearing. The Cathay Bank statements *do not* show $4,000 per month from St. Tome LLC, and *do not* show a buyout termination payment from St. Tome LLC. *See* Dkt. 237-1 at 34:1-35:18. In fact, there have been *no* deposits from St. Tome LLC since 2022. *See* Dkt. 258. If St. Tome has been paying Qin, that money is going to an unidentified bank account.

honesty and fair dealing among attorneys." *In re Sept. 11th Liab. Ins. Coverage Cases*, 243 F.R.D. 114, 125, 132 (S.D.N.Y. 2007) (joint and several sanctions against client and counsel).

Seiden has represented Qin during the entire period of his post-judgment misconduct. *See* Dkt. 150-5 at 1. Throughout, they have been "on notice" of Qin's attempts to hide assets and stall post-judgment discovery. *See* Dkt. 85 at 23:22-24. Instead of overcoming Qin's efforts to violate court orders, Seiden assisted Qin's efforts. Seiden should be held jointly and severally liable.

Rule 37(a)(5)(A) and 37(b)(2)(C) each provides for joint and several liability. *See J.C. Zimmerman*, No. 22 CIV. 323 (KPF), 2023 WL 6308493, at *11-12 (S.D.N.Y. Sept. 28, 2023) (Failla, J.); *Miller v. Midpoint Resol. Grp. LLC*, No. CV-08-3791 TCP AKT, 2009 WL 2001329, at *1 (E.D.N.Y. July 7, 2009) (defendants and counsel jointly and severally liable under Rule 37(a)(5)(A) given "continued failure to comply with this Court's order"). Discovery sanctions against counsel are appropriate where there has been "inadequate compliance with the Court's discovery orders," where counsel "ma[kes] no effort to review [their client's] accounts for responsive emails or texts," and where "numerous responsive emails in the possession" of the client were not produced. *See J.C.*, 2023 WL 6308493, at *9. This all happened here. *See* Dkt. 237-1 at 32:7-10 (admonishing Seiden for "nothing but excuses"); *see also supra* § II (A)-(D); Dkt. 173 at 3-5, 14-15 (detailing Qin's deficient production of bank records, tax records, and communications, and failure to produce FBI records, vehicle records, immigration records, or trust records); Dkt. 237-1 at 101:10-15 (Qin "willfully" violated orders and is in contempt).

A party and its counsel may be held jointly and severally liable for a months-long delay, especially if production is only made under pain of sanctions. *See Ophir v. Goldstein*, No. 86 CIV. 2963 (WK), 1990 WL 284519, at *3-4 (S.D.N.Y. Oct. 10, 1990) (joint and several liability for "discovery abuses" due to four-month delay where compliance occurred "only under threat of a

default judgment"), *report and recommendation adopted*, 1991 WL 82038 (S.D.N.Y. Jan. 8, 1991). Qin has been in continuous violation of court orders for a full year.

Although not a necessary element, joint and several liability is especially appropriate where "the sanctionable conduct is a 'coordinated effort' of counsel and party." *Metro. Opera Ass'n, Inc. v. Loc. 100, Hotel Emps. & Rest. Emps. Int'l Union*, No. 00 CIV. 3613 (LAP), 2004 WL 1943099, at *25 (S.D.N.Y. Aug. 27, 2004). Clients "and their counsel may not engage in parallel know-nothing, do-nothing, head-in-the-sand behavior in an effort consciously to avoid knowledge of or responsibility for their discovery obligations and to obstruct [opposing parties]." *Id.*; *see also Walker v. Carter*, No. 12CV05384ALCRLE, 2017 WL 3668585, at *3 (S.D.N.Y. July 12, 2017), *aff'd sub nom. Walker v. Burke*, 739 F. App'x 72 (2d Cir. 2018) ("obstructive conduct" by party and counsel merits joint and several liability for discovery sanctions).

Here, Seiden denied Qin ever used email despite corresponding with Qin via email and despite having accessed Qin's email account. Qin and his counsel give "nothing but excuses" that "make no sense" (*id.* at 32:8-10, 37:1-3), make "internally inconsistent" arguments, *see* Dkt. 237-1 at 40:6, 50:2-3, and delay productions (*id.* at 51:13-15 ("THE COURT: It shouldn't be a rolling production at this stage of the game. It should have been done long before today.")).

The Contempt Hearing was the third time the Court admonished Seiden for violating their obligations. In January, the Court held, "I think it should be clear that I don't think Respondent's counsel has satisfied their obligations." Dkt. 106-1 at 46:21-23. At that time, Seiden told the Court that they "did diligently collect" all documents, and "expect[ed]" any subsequent production would be "limited." *Id.* at 41:18-23, 48:19-20. (Nine months after this assertion, Seiden finally began producing Qin's emails, now amounting to *4,765 additional pages*. Lee Decl. ¶¶ 29-31.) On April 18, 2023, the Court again found production to be "woefully inadequate," warned Seiden that it had

"no excuse for not conducting a thorough investigation" and demanded Seiden "diligently ensure respondent's compliance with his discovery obligations." Dkt. 136 at 15:10-20, 17:12-13, 26:11-12, 27:1-5. The Court warned that failure to comply may result in sanctions against Seiden. *Id.* 27:7-8. Seiden produced no new documents by the Court's deadline.

At the Contempt Hearing, the Court found it "very shocking" that Seiden had not produced bank statements it had at hand. Dkt. 237-1 at 31:1-4. It is "so difficult to believe" this failure was an "oversight" (*id.* at 31:12-14) and yet: "We don't have them. You haven't produced them." *Id.* Seiden has not only "not produced these documents, you can't even tell me today, which is August, whether these documents exist." *Id.* at 50:21-51:1. The four-month delay from April 18 to August 18 calls for joint and several liability. *See Ophir*, 1990 WL 284519, at *3.

At the Contempt Hearing, the Court had to force Seiden to do its job. When Seiden could not answer "how much money is in the Cathay Bank account," the Court directed Seiden to "walk right over to" Qin for the answer. Dkt. 237-1 at 33:5-17. Later, the Court again directed Seiden to approach their client to get information about his travels to China. *Id.* at 72:13-18 ("MS. BLECHER: I don't know if I am in a position to answer that question. THE COURT: I am sure there is someone at the table who is."). When the Court asked Seiden to confirm "as an officer of the court that there is nothing else out there," Ms. Blecher responded "based on [Qin's] representations." *Id.* at 76:17-77:1. The Court cut this off: "I want you to put yourself out there. It's not enough for me to put your client [out there]." *Id.* at 77:2-3. The Court questioned "how good of a job [Seiden] did at communicating with [its] client the significance of this." *Id.* at 77:3-5. *Cf. Standard Dyeing & Finishing Co. v. Arma Textile Printers Corp.*, No. 85 CIV. 5399-CSH, 1987 WL 6905, at *3 (S.D.N.Y. Feb. 10, 1987) (counsel's failure to advise client of Rule 34 responsibilities resulted in joint and several liability for Rule 37 sanctions).

Seiden's "blasé attitude towards their discovery obligations . . . over a period of months, despite multiple directives from the Court" and "multiple detailed explanations from [Petitioners] concerning what materials were missing," merits Rule 37 liability. *J.C.*, 2023 WL 6308493, at *10; Dkt. 237-1 at 31:1. Seiden "should be held jointly and severally liable for the . . . award, because [they are] the attorney[s] advising the party failing to obey the order" and "contributed significantly to the pattern of delay and defiance." *Chesa Int'l, Ltd. v. Fashion Assocs., Inc.*, 425 F. Supp. 234, 238 (S.D.N.Y. 1977), *aff'd*, 573 F.2d 1288 (2d Cir. 1977).

Seiden even failed to comply with discovery to their firm. In November 2022, Seiden gave a fake, nonexistent address for Qin. Dkt. 111 at 9. Recently, Petitioners discovered Seiden withheld records of payments through Seiden to Abell Eskew Landau LLP ("Abell"). Ex. X. Petitioners subpoenaed these records, but Seiden denied they had them. *Id.* Only after Abell produced these documents did Seiden admit to yet another "oversight." *Id.*; *see also* Ex. M.

Qin appears to pay counsel through money laundering. At the Contempt Hearing, the Court found incredible the assertion that Qin's friends were paying "a million dollars in legal fees." Dkt. 237-1 at 83:20-24. Seiden couldn't answer "[h]ow many entities are paying the fees" or whether Seiden "know[s] where this money is coming from." *See id.* at 83:24-85:18.

### D.    Petitioners' Fees Are Reasonable.

"[T]he best guarantee of reasonableness is willingness to pay." *Balcor Real Estate v. Walentas-Phoenix Corp.*, 73 F.3d 150, 153 (7th Cir. 1996); *see also Matthews v. Wis. Energy Corp.*, 642 F.3d 565, 572-73 (7th Cir. 2011) (same). "[I]t is not the function of judges in fee litigation to determine the equivalent of the medieval just price," replacing actual fees with an ideal fee. *Matter of Cont'l Illinois Sec. Litig.*, 962 F.2d 566, 568 (7th Cir. 1992). "A law firm is a business, and like any business its charges must be commercially reasonable or its client base will

dry up." *Armament, Sys. & Procedures, Inc. v. IQ H.K. Ltd.*, 546 F.Supp.2d 646, 649 (E.D.Wis. 2008). A court "is reluctant to second-guess counsel's time allocation for what has proved to be a winning case." *Fla. Rock Indus. v. United States*, 9 Cl. Ct. 285, 288 (1985).

Qin's own counsel, Mr. Ansari of Aidala, admitted that rates agreed to by clients are necessarily "reasonable because a client can choose their counsel." *In re Jackson*, No. 15-21233 (AMN), 2023 WL 2202738, at *2-3 (Bankr. D. Conn. Feb. 23, 2023). Petitioners negotiated a fixed hourly rate of ███ for all their attorneys. Qin pays Aidala fixed rates of ███ for partners, ███ for associates and *law clerks*, and ███ for staff. *Qin pays law clerks higher hourly rates than Petitioners pay their attorneys who are partners. See* Ex. J.

An award of fees is mandatory for any contempt order, where a discovery motion is granted, or where documents are produced after the motion is filed. On August 17, 2023, this Court found Respondent Hui Qin "has willfully not abided by my orders," "has done everything possible to avoid abiding by my orders," "has lied to me and he has lied at his deposition," has violated "my prior discovery orders," and "he is [in] contempt." Dkt. 237-1 at 101:11-15. A "successful Rule 37 motion" is to make the winning party "whole." *In re Terrorist Attacks on Sept. 11, 2001*, 2015 WL 6666703, at *18 (S.D.N.Y. Dec. 18, 2015) (citing *On Time Aviation, Inc. v. Bombardier Capital, Inc.*, 354 F. App'x 448, 452 (2d Cir. 2009)); *Ceglia v. Zuckerberg*, No. 10–CV–00569A (LF), 2012 WL 503810, at *6 (W.D.N.Y. Feb. 12, 2012) (similar).

## IV.   <u>CONCLUSION</u>

Petitioners respectfully request that this Court require Qin and Seiden to pay ███ in fees, which represents only 50% of the fees actually incurred by Petitioners, and ███ in costs, or such other amount as this Court deems reasonable and appropriate, together with any interest and other expenses resulting from the Renewed Contempt Motion.

Dated: November 27, 2023
     New York, New York

PILLSBURY WINTHROP SHAW PITTMAN LLP

By: */s/ Geoffrey Sant*
    Geoffrey Sant
    Andrew C. Smith
    Hugh M. Ray III (*pro hac vice*)
    Carol Lee
    31 West 52nd Street
    New York, New York 10019
    Tel: (212) 858-1000
    Fax: (212) 858-1500
    andrew.smith@pillsburylaw.com
    geoffrey.sant@pillsburylaw.com
    hugh.ray@pillsburylaw.com
    carol.lee@pillsburylaw.com

    *Attorneys for Petitioners Huzhou Chuangtai*
    *Rongyuan Investment Management*
    *Partnership, Huzhou Huihengying Equity*
    *Investment Partnership, and Huzhou*
    *Huirongsheng Equity Investment Partnership*